# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND; COUNTY OF BEAVER, PENNSYLVANIA; GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM; MAGNOLIA REGIONAL HEALTH CENTER; COUNTY OF MONTGOMERY, PENNSYLVANIA; COUNTY OF WASHINGTON, PENNSYLVANIA; COUNTY OF WESTMORELAND, PENNSYLVANIA; and CITY OF NEW BRITAIN, CONNECTICUT, on behalf of themselves and all others similarly situated, | Civil Action Nos. |
| | 14-cv-7126 (JMF) |
| | 14-cv-7907 (JMF) |
| | 14-cv-8342 (JMF) |
| | 14-cv-8365 (JMF) |
| | 14-cv-8576 (JMF) |

Plaintiffs,

v.

BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BNP PARIBAS SA; CITIGROUP INC.; CREDIT SUISSE AG, NEW YORK BRANCH; DEUTSCHE BANK AG; THE GOLDMAN SACHS GROUP, INC.; HSBC BANK PLC; ICAP CAPITAL MARKETS LLC; JPMORGAN CHASE & CO.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; ROYAL BANK OF SCOTLAND PLC; UBS AG; and WELLS FARGO BANK, N.A.,

Defendants.

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL ALLEGATIONS ................................................................................................4

    A.   Interest Rate Swaps .....................................................................................4

    B.   Swaptions .....................................................................................................4

    C.   The USD ISDAFIX Benchmark Interest Rate ............................................5

    D.   The Parties ..................................................................................................6

    E.   Plaintiffs' Allegations of Wrongdoing .......................................................7

ARGUMENT........................................................................**Error! Bookmark not defined.**

I.     PLAINTIFFS FAIL TO PLEAD INJURY IN FACT OR DAMAGES................................9

II.    PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY...................................................12

    A.   Plaintiffs Have Not Alleged Any Harm to Competition ...................................13

    B.   Plaintiffs Have Not Alleged an Injury That Stems from an Anticompetitive
        Aspect of the Alleged Misconduct ................................................................16

III.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE EACH DEFENDANT'S
       PARTICIPATION IN A CONSPIRACY TO RESTRAIN TRADE ...............................18

    A.   Plaintiffs Allege No Direct Evidence of a Conspiracy....................................18

    B.   Circumstantial Allegations of Supposed Parallel Conduct Are Insufficient ...................19

       1.   Plaintiffs Have Not Alleged a Common Motive to Conspire ......................................20

       2.   Plaintiffs Fail to Plead Parallel Conduct against the Banks' Independent
            Self-Interests ..............................................................................21

       3.   References to Government Investigations Cannot Salvage Plaintiffs'
            Conspiracy Claims..........................................................................24

IV.   PLAINTIFFS' CEA CLAIMS FAIL............................................................................26

    A.   Plaintiffs Do Not Have Standing to Bring CEA Section 22 Claims for
        Conduct Occurring Before October 12, 2012 ................................................26

    B.   The CEA Did Not Apply to the Transactions at Issue ....................................27

C.   Plaintiffs Fail to State a Claim for Price Manipulation under the CEA ..........................30

    1.   Plaintiffs Fail to Satisfy Rule 9(b)...............................................................30

    2.   Plaintiffs Fail to Plead Price Manipulation.................................................32

    3.   Plaintiffs Fail to Plead Specific Intent ........................................................34

    4.   Plaintiffs Fail to Plead that an Artificial Price Existed or That Defendants Caused an Artificial Price ...........................................................35

D.   Plaintiffs Fail to State a CEA Claim for Fraud-Based Manipulation...............................36

E.   Plaintiffs Fail to State a Claim for Vicarious Liability under the CEA............................38

F.   Plaintiffs' CEA Aiding and Abetting Claim Must Be Dismissed ....................................39

V.   PLAINTIFFS' CLAIMS ARE TIME-BARRED ..................................................................40

A.   Most of Plaintiffs' CEA and Sherman Act Claims Are Time-Barred..............................40

B.   Plaintiffs Have Not Adequately Alleged Fraudulent Concealment .................................43

VI.   PLAINTIFFS' CONTRACT-BASED CLAIMS AGAINST THE BANKS FAIL ..........45

A.   Plaintiffs' Breach of Contract Claim Fails Because Plaintiffs Do Not Allege the Existence of any Contract between the Parties............................................................45

B.   Plaintiffs' Implied Breach of the Covenant of Good Faith Claim Fails...........................46

VII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST THE BANKS...................................................................................................47

A.   Plaintiffs Fail to Allege Adequately Any Direct Dealings with the Banks ......................48

B.   Plaintiffs' Unjust Enrichment Claims Are Duplicative ...................................................49

C.   Plaintiffs' Unjust Enrichment Claims Are Largely Time-Barred ....................................49

CONCLUSION.................................................................................................................51

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Aluminum Warehousing Antitrust Litig.*,
No. 13-md-2481, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .............................. 18, 21, 25

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........................................................................................26

*In re Amaranth Natural Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................... 30, 31, 39

*In re Amaranth Natural Gas Commodities Litig.*,
269 F.R.D. 366 (S.D.N.Y. 2010) ....................................................................................27

*In re Amaranth Natural Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013) ................................................................................. 34, 35, 39

*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*,
No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007).........................................46

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ...........................................................................................42

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) ...........................................................................................18

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................................. 13, 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ....................................................................................... 31, 38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 18, 19, 26

*Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*,
No. 13 Civ. 1111, 2013 WL 6311202 (S.D.N.Y. Dec. 5, 2013).........................................19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ................................................................................................. 12, 16

*Certainteed Ceilings Corp. v. Aiken*,
No. 14-3925, 2014 WL 5461546 (E.D. Pa. Oct. 27, 2014)................................................42

*CFTC v. Hunter Wise Commodities, LLC*,
  No. 12-81311-CV, 2014 WL 2022239 (S.D. Fla. May 16, 2014) .........................................37

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
  No. 11 MD 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ............................. 23, 35, 36

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 777 (2012) ...................................................................................................49

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012) ..............................................................................44

*In re Crude Oil Commodity Litig.*,
  No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007).....................................30, 32

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ...........................................................................................31

*DPWN Holdings (USA) v. United Air Lines Inc.*,
  747 F.3d 145 (2d Cir. 2014) ...........................................................................................36

*Dunn v. CFTC*,
  519 U.S. 465 (1997) ......................................................................................................28

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...........................................................................................37

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ........................................................................................19, 26

*Ferring B.V. v. Allergan, Inc.*,
  932 F. Supp. 2d 493 (S.D.N.Y. 2013) ..........................................................................9, 47

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .......................................25

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ......................................................................................................13

*Gatt Commc'ns v. PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013) ...................................................................................9, 13, 16

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) .....................................................................................23, 38

*Global Fin. Corp. v. Triarc Corp.*,
   93 N.Y.2d 525 (1999)......................................................................................47, 49

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)..................................................................48

*Harris v. Provident Life & Accident Ins. Co.*,
   310 F.3d 73 (2d Cir. 2002) ................................................................................47

*Herman v. Green*,
   234 F.3d 1262 (2d Cir. 2000)............................................................................46

*Hinds Cnty., Miss. v. Wachovia Bank N.A*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..........................................................40, 44

*Howell v. Am. Airlines, Inc.*,
   No. 05-CV-3628, 2006 WL 3681144 (E.D.N.Y. Dec. 11, 2006).........................46

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ...........................................................................12

*Ingrami v. Rovner*,
   847 N.Y.S.2d 132 (2d Dep't 2007) ....................................................................50

*In re Initial Pub. Offering Sec. Litig.*,
   341 F. Supp. 2d 328 (S.D.N.Y. 2004) ................................................................41

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ..........................................................................21, 22

*Jet Star Enters., Ltd. v. Soros*,
   No. 05 CIV 6585, 2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006).........................48

*Keene Corp. v. Bogan*,
   No. 88 Civ. 0217, 1990 WL 1864 (S.D.N.Y. Jan. 11, 1990)...............................46

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) ...........................................................................................45

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) ...............................................................................44

*LaFlamme v. Société Air Fr.*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010).................................................................25

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)......................... 12, 13, 39, 48

*Lenz v. Assoc. Inns & Rest. Co. of Am.*,
   833 F. Supp. 362 (S.D.N.Y. 1993)................................................................41, 43

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013).........................................................*passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MD 2262, 2014 WL 2815645 (S.D.N.Y. June 23, 2014) ............................ 11, 12, 45

*M/A-COM Sec. Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990) ...................................................................9

*Marshall v. Milberg LLP*,
   No. 07-6950, 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009)................................................42

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ..................................................... 18, 20, 24

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998) ...................................................................44

*Morson v. Kreindler & Kreindler, LLP*,
   814 F. Supp. 2d 220 (E.D.N.Y. 2011).................................................................45

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004)................................................................44

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005)................................................................39

*Newman v. Universal Pictures*,
   813 F.2d 1519 (9th Cir. 1987) ...................................................................15

*Nichols v. Mahoney*,
   608 F. Supp. 2d 526 (S.D.N.Y. 2009)................................................................12

*Pappas v. Tzolis*,
   20 N.Y.3d 228 (2012)................................................................49

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ...................................................................12

*Pitcairn Props., Inc. v. LJL 33rd St. Assocs., LLC*,
    No. 11 Civ. 7318, 2012 WL 6082398 (S.D.N.Y. Nov. 20, 2012) .........................................46

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..........................................................25, 34

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) .................................................................9

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    No. 11-cv-2652, 2013 WL 3873074 (S.D. Cal. July 25, 2013)............................................24

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ................................................................16

*Sands v. Ticketmaster-N.Y., Inc.*,
    616 N.Y.S.2d 362 (1st Dep't 1994) ...........................................................49

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006) ................................................................42

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)........................................................................10

*Staehr v. Hartford Fin. Servs. Grp.*,
    547 F.3d 406 (2d Cir. 2008) ................................................................41

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ................................................................39

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...............................................................37

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................31, 35, 37

*Three Crown Ltd. P'ship v. Caxton Corp.*,
    817 F. Supp. 1033 (S.D.N.Y. 1993)..........................................................31

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)..........................................................42

*United States v. Radley,*
  659 F. Supp. 2d 803 (S.D. Tex. 2009)...................................................................................29

*United States v. Radley,*
  632 F.3d 177 (5th Cir. 2011) ................................................................................................28

*United Teamster Fund v. MagnaCare Admin. Servs., LLC,*
  No. 13 Civ. 6062, 2014 WL 4058070 (S.D.N.Y. Aug. 14, 2014) .........................................49

*UNR Indus., Inc. v. Cont'l Ins. Co.,*
  607 F. Supp. 855 (N.D. Ill. 1984) .........................................................................................14

*Vitanza v. Bd. of Trade of N.Y.C.,*
  No. 00-cv-7393, 2002 WL 424699 (S.D.N.Y. 2002).............................................................33

*Wilamowsky v. Take-Two Interactive Software, Inc.,*
  818 F. Supp. 2d 744 (S.D.N.Y. 2011) ...................................................................................42

*Wolff v. Rare Medium, Inc.,*
  171 F. Supp. 2d 354 (S.D.N.Y. 2001) .....................................................................................9

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP,*
  549 F.3d 100 (2d Cir. 2008) .................................................................................................10

CONSTITUTION

U.S. Const. art. III.....................................................................................................................9

STATUTES & RULES

17 C.F.R. § 160.3 (2014)...........................................................................................................42

17 C.F.R. § 180.1 (2014).....................................................................................................36, 37

17 C.F.R. § 180.2 (2014).....................................................................................................32, 34

7 U.S.C. § 1a (2006).......................................................................................................27, 28, 29

7 U.S.C. § 1a (2012)...................................................................................................................29

7 U.S.C. § 2 (2006) ..............................................................................................................27, 29

7 U.S.C. § 9 (2006) ..............................................................................................................32, 34

7 U.S.C. § 9 (2012) ................................................................................ 32, 34, 36, 37

7 U.S.C. § 13 (2006) ...................................................................................... 32, 34

7 U.S.C. § 13 (2012) ...................................................................................... 32, 34

7 U.S.C. § 25 (2006) .............................................................................................26

7 U.S.C. § 25 (2012) ............................................................................... 26, 32, 40

15 U.S.C. § 1 (2012) ............................................................................................18

15 U.S.C. § 15 (2012) ...........................................................................................9

15 U.S.C. § 15b (2012) .......................................................................................40

15 U.S.C. § 78j (2012) .........................................................................................37

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"),
    Pub. L. No. 111-203, 124 Stat. 1376 (2010).................................................3, 27

Fed. R. Civ. P. 9(b) .............................................................................................30

Further Definition of "Swap," "Security-Based Swap," and "Security-Based
    Swap Agreement," 77 Fed. Reg. 48,208 (Aug. 13, 2012)..................................27

Prohibition on the Employment, or Attempted Employment, of Manipulative
    and Deceptive Devices and Prohibition on Price Manipulation,
    76 Fed. Reg. 41,398 (July 14, 2011) ............................................................. 34, 37

N.Y. C.P.L.R. § 202..................................................................................... 47, 49

## OTHER AUTHORITIES

Jack Ewing, *UBS Is Being Investigated Over Possible Libor Manipulation*,
    N.Y. Times, Mar. 15, 2011 ................................................................................41

Jonathan Guthrie, *Spencer Must Lead ICAP to Its Promised Land*, Fin. Times,
    July 11, 2012......................................................................................................41

Stephen Foley, Twitter (Apr. 8, 2013, 1:00 PM EST), https://twitter.com/stephenfoley/
    status/321351791419740161 ..............................................................................41

John C. Hull, Introduction to Futures & Options Markets 319-50 (2d ed. 1995) ........24

ISDA Response to the European Commission's Public Consultation on the
Regulation of Indices (Nov. 29, 2012) .......................................................................... 22, 42

Matthew Leising, *Swaps Probe Finds Banks Rigged Rate at Expense of Retirees*,
Bloomberg (Aug. 2, 2013) ................................................................................................ 19

Michael Mackenzie & Gillian Tett, *Frozen in Time*, Fin. Times, June 16, 2010 ......................... 41

Brooke Masters, Patrick Jenkins & Justin Baer, *Big Banks Investigated over Libor*, Fin. Times,
Mar. 15, 2011 .................................................................................................................... 41

William Wright, *Liborgate:  Conflicts, as far as the eye can see*, Fin. News, July 18, 2012. ....... 41

## PRELIMINARY STATEMENT

In their Consolidated Class Action Complaint ("Complaint" or "CAC"), Plaintiffs claim that the Defendant Banks ("Banks"), along with Defendant ICAP Capital Markets LLC ("ICAP"),[1] conspired to manipulate the U.S. dollar ISDAFIX rate,[2] a benchmark used to calculate the settlement value of certain interest rate derivatives.

But the Complaint fails to plead any facts establishing either the existence of the supposed conspiracy or any purported harm to Plaintiffs.

According to Plaintiffs, this purported conspiracy persisted for more than seven years, from January 1, 2006 to June 30, 2013 (CAC ¶ 186), despite the Banks' admittedly divergent interests with respect to derivatives linked to USD ISDAFIX on any given day. And despite the supposedly vast scope of the alleged conspiracy, the Complaint does not identify *a single instance* in which any of the Defendants engaged in *even one* act to manipulate the USD ISDAFIX rate—relying instead upon generic, blanket allegations of wrongdoing. Nor does it identify *a single transaction* where any Plaintiff was adversely impacted. Accordingly, the Complaint should be dismissed for the following reasons:

*First*, Plaintiffs have failed to plead facts establishing that they were injured in any way by the alleged manipulation. The Complaint claims that a "subset" of Defendants manipulated USD ISDAFIX "*up or down*" on "certain" days during the seven-plus year putative class period. (*Id.* ¶¶ 8, 146, 172 (emphasis added).) But the Complaint pleads *no link* between this alleged

---

[1] The Complaint purports to include not only the named Defendants—Bank of America Corporation; Barclays Bank PLC; BNP Paribas SA; Citigroup Inc.; Credit Suisse AG, New York Branch; Deutsche Bank AG; The Goldman Sachs Group, Inc.; HSBC Bank plc; JPMorgan Chase & Co.; Morgan Stanley & Co. LLC; Nomura Securities International, Inc.; Royal Bank of Scotland plc; UBS AG; and Wells Fargo Bank, N.A; and ICAP Capital Markets LLC—but also each of the named Defendants' "subsidiaries and affiliates." (CAC ¶¶ 38-53.)

[2] There are ISDAFIX rates for a variety of currencies. Plaintiffs' allegations of manipulation relate solely to the U.S. dollar ISDAFIX rate ("USD ISDAFIX").

manipulation and any single transaction in which any individual Plaintiff was *actually injured*. Under these circumstances, there is no factual basis to infer that any Plaintiff was injured simply because it transacted in an instrument linked to USD ISDAFIX at some unidentified point.  This failure to plead facts establishing injury compels dismissal of the Complaint in its entirety.

*Second*, Plaintiffs have failed to allege injury to competition, a required element of an antitrust claim.  The Complaint claims that Defendants committed a "per se violation of § 1" and "price fixing" (*id.* ¶¶ 180, 197), but Plaintiffs have not pleaded how Defendants' alleged conspiracy constrained supply or reduced competition among Defendants in any arena in which Defendants actually compete.  In analogous circumstances, two judges in this District have held that the alleged manipulation of London Interbank Offered Rate ("LIBOR") submissions does not state an antitrust claim because the banks' submissions are not part of a competitive process.  Here, too, the Banks and ICAP do not compete in the ISDAFIX-setting process.

*Third*, Plaintiffs' Sherman Act claim also fails because Plaintiffs have not sufficiently alleged the existence of any horizontal agreement among Defendants to fix prices.  Plaintiffs do not allege any direct evidence of an agreement among competitors (the specific time, place, or Banks involved in the alleged conspiracy), and their allegations of parallel conduct are all equally consistent with each Bank's individual self-interest—and accordingly insufficient to create a plausible inference of an agreement.  While the Complaint baldly asserts that the Banks communicated with one another through electronic chat rooms and other private forums (*id.* ¶ 8), it provides no details concerning any such communication (*see id.* ¶ 15) or indicating that those communications were in furtherance of a conspiracy.  Instead, Plaintiffs' only purported evidence of conspiracy is facile statistical analyses allegedly suggesting that the Banks made uniform submissions to ICAP.  But as Plaintiffs concede (*id.* ¶¶ 14-15), ICAP posted swap

spreads and rates generated from market data ("reference points") *before* these submissions were made.  The Banks' alleged acceptance of ICAP's reference points—if the Banks submitted a quote at all—thus was in line with actual trades in the market and is consistent with independent, non-collusive conduct.  Nor do Plaintiffs ever explain how such a conspiracy could work given the Banks' opposing financial interests.  An alleged conspiracy involving fourteen Banks and spanning seven years therefore makes no economic sense.

*Fourth*, Plaintiffs' Commodity Exchange Act ("CEA") claims fail for several reasons.  Prior to the effective date of the Dodd-Frank[3] amendments to the CEA provisions adding swaps to private rights of action (October 12, 2012), Plaintiffs lacked standing to bring a claim because standing was limited to buyers or sellers of futures, which Plaintiffs were not.  During much of that time, the CEA also did not apply to swaps or swaptions at all.  Further, Plaintiffs have not adequately pleaded the elements of price manipulation under either the pre- or post-Dodd-Frank CEA.  Plaintiffs' vicarious liability and aiding and abetting claims under the CEA also must be dismissed as a matter of law because no primary violation has been adequately pleaded, and, even if it had, Plaintiffs fail to state a claim under these theories of secondary liability.

*Fifth*, Plaintiffs' claims arising outside the Sherman Act's four-year statute of limitations period and the CEA's two-year limitations period must be dismissed as untimely.

*Sixth*, Plaintiffs' contract and good faith and fair dealing claims against the Banks fail because the Complaint does not identify any specific contract between any of the Plaintiffs and any of the Banks.  Nor are there any allegations showing how any Bank breached a specific provision of a given contract.

---

[3] Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), tit. VII, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended in scattered sections of 7 U.S.C. and 15 U.S.C.).

*Finally*, Plaintiffs' unjust enrichment claims against the Banks are duplicative of their antitrust and contract claims and should be dismissed due to similar pleading deficiencies. Moreover, Plaintiffs' unjust enrichment claims are largely time-barred.

## FACTUAL ALLEGATIONS

### A.    Interest Rate Swaps

Interest rate derivatives are financial products whose value depends on one or more interest rates. (CAC ¶ 57.)[4]  One type of interest rate derivative is an interest rate swap, in which two counterparties agree to exchange periodic interest rate payments on an agreed notional amount (e.g., $50 million) for an agreed period of time (e.g., 10 years).  Typically, one party pays a specified fixed interest rate, while the other pays a floating interest rate, that is tied to an established benchmark such as the prime rate. (*Id.* ¶ 58.)

### B.    Swaptions

Another interest rate derivative is a "swaption," which is a contract under which the buyer pays the seller a premium for the option, but not the obligation, to enter into an interest rate swap, at a specified rate (the strike), on a specified date. (*Id.* ¶ 63.)  On the exercise date, a swaption may be either physically settled (i.e., the parties will enter into or terminate the interest rate swap) or cash settled (i.e., the seller pays the buyer the cash value of the swap on the exercise date if the option is "in-the-money"). (*Id.* ¶ 64.)  USD ISDAFIX is relevant only to the settlement value of a cash-settled swaption; a physically-settled swaption results in the parties entering into the underlying swap. (*Id.*)  A physically-settled swaption uses the strike rate agreed

---

[4] For purposes of this motion, Defendants do not contest the factual allegations in the Complaint concerning the interest rate market and its products, but Defendants do not, as a general matter, agree with them.

upon in the swaption contract as the fixed rate for the underlying swap; a rate outside the contract is not needed.[5]

### C.     The USD ISDAFIX Benchmark Interest Rate

Plaintiffs allege that ISDAFIX is the most common interest rate benchmark rate in the financial community for determining the value of cash-settled interest rate swaptions upon expiration.  (*Id.* ¶¶ 65-67.)  The Complaint states that ISDAFIX is intended to represent the average fixed interest rate that an over-the-counter ("OTC") derivatives dealer would quote for a swap of a certain duration and currency in exchange for a specified floating LIBOR rate at 11 a.m. EST (*Id.* ¶ 75.)

USD ISDAFIX is compiled daily.  Plaintiffs allege that each Bank was asked to submit the rate at which it would offer a swap in the relevant maturity for a given amount to an acknowledged dealer of good credit in the swap market.  (*Id.* ¶ 78.)  Each day at 11:02 a.m., it is alleged, ICAP posted to a panel of banks the reference points that were generated using "(1) [i]nformation contained on Reuters page 19901 at 11:00 a.m., which reflects the most recent swap spreads from completed trades and executable bids and offers in market size done/posted at ICAP," and "(2) [i]nformation reflecting executed trades and executable bids and offers at 11 a.m. for US Treasury securities from ICAP's BrokerTec US Treasury electronic trading platform."  (*Id.* ¶ 79.)  Each of the Banks could accept the offered reference points, submit different values, or take no action.  (*Id.*)  Thomson Reuters then compiled the day's USD ISDAFIX rate by eliminating a set number of the highest and lowest submitted rates (including

---

[5] Plaintiffs allege that inaccurate ISDAFIX rates could affect whether the holder of a physically-settled swaption decides to exercise the swaption (CAC ¶ 70), but offer no details regarding how this purported effect results in any injury.  Plaintiffs also fail to allege either that they held physically-settled swaptions or that they relied on ISDAFIX to make any decisions regarding the settlement of these swaptions.  Further, Plaintiffs acknowledge that ISDAFIX does not affect the premium that a swaption purchaser pays for the option contract.  (*Id.* ¶ 70.)

any acceptances of the reference points) and averaging the remainder.  (*Id.*)

###### D.    The Parties

Plaintiffs vaguely claim that they "transacted in interest rate derivatives that were tied to or directly affected by [USD] ISDAfix" at some point during the putative class period.  (*Id.* ¶¶ 31, 186.)  County of Beaver and County of Westmoreland do not allege any transactions with any Bank, while the remaining Plaintiffs only generally allege transactions with one or more Banks, without specifying with which Banks they transacted.  (*Id.* ¶¶ 30-37.)  Completely absent from the Complaint is any allegation about:  (i) the date of *any of Plaintiffs'* purported transactions; (ii) the counterparties to those transactions; (iii) the terms of those transactions (e.g., swap or swaption, physically vs. cash settled); (iv) whether those transactions occurred on or had an exercise or settlement date on a day on which an alleged manipulation took place; (v) how USD ISDAFIX is relevant to those transactions; or (vi) whether the alleged manipulation positively or negatively impacted any of Plaintiffs' transactions.

The Complaint alleges that the Banks were members of the USD ISDAFIX submission panel during all or part of the putative class period.  (*Id.* ¶¶ 38-52.)[6]  The Banks also are alleged to be "competitors in the interest rate derivatives market" as buyers and sellers of interest rate derivatives with one another and with other customers, "compet[ing] with each other for the best possible terms in transactions" and for customers' business.  (*Id.* ¶¶ 6, 172.)  The Complaint alleges that the Banks each have portfolios of interest rate derivatives contracts with notional amounts in the billions, if not trillions, of dollars.  (*Id.* ¶ 62.)

---

[6] The Complaint concedes that Goldman Sachs and HSBC stopped participating in the submissions panel before the end of the purported class period (June 2012 and January 2013, respectively).  (*Id.* ¶¶ 44-45.)  In addition, the Complaint does not identify when each Bank participated on the USD ISDAFIX submissions panel and acknowledges that some Banks participated on the panel during only part of the putative class period.  (CAC ¶ 117.)

The Complaint alleges that Defendant ICAP served as the administrator for USD ISDAFIX during the relevant period.  ICAP also is alleged to be an inter-dealer interest rate derivatives voice broker, executing trades for dealers (but not non-dealers like Plaintiffs) and providing liquidity to the OTC derivatives market.  (*Id.* ¶¶ 10, 72.)[7]

### E.    Plaintiffs' Allegations of Wrongdoing

Plaintiffs claim that, for a period of more than seven years, Defendants conspired, on occasion, to manipulate the daily USD ISDAFIX rate to benefit their own trading positions or, in ICAP's case, to earn brokerage commissions.  (*Id.* ¶¶ 18, 135.)  Plaintiffs do not allege that Defendants' supposed conspiracy was intended to artificially increase or depress the USD ISDAFIX rate in a consistent direction.  Rather, Plaintiffs allege that the Banks and ICAP entered into a nebulous "overarching agreement" to "keep swap rates artificially *high or low* through the polling period" on "such days" when "any subset" of Banks faced exposure to transactions using USD ISDAFIX as a benchmark.  (*Id.* ¶¶ 8, 139 (emphasis added).)  Regardless of whether the purported manipulation was favorable to a particular Bank on any given day, Plaintiffs allege that all Banks agreed to accept the reference points posted by ICAP every day, resulting in identical daily submissions from the Banks.  (*Id.* ¶ 132.)

Plaintiffs do not identify a single manipulative act by any Defendant on any particular day with respect to a particular swap transaction or position.  Instead, Plaintiffs generically plead that the Banks "communicated with each other through electronic chat rooms and other forms of private communication to determine when it was time to manipulate [USD] ISDAfix and how it should be manipulated to serve [a subset of Banks on the given day]."  (*Id.* ¶ 8.)

---

[7] The Complaint also alleges that ICAP ran an electronic service called Screen 19901 which "publicized the bid/offer rates of all swap transactions of the specified terms executed through ICAP."  (*Id.* ¶ 74.)

The Complaint alleges three supposedly manipulative practices carried out by Defendants.  *First*, Plaintiffs claim that the Banks engaged in "banging the close," i.e., carrying out a rapid series of transactions just before 11 a.m. to move the USD ISDAFIX rate to a previously-agreed level.  (*Id.* ¶¶ 9, 130.)  Plaintiffs do not allege any facts to support their conclusory allegation that these transactions were illegitimate or off-market, or anything other than arm's-length transactions in which each party assumed genuine risk.  (*Id.* ¶ 129 (never alleging that counterparties were part of the supposed conspiracy and never explaining why counterparties would agree to off-market terms).)  The Complaint alleges that only a "subset of the . . . Banks" were involved in manipulating the USD ISDAFIX rate to a predetermined level favorable to them, and that this strategy was invoked only on "certain days" over more than seven years.  (*Id.* ¶¶ 132, 146.)  Plaintiffs do not identify any single day when any particular Bank even attempted to "bang the close."  Plaintiffs allege no facts showing that the Banks (as opposed to other market participants) were responsible for any of the alleged trading activity.

*Second*, the Complaint alleges that the Banks conspired with ICAP to delay reporting of swap transactions that would move the USD ISDAFIX rate in a particular direction until the close of the daily polling period.  (*Id.* ¶ 147.)  The Complaint alleges that "when one or more of the Banks wished to push [USD] ISDAfix up or down, they would simply instruct ICAP brokers to delay publication of unfavorable transactions," but Plaintiffs do not support this speculative assertion with even one specific instance in which this allegedly occurred.  (*Id.* ¶ 150.)

*Third*, the Complaint alleges that the Banks agreed to accept the reference points posted by ICAP, which were based on actual, current market data, despite allegedly knowing that the reference points were "off-market" in some unspecified way.  (*Id.* ¶¶ 14, 162.)  Plaintiffs tout the small chance that the Banks would all submit interest rates identical to the fifth decimal point,

but this ignores the fact that, as Plaintiffs concede, the Banks could accept the market-based reference points posted by ICAP, thereby explaining the "identical" submissions.  (*Id.* ¶ 15.)

## ARGUMENT

## I.    PLAINTIFFS FAIL TO PLEAD INJURY IN FACT OR DAMAGES

As set forth in Sections III-VII, the Complaint's substantive allegations are conclusory, implausible, and insufficient to survive a motion to dismiss.  But the Court need not even reach those arguments because Plaintiffs lack standing to bring their claims.

Plaintiffs' generic, conclusory allegations of harm are insufficient to show that they suffered injury in fact (or damages), an essential element of standing and of each of their causes of action.  A plaintiff must adequately plead injury in fact to establish standing under Article III of the Constitution, as well as Section 4 of the Clayton Act.  *See* 15 U.S.C. § 15 (2012); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  A pleading of actual loss is also a required element of a claim for manipulation under the CEA.  *See In re LIBOR-Based Fin. Instruments Litig.*, 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013) ("*LIBOR I*") (a plaintiff must show a net loss from defendants' conduct to have standing to sue under the CEA).[8]

To plead injury in fact, Plaintiffs must allege the "ways in which . . . [they are] in a 'worse position' as a consequence of [Defendants'] conduct."  *Gatt Commc'ns v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013).  Yet, Plaintiffs claim injury in a wholly conclusory fashion.  (*See, e.g.*, CAC ¶¶ 30-37 (for each Plaintiff, repeating only the refrain that they were "injured by Defendants' . . . anticompetitive conduct").)  Even if the Complaint pleaded that *some* purchasers of interest rate derivatives tied to USD ISDAFIX were harmed, Plaintiffs bear the burden of

---

[8] Indeed, each of Plaintiffs' claims for primary liability requires them to plead how they were harmed.  *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (breach of contract); *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (breach of implied covenant of good faith and fair dealing); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 512 (S.D.N.Y. 2013) (unjust enrichment).

pleading their *own claim to relief in particular.  See, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976); *W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) ("[D]istrict courts should be mindful that *named* plaintiffs in a class action 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'").

There is no basis to infer that Plaintiffs were injured merely because they transacted in unidentified "[USD] ISDAfix-linked investments" on some unidentified occasion during the putative class period.  (CAC ¶ 7.)  The Complaint alleges that certain shifting "subset[s]" of the Banks conspired to deploy a variety of ad hoc trading strategies to manipulate USD ISDAFIX *up or down*[9] on certain discrete occasions.[10]  Plaintiffs fail to plead facts establishing *any link* between this alleged episodic, trader-based, multidirectional manipulation and *any Plaintiff's* purported injury.  The Complaint provides no details about (1) which Defendants transacted with which Plaintiffs, (2) on what dates and times, and (3) whether Plaintiffs made or lost money.  Under the circumstances, it is at least as plausible that Plaintiffs *benefited* from, or were not affected by, any alleged manipulation.  Plaintiffs' failure to allege any specifics is fatal to their claims, and is all the more telling given their assertion that they engaged in an extensive

_____

[9] *See, e.g.*, CAC ¶¶ 8 (alleging "an overarching agreement" to manipulate USD ISDAFIX "whenever any subset of banks faced particular exposure to the settlement of a [USD] ISDAfix-linked transaction"), 11, 153 (anomalous USD ISDAFIX rates occurred on "numerous days"), 12-13 (USD ISDAFIX manipulation occurred on certain "occasions"), 18 (the direction of the alleged manipulation depended on whether the banks were buyers or sellers), 132 (alleging communications between various "subset[s]" of banks with an interest in manipulating the USD ISDAFIX to a particular level depending on the day), 139 (alleging manipulations of the USD ISDAFIX rate resulting in "plunges or spikes" that were "artificially high or low"), 150 (alleging that Defendants attempted to "push [USD] ISDAfix up or down").  Plaintiffs concede that certain Banks stopped contributing to the USD ISDAFIX rate as early as 2012, (*see id.* ¶¶ 44-45), but the putative class period extends to June 2013 (*id.* ¶ 186).

[10] *See* CAC ¶¶ 139-42 (alleging that artificial prices were only present during specified periods during the day rather than throughout the entire trading day).

investigation and retained experienced experts to analyze the relevant data.  (*See* Application to

Appoint Quinn Emanuel Urquhart & Sullivan, LLP; Robbins Geller Rudman & Dowd LLP; and

Scott + Scott, Attorneys at Law, LLP Interim Co-Lead Class Counsel at 4, 11-14, ECF No. 125.)

      Recent decisions in this District make plain that Plaintiffs' conclusory allegations of

injury in fact are insufficient as a matter of law.  In the *LIBOR* litigation, the plaintiffs sought to

amend their complaint to add CEA claims premised upon similar allegations of "day-to-day,

trading based manipulation" of a benchmark interest rate.  *See In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 619-24  (S.D.N.Y. 2013) ("*LIBOR II*").  Judge

Buchwald denied the plaintiffs' request for leave to amend, holding that they had failed to

demonstrate sufficiently any possible injury in fact.  *Id*.  When the plaintiffs later moved for

reconsideration of this denial, Judge Buchwald declined, explaining:

> [C]laims based on defendants' persistent suppression of LIBOR require different
> allegations to survive than do those based on day-to-day, trader-based manipulation.  In
> the former scenario, we can assume LIBOR's artificiality over a given time period, which
> in turn would necessarily impact the price of Eurodollar futures contracts purchased or
> sold in the relevant window.  In the latter scenario, since LIBOR was allegedly artificial
> only for discrete days during the Class Period, by their own reckoning, plaintiffs may
> have transacted on many days when LIBOR was "true."  Moreover, because the
> manipulation was allegedly varying in direction, there may be some days when plaintiffs
> were actually *helped*, rather than harmed, by the alleged artificiality, depending on their
> position in the market. . . . [D]amages are merely "conceivable"—and thus insufficiently
> pled—if LIBOR was allegedly being manipulated in different directions on different days
> and plaintiffs fail to provide details of their own positions in the market.

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262, 2014 WL 2815645, at *5

(S.D.N.Y. June 23, 2014) ("*LIBOR III*"); *see also LIBOR I*, 935 F. Supp. 2d at 717-18 (where

alleged manipulation is "akin to disseminating inaccurate information, plaintiffs need to show

that they sold or settled their [trades] at a loss").  Here, Plaintiffs similarly allege that USD

ISDAFIX rates were artificial only on discrete days during the purported class period, yet fail to

provide any details regarding their positions in the market.

Another LIBOR case, *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014), reached a similar result.  There, the plaintiff provided no detail regarding the positions he held, including the purchase and settlement prices, how long he held the positions, and whether an increase or decrease in the futures contracts caused his alleged losses.  *Id.*  Judge Daniels held that the plaintiff's claims did not "demonstrate an adequate connection between the alleged misconduct and the effect" on the market, and that "the alleged injury is too attenuated from the source of the alleged misconduct."  *Id.*  Plaintiffs' allegations here are similarly deficient and must be dismissed.  *See LIBOR III*, 2014 WL 2815645, at *5.

## II.   PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY

In addition to pleading injury in fact, every plaintiff must show that it suffered "antitrust injury" to have standing to pursue a private right of action for violations of the federal antitrust laws.  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).  "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.*  A plaintiff must first show harm to competition because "injury to competition . . . is the type of injury the antitrust laws are intended to prevent."[11]  *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 544 (S.D.N.Y. 2009).  A plaintiff then must also plead that its "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior" because the reduction of competition is what makes conduct unlawful under the antitrust laws.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Gatt Commc'ns*, 711 F.3d at 76 (injury must flow from unlawful anticompetitive conduct).

---

[11] The courts developed this doctrine to ensure that the incentive of treble damage actions—which are a "gift of section 4 of the Clayton Act," *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418-19 (7th Cir. 1989)—only rewards plaintiffs who were injured by conduct "forbidden in the antitrust laws," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), not plaintiffs whose claims should be asserted, if at all, under different legal theories.

Here, Plaintiffs have failed to show either of these two essential elements. Indeed, because the crux of Plaintiffs' Complaint is that Defendants purportedly colluded to manipulate USD ISDAFIX and Plaintiffs do not and cannot allege that the setting of USD ISDAFIX was a competitive process (*see infra* Section II.B), they have not alleged that any injury they suffered flowed directly from any anticompetitive conduct by Defendants.

**A.      Plaintiffs Have Not Alleged Any Harm to Competition**

No antitrust injury lies where "the alleged collusion occurred in an arena in which defendants never did and never were intended to compete." *LIBOR I*, 935 F. Supp. 2d at 689 (plaintiffs lacked antitrust injury where they alleged defendants manipulated a collaborative LIBOR-setting process that was never meant to be competitive); *see also Laydon*, 2014 WL 1280464, at *8 (plaintiff's allegation of injury—that he suffered losses on short positions in future contracts due to artificial Euroyen TIBOR future prices—"does not allege facts that competition was harmed in any way"). Even if alleged collusion caused a Plaintiff to pay a higher price, "that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have." *LIBOR I*, 935 F. Supp. 2d at 689.

The antitrust injury requirement applies with equal force whether a plaintiff alleges a *per se* antitrust violation or conduct that must be assessed under the rule of reason. *See Atl. Richfield*, 495 U.S. at 344. Plaintiffs' use of the conclusory labels "price fixing" and a "per se violation of § 1" (*see, e.g.*, CAC ¶¶ 180, 197) do not satisfy the antitrust injury requirement. True price-fixing allegations have a self-evident mechanism for reducing competition—reducing supply. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) ("constriction of supply is the essence of price-fixing"). Plaintiffs cannot point to any supply restriction in their so-called price-fixing theory. Accordingly, their allegation that the Banks' submissions caused the USD ISDAFIX rate to be "artificial" fails to show any identifiable *harm to competition*.

13

None of the claimed misconduct is alleged to have reduced competition among Defendants.  According to Plaintiffs, the "Banks . . . were supposed to compete with each other for the best possible terms in transactions *and* for the business of their customers."  (CAC ¶ 6.) But Defendants' purported conduct—accepting the reference points posted by ICAP, "banging the close," and manipulating the publication of trades—was independent from and did not reduce the competition that Plaintiffs identify.  All of the alleged conduct is directed at moving a benchmark rate that, by definition, is the same for any buyer and seller in the market, and therefore, was not a basis for competition among Defendants.  That the Banks allegedly competed *outside of the USD ISDAFIX-setting process* to win customers for various interest-rate derivatives products does not change the analysis because Plaintiffs have not alleged any reduction in that competition.  *See LIBOR I*, 935 F. Supp. 2d at 688.

*First*, each type of alleged misconduct occurred only *after* a Bank already had competed for a customer and entered into the purported swap or swaption contract.  The only misconduct that Plaintiffs claim Defendants undertook—the manipulation of USD ISDAFIX in order for the Banks to pay Plaintiffs less than what was otherwise owed—would have occurred weeks, months, or even years later, when the purported contracts expired or were settled.  This misconduct bears no relation to the competition for customers because, by the time Defendants' misconduct allegedly occurred, the customers and the Banks already would have bound themselves in bilateral contractual relationships governed by the agreed-upon terms.  *See, e.g.*, *UNR Indus., Inc. v. Cont'l Ins. Co.*, 607 F. Supp. 855, 859-61 (N.D. Ill. 1984) (dismissing antitrust claims because, at the time of the alleged misconduct, defendants' obligations were "fixed by each defendant's contract . . . [leaving] no role for competition to play"); *see also Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (holding that the

"fundamental problem" with plaintiffs' antitrust claim was that the alleged conspiracy arose after they had entered into contracts).  The Banks' activities could not have given rise to an antitrust injury because they occurred after the alleged competitive process for customers had occurred.

*Second*, the Banks are alleged to have agreed to accept the reference points posted by ICAP as their individual USD ISDAFIX submissions,[12] but Plaintiffs' allegations do not tie the rate-submission process to competition either for customers or for the best possible contract terms.  The submissions were not bought or sold, they were not bids or prices offered to compete for customers, and no customer was won or lost based on whether a Bank submitted a higher or lower rate.  Simply put, the rate-submission process was not in any way competitive.

*Third*, Plaintiffs allege that the Banks were "'banging the close' . . . to push the relevant rate to a particular level" (CAC ¶ 9) through their ICAP-brokered trading, but make no connection between this alleged conduct and competition with respect to customers or terms.  As Plaintiffs allege, ICAP was an "*inter-dealer* broker for . . . Banks" (*id.* ¶ 204) (emphasis added)) that "provide[d] liquidity to the market" (*id.* ¶ 72).  There is no allegation that the manner in which the Banks executed transactions—whether dispersed in time or bunched just before 11 a.m.—affected competition in any way.

*Finally*, Plaintiffs allege (without any particularity whatsoever) that ICAP delayed the publication of certain inter-dealer transactions and at times posted USD ISDAFIX reference points to the Banks "that [were] not truly reflective of actual trades in the marketplace."  (*Id.* ¶¶ 12-13).  Once again, these allegations are untethered to any competition among Defendants.

---

[12] Plaintiffs do not argue that the USD ISDAFIX-setting process itself is anticompetitive.  *See LIBOR I*, 935 F. Supp. 2d at 687-88 (plaintiffs did not allege that the joint process for setting LIBOR violated the antitrust laws).

**B.     Plaintiffs Have Not Alleged an Injury That Stems from an Anticompetitive Aspect of the Alleged Misconduct**

Beyond Plaintiffs' failure to sufficiently allege harm to competition, they also fail to satisfy the second requirement of antitrust injury:  pleading an injury flowing from that which would make the conduct an illegal restraint of trade.  *See Brunswick*, 429 U.S. at 489.  "It is not enough for the actual injury to be causally linked to the asserted violation."  *Gatt Commc'ns*, 711 F.3d at 76.  Rather, a plaintiff must show that its "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield*, 495 U.S. at 344.

Plaintiffs plead as their purported antitrust injury that Defendants' alleged conspiracy deprived them of "the benefit of a legitimate contributor quotation process and *accurate* ISDAfix rates reflecting actual market conditions . . . [and] the ability to *accurately* price interest rate derivatives entered into around the time of the ISDAfix window and to *accurately* determine settlement values of swaptions and other interest rate derivatives."  (CAC ¶ 196 (emphases added).)  Plaintiffs' purported injury thus stems from an alleged *inaccuracy* and not from any Defendant charging supracompetitive prices for an interest rate derivative product.  The antitrust laws, however, are not meant to redress such inaccuracies.  *See LIBOR I*, 935 F. Supp. 2d at 688 (alleged conspiracy to submit artificial estimates of interbank lending rates would result in an injury "from defendants' misrepresentation, not from harm to competition"); *see also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (false statements about a rival's goods were not actionable under the antitrust laws because they did not "drive up prices by curtailing output").  This basic defect also inheres in Plaintiffs' allegations of "banging the close," delayed publication of trades, and off-market reference points during the rate-setting process.  Those allegations also supposedly resulted in injury because they caused inaccurate USD ISDAFIX rates and not because they reduced competition.

Plaintiffs cannot argue that they relied on a competitive market to establish the USD ISDAFIX rate.  The Complaint alleges that USD ISDAFIX rates were based on voluntary submissions by the Banks, not on the actual transactions leading up to the 11 a.m. polling window that ICAP used to generate the daily reference points.  (*See* CAC ¶¶ 4, 79.)  Because the USD ISDAFIX rates were set through voluntary submissions, Plaintiffs could have suffered the same type of injury from unilateral conduct "under normal circumstances of free competition," further demonstrating the absence of antitrust injury.  *LIBOR I*, 935 F. Supp. 2d at 689. Competitive forces would not have deterred any Bank from unilaterally submitting an off-market quote.  An injury from such unilateral conduct—resulting from the USD ISDAFIX rate being inaccurate rather than any Defendant charging a supracompetitive price—is the same injury that Plaintiffs would suffer under the purported conspiracy alleged in the Complaint.  *See id.* at 690 ("[T]he injury plaintiffs suffered from defendants' alleged conspiracy to suppress LIBOR is the same as the injury they would have suffered had each defendant decided independently to misrepresent its borrowing costs.").

As Judge Buchwald explained in the LIBOR context, "[a] misreporting bank . . . would not have been concerned about being forced out of business by competition from other banks." *Id.* at 691.  This distinguishes Plaintiffs' allegations from a true price-fixing scenario in which "the sellers' supracompetitive prices could exist only where the sellers conspired not to compete."  *Id.* at 690-91.  In sum, Plaintiffs have failed to plead either of the two separate and distinct essential components of antitrust injury:  conduct that harmed competition and an injury that flowed from the competition-reducing aspects of that conduct.  Plaintiffs therefore lack antitrust standing, and their Sherman Act claim should be dismissed.

III.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE EACH DEFENDANT'S
        PARTICIPATION IN A CONSPIRACY TO RESTRAIN TRADE

To state a claim for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs

must allege an unreasonable restraint of trade effected by an agreement rather than unilateral

conduct.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).  Plaintiffs cannot simply make a

"conclusory allegation of agreement at some unidentified point" to survive a motion to dismiss.

*Id.* at 556-57.  Rather, Plaintiffs must plead "enough facts to support the inference that a

conspiracy actually existed."  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d

129, 136 (2d Cir. 2013).  To meet this requirement, Plaintiffs must either (i) "assert direct

evidence that the defendants entered into an agreement in violation of the antitrust laws," or

(ii) "present circumstantial facts supporting the *inference* that a conspiracy existed."  *Id.*  An

agreement "may be inferred on the basis of conscious parallelism, when such interdependent

conduct is accompanied by circumstantial evidence and plus factors."  *Id.*  Plaintiffs have failed

to allege any evidence, direct or circumstantial, of a conspiracy.

A.    Plaintiffs Allege No Direct Evidence of a Conspiracy

To survive a motion to dismiss, Plaintiffs must plead at least some "particular facts" to

make out more than a "'mere opportunity to conspire.'"  *In re Aluminum Warehousing Antitrust

Litig.*, No. 13-md-2481, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014).  As the Second

Circuit has observed, conspiracies "concern[ing] long-term complex relationships among

competitors" should be "more susceptible of direct proof."  *Apex Oil Co. v. DiMauro*, 822 F.2d

246, 253 (2d Cir. 1987).  Although Plaintiffs allege that the "Banks communicated with each

other" (CAC ¶ 8) over 7.5 years, they fail to plead when, where, or between whom any such

communications occurred.  *See Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*, No. 13

Civ. 1111, 2013 WL 6311202, at *3 (S.D.N.Y. Dec. 5, 2013) (vague allegations of "hypothetical

discussions or agreements" involving "one or more" defendants "fall[] well short of the line between possibility and plausibility of entitlement to relief"). Because Plaintiffs' antitrust claim is pleaded "in entirely general terms without any specification of any particular activities by any particular defendant," it amounts to an inadequate "list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).[13]

### B. Circumstantial Allegations of Supposed Parallel Conduct Are Insufficient

Plaintiffs' experts' statistical analyses set forth in the Complaint allege, at most, that the Banks engaged in three types of *parallel* conduct: *first*, that the Banks "submit[ted] identical rates matching ICAP's reference points, day-in and day-out" on the days on which they submitted rates (CAC ¶ 129); *second*, that the Banks and ICAP "bang[ed] the close" through actual, open-market trades (*id*. ¶¶ 138, 146); and *third*, that some Banks changed their USD ISDAFIX submission conduct in response to government investigations (*id*. ¶ 15). These allegations of parallel conduct are insufficient to state a Section 1 claim.

Parallel conduct allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "Plus factors" that might suggest concerted action include evidence of (i) "a common motive to conspire"; (ii) "parallel acts . . . against the apparent individual economic self-interest of the alleged conspirators"; and (iii) "evidence of a high level of interfirm

---

[13] The only basis in the Complaint for Plaintiffs' allegation of any communications about the alleged misconduct arises from a few citations to news articles, which discuss unidentified communications only between "traders" within a single bank and "ICAP brokers," not between or among employees of different Banks, and without any detail as to when the conversations took place or what was discussed. (*See, e.g.*, CAC ¶ 131 (citing Matthew Leising, *Swaps Probe Finds Banks Rigged Rate at Expense of Retirees*, Bloomberg (Aug. 2, 2013), *available at* http://www.bloomberg.com/news/2013-08-02/swaps-probe-finds-banks-manipulated-rate-at-expense-of-retirees.html).) This is not evidence of a horizontal agreement between competitor Banks.

communications." *Citigroup*, 709 F.3d at 136.  Plaintiffs fail to plead any of these plus factors.
Nor can allegations regarding pending government investigations salvage their claims.

1.    <b>Plaintiffs Have Not Alleged a Common Motive to Conspire</b>

Plaintiffs theorize that the "Banks conspired to manipulate the [USD] ISDAfix
benchmark rate to extract supracompetitive profits on interest rate derivatives transactions, all at
their customers' expense."  (CAC ¶ 96.)  But the allegation that fourteen of the world's largest
financial institutions could *all* profit from a conspiracy to manipulate USD ISDAFIX, not
persistently higher or lower, but "up or down" on any given day, makes no rational economic
sense.  Such a theory hinges on the implausible premise that these institutions' swap positions
were aligned throughout the purported class period at the moment of each episodic manipulation.
Plaintiffs give the Court no basis for crediting that premise, and as the Complaint notes, the
Banks were "competitors in the interest rate derivatives market," (*id.* ¶ 6) often acting as
counterparties to transactions in that market (*id.* ¶ 172).

In an effort to make their imaginative theory more plausible, Plaintiffs allege that
"whenever any subset of banks faced particular exposure to the settlement of an ISDAfix-linked
transaction," on such days, "the other conspiring banks and ICAP would help manipulate the
targeted USD ISDAfix rate to a level that would help that subset of banks."  (*Id.* ¶ 8.)  But
Plaintiffs have articulated no rational motive for all Banks to join such a conspiracy because the
scheme would confer no reliable net benefit.  The Banks were counterparties in a multitude of
ISDAFIX-linked transactions and held opposing positions.  (*Id.* ¶ 172.)  For the alleged
conspiracy to financially benefit some Banks, it would necessarily disadvantage others and
possibly even disadvantage other positions within a single Bank.  Because Plaintiffs' theory of
conspiracy relies on the implausible premise that all Banks were similarly positioned to benefit

20

from the alleged collusive behavior, their claim is "not economically plausible." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *29.

Moreover, Plaintiffs fail to connect their purported evidence of "banging the close" to the Banks' actions.  There is no reason alleged in the Complaint to believe that the Banks, and not other market participants, engaged in the purported trading spikes around 11 a.m.  Indeed, the market was not limited to the submitting Banks, and *any* market participant that matched through ICAP could have placed those trades.  The logical inference from Plaintiffs' allegations also renders the Banks' participation in any trading misconduct implausible:  A Bank that wanted to manipulate ISDAFIX could have employed more direct methods than relying on the uncertainty of the alleged "banging the close" strategy.  That the Banks would also engage in trading-based manipulation—a much more complicated method if one were inclined to manipulate the rate— simply makes no sense.

### 2. Plaintiffs Fail to Plead Parallel Conduct against the Banks' Independent Self-Interests

"*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010).  Here, none of Plaintiffs' statistical allegations regarding the purported similarity of the Banks' USD ISDAFIX submissions, or supposed trading spikes ahead of the submission deadline, support any plausible inference of conspiracy.  To the contrary, these allegations "tell a story consistent with market-driven behavior." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *29.

Plaintiffs assert that, "without some form of advanced coordination," the Banks could not have submitted identical quotes on "almost every single day between at least 2009 and December

2012."  (CAC ¶ 99.)  This allegation is not only wrong, but is also blatantly misleading because it ignores the fact, as alleged, that those purportedly identical submissions could have been generated simply by each of the Banks accepting the reference points posted by ICAP.  (*See id.* ¶ 128 (acknowledging the "ISDAfix setting process starts with ICAP providing a 'reference point' to the Defendant Banks").)  Accepting the reference points (and thus, submitting identical quotes) would not require any inter-bank communication because, as Plaintiffs allege, ISDA has made clear that contributing banks "may accept" the reference points posted by ICAP.  (*Id.* ¶ 79.)  Further, by Plaintiffs' own admission, ICAP "is the largest interest rate derivatives broker in the business," making the Banks' acceptance of the reference points posted by ICAP wholly understandable.  (*Id.* ¶ 10.)  Additionally, each Bank's daily ISDAFIX submission was publicly available, which means that anyone who cared to look would have known that the Banks were allegedly accepting the reference points almost every day.  Such public conduct is not indicative of the type of conspiracy that Plaintiffs allege.  Thus, Plaintiffs "do not plausibly imply that each [Bank] acted other than independently" when submitting quotes that matched the reference points posted by ICAP.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349.

Moreover, while Plaintiffs allege that "[q]uote submissions for analogous benchmarks did not come close to showing [USD] ISDAfix's level of uniformity" for a cherry-picked sample of dates (CAC ¶¶ 102, 105 n.30), the Complaint conveniently omits that USD was the *only* ISDAFIX currency for which contributor banks were provided with reference points for their submissions.  *See* ISDA Response to the European Commission's Public Consultation on the Regulation of Indices, at 7-8 (Nov. 29, 2012), which is incorporated by reference into the Complaint (CAC ¶ 79), and *available at* http://www2.isda.org/news/isda-response-to-the-european-commissions-public-consultation-on-the-regulation-of-indices ("ISDA Response

Letter").[14]  Thus, no inference of collusion can be drawn from Plaintiffs' allegations regarding

submissions.  Because USD ISDAFIX is calculated by eliminating the highest and lowest

submitted rates (including acceptances of the reference points) and then averaging the remainder,

it is unsurprising that the rate would tend to be fairly uniform.  (*Id.*)

Likewise, Plaintiffs' allegation that, "regularly on certain days throughout the [7.5-year]

Class Period" (CAC ¶ 146), the Banks "bang[ed] the close" just before 11 a.m. to push the

reference points to a particular level, fails to meet Plaintiffs' burden.  (*Id.* ¶ 9.)  As noted above,

Plaintiffs allege no facts showing that the alleged trading activity was undertaken by the Banks

as opposed to other market participants.  Regardless, the Banks' alleged activity is more

consistent with a non-collusive explanation—namely, their independent and legitimate need to

hedge the risk from their expiring swaptions at 11 a.m.  As Plaintiffs allege, USD ISDAFIX, and,

thus, the price at which cash-settled swaptions expiring that day will settle, is based on market

activity at 11 a.m.  (CAC ¶ 67.)  For Banks and others looking to "manage and transfer risk" by

trading interest rate derivatives (*id.* ¶ 57), the degree of risk to be managed would only become

clear as 11 a.m. approached.  Thus, it is unsurprising that there was an increase in trading volume

as the ISDAFIX-setting window approached.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272

F.3d 189, 207-12 (3d Cir. 2001) (no evidence that short selling had manipulative intent, rather

than as part of a bona fide hedging strategy); *In re Commodity Exch., Inc., Silver Futures &

Options Trading Litig.*, No. 11 MD 2213, 2012 WL 6700236, at *20 (S.D.N.Y. Dec. 21, 2012)

(rejecting the plaintiffs' conclusory allegations of market manipulation which showed only that

---

[14] Plaintiffs' comparison of the level of dispersion in submissions for USD ISDAFIX and other benchmarks reflects a skewed comparison of inapposite data from different date ranges and markets with vastly different liquidity characteristics which largely account for any difference in "dispersion" rates.  (*Compare* CAC ¶ 105 n.30, *with id.* ¶ 107 n.31.)

the defendant "was engaged in some level of ordinary market activity"), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).[15]

Regardless, the Complaint identifies only two days—out of the more than 1,900 days in the putative class period—on which Plaintiffs claim there is evidence consistent with their "banging the close" theory.  (CAC ¶¶ 140-42.)[16]  The absence of additional examples is all the more notable given the allegation that "Plaintiffs' experts analyzed swap rates surrounding the USD polling period for *each day* from January 2007 to December 2013."  (*Id.* ¶ 138 (emphasis added).)  Allegations of such infrequent action cannot plausibly show a seven-and-a-half-year conspiracy involving all fourteen Banks.  *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652, 2013 WL 3873074, at *9 (S.D. Cal. July 25, 2013) (allegation of an "isolated action" insufficient to support a "huge antitrust conspiracy" theory); *Citigroup*, 709 F.3d at 140 (allegations of "isolated discussions among only three defendants" insufficient to support an alleged industry-wide conspiracy).

### 3. References to Government Investigations Cannot Salvage Plaintiffs' Conspiracy Claims

Plaintiffs' references to ongoing investigations into USD ISDAFIX and other benchmark rate-setting are insufficient to support an inference of conspiracy.  "[V]ague allegations regarding pending investigations . . . are not probative of [] Sherman Act Section 1 violations . . . because neither mere participation in an investigatory interview nor the receipt of a subpoena is

---

[15] Pursuant to basic theory of options risk management, a market-maker needs to hedge at or around the 11 a.m. USD ISDAFIX setting when an in-the-money swaption cash settles in order to rebalance its portfolio by executing a transaction at a rate that closely matches the rate it will need to pay (or receive) when cash settling the swaption.  *See generally* John C. Hull, Introduction to Futures & Options Markets 319-50 (2d ed. 1995); (*see* CAC ¶¶ 64, 67). This practice is entirely consistent with legitimate trading activities.

[16] Plaintiffs allege that, "[o]n numerous days," USD ISDAFIX "remained stable until just after [11] a.m. EST, after which it shot up or plunged," allegedly reflecting ICAP's delay in publishing unfavorable transactions that could impact prearranged USD ISDAFIX reference points.  (CAC ¶ 153.)  Plaintiffs, however, plead only two instances from 2011 that supposedly "demonstrate this phenomenon."  (*Id.* ¶¶ 153-54.)

necessarily probative of conspiracy."  *LaFlamme v. Société Air Fr.*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *34 (no "binding case law" suggesting that "investigations alone can plausibly support an alleged § 1 conspiracy").[17]

Plaintiffs' allegations of collusion based on assertions that the Banks' USD ISDAFIX submission conduct changed after the December 2012 announcement of the UBS settlements related to LIBOR, are similarly deficient.  Plaintiffs allege that, "[a]fter late 2012, . . . high, volatile [daily average bid-offer] spreads [were] replaced with a lower, almost constant bid-offer spread" (CAC ¶ 161), which Plaintiffs speculate reflected the breakdown of Defendants' conspiracy to delay "inputting unfavorable swap rates to set the ISDAfix rate at a predetermined level" (*id.* ¶ 156).[18]  The Complaint, however, concedes that forces unrelated to an alleged conspiracy can just as easily cause a change in the bid-offer spread:  indeed, Plaintiffs attribute a subsequent "increase in spreads in October 2013" to the "combination of the federal government shutdown and the uncertainty surrounding the implementation of regulations under the Dodd-Frank [A]ct," not the resumption of any alleged conspiracy.  (*Id.* ¶ 159 n.53.)  Likewise, evidence of less volatile spreads after December 2012 is just as consistent with market stabilization at the end of the financial crisis as it is with any conspiracy.

---

[17] Indeed, references to ongoing investigations into ISDAFIX and other benchmarks, as well as references to the LIBOR investigations and settlements, should be stricken from the Complaint.  *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011) (striking references to a CFTC consent order, finding that it was the product of a settlement between the CFTC and the defendant, and not an adjudication of the underlying issues); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) ("[D]efendants' motion to strike is granted with respect to the allegations . . . insofar as they are based on pleadings, settlements, and government investigations in other cases.").

[18] Plaintiffs do not allege that any of Defendants' purported conduct resulted in actual wider bid/offer spreads, but rather that, due to ICAP's alleged delayed reporting of "pre-fix bids and offers" until after the fixing window, "it would *momentarily appear* as if the Defendant Banks had a distortedly large bid-offer spread as all of their delayed transactions were entered simultaneously with their current trades."  (CAC ¶ 160 (emphasis added).)

Plaintiffs also argue that the alleged increase in the rate of variation of USD ISDAFIX submissions and the withdrawal of certain Banks from the submission panel "amid news of brokers' role in LIBOR and other benchmark scandals" demonstrates the Banks' "consciousness of guilt." (*Id.* ¶¶ 21, 114, 126.) Not so.[19]  As the Supreme Court has explained, mere "parallel conduct" that could just as well arise from "independent responses to common stimuli," such as regulatory developments, does not suffice to state a claim under the Sherman Act.  *Twombly*, 550 U.S. at 556 n.4.  There are any number of plausible reasons why a bank would change its voluntary rate-setting activities in response to regulatory developments, including ongoing control enhancements and resource management.  Moreover, the rash of class actions has given banks good reason to reconsider their participation in setting various financial benchmark rates, which have become a target for strike suits.

## IV.   PLAINTIFFS' CEA CLAIMS FAIL

### A.   Plaintiffs Do Not Have Standing to Bring CEA Section 22 Claims for Conduct Occurring Before October 12, 2012

Plaintiffs' CEA claims arise under CEA Section 22, 7 U.S.C. § 25.  Before Dodd-Frank amended the CEA, however, Section 22 granted standing only to persons who purchased or sold a "contract of sale of any commodity for future delivery," i.e., a futures contract.  7 U.S.C. § 25(a)(1)(B) & (D) (2006); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,* 977 F.2d 1147, 1153 (7th Cir. 1992) (plaintiff farmers had no standing because they did not trade futures); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010) ("*Amaranth*

---

[19] Plaintiffs' LIBOR-related allegations (e.g., CAC ¶¶ 81-87) are not sufficient to render any of their allegations of a conspiracy plausible because allegations of a conspiracy in one market are insufficient to give rise to a plausible inference of conspiracy in another absent "any evidence of linkage between" the two.  *In re Elevator Antitrust Litig.*, 502 F.3d at 52.  Additionally, Plaintiffs' reliance on the LIBOR investigations to support their ISDAFIX allegations does not facially apply to Defendants—such as Goldman Sachs, Morgan Stanley, Nomura, and Wells Fargo—that had no involvement in the LIBOR-setting process or related investigations and settlements.

*II*") ("To have standing under the CEA, a private plaintiff must have purchased or sold a futures contract."). Plaintiffs have *not* alleged that they bought or sold futures. Dodd-Frank ultimately expanded the parties who may bring a private cause of action under Section 22 to include persons that purchase or sell "swaps," but that change did not become effective until October 12, 2012.[20] Plaintiffs' CEA claims that are based on conduct occurring before October 12, 2012 must be dismissed.

### B.    The CEA Did Not Apply to the Transactions at Issue

Prior to Dodd-Frank, interest rate swaps and swaptions were expressly excluded from the reach of the CEA. These exclusions remained effective until their repeal on July 16, 2011 by Dodd-Frank. *See* Dodd-Frank § 723(a)(1)(A) (repealing Sections 2(d) and (g)); *id.* § 754 (establishing effective date).[21] Former CEA Section 2(d) provided that "[n]othing in [the CEA] . . . governs or applies" to (i) any "agreement, contract, or transaction in an excluded commodity" (ii) between "eligible contract participants" (iii) that was "not executed or traded on a trading facility." 7 U.S.C. § 2(d)(1) (2006). The term "excluded commodity" was defined broadly to cover virtually all financial commodities, including, specifically, "an interest rate, exchange rate, . . . or . . . any other rate, differential, [or] index[.]" *Id.* § 1a(13)(i)-(ii).

*First*, it is clear that Plaintiffs seek to apply the CEA to "agreement[s], contract[s], or transaction[s]" in excluded commodities. Whether Plaintiffs' claims are that Defendants

---

[20] *See* Dodd-Frank § 721(a)(21) (adding the term "swap" to the CEA); *id.* §712(d)(1) (requiring the CFTC and SEC, "[n]otwithstanding any other provision" of Dodd-Frank, to promulgate a rule "further defin[ing]" the term "swap"); *id.* § 754 (providing that any Dodd-Frank amendment to the CEA that requires a rulemaking shall not take effect earlier than 60 days after publication of the final rule); Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement," 77 Fed. Reg. 48,207, 48,304 (Aug. 13, 2012) (effective 60 days later on October 12, 2012); *id.* at 48,259 (interpreting that a "'swaption'[] would itself be a swap" under the Dodd-Frank statutory "swap" definition).

[21] Although the Section 2(d) and 2(g) exclusions were repealed on July 16, 2011, Plaintiffs did not gain standing to bring a private right of action with respect to the purchase or sale of swaps until October 12, 2012. (*See supra* Section IV.A.)

allegedly manipulated the price of (i) interest rate swaps as set by USD ISDAFIX, or (ii) contracts or swaps tied to USD ISDAFIX (*see* CAC ¶ 202), the transactions at issue—swaps and swaptions—are plainly transactions "in" interest rates, which are excluded commodities.  *See Dunn v. CFTC*, 519 U.S. 465, 469-70 (1997) (interpreting a similar CEA exclusion for "transactions in foreign currency" broadly to include "all transactions [including options] in which foreign currency is the fungible good whose fluctuating market price provides the motive for trading").[22]

Second, the Banks and Plaintiffs were sophisticated market participants that qualified as "eligible contract participants."  "Eligible contract participants" are defined in 7 U.S.C. § 1a(12) (2006) as any of several enumerated entities acting for their own accounts, including financial institutions, corporations and other entities with total assets greater than $10 million, political subdivisions of states, and certain employee benefit plans with total assets greater than $5 million.  Defendants and each named Plaintiff plainly fall into these categories.  *See id.* § 1a(12)(A)(i), (v)-(vii).

Third, the interest rate derivatives transactions allegedly entered into by Plaintiffs were not traded on a "trading facility."  The CEA defines a trading facility as a system in which multiple participants have the ability to execute bids or offers that are open to multiple participants, which is known as a central limit order book or "many-to-many" trading environment.  *See* 7 U.S.C. § 1a(33)(A) (2006) (now codified unchanged at 7 U.S.C. § 1a(51)(A) (2012)).  To the contrary, the Complaint alleges that the financial instruments at issue were not

---

[22] The *Dunn* court concluded that "[i]t seems quite natural in this context to read the . . . exemption of transactions in foreign currencies as a complete exclusion of that commodity from the regulatory scheme."  *Id.* at 475-76; *see also United States v. Radley*, 632 F.3d 177, 183-84 (5th Cir. 2011) (defining the term "transaction" broadly to cover acts of "conducting business or other dealings" and holding that the term encompasses entering bids without intent to enter into transactions and making false and misleading statements).

traded through a centralized and regulated exchange.  (*See* CAC ¶ 72.)  Such transactions plainly

fall outside of the CEA's definition of "trading facility."  *See United States v. Radley*, 659 F.

Supp. 2d 803, 812 (S.D. Tex. 2009) ("Transactions entered into directly between two parties or

through voice brokers were not executed on a trading facility."), *aff'd*, 632 F.3d 177 (5th Cir.

2011).

Although the exclusion in Section 2(d) is sufficient to bar Plaintiffs' pre-Dodd-Frank

manipulation claims, Plaintiffs' claims are also barred by a separate exclusion pertaining to

swaps that was embodied in Section 2(g).  This exclusion broadly shielded from the CEA,

including its antimanipulation provisions, (i) "any agreement, contract, or transaction in a

commodity other than an agricultural commodity," *provided* that the transaction was (ii) between

"eligible contract participants," (iii) "not executed or traded on a trading facility," and (iv)

"subject to individual negotiation by the parties."  7 U.S.C. § 2(g) (2006).  The first three criteria

are met for the reasons described above, and the fourth—individual negotiation—also plainly

applies.  (*See* CAC ¶ 173 ("The parties customize the ISDA Master Agreement through use of a

Schedule, which contains elections, additions, and amendments.")); *see also Radley*, 659 F.

Supp. 2d at 811 ("[A] contract can be subject to negotiation, even if some of the terms are

predetermined.").[23]  For these reasons, Plaintiffs may not bring any claim under the CEA that

would have arisen prior to the Dodd-Frank amendments.

---

[23] Defendants maintain that Plaintiffs have not adequately alleged the existence of any contracts.  To the extent that the Court finds otherwise or Plaintiffs amend the Complaint to address this deficiency, Plaintiffs' CEA claims are defective for this additional reason.

### C.      Plaintiffs Fail to State a Claim for Price Manipulation under the CEA

Even if the foregoing fatal flaws in Plaintiffs' pre-Dodd-Frank era CEA claims did not

exist, Plaintiffs nevertheless fail to allege adequately any price manipulation to support *any* claim

under the CEA regardless of time period.

### 1.      Plaintiffs Fail to Satisfy Rule 9(b)

Plaintiffs' CEA claims are subject to the requirement in Fed. R. Civ. P. 9(b) ("Rule 9(b)")

that the supporting allegations be pled with particularity.  A CEA claim that "sound[s] in fraud"

must satisfy Rule 9(b).  *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 713.  Plaintiffs' CEA claims

unquestionably sound in fraud:  they are based on allegations that Defendants misled the market

by engaging in "knowingly unlawful conduct" intended to cause "an artificial ISDAfix rate that

was not reflective of actual market prices."  (CAC ¶¶ 150, 205.)  *See LIBOR I*, 935 F. Supp. 2d at

713-14 ("[T]he present allegations sound in fraud and thus must be pled with particularity"

because "the claim is that defendants, by submitting artificial LIBOR quotes, misled the

market[.]"); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *4-5

(S.D.N.Y. June 28, 2007) (Rule 9(b) applied to CEA claim because "the crux of plaintiffs'

allegations is that defendants misled the market.").[24]

Plaintiffs thus "must satisfy Rule 9(b)'s requirement that 'the circumstances constituting

fraud . . . be stated with particularity.'"  *Amaranth I*, 587 F. Supp. 2d at 535 (quoting Rule 9(b)).

Specifically, the Complaint must specify "what manipulative acts were performed, which

defendants performed them, when the manipulative acts were performed, and what effect the

---

[24] At least one decision has held that, rather than engage in a "sounds in fraud" inquiry to determine Rule 9(b)'s applicability, courts should always require CEA manipulation claims to be pled with particularity.  *See In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) ("*Amaranth I*") ("[M]arket manipulation is inherently deceptive.  Thus, a complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)."), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  The Court need not resolve this disagreement since Rule 9(b) applies here under either approach.

scheme had on the market." *Id.* A complaint also must put forward factual allegations that "give rise to a 'strong inference' of scienter." *Id.* A court "must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Thus, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Plaintiffs do not come close to satisfying these requirements.

As a threshold matter, the Complaint relies on broad allegations made against "Defendants" or "Defendant Banks" (or in some cases undefined "subsets" of Banks) as a group that do not differentiate among Defendants or attribute any specific act to any particular Defendant. (*See, e.g.*, CAC ¶¶ 2, 9, 127, 129 ("Defendants conspired"); *id*. ¶ 12 ("Defendant Banks manipulated"); *id*. ¶¶ 96, 149, 170 ("Defendant Banks conspired"); *id*. ¶ 98 ("Defendants agreed"); *id*. ¶ 162 ("Defendants regularly colluded").) "Such wide-scale clumping is unacceptable." *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) ("In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant.").

The only Defendant-specific factual allegations in the Complaint involve the presentation of statistical USD ISDAFIX submission data (CAC ¶¶ 98-126) that, as explained previously, does not support an inference of wrongdoing. (*See supra* Section III.B.) In any event, Plaintiffs' speculation about the meaning of this data does not satisfy the requirement of pleading the who, what, when, and where of the supposed fraud. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 102 (2d Cir. 2007).  Plaintiffs never offer a single example of a specific act performed by a specific defendant on a particular date to support the claimed manipulation.[25]

### 2.   Plaintiffs Fail to Plead Price Manipulation

CEA Section 22 provides a private right of action for "manipulation of the price" of a futures contract, a swap (post-Dodd-Frank *only*), or the commodity underlying a futures contract or swap.  7 U.S.C. § 25(a)(1)(D)(ii) (2012).[26]  The Complaint alleges that Plaintiffs traded interest rate swaps and swaptions (CAC ¶¶ 186, 189), but never identifies the relevant "commodity" underlying such transactions whose price allegedly was manipulated.  Rather, Plaintiffs allege only that Defendants violated the CEA by manipulating the price of *either* (i) "USD interest rate swaps as set by ISDAfix," *or* (ii) "any contract or swap benchmarked, traded, priced and/or settled to ISDAfix, or traded, priced and/or settled around the time of the ISDAfix setting window."  (*Id.* ¶ 202.)

USD ISDAFIX plays no role at all in the pricing of an interest rate swap.  Plaintiffs' assertion that the prices of "USD interest rate swaps" are "set by ISDAfix" is nonsensical.  The price of an interest rate swap is simply the fixed rate that one agrees to pay (or receive) in exchange for the right to receive (or pay) payments based on a floating rate.  Neither the fixed

---

[25] Indeed, Plaintiffs' allegations that the supposed conspiracy endured for the entire purported class period are wafer thin.  The only support Plaintiffs provide for their assertion that Defendants should be held liable for conduct beginning in January 1, 2006 (CAC ¶ 186) is that "since at least 2009 (and likely before), the . . . Banks" conspired to manipulate the USD ISDAFIX.  (*Id.* ¶ 15; *see also id.* ¶¶ 23, 98.)  Plaintiffs also concede that some Banks stopped participating in the submissions process as early as 2012.  (*See id.* ¶ 44.)  Plaintiffs' broad allegations concerning "all defendants" thus fail to meet the specificity required by Rule 9(b) for asserting when manipulative acts occurred.  *See In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6 ("[A]bsent the delineation of the class period, there is no date specified of when any of the purportedly manipulative acts were performed by defendants or their coconspirators.  Courts have consistently held that such a lengthy time-frame fails to satisfy the particularity requirement of Rule 9(b).").

[26] *See infra* Section IV.C for the elements of price manipulation under pre-Dodd-Frank CEA Sections 6(c) and 9(a)(2), 7 U.S.C. §§ 9 & 13(a)(2) (2006); post-Dodd-Frank CEA Sections 6(c)(3) and 9(a)(2), 7 U.S.C. §§ 9(3) & 13(a)(2) (2012); and post-Dodd-Frank CFTC Rule 180.2, 17 C.F.R. § 180.2.

rate, which is negotiated by the parties, nor the floating rate, is determined by USD ISDAFIX. (*See id.* ¶¶ 58-60.)

Describing the commodity as a "contract or swap" linked to ISDAFIX (*id.* ¶ 202) fares no better, as the only such "contract[s] or swap[s]" at issue in this Complaint are interest rate swaps and swaptions. But the price of a swaption does not depend on USD ISDAFIX either. Rather, the price of a swaption contract is the premium that the buyer pays to the seller for the option to enter into the underlying transaction. (*Id.* ¶ 63.) Critically, the premium is not alleged to be related to USD ISDAFIX in any way.[27] Plaintiffs concede that USD ISDAFIX comes into play only at the time of settlement, long after the swaption was bought or sold. (*See Id.* ¶¶ 17 (alleging that USD ISDAFIX is a factor in the value of cash-settled swaptions at expiry), 70.) But the "expiry value" of a swaption is not its price. *See Vitanza v. Bd. of Trade of N.Y.C.*, No. 00-cv-7393, 2002 WL 424699, at *5-6 (S.D.N.Y. 2002) (plaintiffs lacked standing under CEA to sue for manipulation of the "settlement price" of commodity futures and options because "the settlement price is not the value of the contract itself or the value of the commodity underlying the contract"). Plaintiffs' CEA claims for price manipulation fail for this additional reason.

---

[27] The premium that one pays for a swaption is based in part on the prevailing interest rate swap rate, which is generally determined by reference to a real-time indicator of the swap rate. USD ISDAFIX is not—and is not alleged to be—used for this purpose because of the time lag associated with its publication: it reflects the mid-market rate as of 11 a.m., but is not calculated until 11:26 a.m. and is only published after that. (CAC ¶ 79.) By the time it is published, USD ISDAFIX no longer reflects the current market rate. This distinguishes the present matter from the LIBOR case, in which the plaintiffs alleged manipulation of the price of Eurodollar futures contracts through systematic suppression of LIBOR. There, Judge Buchwald credited plaintiffs' allegation that "[t]o the extent that LIBOR is mispriced in the present, expectations of what LIBOR will be in the future will also be skewed" and thereby affect the price of a Eurodollar futures contract in the present. *LIBOR I,* 935 F. Supp. 2d at 715. By contrast, mispricing of USD ISDAFIX in the present does not affect the price of a swaption in the present (particularly where, as is alleged here, the manipulation was ad hoc, sometimes up and sometimes down (*see, e.g.,* CAC ¶¶ 8, 139) ).

### 3.    Plaintiffs Fail to Plead Specific Intent

Although the elements of certain CEA manipulation claims changed with the implementation of Dodd-Frank,[28] the same four-element test for price manipulation applies both to claims relating to conduct prior to the effective date of Dodd-Frank (brought under CEA Sections 6(c) and 9(a)(2), 7 U.S.C. §§ 9 and 13(a)(2) (2006)), *and* to claims brought pursuant to the CEA as amended by Dodd-Frank (brought under CEA Sections 6(c)(3) and 9(a)(2), 7 U.S.C. §§ 9(3) and 13(a)(2) (2012) and CFTC Rule 180.2, 17 C.F.R. § 180.2 (2014)).[29]

To state a manipulation claim under the four-part test, Plaintiffs must allege that (i) each Defendant possessed an ability to influence interest rate swaps and swaptions prices; (ii) an artificial price existed for interest rate swaps and swaptions; (iii) each Defendant caused the artificial price; and (iv) each Defendant specifically intended to create an artificial price. *Amaranth III*, 730 F.3d at 173.

To establish the required specific intent, a plaintiff must show that a defendant "acted with the purpose . . . of causing . . . a price or price trend in the [particular] market that did not reflect the legitimate forces of supply and demand," *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d at 598, and must do so with the particularity required by Rule 9(b). Plaintiffs have not pleaded facts demonstrating Defendants' specific intent to influence a price or

---

[28] The effective date of the CEA's new antimanipulation rules was August 15, 2011.  *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,398 (July 14, 2011) (codified at 17 C.F.R. 180); *see also In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 173 n.1 (2d Cir. 2013). ("*Amaranth III*") (noting effective date of August 15, 2011).  As explained above in Section IV.A, however, the addition of the term "swap" to the CEA did not become effective until October 12, 2012.  Therefore, CFTC rules could not be applicable to swaps until October 12, 2012.

[29] *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. at 41,407 (July 14, 2011) ("[I]n applying final Rule 180.2, [the CFTC] will be guided by the traditional four-part test for manipulation that has developed in case law arising under [CEA Sections] 6(c) and 9(a)(2).").

price trend; their generic allegations, and impermissible group pleading, that Banks (or some undefined subset of Banks) attempted to move USD ISDAFIX "up or down" are not enough. For the same reasons that Plaintiffs' allegations of Defendants' supposed parallel conduct are insufficient to plead a conspiracy (*see supra* Section III.B), inferences of innocent conduct are far more compelling than the inference of manipulation. *See Tellabs*, 551 U.S. at 314.

### 4.   Plaintiffs Fail to Plead that an Artificial Price Existed or That Defendants Caused an Artificial Price

Plaintiffs also fail to allege that the Banks' conduct caused an artificial price in the market for interest-rate swaps and swaptions.  To state a claim for manipulation under CEA Section 9(a)(2) or Rule 180.2, Plaintiffs must allege specific facts showing both the existence of an artificial price, and that each Defendant's conduct caused that artificial price.  *See Amaranth III*, 730 F.3d at 183.  Plaintiffs here do neither.

As discussed *supra*, the Complaint relies entirely on allegations against all Defendants as a group, never providing a single example of a particular Defendant's alleged conduct on a particular date that would cause an artificial price.  Moreover, Plaintiffs' allegation that the Banks accepted the reference points posted by ICAP is fatal to this claim, because, as Plaintiffs concede, the reference points are "based on the then-current swap rate of trades brokered by ICAP and executable bids and offers submitted by dealers."  (CAC ¶ 128).  Accordingly, Plaintiffs themselves allege that the Banks' USD ISDAFIX submissions, rather than being "artificial," reflected current information about actual trades in the market. *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *12 ("When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue."), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).

Plaintiffs do not allege any miscalculation or other error caused USD ISDAFIX to deviate from the market conditions that it purports to reflect.  Moreover, the fact that Plaintiffs have alleged the Banks attempted to "bang the close" does not remedy this shortcoming:  the trading in interest rate swaps around 11 a.m. were open-market transactions.  Plaintiffs do not allege any facts demonstrating that those transactions were anything other than real transactions in which each party assumed genuine risk.  (*Id.* ¶ 129.)  Even assuming that those trades moved the price of the market, it was a true market movement.  *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236 at *16 ("The allegation that large unspecified and 'uneconomic' trades were taking place . . . during the more than two-and-a-half year Class Period is too general to plead the existence of artificial prices.").  And although Plaintiffs allege that Defendants occasionally delayed reporting of trades, there is nothing in the Complaint to support any inference that any such conduct happened on more than a handful of occasions in seven and a half years, if it occurred at all.  (CAC ¶¶ 12, 153.)

Plaintiffs have thus failed to satisfy their burden of pleading a plausible claim, much less one that satisfies Rule 9(b).  *See DPWN Holdings (USA) v. United Air Lines Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014) (declining to accept as true conclusory allegations contradicted by other allegations in the complaint).

### D.       Plaintiffs Fail to State a CEA Claim for Fraud-Based Manipulation

Plaintiffs' claim that Defendants violated the post-Dodd-Frank prohibitions on fraud-based manipulation under CEA Section 6(c)(1), 7 U.S.C. § 9(1) (2012), and CFTC Rule 180.1, 17 C.F.R. § 180.1 (2014) (*see* CAC ¶ 202), also fails.  CEA § 6(c)(1) is modeled on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and makes it unlawful for any person, directly or indirectly, to use or employ, in connection with a swap, future or commodity in interstate commerce, any manipulative or deceptive device or contrivance, in contravention of

such rules adopted by the CFTC.  7 U.S.C. § 9(1); 17 C.F.R. § 180.1; *see* Prohibition on the

Employment, or Attempted Employment, of Manipulative and Deceptive Devices and

Prohibition on Price Manipulation, 76 Fed. Reg. at 41,399 & n.11.  To implement this provision,

the CFTC adopted Rule 180.1, which it modeled on SEC Rule 10b-5, because the SEC's rule

was adopted pursuant to "virtually identical" statutory language in the Exchange Act.  *See* 76

Fed. Reg. at 41,399 & n.11.  The CFTC has stated it will be guided by precedent applying Rule

10b-5's comparable language.  *See id.*; *CFTC v. Hunter Wise Commodities, LLC*, No. 12-81311-

CV, 2014 WL 2022239, at *24 (S.D. Fla. May 16, 2014).

   To our knowledge, no court has interpreted Rule 180.1 in the context of a private right of

action.  Therefore, consistent with the CFTC's guidance, the Court should apply the same

standard as it would to a claim brought under Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b) (2012).  In relevant part, a Section 10(b) "plaintiff must establish that 'the defendant . . .

made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's

reliance on the defendant's action caused injury to the plaintiff.'"  *ECA & Local 134 IBEW Joint*

*Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  A complaint

brought under Section 10(b) "must specify 'each statement alleged to have been misleading,

[and] the reason or reasons why the statement is misleading, and if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed.'"  *Teachers' Ret. Sys. of La. v. Hunter*, 477

F.3d 162, 172 (4th Cir. 2007).  Claims brought under Section 10(b) also must satisfy a stringent

scienter standard, pleading either intentional misconduct or such a degree of recklessness that

"the danger was either known to the defendant or so obvious that the defendant must have been

aware of it."  *Id.; Tellabs*, 551 U.S. at 321; *ECA*, 553 F.3d at 198, 202-03.  Just as Plaintiffs have

not sufficiently alleged that Defendants acted with intent (*see supra* Section IV.C.3), they also fail to allege with sufficient particularity that Defendants acted recklessly.

In addition, Plaintiffs fail to adequately plead that Defendants' market activity, such as the alleged "banging the close" transactions (*see* CAC ¶ 9), would constitute a violation of Section 10(b).  In the Second Circuit, open-market transactions only violate Section 10(b) if "willfully combined with *something more* to create a false impression of how market participants value a security."  *ATSI Commc'ns*, 493 F.3d at 101 (emphasis added).  Market manipulation must include "some market activity, such as 'wash sales, matched orders, or rigged prices.'"  *Id.*; *see also Colkitt*, 272 F.3d at 207 (lawful short selling that "may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct").  The *ATSI* "something more" standard applies to Rule 180.1 claims for the same reasons that it applies to a Section 10(b) claim.  Plaintiffs fail to plead facts establishing that Defendants' open-market trading activity included "something more" to create a false impression of the interest rate markets.  For the same reason that Plaintiffs' price manipulation claims do not satisfy Rule 9(b), they also do not state a claim under Rule 180.1.

### E.     Plaintiffs Fail to State a Claim for Vicarious Liability under the CEA

Plaintiffs also have failed to plead adequately the additional elements required to state a claim for vicarious liability under the CEA.  "[T]o state a claim for vicarious liability," in addition to adequately pleading a primary violation of the CEA, "plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal 'maintain[ed] control over key aspects of the undertaking.'"  *LIBOR I*, 935 F. Supp. 2d at 721.  Here, Plaintiffs merely assert in a vague and conclusory manner that "[e]ach Defendant is liable . . . for the manipulative acts of their agents, representatives, and/or other persons acting for them."  (CAC ¶ 210.)  There are no allegations of fact that support this bald assertion.  *See, e.g.*,

38

*Laydon*, 2014 WL 1280464, at *6 n.2 (claim for vicarious liability relating to alleged LIBOR manipulation dismissed where complaint failed to plead such facts); *Amaranth I*, 587 F. Supp. 2d at 547 (vicarious liability claim dismissed because "[t]he only language that would justify [finding a principal-agent] relationship is general, vague, and conclusory").[30]

### F.   Plaintiffs' CEA Aiding and Abetting Claim Must Be Dismissed

Plaintiffs' aiding and abetting claim must also be dismissed.  As an initial matter, as addressed above, Plaintiffs have failed to allege a primary CEA violation.  *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).  But even if Plaintiffs had sufficiently pled a primary violation, they must additionally establish that each Defendant (1) associated itself with the violations of the CEA, (2) "participate[d] in [the violations] as in something that [it] wishe[d] to bring about," and (3) by its action, sought to make the venture succeed.  *Amaranth III*, 730 F.3d at 182.  Plaintiffs must allege facts to support their aiding and abetting claim that are distinct from the conduct underlying the primary CEA manipulation claim.  *See LIBOR I*, 935 F. Supp. 2d at 723-24.  And they must allege these elements with particularity sufficient to satisfy Rule 9(b).  *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 342-43 (S.D.N.Y. 2005).  Plaintiffs have not satisfied any element of an aiding and abetting claim.  The generic allegations that Banks engaged in "banging the close" and asked ICAP to delay publication of certain rates until after the daily polling period do not support an inference that any particular Defendant, much less all of them, took an action in support of another Defendant's violation of the CEA, let alone satisfy the particularity required by Rule 9(b).

---

[30] The allegations here fall far short of those in *LIBOR I* that were found to adequately plead a vicarious liability claim.  In that case, for example, the complaint had "identified several '[i]ndividuals employed by the Defendants,'" by name, who had allegedly "'engaged in the illegal communications and conduct.'"  *LIBOR I*, 935 F. Supp. 2d at 722.  The complaint had also alleged particularized facts "indicat[ing] that [defendant] employees contributed to the manipulation of USD LIBOR within the scope of their employment."  *Id.*  There are no such allegations here.

V.      **PLAINTIFFS' CLAIMS ARE TIME-BARRED**

     A.      **Most of Plaintiffs' CEA and Sherman Act Claims Are Time-Barred**

A CEA claim must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). A CEA claim arises when a plaintiff is placed on inquiry notice of "circumstances [that] suggest to a person of ordinary intelligence the probability" that he has suffered an injury. *LIBOR I*, 935 F. Supp. 2d at 698, 700 (such circumstances can include "pleadings and . . . public disclosures").

Plaintiffs did not file suit until September 4, 2014, but base their claims on conduct that allegedly was ongoing for nearly a decade. (CAC ¶ 186.) Plaintiffs aver that April 2013 marked the earliest point at which they could have learned of "facts indicating that Defendants were colluding to manipulate the [USD] ISDAfix rate." (*Id.* ¶ 182.) But the clock began running as soon as Plaintiffs were on notice of a probability that they had suffered injury, not when they started to actually believe that USD ISDAFIX was affected by collusion. *LIBOR I*, 935 F. Supp. 2d at 704 (reports did not need to "definitively establish[] that LIBOR was being manipulated" for plaintiffs to be on notice of their claims). Because the apparent probability of an injury necessary to trigger a duty to investigate and the information Plaintiffs rely on to plead their claims were both available well before September 4, 2012, any CEA claims that arose before this date are time-barred.

A Sherman Act claim is subject to a four-year statute of limitations that runs from the date of the injury, absent fraudulent concealment. *See* 15 U.S.C. § 15b; *Hinds Cnty., Miss. v. Wachovia Bank N.A*, 620 F. Supp. 2d 499, 519-20 (S.D.N.Y. 2009). Thus, any Sherman Act claims that arose before September 4, 2010 are untimely.

**Press Reports Since 2010.**  Press reports illustrate that Plaintiffs were on notice of their alleged claims years before they filed suit. Over four years ago, a *Financial Times* article

reported that, in the months preceding its publication, "controversy ha[d] grown around the behaviour of prices on the 19901 screen around the crucial 11am point each day," and one instance of an apparent, significant swing in pre-11 a.m. submissions "fuel[ed] suspicions that some dealers [were] influencing price levels to achieve more favourable reference points." Michael Mackenzie & Gillian Tett, *Frozen in Time*, Fin. Times, June 16, 2010, at 3-4.[31]  These suspicions are precisely what Plaintiffs now allege.[32]

In July 2012, for example, the *Financial News* posited that regulators would want to investigate "ISDA Fix, where banks submit their own swap prices," given the similarities to the LIBOR submission process.  *See* William Wright, *Liborgate:  Conflicts, as far as the eye can see*, Fin. News, July 18, 2012, http://www.efinancialnews.com/story/2012-07-18/libor-regulators-conflicts-benchmarks-fixing-comment.  Similarly, the *Financial Times* reported that "[i]t would be reasonable to expect regulators to give ISDAfix a precautionary [look]."  *See* Jonathan Guthrie, *Time for Spencer to Lead ICAP to Its Promised Land*, Fin. Times, July 12, 2012, at 18.  Based on these reports, Plaintiffs have been on inquiry notice of their purported injuries since as early as 2010—and no later than June 2012.[33]  *See Staehr v. Hartford Fin. Servs.*

---

[31] *Frozen in Time* was subsequently referenced in a tweet by the U.S. Investment Reporter for the *Financial Times* in April 2013, after the CFTC investigation into ISDAFIX became public:  "Traders subpoenaed over swaps fixing.  CFTC should have read [*Frozen in Time*] THREE YRS ago."  Stephen Foley, Twitter (Apr. 8, 2013, 1:00 PM EST), https://twitter.com/stephenfoley/status/321351791419740161.

[32] While it is not the case that the LIBOR regulatory investigations and settlements somehow render Plaintiffs' USD ISDAFIX allegations more plausible, the fact that Plaintiffs believe there is a link between their claims and those investigations and settlements (*see, e.g.*, CAC ¶¶ 81-89), demonstrates that they were on notice of potential claims prior to September 4, 2012.  As Plaintiffs acknowledge, a news report of a LIBOR settlement was published in June 2012.  (*Id.* ¶ 58 n.5.)  Well over a year earlier, on March 15, 2011—around the time that banks disclosed they were the subject of LIBOR-related regulatory investigations—press articles reported on the allegations of LIBOR manipulation.  *See, e.g.*, Brooke Masters, Patrick Jenkins & Justin Baer, *Big banks Investigated over Libor*, Fin. Times, Mar. 16, 2011, at 15; *see also In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 349 (S.D.N.Y. 2004); *Lenz v. Associated Inns & Rest. Co. of Am.*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993).

[33] *See LIBOR I*¸ 935 F. Supp. 2d at 706 (news articles that, inter alia, were "'reported in 'widespread and prominent' sources, such as The Wall Street Journal and the Financial Times, and were presented in an accessible (....continued)

*Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (applying a "totality-of-the-circumstances analysis" to determine whether circumstances "would suggest to [a plaintiff] of ordinary intelligence the probability" of fraud).

**Real-Time Access to Trading Data and USD ISDAFIX Submissions.** Plaintiffs maintain that trading data—specifically, swap rates around the 11 a.m. USD ISDAFIX polling window—as well as the Banks' USD ISDAFIX submissions, provide "telltale evidence" of supposedly obvious collusion. (CAC ¶ 14.) This information undercuts the timeliness of their claims because it was all available to them at all times. Indeed, the daily USD ISDAFIX submissions of contributing banks, including the Banks, were published by Thomson Reuters.[34] Also, as Plaintiffs allege, ICAP's 19901 Screen published the bid/offer rates of "all swap transactions of the specified terms executed through ICAP," the "largest interest rate derivatives

---

(continued….)

fashion, explaining their conclusions in clear English that a person of ordinary intelligence, without technical training, could understand" put plaintiffs on inquiry notice); *see also Shah v. Meeker*, 435 F.3d 244, 249-50 (2d Cir. 2006) (determining plaintiff's claims to be time-barred because a single news article of sufficient specificity had triggered the duty to inquire); *Marshall v. Milberg LLP*, No. 07-6950, 2009 WL 5177975, at *4 (S.D.N.Y. Dec. 23, 2009) (explaining that "[e]ven a single news article" can trigger a duty to inquire if it "describes an allegation of wrongful conduct with a sufficient degree of specificity"); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692-93 (S.D.N.Y. 2000) (concluding that a single article on issues underlying plaintiffs' claims triggered inquiry notice).

[34] *See ISDAFIX* (archived page dated June 30, 2012), ISDA, https://web.archive.org/web/20120630173533 /http://www2.isda.org/asset-classes/interest-rates-derivatives/isdafix (archived page last visited Dec. 10, 2014) ("In order to increase the transparency of ISDAFIX, Thomson Reuters [] displays the rates contributed by individual panel members."); *see also* ISDA Response Letter at 3 ("ISDA developed ISDAFIX to facilitate the determination of exercise values for cash-settled swap options. The existence of such a benchmark provides a transparent, readily available value to which parties to a transaction can refer as a settlement rate."). The Court may take judicial notice of the fact that the submissions were published. *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 757 n.8 (S.D.N.Y. 2011). Plaintiffs' baseless and contradictory allegation that submissions were "not openly published" (CAC ¶ 184) should be disregarded. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) ("where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true"). The fact that the individual bank submissions were available through a subscription does not mean they were not widely available under the law. *See, e.g.*, 17 C.F.R. § 160.3(w)(2)(iii) (2014) ("Publicly available information from widely distributed media includes information from . . . a web site that is available to the general public on an unrestricted basis. A web site is not restricted merely because an Internet service provider or a site operator requires a fee or password, so long as access is available to the general public."); *see also Certainteed Ceilings Corp. v. Aiken*, No. 14-3925, 2014 WL 5461546, at *2 (E.D. Pa. Oct. 27, 2014) ("Various details about ongoing or upcoming projects, which can include the text of the architect's specifications, are publicly available through subscription databases like McGraw Hill's Dodge system.").

broker." (*Id.* ¶¶ 10, 74.)  As sophisticated participants in the interest rate derivatives market, Plaintiffs had access to this information, and, as a result, to the purported swings in USD ISDAFIX and other anomalous trading spikes they allege prompted them to file this lawsuit.  *See Lenz*, 833 F. Supp. at 375.  For example, Plaintiffs aver that "certain days" saw "unexpected bursts of activity," which they allege "points to one conclusion":  that the Banks were allegedly "banging the close" with the cooperation of ICAP.  (CAC ¶ 146.)  This information was contemporaneously available to Plaintiffs.  Plaintiffs also could have tracked the alleged identity between contributors' daily rate submissions and the USD ISDAFIX rate because the Banks' submissions were published.  Plaintiffs cannot rely on this real-time data to plead their claims and yet also claim they lacked notice.

Moreover, Plaintiffs claim that they were damaged by the alleged sudden changes in swap rates and unfavorable movements in USD ISDAFIX from day to day.  If, as Plaintiffs assert, they held swaptions to be cash-settled that suddenly became "out-of-the-money" due to a change in the market at 11 a.m., they would have suffered a readily apparent loss immediately. If this phenomenon occurred repeatedly over a seven-and-a-half-year period, Plaintiffs' alleged injuries would be even more apparent and would have been more than sufficient to put Plaintiffs on inquiry notice of their purported claims.  *See LIBOR I*, 935 F. Supp. 2d at 709-10.

These factors put Plaintiffs on inquiry notice that they should have investigated further and brought any claims long ago.  Together, they bar Plaintiffs' pre-September 4, 2012 CEA claims and their pre-September 4, 2010 Sherman Act claims.

### B.    Plaintiffs Have Not Adequately Alleged Fraudulent Concealment

To toll the statute of limitations due to fraudulent concealment, a plaintiff must allege with the particularity required by Rule 9(b):  "(1) that the defendant concealed the existence of the [] violation; (2) that the plaintiff remained unaware of the violation during the limitations

period; and (3) that the plaintiff's continuing ignorance as to the claim was not a result of a lack

of due diligence." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y.

2004).  "Reasonable diligence is a prerequisite to the applicability of equitable tolling."  *Koch v.*

*Christie's Int'l PLC,* 699 F.3d 141, 157 (2d Cir. 2012).  Plaintiffs' conclusory allegations that

Defendants "actively and effectively concealed" the conspiracy, that their conduct was "secretive

and self-concealing," and that "reasonable due diligence could not have uncovered" Defendants'

misconduct are insufficient.  (CAC ¶¶ 179, 180, 184); *see In re Crude Oil Commodity Futures*

*Litig*., 913 F. Supp. 2d 41, 59 (S.D.N.Y. 2012) (the heightened pleading standard of Rule 9(b)

was not met where plaintiffs relied only on the conclusory statement that they "neither knew,

nor, in the exercise of reasonable diligence, could have known of the violations").  Plaintiffs'

concealment claims also make no sense because both the Banks' submissions and the final

published ISDAFIX rates were always public.  *See LIBOR I*, 935 F. Supp. 2d at 711 (no

concealment when "[a] person of ordinary intelligence could have reviewed the submitted quotes

along with numerous articles analyzing these quotes and explaining why they were likely

artificial").

      Plaintiffs try to avoid their due diligence duty by claiming that "[d]ue to Defendants'

efforts to conceal their collusive conduct, Plaintiffs could not, through the exercise of reasonable

diligence, have learned of facts indicating that Defendants were colluding."  (CAC ¶ 182.)  But

Plaintiffs' admitted inaction is fatal to their fraudulent concealment argument.  *See In re Merrill*

*Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).  Indeed, "a brief reference to

'reasonable diligence,' coupled with general allegations of secrecy and deception . . . [cannot]

satisf[y] the Named Plaintiffs' burden under Rule 9(b) to plead the third prong of fraudulent

concealment with particularity."  *Hinds Cnty.*, 620 F. Supp. 2d at 522.

## VI.    PLAINTIFFS' CONTRACT-BASED CLAIMS AGAINST THE BANKS FAIL

### A.    Plaintiffs' Breach of Contract Claim Fails Because Plaintiffs Do Not Allege the Existence of any Contract between the Parties

The starting point for any breach of contract claim is the existence of an agreement between the parties.  *See, e.g.*, *LIBOR III*, 2014 WL 2815645, at *20.[35]  In addition, where, as here, Plaintiffs have sued multiple parties, they must allege the existence of a contract with *each* Bank.  *See, e.g.*, *id.*

The Complaint fails to allege this essential foundation of contract-based claims.  Two of the Plaintiffs—Beaver County and Westmoreland County—do not allege that they transacted with *any* of the Banks.  (CAC ¶¶ 31, 36.)  With respect to the remaining Plaintiffs, the Complaint relies only on the general allegations that each Plaintiff "transacted with one or more . . . Banks in interest rate derivatives that were tied to or directly affected by [USD] ISDAfix" (*id.* ¶¶ 30, 32-35, 37) and that the "Banks and Class members (including Plaintiffs) entered into ISDA Master Agreements."  (*Id.* ¶¶ 218, 224.)  Plaintiffs fail to allege, however, that their purported transactions with the Banks were actually governed by ISDA Master Agreements.  Plaintiffs claim that "[a]ll of the cash-settled swaptions . . . that settled with reference to [USD] ISDAfix were documented under the ISDA Master Agreement."  But Plaintiffs allege that they engaged in other derivative transactions as well, and they claim that only *some* of these transactions were subject to the ISDA Master Agreement.  (*Id.* ¶ 173 ("many of the other derivative transactions that settled with reference to [USD] ISDAfix were documented under the ISDA Master Agreement").)

---

[35] A federal court exercising supplemental jurisdiction over state-law claims applies the law of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), including its choice of law rules and statutes of limitations, *Morson v. Kreindler & Kreindler, LLP*, 814 F. Supp. 2d 220, 225 (E.D.N.Y. 2011).

In addition, Plaintiffs must allege the details of actual contracts, including which Plaintiff entered into a contract with which Bank, how that Bank breached the alleged contract and how the alleged breach injured that Plaintiff. *See Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *2 (S.D.N.Y. June 14, 2007); *Howell v. Am. Airlines, Inc.*, No. 05-CV-3628, 2006 WL 3681144, at *4 (E.D.N.Y. Dec. 11, 2006).  Although Plaintiffs repeat the same generalized allegation that the Banks improperly manipulated the rate at which certain ISDA Master Agreements settled (*see* CAC ¶¶ 177, 219-21, 224-26), Plaintiffs do not specify *which* of those actions constituted a breach of *which* terms of *which* specific contracts with *which* Banks.  Without such allegations, Plaintiffs' contract-based claims must fail.

### B.      Plaintiffs' Implied Breach of the Covenant of Good Faith Claim Fails

Plaintiffs' failure to plead the existence of a specific contract with each Bank also requires dismissal of their implied covenant claim.  The implied covenant of good faith and fair dealing cannot "bind someone who was not a party to [a] contract." *Herman v. Green*, 234 F.3d 1262, 1262 (2d Cir. 2000).  Nor can the Banks acted in bad faith with respect to the terms of a particular contract when Plaintiffs have not identified that particular contract.

The implied covenant doctrine further requires allegations that the Banks acted with bad faith or with intent to harm. *See Keene Corp. v. Bogan*, No. 88 Civ. 0217, 1990 WL 1864, at *14-16 (S.D.N.Y. Jan. 11, 1990).  Plaintiffs do not allege that Defendants either acted in bad faith or with intent to harm Plaintiffs.  At most, Plaintiffs' allegations suggest that the Banks had a general awareness that the Banks were parties to various USD ISDAFIX-referenced transactions.  But allegations that the Banks had a general awareness that USD ISDAFIX movements might affect some unspecified contracts fall far short of what is needed to plead a breach of the covenant of good faith. *See Pitcairn Props., Inc. v. LJL 33rd St. Assocs., LLC*, No. 11 Civ. 7318, 2012 WL 6082398, at *5 (S.D.N.Y. Nov. 20, 2012) (a plaintiff must allege facts

which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff), *aff'd in part, rev'd in part on other grounds*, 725 F.3d 184, 195-96 (2d Cir. 2013).  That is especially true where, as here, the Banks had legitimate independent reasons for the challenged conduct.

Finally, Plaintiffs' implied covenant claim is merely an attempt to re-plead their breach of contract claim in a different guise.  Both claims are based on precisely the same facts—that certain Plaintiffs and certain Banks were parties to unspecified "ISDA Master Agreements," and that the Banks' collective conduct improperly manipulated the underlying rate at which those agreements were purportedly settled.  (*Compare* CAC ¶¶ 219-20 *with id.* ¶¶ 224-25.)  "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  Thus, both contract-based claims are inadequately pled and should be dismissed.[36]

## VII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST THE BANKS

To state a claim for unjust enrichment in New York, Plaintiffs must allege "(1) the defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution."  *Ferring B.V.*, 932 F. Supp. 2d at 512.  Moreover, "[g]iven that unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant."  *LIBOR I*, 935 F. Supp. 2d at 737.  Plaintiffs' unjust enrichment claims fail for three independent reasons.

---

[36]   In addition, although it is impossible to tell from the Complaint which Plaintiffs might have had contract-based claims, any claims they may have had accrued at different (unidentified) times and in different (unidentified) states, and it is likely many such claims would be barred by the statutes of limitations.  Under New York's borrowing statute (N.Y. C.P.L.R. § 202), a claim must be timely under *both* New York law and the law of the place where the cause of action accrued.  *See Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999).

## A.    Plaintiffs Fail to Allege Adequately Any Direct Dealings with the Banks

*First*, Plaintiffs must allege they "had direct dealings or some sort of quasi-contractual relationship with each [Bank]." *Jet Star Enters., Ltd. v. Soros*, No. 05 CIV. 6585, 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006).  While Plaintiffs "'need not be in privity with the [Banks] to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'  Where [the parties] 'simply had no dealings with each other,' their relationship is 'too attenuated.'"  *LIBOR I*, 935 F. Supp. 2d at 737.

As discussed above, Plaintiffs Beaver County and Westmoreland County plead *no* direct dealings with any of the Banks.  (*See* CAC ¶¶ 31, 36.)  The remaining Plaintiffs fail to allege a contractual or other transactional relationship with any specific Bank to cure the wholly ambiguous assertion that "Defendant Banks" and "Class members," or "members of the Class, (including Plaintiffs)," "entered into ISDA Master Agreements."  (*Id.* ¶¶ 218, 224.)

In *LIBOR I*, Judge Buchwald analyzed very similar unjust enrichment claims brought by plaintiffs who alleged that their futures trading positions were harmed by an alleged conspiracy to manipulate LIBOR.  935 F. Supp. 2d at 737.  Judge Buchwald dismissed the claims because the LIBOR plaintiffs had "not alleged that they purchased [] contracts from defendants or that they had any other relationship with defendants."  *Id.*  This Court should dismiss Plaintiffs' unjust enrichment claims for the same reason.[37]

---

[37] Likewise, an unjust enrichment claim will lie "when the defendant receives a benefit of money or property belonging to the plaintiff."  *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 313 (S.D.N.Y. 1998); *Laydon*, 2014 WL 1280464, at *13-14.  Whatever benefit the Banks are accused of acquiring from their alleged USD ISDAFIX-related conduct, that benefit could not have plausibly come from Plaintiffs with which they had no dealings.

### B.     Plaintiffs' Unjust Enrichment Claims Are Duplicative

*Second*, "[a] party may not recover in . . . unjust enrichment where the parties have

entered into a contract that governs the subject matter" of their dispute.  *Pappas v. Tzolis*, 20

N.Y.3d 228, 234 (2012).  Here, Plaintiffs allege that their injurious transactions with

(unidentified) Banks "were documented under the ISDA Master Agreement."  (CAC ¶ 173; *see*

*also id.* ¶ 218.)  If Plaintiffs actually transacted with one of the Banks, then they seek a remedy

plainly traceable to their alleged contracts.  They seek to recover the loss in "value [that] they

would have received" upon "execution or settlement of their trades" under "swaptions and other

financial instruments."  (*Id.* ¶ 230.)  Because these unjust enrichment claims are based on what

Plaintiffs were allegedly entitled to receive by contract, they fail as a matter of law.

To the extent that any of Plaintiffs' Sherman Act or CEA claims survive, the "unjust

enrichment claim is duplicative; [but] if [Plaintiffs'] other claims are defective," which they are,

"an unjust enrichment claim cannot remedy the defects."  *Corsello v. Verizon N.Y., Inc.*, 18

N.Y.3d 777, 791 (2012); *see also Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 364 (1st

Dep't 1994) ("[T]he IAS court sustained the sixth cause of action for unjust enrichment because

it 'hinges on the [antitrust] practices claimed by plaintiff to be illegal.'  Since we find the other

causes of action alleging illegality to be meritless, this cause of action must also fail.").

### C.     Plaintiffs' Unjust Enrichment Claims Are Largely Time-Barred

Finally, where, as here, Plaintiffs seek "restoration of [] monies" (CAC ¶ 232) rather than

equitable relief, unjust enrichment claims are subject to a three-year statute of limitations.[38]  *See*

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*, No. 13 Civ. 6062, 2014 WL 4058070,

---

[38] As with Plaintiffs' contract-based claims, Plaintiffs' unjust enrichment claims must be timely under both New York law and the law of the place where the cause of action accrued, pursuant to C.P.L.R. § 202.  *See Global Fin. Corp.*, 93 N.Y.2d at 529.

at *12 (S.D.N.Y. Aug. 14, 2014).  "The statute of limitations on an unjust enrichment claim begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution." *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134-35 (2d Dep't 2007).  Because Plaintiffs did not file suit until September 4, 2014, any claims based on alleged wrongdoing occurring prior to September 4, 2011 are time-barred.  Further, since Plaintiffs were on inquiry notice by, at the latest, June 2010 (*see supra* Section V.A), they cannot rely upon the fraudulent concealment doctrine to extend the limitations period.  *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 710-12.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Complaint should be dismissed in its entirety.

DATED: December 12, 2014        SHEARMAN & STERLING LLP
ADAM HAKKI
RICHARD SCHWED
KEITH PALFIN

/s/Adam Hakki

_____
ADAM HAKKI

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Fax: (646) 848-4000
ahakki@shearman.com
rschwed@shearman.com
keith.palfin@shearman.com

*Attorneys for Defendant Bank of America Corporation*

DATED: December 12, 2014        SULLIVAN & CROMWELL LLP
DAVID H. BRAFF
JEFFREY T. SCOTT
MATTHEW A. SCHWARTZ
ALEXANDER J. WILLSCHER
BENJAMIN R. WALKER
MATTHEW J. PORPORA

/s/David H. Braff

_____
DAVID H. BRAFF

125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
braffd@sullcrom.com
scottj@sullcrom.com
schwartzmatthew@sullcrom.com
willschera@sullcrom.com
walkerb@sullcrom.com
porporam@sullcrom.com

DATED: December 12, 2014        BOIES, SCHILLER & FLEXNER LLP
JONATHAN D. SCHILLER
ANDREW Z. MICHAELSON


_____
/s/Andrew Z. Michaelson
ANDREW Z. MICHAELSON

575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
jschiller@bsfllp.com
amichaelson@bsfllp.com

*Attorneys For Defendant Barclays Bank PLC*

DATED: December 12, 2014        PATTERSON BELKNAP WEBB & TYLER
    LLP
WILLIAM F. CAVANAUGH, JR
JOSHUA A. GOLDBERG
DEIRDRE A. McEVOY


_____
/s/Joshua A. Goldberg
JOSHUA A. GOLDBERG

1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
wfcavanaugh@pbwt.com
jgoldberg@pbwt.com
dmcevoy@pbwt.com

*Attorneys for Defendant BNP Paribas SA*

52

DATED: December 12, 2014          COVINGTON & BURLING LLP
                                  ANDREW A. RUFFINO


                                          /s/Andrew A. Ruffino
                                  _____
                                      ANDREW A. RUFFINO

                                  The New York Times Building
                                  620 Eighth Avenue
                                  New York, NY 10018-1405
                                  Telephone: (212) 841-1000
                                  Fax: (212) 841-1010
                                  aruffino@cov.com

                                  COVINGTON & BURLING LLP
                                  ALAN WISEMAN
                                  THOMAS A. ISAACSON
                                  One CityCenter
                                  850 Tenth Street, N.W.
                                  Washington, DC 20001
                                  Telephone: (202) 662-6000
                                  Fax: (202) 662-6291
                                  awiseman@cov.com
                                  tisaacson@cov.com

                                  *Attorneys for Defendant Citigroup Inc.*

DATED: December 12, 2014   CAHILL GORDON & REINDEL LLP
            DAVID G. JANUSZEWSKI
            HERBERT S. WASHER
            LANDIS C. BEST


             /s/David G. Januszewski
            _____
             DAVID G. JANUSZEWSKI

            80 Pine Street
            New York, NY 10005
            Telephone: (212) 701-3000
            Fax: (212) 269-5420
            djanuszewski@cahill.com
            hwasher@cahill.com
            lbest@cahill.com

            *Attorneys for Defendant Credit Suisse AG, New York Branch*

DATED: December 12, 2014   PAUL, WEISS, RIFKIND, WHARTON &
              GARRISON LLP
            MOSES SILVERMAN
            JAMES L. BROCHIN
            AARON DELANEY


             /s/Moses Silverman
            _____
             MOSES SILVERMAN

            1285 Avenue of the Americas
            New York, NY 10019
            Telephone: (212) 373-3000
            Fax: (212) 757-3990
            msilverman@paulweiss.com
            jbrochin@paulweiss.com
            adelaney@paulweiss.com

            *Attorneys for Defendant Deutsche Bank AG*

DATED: December 12, 2014

CLEARY GOTTLIEB STEEN & HAMILTON
  LLP
THOMAS J. MOLONEY
GEORGE S. CARY
LEAH BRANNON
ELIZABETH VICENS


/s/Thomas J. Moloney
THOMAS J. MOLONEY

One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999
tmoloney@cgsh.com
gcary@cgsh.com
lbrannon@cgsh.com
evicens@cgsh.com

*Attorneys for Defendant Goldman Sachs & Co.*

55

DATED: December 12, 2014               LOCKE LORD LLP
                                          EDWIN R. DEYOUNG
                                          GREGORY T. CASAMENTO
                                          ANDREW L. FISH

                                              /s/Gregory T. Casamento
                                        GREGORY T. CASAMENTO

                                        Three World Financial Center
                                        New York, New York 10281-2101
                                        Tel.: (212) 415-8600
                                        Fax: (212) 303-2754
                                        edeyoung@lockelord.com
                                        gcasamento@lockelord.com
                                        afish@lockelord.com

                                        LOCKE LORD LLP
                                        ROGER B. COWIE
                                        2200 Ross Avenue, Suite 2200
                                        Dallas, Texas 75201-6776
                                        Tel.: (214) 740-8000
                                        Fax: (214) 740-8800
                                        rcowie@lockelord.com

                                        *Attorneys for Defendant HSBC Bank plc*

DATED: December 12, 2014                    RICHARDS KIBBE & ORBE LLP
                                            BRIAN S. FRASER
                                            SHARI A. BRANDT
                                            H. ROWAN GAITHER
                                            RACHEL MECHANIC
                                            ROBYN FRUMKIN


                                                    /s/Brian S. Fraser
                                            _____
                                                BRIAN S. FRASER

                                            200 Liberty Street
                                            New York, NY 10281
                                            Telephone: (212) 530-1800
                                            Fax: (212) 530-1801
                                            bfraser@rkollp.com
                                            sbrandt@rkollp.com
                                            rgaither@rkollp.com
                                            rmechanic@rkollp.com
                                            rfrumkin@rkollp.com

                                            *Attorneys for Defendant ICAP Capital Markets
                                            LLC*

DATED: December 12, 2014                    DAVIS POLK & WARDWELL LLP
                                            ARTHUR J. BURKE
                                            GREG D. ANDRES
                                            JAMES I. McCLAMMY


                                                    /s/Arthur J. Burke
                                            _____
                                                ARTHUR J. BURKE

                                            450 Lexington Avenue
                                            New York, NY 10017
                                            Telephone: (212) 450-4000
                                            Fax: (212) 701-5800
                                            arthur.burke@davispolk.com
                                            greg.andres@davispolk.com
                                            james.mcclammy@davispolk.com

                                            *Attorneys for Defendant JPMorgan Chase &
                                            Co.*

DATED: December 12, 2014

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
JAY KASNER
SHEPARD GOLDFEIN
PAUL M. ECKLES
THOMAS M. LEINEWEBER


_____
                /s/Paul M. Eckles
PAUL M. ECKLES

4 Times Square
New York, NY 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000/1
jay.kasner@skadden.com
shepard.goldfein@skadden.com
paul.eckles@skadden.com
thomas.leineweber@skadden.com

*Attorneys for Defendant Royal Bank of
Scotland plc*

DATED: December 12, 2014          GIBSON, DUNN & CRUTCHER LLP
                                  JOEL S. SANDERS
                                  MARC J. FAGEL


                                  _____/s/Joel S. Sanders_____
                                  JOEL S. SANDERS
                                  (*Admitted Pro Hac Vice*)
                                  555 Mission Street
                                  San Francisco, CA 94105
                                  Telephone: (415) 393-8200
                                  Fax: (415) 393-8306
                                  jsanders@gibsondunn.com
                                  mfagel@gibsondunn.com

                                  GIBSON, DUNN & CRUTCHER LLP
                                  PETER SULLIVAN
                                  JEFFERSON E. BELL
                                  200 Park Avenue
                                  New York, NY 10166
                                  Telephone: (212) 351-4000
                                  Fax: (212) 351-4035
                                  psullivan@gibsondunn.com
                                  jbell@gibsondunn.com

                                  *Attorneys for Defendant UBS AG*

59

DATED: December 12, 2014

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
ERIC SEILER
ANDREW W. GOLDWATER
ANNE E. BEAUMONT
ANDREW C. KOSTIC


/s/Anne E. Beaumont
ANNE E. BEAUMONT

7 Times Square
New York, NY 10036
Telephone: (212) 833-1100
abeaumont@fklaw.com
eseiler@fklaw.com
agoldwater@fklaw.com
akostic@fklaw.com

*Attorneys for Defendant Wells Fargo Bank, N.A.*


DATED: December 12, 2014

SHEARMAN & STERLING LLP
JOSEPH J. FRANK
BRIAN H. POLOVOY
ETIENNE BARG-TOWNSEND


/s/Brian H. Polovoy
BRIAN H. POLOVOY

599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Fax: (646) 848-4703
Joseph.Frank@shearman.com
Bpolovoy@shearman.com
Etienne.Barg@shearman.com

*Attorneys for Defendant Nomura Securities International, Inc.*

DATED: December 12, 2014          MORGAN, LEWIS & BOCKIUS LLP
JON R. ROELLKE
ANTHONY R. VAN VUREN

/s/Jon R. Roellke
_____

JON R. ROELLKE
(*Admitted Pro Hac Vice*)

2020 K Street, NW
Washington, DC 20006
Tel. (202) 373-6000
Fax (202) 373-6001
jon.roellke@morganlewis.com
anthony.vanvuren@morganlewis.com

*Attorneys for Defendant Morgan Stanley*
  *& Co. LLC*