UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALASKA ELECTRICAL PENSION FUND;
GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM; COUNTY OF
MONTGOMERY, PENNSYLVANIA; COUNTY
OF WASHINGTON, PENNSYLVANIA; and CITY
OF NEW BRITAIN, CONNECTICUT,
on behalf of themselves and all others similarly
situated,

             Plaintiffs,

      v.

BANK OF AMERICA, N.A.; BARCLAYS BANK
PLC; B.N.P. PARIBAS SA; CITIGROUP INC.;
CREDIT SUISSE AG, NEW YORK BRANCH;
DEUTSCHE BANK AG; THE GOLDMAN SACHS
GROUP, INC.; HSBC BANK USA, N.A.; ICAP
CAPITAL MARKETS LLC; JPMORGAN CHASE
& CO.; MORGAN STANLEY & CO. LLC;
NOMURA SECURITIES INTERNATIONAL, INC.;
ROYAL BANK OF SCOTLAND PLC; UBS AG;
and WELLS FARGO BANK, N.A.,

             Defendants.

Civil Action Nos.
      14-cv-7126 (JMF)
      14-cv-7907 (JMF)
      14-cv-8342 (JMF)
      14-cv-8365 (JMF)
      14-cv-8576 (JMF)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION
TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL ALLEGATIONS .............................................................................. 4

      A.      Interest Rate Swaps .......................................................................... 4

      B.      Swaptions ........................................................................................... 4

      C.      The ISDAFIX Benchmark Interest Rate ........................................ 5

      D.      The Parties ......................................................................................... 6

      E.      Plaintiffs' Allegations of Wrongdoing ........................................... 7

ARGUMENT ....................................................................................................... 8

I.      PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE EACH DEFENDANT'S
      PARTICIPATION IN A CONSPIRACY TO RESTRAIN TRADE ............... 8

      A.      Plaintiffs Allege No Direct Evidence of a Conspiracy ............... 9

      B.      Plaintiffs' Circumstantial "Evidence" of Supposed Parallel
              Conduct Is Insufficient As a Matter of Law ............................... 10

              1.      Plaintiffs Have Not Alleged a Common Motive to
                     Conspire ............................................................................. 11

              2.      Plaintiffs Fail to Plead Parallel Conduct Against the
                     Banks' Independent Self-Interests ............................... 12

              3.      References to Government Investigations Cannot Salvage
                     Plaintiffs' Conspiracy Claim ....................................... 15

II.     PLAINTIFFS LACK ANTITRUST STANDING ............................................. 19

      A.      Plaintiffs Cannot Plead Injury to Competition Because
              ISDAFIX Is Set Through a Cooperative, Not Competitive,
              Submission-Based Process ............................................................. 20

      B.      The Alleged Misconduct Could Not Reduce Competition for
              Plaintiffs' Business Because That Competition Was Already
              Complete When the Alleged Misrepresentations Occurred ........ 24

      C.      Plaintiffs' Purported Injuries Do Not Stem from Any
              Competition-Reducing Aspect of the Alleged Misconduct ........ 25

i

D.      Plaintiffs Fail to Plead That They Are "Efficient Enforcers" ................ 26

III.    PLAINTIFFS FAIL TO PLEAD INJURY IN FACT OR DAMAGES ............ 30

IV.     PLAINTIFFS' CONTRACT-BASED CLAIMS AGAINST THE
        BANKS FAIL ............................................................................................. 34

        A.      Plaintiffs' Breach of Contract Claim Fails .............................................. 34

        B.      Plaintiffs' Breach of the Implied Covenant of Good Faith
                Claim Fails ............................................................................................ 36

V.      PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM FAILS ...................... 37

VI.     PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST
        ENRICHMENT .......................................................................................... 39

        A.      Plaintiffs' Unjust Enrichment Claim Against the Counterparty
                Banks Is Duplicative of Their Breach of Contract Claim ...................... 39

        B.      No Unjust Enrichment Claim Lies Against the Non-Counterparty
                Banks .................................................................................................... 40

        C.      Plaintiffs' Conspiracy Allegations Cannot Save Their
                Otherwise Inadequately Pleaded Claims ................................................ 40

VII.    MANY OF PLAINTIFFS' CLAIMS ARE TIME-BARRED ........................... 41

        A.      Most of Plaintiffs' Sherman Act Claims Are Time-Barred ................... 41

                1.      Plaintiffs Do Not Plausibly Plead That Defendants
                        Concealed Any Alleged Conduct ................................................ 42

                2.      Plaintiffs' Lack of Diligence Precludes Equitable
                        Tolling ....................................................................................... 45

        B.      Many of Plaintiffs' State Law Claims Are Time-Barred ....................... 46

                1.      Many of Plaintiffs' Breach of Contract and Implied
                        Covenant of Good Faith Claims Are Time-Barred ................... 47

                2.      Many of Plaintiffs' Tortious Interference Claims Are
                        Time-Barred .............................................................................. 48

                3.      Many of Plaintiffs' Unjust Enrichment Claims Are
                        Time-Barred .............................................................................. 49

CONCLUSION ..................................................................................................... 50

**TABLE OF AUTHORITIES**

PAGE(S)

CASES

*7 W. 57th St. v. Citigroup, Inc.*,
   No. 13 CIV.981 PGG, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015)........................ 22, 23, 24

*101 McMurray, LLC v. Porter*,
   No. 10-cv-9037, 2012 WL 997001 (S.D.N.Y. Mar. 26, 2012)................................. 49

*Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*,
   No. 13-CV-7307, 2014 WL 4804465 (S.D.N.Y. Sept. 26, 2014)........................... 31

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-MD-2481, 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ......................... 29, 30, 32, 41

*In re Amaranth Natural Gas Commodities Litig.*,
   730 F.3d 170 (2d Cir. 2013)................................................................... 20

*Am. Exp. Centurion Bank v. Head*,
   115 Conn. App. 10 (2009) ..................................................................... 39

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)................................................................... 43

*Am. Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974)............................................................................. 42

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987)................................................................... 9

*Appleton v. Bd. of Educ. of Town of Stonington*,
   254 Conn. 205 (2000) .......................................................................... 38

*Arista Records LLC v. Lime Grp. LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007)................................................... 9, 12

*Assoc. Gen. Contractors of Ca., Inc. v. Ca. State Council
   Council of Carpenters*, 459 U.S. 519 (1983)...................................... 19, 26, 27, 28

*Atateks Foreign Trade Ltd. v. Dente*,
   798 F. Supp. 2d 506 (S.D.N.Y. 2011)..................................................... 49

*AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*,
   No. 3:10-cv-0153, 2014 WL 7270160 (D. Conn. Dec. 18, 2014) ........................... 47

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ........................................................................................ 19, 26

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
  921 F. Supp. 2d 56 (S.D.N.Y. 2013) .......................................................................... 39

*Beecher v. Feldstein*,
  8 A.D.3d 597 (2d Dep't 2004) ................................................................................. 39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... 9, 11, 12, 18

*Belluomini v. Fred Meyer of Alaska, Inc.*,
  993 P.2d 1009 (Alaska 1999) ..................................................................................... 37

*Bendix Corp. v. Adams*,
  610 P.2d 24 (Alaska 1980) ....................................................................................... 38

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ................................................................................................. 29

*Boehner v. Heise*,
  734 F. Supp. 2d 389 (S.D.N.Y. 2010) ....................................................................... 38

*Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. Dec. 5, 2013) .......................................................... 9

*BP Envtl. Servs., Inc. v. Republic Serv., Inc.*,
  946 F. Supp. 2d 402 (E.D. Pa. 2013) ........................................................................ 37

*BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*,
  No. 13-0638, 2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013) ............................ 18, 44

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................................. 19

*Burton v. William Beaumont Hosp.*,
  373 F. Supp. 2d 707 (E.D. Mich. 2005) .................................................................... 39

*Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*,
  392 F. Supp. 2d 621 (S.D.N.Y. 2005) ....................................................................... 46

*Casper v. Combustion Eng'g, Inc.*,
  No. CV 97-0570516S, 1998 WL 389215 (Conn. Super. Ct. June 23, 1998) ............ 37

*Certainteed Ceilings Corp. v. Aiken*,
  No. 14-3925, 2014 WL 5461546 (E.D. Pa. Oct. 27, 2014) ...................................... 43

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...................................... 43

*Cohen v. S.A.C. Trading Corp.*,
  711 F.3d 353 (2d Cir. 2013)...................................... 49

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
  No. 11 Md. 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012)........................................ 14

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 377 (2012) ...................................... 41

*Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.*,
  385 Pa. Super. 30 (1989)...................................... 47

*Davis v. AT&T Wireless Servs. Inc.*,
  No. CV 11–02674, 2012 WL 692413 (C.D. Cal. Mar. 1, 2012) ...................................... 27

*De Atucha v. Commodity Exch., Inc.*,
  608 F. Supp. 510 (S.D.N.Y. 1985) ...................................... 29

*Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011)...................................... 40

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)...................................... 28

*Domke v. Alyeska Pipeline Serv. Co.*,
  137 P.3d 295 (Alaska 2006)...................................... 50

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)...................................... 10, 16

*Ely-Cruikshank Co. v. Bank of Montreal*,
  81 N.Y.2d 399 (1993) ...................................... 48

*Ferring B.V. v. Allergan, Inc.*,
  932 F. Supp. 2d 493 (S.D.N.Y. 2013)...................................... 31, 39, 48

*Ferring B.V. v. Allergan, Inc.*,
  4 F. Supp. 3d 612 (S.D.N.Y. 2014) ...................................... 38

*Finley v. Giacobbe,*
    79 F.3d 1285 (2d Cir. 1996)..........................................................................................38

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
    No. 13 CIV. 7789, 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015)......................................24, 33

*FTC v. Superior Court Trial Lawyers Ass'n,*
    493 U.S. 411 (1990)................................................................................................21, 26

*Garb v. Republic of Poland,*
    440 F.3d 579 (2d Cir. 2006)..........................................................................................14

*Gatt Commc'ns v. PMC Assocs., LLC,*
    711 F.3d 68 (2d Cir. 2013)...............................................................................19, 25, 31

*Generation Partners, LP v. Mandell,*
    No. FSTCV095010537S, 2011 WL 3671966
    (Conn. Super. Ct. July 22, 2011) ....................................................................................50

*GFL Advantage Fund, Ltd. v. Colkitt,*
    272 F.3d 189 (3d Cir. 2001)..........................................................................................14

*Glen Holly Entm't, Inc. v. Tekronix, Inc.,*
    352 F.3d 367 (9th Cir. 2003) .........................................................................................27

*Global Fin. Corp. v. Triarc Corp.,*
    93 N.Y.2d 525 (1999) ...................................................................................................47

*Granite State Ins. Co. v. Clearwater Ins. Co.,*
    No. 09 Civ. 10607, 2014 WL 1285507 (S.D.N.Y. Mar. 31, 2014) .........................................34

*Harris v. Provident Life & Accident Ins. Co.,*
    310 F.3d 73 (2d Cir. 2002)............................................................................................37

*Harry Miller Corp. v. Mancuso Chems. Ltd.,*
    469 F. Supp. 2d 303 (E.D. Pa. 2007) ..............................................................................50

*Hinds Cnty., Miss. v. Wachovia Bank N.A.,*
    620 F. Supp. 2d 499 (S.D.N.Y. 2009).....................................................................41, 42, 45

*Hughes v. Patel,*
    No. 259174, 2006 WL 931568 (Mich. Ct. App. Apr. 11, 2006) ............................................47

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.,*
    864 F.2d 1409 (7th Cir. 1989) .......................................................................................19

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ..................................................................................... 12, 13

*Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*,
  7 A.3d 278 (2010) .......................................................................................................... 39

*Jet Star Enters., Ltd. v. Soros*,
  No. 05 CIV. 6585, 2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006) ........................................... 40

*Johnson & Johnson v. Guidant Corp.*,
  No. 06 Civ. 7685, 2010 WL 571814 (S.D.N.Y. Feb. 16, 2010) ........................................... 34

*K&K Recycling, Inc. v. Alaska Gold Co.*,
  80 P.3d 702 (2003) ........................................................................................................ 38

*Katel Ltd. Liab. Co. v. AT&T Corp.*,
  607 F.3d 60 (2d Cir. 2010) ............................................................................................. 37

*Keene Corp. v. Bogan*,
  No. 88 Civ. 0217, 1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) ............................................... 36

*King of Prussia Equip. Corp. v. Power Curbers, Inc.*,
  158 F. Supp. 2d 463 (E.D. Pa. 2001) ............................................................................... 37

*Klein v. ATP Flight Sch.,LLP*,
  No. 14-CV-1522, 2014 WL 3013294 (E.D.N.Y. July 3, 2014) ............................................. 34

*Knight Enters., v. RPF Oil Co.*,
  299 Mich. App. 275 (2013) ............................................................................................. 37

*Koch v. Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012) ........................................................................................... 45

*Kronos, Inc. v. AVX Corp.*,
  81 N.Y.2d 90 (1993) ....................................................................................................... 48

*LaFlamme v. Société Air Fr.*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) .............................................................................. 16

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ..................................................................................................... 38

*La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*,
  No. 12 Civ. 6659, 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ............................................ 40

*Langreich v. Gruenbaum,*
No. 06CIV4931, 2009 WL 321253 (S.D.N.Y. Jan. 30, 2009)................................................. 35

*Laumann v. NHL,*
907 F. Supp. 2d 465 (S.D.N.Y. 2012)........................................................................ 28

*Laydon v. Mizuho Bank, Ltd.,*
No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014).................................... *passim*

*Laydon v. Mizuho Bank, Ltd.,*
No. 12 CIV. 3419, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ................................... 34, 42

*Liberty Heating & Cooling, Inc. v. Builders Square, Inc.,*
788 F. Supp. 1438 (E.D. Mich. 1992)........................................................................ 38

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
935 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................ *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
962 F. Supp. 2d 606 (S.D.N.Y. 2013)........................................................................ 33, 36

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
27 F. Supp. 3d 447 (S.D.N.Y. 2014) ........................................................................ 33, 34, 41

*LightSquared Inc. v. Deere & Co.,*
No. 13 CIV. 5543, 2015 WL 585655 (S.D.N.Y. Feb. 5, 2015)..................................... 38

*M/A-COM Sec. Corp. v. Galesi,*
904 F.2d 134 (2d Cir. 1990).................................................................................... 31

*Maya NY, LLC v. Hagler,*
106 A.D.3d 583 (1st Dep't 2013) ............................................................................. 49

*Mayfield v. British Bankers' Ass'n,*
No. 14-CV-4735, slip op. (S.D.N.Y. July 22, 2014) .................................................. 22

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.,*
709 F.3d 129 (2d Cir. 2013).................................................................................... 9, 11, 15

*McCann v. U.S. Bank, N.A.,*
873 F. Supp. 2d 823 (E.D. Mich. 2012).................................................................... 37

*In re Merrill Lynch Ltd. P'ships Litig.,*
154 F.3d 560 (2d Cir. 1998).................................................................................... 45

*Newman v. Universal Pictures,*
  813 F.2d 1519 (9th Cir. 1987) ................................................... 25

*Nichols v. Mahoney,*
  608 F. Supp. 2d 526 (S.D.N.Y. 2009)..................................... 19

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.,*
  No. 98 CIV. 4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999).......................... 29

*Orange Landing Condo. Ass'n v. White,*
  No. CV044000341S, 2004 WL 2397251
  (Conn. Super. Ct. Sept. 24, 2004) ......................... 38

*Ostrofe v. H.S. Crocker Co, Inc.,*
  740 F.2d 739 (9th Cir. 1984) ................................................... 29

*Pappas v. Tzolis,*
  20 N.Y.3d 228 (2012) ............................................................ 40

*In re Parcel Tanker Shipping Servs. Antitrust Litig.,*
  541 F. Supp. 2d 487 (D. Conn. 2008).................................... 16

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.,*
  467 F.3d 283 (2d Cir. 2006)............................................. 19, 26

*Pitcairn Props., Inc. v. LJL 33rd St. Assocs., LLC,*
  No. 11 Civ. 7318, 2012 WL 6082398 (S.D.N.Y. Nov. 20, 2012) ........................... 36

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,*
  507 F.3d 117 (2d Cir. 2007)................................................... 30

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union,*
  No. 11-cv-2652, 2013 WL 3873074 (S.D. Cal. July 25, 2013) ............................ 15

*Qube Films Ltd. v. Padell,*
  No. 13- 8405, 2014 WL 3952931 (S.D.N.Y. Aug. 12, 2014)............................... 38

*RAN Corp. v. Hudesman,*
  823 P.2d 646 (Alaska 1991)................................................... 38

*Reading Indus. v. Kennecott Copper Corp.,*
  631 F.2d 10 (2d Cir. 1980).................................................... 28

*In re Refco Inc. Sec. Litig.,*
  826 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................... 39

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*,
  992 F. Supp. 2d 213 (S.D.N.Y. 2013)................................................................. 38

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ............................................................................. 23

*Sarpolis v. Tereshko*,
  No. 13-5521, 2014 WL 2765088 (E.D. Pa. June 17, 2014).................................... 47

*Schaefer v. First Nat'l Bank of Lincolnwood*,
  326 F. Supp. 1186 (N.D. Ill. 1970) .................................................................... 23

*Silvester v. Time Warner, Inc.*,
  763 N.Y.S.2d 912 (Sup. Ct. 2003)...................................................................... 47

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)............................................................................................ 31

*State, Dep't of Revenue, Child Support Enforcement Div. v. Wetherelt*,
  931 P.2d 383 (Alaska 1997)................................................................................ 39

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)................................................................... 47, 48, 49

*Synthes, Inc. v. Emerge Med., Inc.*,
  25 F. Supp. 3d 617 (E.D. Pa. June 5, 2014)......................................................... 38

*United States ex rel. Walter Toebe Const. Co. v. Guarantee Co. of N. Am.*,
  No. 14-cv-13398, 2014 WL 7211294 (E.D. Mich. Dec. 11, 2014) ........................ 50

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
  39 F. Supp. 3d 461 (S.D.N.Y. 2014)................................................................... 49

*UNR Indus., Inc. v. Cont'l Ins. Co.*,
  607 F. Supp. 855 (N.D. Ill. 1984) ...................................................................... 25

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)................................................................................. 27

*Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*,
  982 A.2d 94 (Pa. 2009) ..................................................................................... 37

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
  818 F. Supp. 2d 744 (S.D.N.Y. 2011).................................................................. 43

*Williams v. Williams*,
    129 P.3d 428 (Alaska 2006).......................................................................................... 47

*Wolff v. Rare Medium, Inc.*,
    171 F. Supp. 2d 354 (S.D.N.Y. 2001)........................................................................... 31

*Wood v. Herndon & Herndon Investigations, Inc.*,
    186 Mich. App. 495 (1990)............................................................................................ 38

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008).......................................................................................... 31

*Yucyco, Ltd. v. Republic of Croatia*,
    No. 96 Civ. 5559, 1997 WL 728173 (S.D.N.Y. Nov. 19, 1997) ............................... 36

*Zola v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    No. 84 CIV. 8522, 1986 WL 1163 (S.D.N.Y. Jan. 23, 1986)..................................... 32

## STATUTES & RULES

15 U.S.C. § 1 ......................................................................................................................... 8

15 U.S.C. § 15 ..................................................................................................................... 30

15 U.S.C. § 15b ................................................................................................................... 41

17 C.F.R. § 160.3(w)(2)(iii) ............................................................................................... 43

42 Pa. Cons. Stat. § 5524(3) .............................................................................................. 48

42 Pa. Cons. Stat. § 5525(a) .............................................................................................. 47

Alaska Stat. § 09.10.053 ..................................................................................................... 47

Alaska Stat. § 09.10.070 ..................................................................................................... 48

Conn. Gen. Stat. § 52-576(a) ............................................................................................. 47

Conn. Gen. Stat. § 52-577 .................................................................................................. 48

Fed. R. Civ. P. 9(b) .................................................................................................. 41, 42, 45

Fed. R. Evid. 201 ................................................................................................................ 14

Mich. Comp. Laws § 600.5805(10) ............................................................................. 48

Mich. Comp. Laws § 600.5807(8) ............................................................................... 47

N.Y. C.P.L.R. § 202 .................................................................................... 47, 48, 49

N.Y. C.P.L.R. § 213(2) ............................................................................................. 47

N.Y. C.P.L.R. § 214(4) ............................................................................................. 48

OTHER AUTHORITIES

Giuseppe Campolieti and Roman N. Makarov, *Financial Mathematics:*
  *A Comprehensive Treatment* (1st ed. 2014) ............................................... 14

*ISDAFIX* (archived page dated June 30, 2012), ISDA, https://web.archive.org/web/
  20120630173533/http://www2.isda.org/asset-classes/interest-rates-
  derivatives/isdafix ........................................................................................ 43

John C. Hull, *Introduction to Futures & Options Markets* (2d ed. 1995) .................... 14

Michael Mackenzie & Gillian Tett, *Frozen in Time*, Fin. Times, June 16, 2010 .................. 44, 46

Stephen Foley, Twitter (Apr. 8, 2013, 1:00 PM EST),
  https://twitter.com/stephenfoley/status/321351791419740161 ............................... 46

ISDA Response to the European Commission's Public Consultation on the
  Regulation of Indices (Nov. 29, 2012) ......................................................... 13

## PRELIMINARY STATEMENT

Implicitly conceding the deficiencies of the prior complaint, the Amended Complaint[1]

jettisons all Commodities Exchange Act ("CEA") claims, along with any linkage between the

putative class and ISDAFIX[2] that was supposedly the centerpiece of this litigation.  As explained

below, the Amended Complaint improperly attempts to shoehorn Plaintiffs' original CEA

"misrepresentation" claims into a Sherman Act price-fixing claim.  In addition, the Amended

Complaint now seeks relief on behalf of any person who transacted in *any interest rate*

*derivative* (an exponentially larger group than the original class) and the proposed class

definition now makes *no reference at all to ISDAFIX.*  These radical modifications merely

exacerbate the fundamental deficiencies in Plaintiffs' case.  At bottom, Plaintiffs assert an

extraordinary and implausible seven-year conspiracy among fourteen banks ("Banks") and ICAP

Capital Markets LLC ("ICAP").[3]  Plaintiffs' new allegations and exhibits amount to little more

than irrelevant filler.  The Court should dismiss the Amended Complaint with prejudice.

*First*, Plaintiffs do not plausibly allege a violation of Section 1 of the Sherman Act

because they do not plead facts sufficient to show a horizontal agreement among Defendants to

fix prices.  Plaintiffs do not allege any direct evidence of an agreement among competitors,

offering instead only a bald assertion that Defendants communicated with one another through

private forums.  (AC ¶ 93.)  Nor is the alleged circumstantial evidence of parallel conduct by the

---

[1] Consolidated Amended Class Action Complaint ("Amended Complaint" or "AC").

[2] ISDAFIX is a benchmark used to calculate the settlement value of certain (but far from all) interest rate
derivatives.  Until March 31, 2015, ISDAFIX was set based on the submissions of a panel of dealers, including the
defendant banks.  Just after 11 a.m. each day, the administrator would send the panel members reference points
based on swaps traded through ICAP (an interdealer broker) and U.S. Treasury securities traded on BrokerTec (an
electronic trading platform) exactly at 11 a.m.  The Banks could then accept the reference points, submit a different
rate, or take no action.  There are ISDAFIX rates for a variety of currencies.  Plaintiffs' allegations relate solely to
the U.S. dollar ISDAFIX rate.  Accordingly, as used in this brief, "ISDAFIX" refers to the U.S. dollar ISDAFIX
rate.

[3] The Amended Complaint purports to include not only the named Defendants, but also each of the named
Defendants' "subsidiaries and affiliates."  (AC ¶¶ 28-43.)

Banks indicative of a conspiracy; rather, it is entirely consistent with noncollusive, self-interested behavior.  Plaintiffs' allegations regarding the Banks' uniform submissions to ICAP are not evidence of a conspiracy because, as Plaintiffs concede, those submissions were based on reference points that ICAP posted *before* the Banks made their submissions.  Since each Bank received the same reference points from ICAP, the supposed identical submissions just as likely could have occurred without any interbank communication or coordination and were fully consistent with independent unilateral action by each of the polled Banks.  The alleged "banging the close" likewise does not support an inference of a conspiracy.  Increased market activity near 11 a.m. would be expected, given the legitimate need of the Banks and other nondefendant dealers trading in the market to transact around 11 a.m. to hedge their exposure due to expiring swaptions that settle with reference to ISDAFIX.  And fundamentally, Plaintiffs never explain how fourteen Banks that trade with one another daily and often hold opposing positions would have had a common motive to enter into an alleged conspiracy that, by Plaintiffs' own account, would have required that they routinely act contrary to their own economic interests.  The alleged conspiracy is thus implausible as a matter of law under controlling precedent.

*Second*, Plaintiffs' Sherman Act claim should be dismissed for the additional reason that Plaintiffs fail to adequately allege antitrust standing.  The Amended Complaint fails to plead any injury to competition or any loss stemming from such injury.  In fact, most of the Amended Complaint's allegations focus on noncompetitive, nonmarket activity that, in analogous circumstances relating to the alleged manipulation of London Interbank Offered Rate ("LIBOR"), four judges in this District have held does not state an antitrust claim.  Here, as in the LIBOR cases, ISDAFIX is the product of a cooperative, submission-based process.  Moreover, because of the vastly expanded class definition and the corresponding remoteness of

any purported injury from the alleged misconduct, Plaintiffs fail to allege that they are the "efficient enforcers" permitted under the law to bring antitrust claims.

*Third*, Plaintiffs fail to plead injury in fact or damages adequately, which is an essential element of *all* of Plaintiffs' claims.  For the five Plaintiffs remaining in the action (three were dropped since the prior complaint), the Amended Complaint identifies 1,952 transactions during the relevant period, but fails to link these transactions to any alleged manipulation by Defendants that caused any harm.  Indeed, it is for only *12 of those 1,952 transactions* that Plaintiffs even try to establish any nexus between the transaction and some supposed wrongdoing by Defendants. (*See id.* ¶¶ 27, 194-95, 206, 208.)  These allegations, however, fall far short of establishing the required link.  Indeed, Plaintiffs' allegations demonstrate only that they were just as likely to have benefited from the alleged misconduct as they are to have been harmed.

*Fourth*, Plaintiffs' breach of contract claim fails to plead adequately how any Bank breached any specific contract with any particular Plaintiff.  Furthermore, Plaintiffs' implied duty of good faith and fair dealing claim fails because the Amended Complaint does not allege Defendants' supposed wrongful intent with the requisite specificity, and because such a claim cannot be predicated on the same behavior as the contract claim.

*Fifth*, Plaintiffs' tortious interference claim also is inadequately pleaded.  Plaintiffs fail to allege that Defendants had knowledge of any specific swap or swaptions contract between Plaintiffs and third parties.  They also fail to plead that each Defendant intentionally interfered with such a contract.  Instead, Plaintiffs claim that Defendants' purpose was to benefit themselves in their own contracts.  (*Id.* ¶ 134.)

*Sixth*, Plaintiffs' unjust enrichment claim must be dismissed because it duplicates the antitrust and contract claims, and, at any rate, the allegations fail to demonstrate that Plaintiffs

had either direct dealings or a quasi-contractual relationship with each non-counterparty Bank, a required element of an unjust enrichment claim.

*Finally*, many of Plaintiffs' Sherman Act claims and state law claims are time-barred. Plaintiffs do not come close to alleging the elements of fraudulent concealment such that equitable tolling would apply.

## FACTUAL ALLEGATIONS

### A.    Interest Rate Swaps

Interest rate derivatives are financial products whose value depends on one or more interest rates.  (*Id.* ¶¶ 47-48.)[4]  One type of interest rate derivative is an interest rate swap, in which two counterparties agree to exchange periodic payments tied to specific interest rates on an agreed notional amount (e.g., $50 million) for an agreed period of time (e.g., 10 years). Typically, one party pays a specified fixed interest rate, and the other pays a floating interest rate that is tied to an established benchmark, such as LIBOR.  (*Id.* ¶ 48.)

### B.    Swaptions

Another interest rate derivative is a "swaption," which is a contract under which the buyer pays the seller a premium for the option, but not the obligation, to enter into an interest rate swap at a specified rate (the strike) on a specified date.  (*Id.* ¶¶ 55-56.)  On the exercise date, a swaption may expire either unexercised (e.g., if it is "out of the money") or be exercised (e.g., if it is "in the money").  If exercised, the swaption may either physically settle (i.e., the parties will enter into the swap) or cash settle (i.e., the seller pays the buyer the cash value of the swap on the exercise date).  (*Id.* ¶¶ 56-57.)

Some swaptions specify that ISDAFIX will be used to determine the settlement value

---

[4] For purposes of this motion, Defendants do not contest Plaintiffs' allegations concerning the interest rate derivatives market and its products, but Defendants do not, as a general matter, agree with them.  Defendants, however, do not concede that Plaintiffs have pleaded a relevant market under the antitrust laws.

upon expiration.  (*Id.* ¶¶ 58-59, 61.)  In that case, a swaption holder may compare the swaption's fixed rate with the relevant ISDAFIX rate on the exercise date to determine whether the swaption is in the money.  (*Id.* ¶¶ 60, 209.)  If the fixed rate is more favorable than the prevailing ISDAFIX rate, the swaption is in the money and thus the swaption holder may opt to exercise it.

      C.      **The ISDAFIX Benchmark Interest Rate**

      Plaintiffs allege that ISDAFIX is the most common interest rate benchmark for determining the value of cash-settled interest rate swaptions upon expiration.  (*Id.* ¶ 58.)  The Amended Complaint states that ISDAFIX is intended to "represent the average fixed interest rate that an over-the-counter derivatives market dealer would bid or offer for a swap of a certain tenor and currency in exchange for a specified floating LIBOR rate."  (*Id.* ¶ 71.)

      ISDAFIX is compiled daily.  Each day at 11:02 a.m., ICAP would post to a panel of banks a set of reference points that were generated using (1) "[i]nformation contained on Reuters page 19901 at 11:00 a.m., which reflects the most recent swap spreads from completed trades and executable bids and offers in market size done/posted at ICAP,"[5] and (2) "[i]nformation reflecting executed trades and executable bids and offers at 11 a.m. for US Treasury securities from ICAP's BrokerTec US Treasury electronic trading platform."  (*Id.* ¶ 72.)

      Plaintiffs allege that each Bank was asked by ICAP, the panel administrator, to submit the midpoint between the rate at which it would bid or offer for a swap in the relevant maturity for a given amount to an acknowledged dealer of good credit in the swap market.  (*Id.* ¶¶ 71, 224.)  Every day ICAP would offer reference points to all the Banks, and for its submission, each Bank could accept ICAP's offered reference points, submit different values, or take no action.  (*Id.* ¶ 72.)  Thomson Reuters then compiled the day's ISDAFIX rate by eliminating a set number

---

[5] Because ICAP is an interdealer broker, information about swap spreads, by definition, contained data only for interdealer transactions, not transactions with nondealers like Plaintiffs.  (*See id.* ¶¶ 1, 63.)

of the highest and lowest rates submitted and averaging the remainder.  (*Id.*)

**D.    The Parties**

Plaintiffs allege that they "transacted in interest rate derivatives expressly tied to ISDAfix *or* directly impacted by Defendants' manipulation of ISDAfix," and that they "transacted on days that have been identified as being subject to manipulation, with one or more Defendant Banks."[6] (*Id.* ¶¶ 23-27 (emphasis added).)

Apparently in response to Defendants' prior motion to dismiss, Plaintiffs filed Appendix A, which offers limited details about Plaintiffs' alleged transactions with the Banks, namely the counterparty, type of transaction, transaction date, and the exercise date of swaptions.  (*Id.* App. A.)  While Plaintiffs have supplied transactional documents for two purported transactions (*id.* App. S, T), they have not identified the counterparty entities with particularity for the other 1,950 alleged transactions.  (*See id.* App. A.)  Instead, Plaintiffs only vaguely define the alleged counterparty as a given Bank and all of its unidentified "subsidiaries and affiliates."[7]  (*See id.* ¶¶ 28-41.)  For the vast majority of alleged transactions, the Amended Complaint does not allege whether a transaction occurred on or had an exercise or settlement date on a day on which purported manipulation took place, the direction of the alleged manipulation on the dates in question, or how ISDAFIX is relevant to the transactions, if at all.

The Amended Complaint alleges that the Banks were members of the ISDAFIX submission panel during all or part of the putative class period and, for the most part, transacted in interest rate derivatives with Plaintiffs and members of the purported class.[8]  According to the

---

[6] Plaintiffs are Alaska Electrical Pension Fund ("Alaska Fund"), Genesee County Employees' Retirement System ("GCERS"), County of Montgomery, Pennsylvania ("Montgomery County"), County of Washington, Pennsylvania ("Washington County"), and City of New Britain, Connecticut ("New Britain").

[7] The Amended Complaint fails to distinguish between Defendants with which Plaintiffs allegedly transacted ("Counterparty Banks") and those with which they allege no transactional relationship ("Non-Counterparty Banks").

[8] Defendant Nomura is not alleged to have transacted with any Plaintiff.  (*See id.* ¶¶ 23-27, 38, App. A.)

Amended Complaint, the Banks "dominate the market for interest rate derivatives" (*id.* ¶ 1) and maintain large portfolios of these products (*id.* ¶¶ 53-54).

The Amended Complaint also alleges that Defendant ICAP served as the administrator for ISDAFIX during the relevant period.  In addition, ICAP is alleged to be an interdealer interest rate derivatives voice broker, executing trades for dealers (but not nondealers like Plaintiffs) and providing liquidity to the interdealer over-the counter derivatives market.  (*Id.* ¶¶ 43, 63.)  The Amended Complaint further alleges that ICAP controlled a Reuters electronic screen service called "Screen 19901" which published the bid/offer rates of all interdealer (but not dealer-client) swap transactions executed through ICAP.  (*Id.* ¶ 65.)

### E.    Plaintiffs' Allegations of Wrongdoing

Plaintiffs claim that, for a period of more than seven years, Defendants conspired to manipulate the daily ISDAFIX rate to benefit Defendants' own trading positions, or, in ICAP's case, to earn brokerage commissions.  (*Id.* ¶¶ 137-39.)  Plaintiffs allege that varying permutations of Banks and ICAP agreed to help each other manipulate ISDAFIX "up or down," depending on the changing preferences of some "subset of . . . Banks that had a particular interest in moving the rate on a given day."  (*Id.* ¶¶ 135 n.48, 154.)  Even if the purported manipulation would harm a Bank's trading position on a given day, Plaintiffs allege that all Banks agreed to go along with the alleged scheme.  (*Id.* ¶¶ 10, 191.)

The Amended Complaint alleges a number of manipulative practices purportedly carried out by Defendants.  First, Plaintiffs allege that Defendants colluded with respect to their ISDAFIX submissions by agreeing to accept the reference points posted by ICAP.  (*Id.* ¶¶ 8-9.) Plaintiffs tout the small chance that all of the Banks would submit interest rates identical to the fifth decimal point but ignore the common-sense explanation that each Bank was permitted to accept the reference points.  (*Id.* ¶¶ 9, 65, 72.)

Second, Plaintiffs allege that Defendants manipulated the reference rate by "bang[ing] the close" (*id.* ¶¶ 134, 136-37) or by having ICAP alter or delay the reporting of market-moving transactions (*id.* ¶¶ 6, 151-60).  Plaintiffs allege that, by "banging the close," the Banks carried out transactions in the interdealer (but not dealer-client) swaps market just before 11 a.m. to move ICAP's reference points to a previously agreed level.  (*Id.* ¶¶ 134, 136-37.)  To execute these trades, Plaintiffs allege—in conclusory terms only—that Defendants colluded with one another by sharing information such as intended orders and the Banks' exposure on a particular day, which allegedly allowed them to coordinate their trading activities.  (*Id.* ¶¶ 6, 130.)  Even when Defendants supposedly failed to manipulate the reference points to the desired level, Plaintiffs allege—without any factual support—that "ICAP could and would also simply set the reference rate at the predetermined level."  (*Id.* ¶ 130 n.45; *see also id.* ¶ 96.)  Plaintiffs do not allege how ICAP would have accomplished "setting" the reference points.  Plaintiffs also allege that the Banks instructed ICAP to delay reporting transactions until after the setting of ISDAFIX. (*Id.* ¶¶ 6, 151-60.)

According to Plaintiffs, their experts identified manipulation on more than 1,700 days, or nearly every trading day during the putative class period.  (*Id.* ¶ 7.)  Yet, despite the scope and difficulties inherent in such purported collusion, and despite their bald assertion that Banks "communicate[d] with each other via phone, email, and online chat rooms" to carry out the supposed conspiracy (*id.* ¶ 100), Plaintiffs fail to point to even a single communication on any day between any Defendants in which any of them agreed to manipulate ISDAFIX.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE EACH DEFENDANT'S PARTICIPATION IN A CONSPIRACY TO RESTRAIN TRADE

To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs must allege

an unreasonable restraint of trade "effected by a contract, combination, or conspiracy," rather

than by unilateral conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Plaintiffs

cannot simply make a "conclusory allegation of agreement at some unidentified point" to survive

a motion to dismiss. *Id*. at 556-57. Rather, Plaintiffs must plead "enough facts to support the

inference that a conspiracy actually existed." *Mayor & City Council of Balt., Md. v. Citigroup,*

*Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("*Citigroup*"). Plaintiffs must either (i) "assert direct

evidence that the defendants entered into an agreement in violation of the antitrust laws," or

(ii) "present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* An

agreement "may be inferred on the basis of conscious parallelism, when such interdependent

conduct is accompanied by circumstantial evidence and plus factors." *Id.* Here, Plaintiffs have

failed to allege any evidence, direct or circumstantial, of a conspiracy.

### A.    Plaintiffs Allege No Direct Evidence of a Conspiracy

To state a claim premised on direct evidence of conspiracy, Plaintiffs must plead at least

some particular facts to make out more than "the mere opportunity to conspire." *Arista Records*

*LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 577, 579 n.30 (S.D.N.Y. 2007). Where, as here,

Plaintiffs allege conspiracies "concern[ing] long-term complex relationships among

competitors," their claim should be more "susceptible of direct proof." *Apex Oil Co. v.*

*DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).

Although Plaintiffs allege that the "Banks could and would communicate with each

other" (AC ¶ 100), Plaintiffs fail to plead when, where, or between which Banks any such

communications occurred, much less that they resulted in any agreement between any of the

Banks. *See Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618

(S.D.N.Y. 2013) (allegations of "hypothetical discussions or agreements" involving "one or

more" defendants "fall[] well short of the line between possibility and plausibility of entitlement

to relief" (internal quotation marks omitted)).  Because Plaintiffs' antitrust claim is pleaded "in

entirely general terms without any specification of any particular activities by any particular

defendant," it amounts to an inadequate "list of theoretical possibilities, which one could

postulate without knowing any facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-

51 (2d Cir. 2007).[9]  Indeed, Plaintiffs' antitrust allegations amount to less than those rejected in

*In re Elevator*, where the Second Circuit dismissed claims premised on (i) generalized and

conclusory allegations that defendants "[p]articipated in meetings" and "[a]greed to fix prices,"

(ii) circumstantial allegations of "similarities in . . . pricing," and (iii) references to investigations

by antitrust authorities.  *Id*. at 50-51 & nn.5-6.[10]

### B.  Plaintiffs' Circumstantial "Evidence" of Supposed Parallel Conduct Is Insufficient As a Matter of Law

The statistical analyses in the Amended Complaint allege, at most, that the Banks

engaged in three types of *parallel* conduct:  *first*, that the Banks "claimed to have the exact same

bid/ask spread" matching the ICAP reference points "nearly every day for multiple years" (AC

¶¶ 9, 102); *second*, that the Banks and ICAP "bang[ed] the close" through actual, open-market

trades (*see, e.g., id*. ¶¶ 133-34); and *third*, that the Banks changed their ISDAFIX submissions

and/or their trading behavior in response to government investigations (*see, e.g., id*. ¶¶ 112, 140-

41).  Without more, allegations of such parallel conduct do not state a Section 1 claim.

Parallel conduct allegations "must be placed in a context that raises a suggestion of a

---

[9] The only allegations of any communications about the alleged misconduct are citations to news articles, which discuss unidentified communications between traders within a single bank and "ICAP brokers," not between or among different Banks, and without any detail as to when they took place or what was discussed.  (*See, e.g.*, AC ¶ 154.)  This is not evidence of a horizontal agreement between competitor Banks (much less among all fourteen Banks), nor of ICAP's participation in such a conspiracy.  The remainder of Plaintiffs' allegations about communications come from government investigations into some Banks' actions concerning foreign currency trades (*e.g., id*. ¶¶ 92-93), not ISDAFIX-related transactions, and provide no support for Plaintiffs' claim.  (*See infra* Section I.B.3.)

[10] *Compare* AC ¶¶ 74-90, 93, 103-27, 135.

preceding agreement, not merely parallel conduct that could just as well be independent action."

*Twombly*, 550 U.S. at 557.  The "plus factors" that a plaintiff can plead to create a cognizable

inference of concerted action include evidence of (i) "a common motive to conspire,"

(ii) "parallel acts . . . against the apparent individual economic self-interest of the alleged

conspirators," and (iii) "evidence of a high level of interfirm communications."  *Citigroup*, 709

F.3d at 136.  Plaintiffs fail to plead any such plus factors.

### 1.    Plaintiffs Have Not Alleged a Common Motive to Conspire

Plaintiffs claim that the Banks "secretly collud[ed] to collectively manipulate ISDAfix

. . . [and] extracted supra-competitive profits from Plaintiffs."  (AC ¶ 2.)  But the allegation that

fourteen of the world's largest financial institutions *all* could profit from a conspiracy to

manipulate ISDAFIX, not in a consistently higher or lower direction, but "up or down" (*id.*

¶ 154) on any given day, makes no economic or logical sense.  Such a theory hinges on the

implausible premise that these fourteen institutions' swap and swaption positions were aligned

throughout the putative class period at the moment of each alleged manipulation.  Plaintiffs give

the Court no basis for crediting that premise.  Indeed, the Banks were often counterparties—

holding opposing positions—in ISDAFIX-linked transactions.

To compensate for this defect,  Plaintiffs theorize that, while some Banks would have

"lost due to a divergence of interests on any particular trading day," they were willing to

participate in the alleged conspiracy "because the other banks would return the favor on another

day."  (*Id.* ¶ 10.)  In addition to the uncertainty of such a "losing to win" strategy, the plausibility

of the alleged conspiracy is further undermined by Plaintiffs' allegation that trades at 11 a.m.

"shock[ed]" the interest rate swap market for a period of time.  (*Id.* ¶ 201.)  It would have been

contrary to the Banks' interests to manipulate ISDAFIX higher (or lower) to help another Bank

evade an expiring cash-settling swaption, only to incur the purported "lasting effect" (*id.*) of

artificially inflated (or deflated) interest rate swap prices.  Plaintiffs articulate no rational motive

for any Bank to join such a conspiracy because the scheme would confer no reliable net benefit

on any particular Bank.  "Accordingly, 'when viewed in light of common economic

experience,'" Plaintiffs' theory "does not plausibly suggest the existence of concerted action."

*Arista Records*, 532 F. Supp. 2d at 579 (quoting *Twombly*, 550 U.S. at 565).

### 2.    Plaintiffs Fail to Plead Parallel Conduct Against the Banks' Independent Self-Interests

"*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should

be dismissed if 'common economic experience' or the facts alleged in the complaint itself, show

that independent self-interest is an 'obvious alternative explanation' for defendants' common

behavior."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010).  Here, none of

Plaintiffs' statistical allegations regarding the (i) purported similarity of the Banks' ISDAFIX

submissions, or (ii) supposed trading spikes ahead of the submission deadline, supports any

plausible inference of conspiracy.  To the contrary, these allegations are consistent with "'the

natural, unilateral reaction' of each" Bank.  *Arista Records*, 532 F. Supp. 2d at 578-79 (quoting

*Twombly*, 550 U.S. at 566).

Plaintiffs assert that it was highly improbable, "absent collusion," for the Banks to have

submitted identical quotes almost every day for several years.  (AC ¶¶ 102-03.)  This allegation

ignores the fact that the purportedly identical quotes were the logical result of each of the Banks

accepting the market-reflecting reference points posted by ICAP.  (*See id.* ¶¶ 4, 118.)  Accepting

the reference points (and thus, submitting identical quotes) would not require any agreement

among Banks because contributing Banks "may accept" the reference points posted by ICAP.

(*Id.* ¶ 72.)  It is entirely plausible, and indeed logical, that the Banks independently accepted

ICAP's posted reference points given that ICAP served "as a broker for billions, if not trillions,

of dollars of interest rate derivative transactions," and was a leading voice broker of swaps.  (*Id.* ¶¶ 64-65.)  Finally, each Bank's daily ISDAFIX submission was *publicly available.*  (*See infra* n.55.)  Such transparency is inconsistent with the type of conspiracy that Plaintiffs allege.  Thus, Plaintiffs "do not plausibly imply that each [Bank] acted other than independently" when submitting quotes that matched the reference points posted by ICAP.[11]  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349.

Plaintiffs' allegation that "[t]he level of uniformity observed in ISDAfix was not present in the rate submissions for analogous benchmarks" (AC ¶ 105) is misleading and irrelevant because U.S. dollar ISDAFIX was the *only* ISDAFIX currency for which contributor banks were provided with reference points for their submissions.[12]  Thus, no inference of collusion can be drawn from Plaintiffs' allegations regarding U.S. dollar ISDAFIX submissions.

Nor do Plaintiffs meet their burden by alleging that, "[t]o move the market, Defendants would collusively 'bang the close' by executing a series of rapid-fire transactions through ICAP immediately before the opening of the polling window."[13]  (*Id.* ¶ 6.)  As a threshold matter, Plaintiffs allege no facts showing that such conduct is unique to the alleged conspirators or that the many other dealers that matched through ICAP did not engage in such strategies.[14]

---

[11] Any inference of collusion is further undermined by the fact that the Amended Complaint concedes that Goldman Sachs and HSBC stopped participating in the submissions panel before the end of the purported class period (June 2012 and January 2013, respectively) (AC ¶¶ 34-35) and that some Banks participated on the panel during only part of the putative class period (*id.* ¶ 122).

[12] *See* ISDA Response to the European Commission's Public Consultation on the Regulation of Indices, at 7-8 (Nov. 29, 2012) (incorporated by reference into the Amended Complaint at ¶ 72)), *available at* http://www2.isda.org/ news/isda-response-to-the-european commissions-public-consultation-on-the-regulation-of-indices.

[13] Equally deficient are Plaintiffs' conclusory allegations that "ICAP could and would [] simply set the reference rate at [a] predetermined level" when it is contended that "banging the close" did "not move [the market] far enough to hit [a] target rate exactly."  (AC ¶ 130 n.45.)  Plaintiffs have set forth no nonconclusory allegations of any agreement between the Banks or with ICAP pursuant to which ICAP could provide a predetermined reference rate.

[14] The interdealer market, of course, was not limited to the Banks that were contributors to ISDAFIX.  Plaintiffs' references to the Banks' allegedly high market share in interest rate swaps (*see, e.g.*, *id.* ¶¶ 53-54, 185) are misleading.  That data is based on information reported by federally insured commercial banks to the Office of the Comptroller of the Currency ("OCC").  (*Id.* ¶ 54 n.9.)  That interest rate swap holdings *among those banks* might be

13

The activity that Plaintiffs allege demonstrates "banging the close" is more consistent with a noncollusive explanation—the Banks' independent, legitimate need to hedge the risk from expiring swaptions.  As Plaintiffs allege, the reference points for ISDAFIX are based on market activity at 11 a.m.  (*Id.* ¶¶ 58 n.11, 72.)  For entities looking to "manage and transfer [their own] risk" by trading interest rate derivatives (*id.* ¶ 47), the degree of risk would become clear only as 11 a.m. approached.  Thus, it is natural that trading volume increased around that time.[15]

As Plaintiffs themselves recognize, "banging the close" may "be a proper trading strategy when conducted in isolation or pursuant to an arm's-length transaction."  (*Id.* ¶ 134 n.47.)  It is thus unreasonable "to infer unlawful intent from lawful activity alone."  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001).  For this reason, courts have rejected market manipulation allegations based on the short selling of stock where there was no evidence that the trading strategy was manipulative, rather than a bona fide hedge.  *Id.* at 207-12; *see also In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213, 2012 WL 6700236, at *20 (S.D.N.Y. Dec. 21, 2012) (rejecting plaintiffs' conclusory allegations of market manipulation and conspiracy, which showed only that the defendant "was engaged in some level of ordinary market activity"), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).

---

highly concentrated has no bearing on how many *other* market participants held and traded interest rate swaps during the putative class period, nor does it account for the counterparties to the swaps comprising trillions of dollars in notional value reported by banks to the OCC.

[15] Pursuant to basic theory of options risk management, a market-maker needs to hedge at or around the 11 a.m. ISDAFIX setting when an in-the-money swaption cash settles in order to rebalance its portfolio by executing a transaction at a rate that closely matches the rate it will need to pay (or receive) when cash settling the swaption.  On the basis that a perfect hedge coincides with ISDAFIX, it is logical that the Banks would have been more active as 11 a.m. approached, given that the closer they transacted to the final price, the closer their hedges would have been to the final ISDAFIX.  *See generally* John C. Hull, *Introduction to Futures & Options Markets* 319-50 (2d ed. 1995); *see also* Giuseppe Campolieti and Roman N. Makarov, *Financial Mathematics:  A Comprehensive Treatment* 509 (1st ed. 2014) (discussing "re-balancing" of hedge positions just before expiry, and noting that if the price "moves just before expiry from one side of the strike to the other, then the writer or trader must rapidly trade enough of the underlying stock before expiration in order to hedge the loss against such a movement").  This practice is entirely consistent with legitimate trading activities.  The Court may take judicial notice of academic texts pursuant to Rule 201 of the Federal Rules of Evidence.  *See Garb v. Republic of Poland*, 440 F.3d 579, 594 n.18 (2d Cir. 2006) ("We have previously taken judicial notice of 'authoritative text[s].'").

Despite Plaintiffs' unsubstantiated assertion that they have identified "*thousands of instances* . . . on which manipulative trading practices . . . occurred" (AC ¶ 131 (emphasis added)), the Amended Complaint identifies only *two* days—out of more than 1,900 days in the putative class period—on which Plaintiffs claim there is evidence consistent with their "banging the close" theory.[16]  (*Id.* ¶¶ 147-48.)  Even in a market entirely free from any manipulation, one would expect, purely as a matter of chance, that there would be two out of 1,900 days showing statistically unusual trading.  The absence of additional examples is all the more notable given the allegation that Plaintiffs analyzed intra-day swap rates for *the entire putative class period* from January 2006 to June 2013.  (*See, e.g.*, *id.* ¶ 7.)  The two examples cited in the Amended Complaint cannot plausibly show a seven-and-a-half-year conspiracy involving all fourteen Banks.  *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652, 2013 WL 3873074, at *9 (S.D. Cal. July 25, 2013) (allegation of an "isolated action" insufficient to support a "huge antitrust conspiracy" theory); *Citigroup*, 709 F.3d at 140 (allegations of "isolated discussions among only three defendants" insufficient to support an alleged industry-wide conspiracy).

### 3.     References to Government Investigations Cannot Salvage Plaintiffs' Conspiracy Claim

Plaintiffs' references to ongoing investigations into the setting of ISDAFIX are also insufficient to support an inference of an antitrust conspiracy.  "[V]ague allegations regarding pending investigations . . . are not probative of [] Sherman Act Section 1 violations . . . because neither mere participation in an investigatory interview nor the receipt of a subpoena is

---

[16] Similarly, the Amended Complaint identifies only *two* specific days on which Plaintiffs claim there is evidence consistent with their "delay[ed] publication" theory.  (*See* AC ¶¶ 151-58.)  Notably, Plaintiffs' Appendix A does not set forth any transaction with Defendants that was entered into or exercised on either of the two days that purportedly show "banging the close" activity—April 12, 2011 and July 5, 2011—or on either of the two days that purportedly show "delayed publication" of transactions—March 8, 2011 and April 5, 2011—further evidencing Plaintiffs' failure to allege an injury in fact or damages.  (AC App. A.)

necessarily probative of conspiracy." *LaFlamme v. Société Air Fr.*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010).  Moreover, Plaintiffs cannot salvage their claims by pointing to investigations concerning other benchmark interest rates.  (*See, e.g.*, AC ¶ 93.)  Where, as here, there is no "evidence of linkage between" prior investigations and the alleged ISDAFIX-related conduct, Plaintiffs cannot rest on the contention that "if it happened there, it could have happened here." *In re Elevator Antitrust Litig.*, 502 F.3d at 52; *see also In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008).

Equally deficient are Plaintiffs' allegations that the Banks' trading conduct changed after the December 2012 announcement of settlements related to LIBOR.  Plaintiffs' many charts purporting to contrast various metrics before and after December 2012 are a strained attempt to show that the Banks' trading conduct changed at that time, but the analysis is fundamentally flawed.  As an initial matter, the vast majority of the charts improperly compare data for up to six years prior to December 2012—a period encompassing the unique circumstances of the financial crisis—with data for the two years afterward.  (*See, e.g.*, AC ¶¶ 141, 145, 163, 167-69, 172-76, 183.)  Data for the time period prior to December 2012 is bound to reflect market "anomalies" (*id*. ¶ 168) caused by the financial crisis, while the subsequent period would not.[17]

This deficiency is compounded to the extent Plaintiffs have compared aggregate data for unequal time periods before and after December 2012.  For example, no meaningful conclusion can be drawn about any change in the "number" of so-called "anomalous movements . . . [in swap rates around] the 11:00 a.m. fixing window" (*id*. ¶¶ 168-69) because Plaintiffs' analysis

---

[17] For example, no meaningful conclusion can be drawn about the Banks' trading conduct before December 2012 based on Plaintiffs' analysis of the day-to-day relationship between price movements leading up to the polling window.  (*Id.* ¶¶ 178-83).  Plaintiffs maintain that their analysis of data for the period January 2008 through December 2012 demonstrates "patterns of market inefficiency" (*id.* ¶ 183), but that would be expected amid the uncertainty of the financial crisis.  Given the market context, Plaintiffs' analysis does not show trading activity that was in any way inconsistent with "market actors independently trying to hedge themselves." (*Id.* ¶ 181 n.66.)

appears to compare the frequency of such movements across six years (January 2007 through December 2012) and one year (January 2013 through December 2013) based upon the *absolute*—as opposed to average—number of movements over those time periods.  To the extent Plaintiffs use aggregate data, their analysis says nothing about whether (and why) the Banks' behavior changed in December 2012, as opposed to whether there was a change between the Banks' average behavior from January 2007 through December 2012, on one hand, and January 2013 through December 2013, on the other.

Moreover, the Amended Complaint fails to tie any alleged change in conduct to a conspiracy.  For example, Plaintiffs allege that "the daily average [bid/offer] spreads for 10-year USD swaps drops suddenly right around December 2012" (*id.* ¶ 170), which Plaintiffs speculate reflected the breakdown of Defendants' conspiracy.[18]  The Amended Complaint, however, concedes that innocuous forces can just as easily cause a change in the bid/offer spread:  indeed, Plaintiffs attribute an "increase in spreads in October 2013" to the "combination of the federal government shutdown and the uncertainty surrounding the implementation of regulations under the Dodd-Frank [A]ct," not the resumption of any alleged conspiracy.  (*Id.* ¶ 170 n.63.) Evidence of less volatile spreads after December 2012 is just as consistent with market stabilization at the end of the financial crisis as it is with the cessation of any conspiracy.

Plaintiffs' assertion that the alleged increase in the rate of variation of ISDAFIX submissions after December 2012 demonstrates the Banks' "consciousness of guilt" (*id.* ¶¶ 15, 112-22) also fails to state or support a claim for relief.  As the Supreme Court has explained, mere "parallel conduct" that could just as well arise from "independent responses to common

---

[18] Plaintiffs do not allege that any of Defendants' purported conduct resulted in actual wider bid/offer spreads, but rather that, due to ICAP's alleged delayed reporting of pre-fix bids and offers until after the fixing window, it "would *make it appear* as though the Defendant Banks had distortedly large bid-offer spreads as those delayed transactions would be reported alongside later ones on different terms."  (*Id.* ¶ 170 (emphasis added).)

stimuli," such as regulatory developments, does not suffice to state a claim under the Sherman Act. *Twombly*, 550 U.S. at 556 & n.4. There are any number of plausible reasons why a bank would change its voluntary rate-setting activities in response to regulatory developments, including ongoing control enhancements and resource management. Moreover, the rash of class actions has given banks good reason to reconsider their participation in setting various financial benchmark rates, which have become targets for strike suits.[19]

Finally, Plaintiffs' selection of December 19, 2012 as a dividing line evincing consciousness of guilt is specious. Plaintiffs allege that the Banks' trading conduct changed then due to "the announcement of the UBS LIBOR settlement and the subsequent announcements" of other benchmark investigations (AC ¶ 113) and that the purported conspiracy "began to unravel after that time in response to the publication of news related to the conspiracy affecting LIBOR." (*Id.* ¶ 233.) But the government's settlement of LIBOR claims against Barclays was publicly announced six months earlier, in June 2012. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 709 (S.D.N.Y. 2013) ("*LIBOR I*"). And, of course, these settlements did not materialize overnight; the Banks were obviously aware of the LIBOR investigations well before December 2012. The Wall Street Journal began its reporting into possible problems with LIBOR on April 16, 2008 (*see BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, No. 13-cv-0638, 2013 WL 6003701, at *7 (S.D.N.Y. Nov. 13, 2013) (Furman, J.)). To the extent the LIBOR investigations, and their settlements, would have triggered the collapse of the alleged conspiracy, there is simply no logical basis to draw any inference that this would have occurred in December 2012. Rather, Plaintiffs appear to have backed into this date to support their (deeply flawed)

---

[19] Additionally, any inference that could be drawn from the LIBOR investigations does not apply to those Defendants—such as Goldman Sachs, Morgan Stanley, Nomura, and Wells Fargo—that had no involvement in the LIBOR-setting process or any of the LIBOR-related investigations and settlements. The same principle applies to Defendants Nomura and Wells Fargo with respect to the FX-related investigations and settlements.

statistical analyses, and the alleged changes in behavior after December 19 provide no support for their theory of a purported conspiracy.

## II.   PLAINTIFFS LACK ANTITRUST STANDING

Plaintiffs' Sherman Act claim fails for the additional reason that they do not adequately plead antitrust standing.  A private antitrust plaintiff must plead both that it suffered "antitrust injury" and that it is an "efficient enforcer" of the antitrust laws to pursue a claim.  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-291 (2d Cir. 2006).  "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id*.  To allege such an injury, a plaintiff must plead two elements.  First, a plaintiff must allege an injury to competition, because "injury to competition . . . is the type of injury the antitrust laws are intended to prevent."  *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 544 (S.D.N.Y. 2009).  Second, a plaintiff must plead that its "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Gatt Commc'ns v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (injury must flow from unlawful anticompetitive conduct).[20] "Even if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing" if the factors articulated in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), show that it is "nevertheless not a proper antitrust plaintiff."  *Paycom*, 467 F.3d at 290 (internal quotation marks omitted).

Here, Plaintiffs allege three types of conduct, all of which are allegedly aimed at manipulating ISDAFIX.  Two types of alleged conduct—(1) Banks accepting the ICAP

---

[20] Courts developed the antitrust injury screen at the pleading stage to ensure that the incentive of treble damage actions—which are a "gift of section 4 of the Clayton Act," *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418-19 (7th Cir. 1989)—only rewards plaintiffs who were injured by conduct "forbidden in the antitrust laws," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977), not plaintiffs whose claims should be asserted, if at all, under different legal theories.

reference points, and (2) ICAP delaying the publication of trade information or altering the reference points—involve alleged misrepresentations, rather than agreements to restrict competition, and therefore cannot support antitrust injury.  (AC  ¶¶ 6, 8, 96, 151.)  The third type of alleged conduct, "bang[ing] the close" (*id.* ¶ 6), while arguably market conduct, is alleged to have occurred only in transactions between *dealers* that do not involve Plaintiffs, and, in any event, are not agreements to restrict competition, let alone competition for Plaintiffs' business, and therefore also are insufficient to adequately allege antitrust injury.

Tellingly, Plaintiffs' allegations are replete with references to "artificial" rates (*see, e.g.*, *id.* ¶¶ 82 n.25, 132-35 & n.48, 144-45, 147, 158, 162-63, 165, 171, 181-84, 258, and 275) rather than supracompetitive prices.  This is no surprise given that the Amended Complaint is, at best, an unsuccessful attempt to shoehorn Plaintiffs' now-abandoned CEA allegations into a Sherman Act claim.  Although an "artificial" rate might give rise to a claim of misrepresentation under some other law,[21] it does not support antitrust standing.  At bottom, Plaintiffs nowhere allege that they suffered any injury as a result of a reduction of competition in a market in which they are competitors or consumers.

### A.    Plaintiffs Cannot Plead Injury to Competition Because ISDAFIX Is Set Through a Cooperative, Not Competitive, Submission-Based Process

No antitrust injury lies where "alleged collusion occurred in an arena in which defendants never did and never were intended to compete."  *LIBOR I*, 935 F. Supp. 2d at 689; *see also Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *2, *8 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*") (plaintiff's allegation of injury "does not allege facts that competition was harmed in any way").  Even if alleged collusion caused "artificial" prices, in order to state an

---

[21] A fundamental requirement of a manipulation claim under the CEA is an artificial price caused by the defendant's conduct.  *See In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013).

antitrust claim, "that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have." *LIBOR I*, 935 F. Supp. 2d at 689.  Because the setting of the ISDAFIX benchmark rate, like LIBOR, is based on a cooperative process—the Banks' submissions of answers to a hypothetical question (i.e., what each Bank "would" bid/offer for a swap (AC ¶ 71))—and is not the product of competition to win Plaintiffs' business, there is no injury to competition.  Rather, if the Banks gave false answers to the hypothetical question, any injury to Plaintiffs would result from the alleged misrepresentation, not from any reduction in competition.  *LIBOR I*, 935 F. Supp. 2d at 688.

Plaintiffs' use of the conclusory labels "price fixing" and "per se violation of § 1" (*e.g.*, AC ¶¶ 130, 249) does not dispense with their obligation to plead antitrust injury, which applies with equal force whether a plaintiff alleges a per se antitrust violation or conduct that must be assessed under the rule of reason.  *LIBOR I*, 935 F. Supp. 2d at 687.  True price-fixing schemes have a self-evident mechanism for reducing competition—constricting the supply of the relevant product to elevate prices.  *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) ("constriction of supply is the essence of price-fixing").  Plaintiffs here, as in the LIBOR decisions described below, cannot identify any supply restriction.  *See Laydon I*, 2014 WL 1280464, at *12 ("Nor is there any allegation that output of Euroyen futures contracts was eliminated or diminished.").  Plaintiffs' allegations that the Banks' submissions caused the ISDAFIX rates to be merely "artificial" therefore fail to plead any identifiable harm to competition.  *See id.* at *8 ("At most, Plaintiff alleges that prices were distorted.  Plaintiff, however, does not allege that this was a result of a reduction in competition.").

In *LIBOR I*, *Laydon I*, and *7 West 57th Street v. Citigroup*, three judges in this District dismissed purported price-fixing claims where plaintiffs alleged that defendants collusively

manipulated benchmark interest rates.  *LIBOR I*, 935 F. Supp. 2d at 679, 695; *Laydon I*, 2014 WL 1280464, at *12; *7 W. 57th St. v. Citigroup, Inc.*, No. 13 Civ. 981, 2015 WL 1514539, at *20 (S.D.N.Y. Mar. 31, 2015) ("*7 W. 57th St.*").[22]  In each case, the manipulation allegedly harmed the value of plaintiffs' financial instruments, including futures contracts and interest rate swaps that incorporated the benchmark rates into their terms.  *LIBOR I*, 935 F. Supp. 2d at 681-82; *Laydon I*, 2014 WL 1280464, at *8; *7 W. 57th St.*, 2015 WL 1514539, at *2-4.  As Judge Buchwald explained in *LIBOR I*, such harm is not an antitrust injury because the submission-based[23] process of setting these benchmark rates "was never intended to be competitive."  935 F. Supp. 2d at 688; *see also 7 W. 57th St.*, 2015 WL 1514539, at *19.  Manipulation of the benchmark-setting process therefore could not constitute harm to competition.  *See also Laydon I*, 2014 WL 1280464, at *8 (allegation that "otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate index" does not allege harm to competition).

Plaintiffs here allege the same type of injury from alleged manipulation of a noncompetitive, submission-based process (AC ¶¶ 72, 99), and therefore have not pleaded harm to competition.  As in *LIBOR I*, *Laydon I*, and *7 W. 57th St.*, the Amended Complaint here alleges that ISDAFIX rates were set based on voluntary submissions by the Banks in response to a hypothetical question (*see id.* ¶¶ 71-72), and so Plaintiffs could have suffered the same type of purported injury "under normal circumstances of free competition."  *LIBOR I*, 935 F. Supp. 2d at 689.  Competitive forces would not have deterred any Bank from unilaterally submitting an off-

---

[22] *See also Mayfield v. British Bankers' Ass'n*, No. 14-cv-4735, slip op. at 4 (S.D.N.Y. July 22, 2014) (Preska, J.) (adopting Judge Buchwald's reasoning in *LIBOR I* to dismiss other LIBOR-related antitrust claims for lack of antitrust injury).

[23] Like ISDAFIX, LIBOR rates were calculated from the average of submissions made by banks after removing a set of the highest and lowest submissions.  *See LIBOR I*, 935 F. Supp. 2d at 678.

market quote.  As Judge Buchwald explained in the LIBOR context, "[a] misreporting bank . . . would not have been concerned about being forced out of business by competition from other banks."  *Id.* at 691.  In a true price-fixing scenario, "the sellers' supracompetitive prices could exist only where the sellers conspired not to compete."  *Id.* at 690-91.  If one competitor raised its price while others did not, the price-raising firm would lose business.  In contrast, here, there would be no competitive consequence to any Bank that submitted an artificial quote.  Any purported agreement to submit "false" rates therefore could not be an agreement that harms competition because the alleged collusion would not have allowed Defendants to do anything that competition would have prevented.  Plaintiffs allege dishonesty rather than a failure to compete,[24] but the antitrust laws are not meant to redress dishonesty.[25]

Similarly, Plaintiffs' allegations that ICAP delayed the publication of certain interdealer transactions and would "simply set the reference [points] at the predetermined level" (AC ¶130 n.45; *see also* ¶ 96) are untethered to any competition among Defendants.  This further highlights that, as in the LIBOR cases, the alleged collusion that caused Plaintiffs' purported injury is a theory of  misrepresentation rather than failure to compete.  *See LIBOR I*, 935 F. Supp. 2d at 688-89; *see also Laydon I*, 2014 WL 1280464, at *8; *7 W. 57th St.*, 2015 WL 1514539, at *20.

Plaintiffs attempt to avoid the central holdings of *LIBOR I*, *Laydon I*, and *7 W. 57th St.* by alleging that market transactions influenced one component of compiled reference points that

---

[24] *See, e.g.*, AC ¶¶ 9, 97, 109, 111, 171, 187, 246 (alleging the Banks did not make honest ISDAFIX submissions); *id.* ¶ 283 (alleging Defendants acted "with dishonest, unfair, and improper means").
[25] *See LIBOR I*, 935 F. Supp. 2d at 688 (alleged conspiracy to submit artificial estimates of interbank lending rates would result in an injury "from defendants' misrepresentation, not from harm to competition"); *see also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (false statements about a rival's goods were not actionable under the antitrust laws because they did not "drive up prices by curtailing output"); *Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186, 1191-92 (N.D. Ill. 1970) ("stock market manipulation schemes have never been within the coverage of the Sherman Act" because they constitute fraud, not a restraint of trade).

Banks were free to accept or not when making ISDAFIX submissions.  (*See* AC ¶¶ 6, 72.)  But the Amended Complaint makes clear that, ultimately, the ISDAFIX rate was set based solely on the Banks' voluntary submissions.[26]  (*See, e.g.*, *id.* ¶ 71-72 (alleging that the Banks' submissions reflected what they "would" bid or ask for a swap, not what they *had* bid or asked in an actual transaction).)[27]  Thus, because ISDAFIX, like LIBOR, was based on submissions that were never competitive in the first place, Plaintiffs have not pleaded an antitrust injury.  *See LIBOR I*, 935 F. Supp. 2d at 687-89; *Laydon I*, 2014 WL 1280464, at *8.

### B.     The Alleged Misconduct Could Not Reduce Competition for Plaintiffs' Business Because That Competition Was Already Complete When the Alleged Misrepresentations Occurred

The three types of conduct described in the Amended Complaint were allegedly designed to eventually move the ISDAFIX benchmark rate up or down (*see id.* ¶¶ 6, 8, 151), *not* to fix the prices the Banks charged customers for swaps, swaptions, or other derivatives.  Indeed, Plaintiffs do not allege that ISDAFIX is a "price" of these instruments.  The "price" of a swap is the fixed rate that a Bank offers to pay in exchange for a floating rate (or vice versa).  (*Id.* ¶¶ 48-49.)  The "price" of a swaption is the premium the buyer pays the seller for the option.  (*Id.* ¶ 55.)[28] Although Banks compete with each other to offer more attractive fixed rates, strike rates, and

---

[26] This allegation also distinguishes the Amended Complaint from the one filed in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, where there was no allegation that the relevant benchmark was set through voluntary submissions made in a cooperative polling process, but, rather, was allegedly set by transactions in the products that plaintiffs claimed to have purchased (currencies).  No. 13 CIV. 7789, 2015 WL 363894, at *11 (S.D.N.Y. Jan. 28, 2015) ("*In re FX*").

[27] In an apparent attempt to suggest that ISDAFIX rates were "based on real transactions," Plaintiffs misleadingly state that ICAP merely "adjusted the reference rate based on Defendants' submissions."  (AC ¶ 4.)  Plaintiffs' own allegations contradict this mischaracterization of the ISDAFIX-setting process.  (*Id.* ¶ 72.)  The "reference rate" was not "adjusted," nor was it even included among the values that Thomson Reuters averaged to calculate the ISDAFIX rate.  (*Id.*)  The only way in which Plaintiffs allege that the reference points could have been part of the calculation of the ISDAFIX rate is if a Bank accepted the reference points as its submission.  (*Id.*)

[28] Swaptions also have a negotiated "strike" rate.  The Amended Complaint refers to, but does not define, the "strike" in a swaption (*see id.* ¶ 207), which is the fixed rate at which the option holder has the right to enter into the swap (*see id.* ¶ 55 (explaining that a swaption spells out the rates that each party would pay if the swaption is exercised)).

premiums, they plainly cannot compete to offer a more attractive ISDAFIX rate.  A benchmark

rate is, by definition, the same for any buyer and seller who uses the benchmark.  In short, that

the Banks may have competed *outside of the ISDAFIX-setting process* to win customers is

irrelevant, because Plaintiffs have not alleged any reduction in that competition.  *See LIBOR I*,

935 F. Supp. 2d at 688 ("It is of no avail to plaintiffs that defendants were competitors outside

the [LIBOR-setting process.]").

Plaintiffs' allegations that Defendants manipulated ISDAFIX to allow the Banks to pay

Plaintiffs less at settlement than what was otherwise owed on ISDAFIX-tied derivatives (*see* AC

¶¶ 194, 196, 281) do not plead harm to competition because the supposed manipulation

necessarily would have occurred when the derivatives expired or were settled—which would

have been long after competition by the Banks for the customer's business was over.  Moreover,

the Banks' conduct could not have given rise to an antitrust injury because such conduct would

have occurred after the Banks and customers had entered into alleged contracts.  *See, e.g.*, *UNR

Indus., Inc. v. Cont'l Ins. Co.*, 607 F. Supp. 855, 859-61 (N.D. Ill. 1984) (dismissing antitrust

claims because, at the time of the alleged misconduct, defendants' obligations were "fixed by

each defendant's contract . . . [leaving] no role for competition to play"); *see also Newman v.

Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (holding that the "fundamental

problem" with plaintiffs' antitrust claim was that the alleged conspiracy arose after they had

entered into contracts).

### C.    Plaintiffs' Purported Injuries Do Not Stem from Any Competition-Reducing Aspect of the Alleged Misconduct

To plead antitrust injury, "[i]t is not enough for the actual injury to be causally linked to

the asserted violation."  *Gatt Commc'ns*, 711 F.3d at 76.  Rather, Plaintiffs must allege that the

injuries they suffered came directly from the "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344 (emphasis in original).

Plaintiffs' purported injuries do not result from any competition-reducing effect of Defendants' alleged conduct. "Banging the close" is the only element of actual market activity that Plaintiffs even attempt to connect to their purported injuries. But "banging the close" does not give rise to antitrust injury. A hallmark of price fixing is an agreement to elevate price by restricting supply. *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 423. In contrast, the Banks here are alleged to have caused injury by introducing *more*—not fewer—transactions into the interdealer interest rate swap market around 11 a.m. (AC ¶¶ 136-37 (alleging that the Banks worked with ICAP "to buy or sell as many interest-rate swaps as necessary to move the benchmark" and that "Defendants would execute an inordinately high volume of transactions during or just before the first two minutes of the ICAP polling window").) Under *Brunswick* and *Atlantic Richfield*—the seminal Supreme Court cases on antitrust injury—plaintiffs, like those here, who complain of harm from anything beside the competition-reducing aspects of the defendant's conduct, fail to plead antitrust injury. *See LIBOR I*, 935 F. Supp. 2d at 689-92 (reviewing *Brunswick* and *Atlantic Richfield* and concluding that, like those cases, plaintiffs' alleged injuries did not stem from the competition-reducing component of defendants' conduct).

### D.      Plaintiffs Fail to Plead That They Are "Efficient Enforcers"

Plaintiffs also lack antitrust standing under the analysis set forth in *AGC*. 459 U.S. at 537-44. Even if a plaintiff pleads antitrust injury, a court must separately determine whether it is an "efficient enforcer" of the antitrust laws. *Paycom*, 467 F.3d at 290 (citing *AGC*). Relevant factors in this analysis include whether the plaintiff was "a consumer or competitor in the market in which trade was restrained," *AGC*, 459 U.S. at 539, "the directness or indirectness of the asserted injury," and "the existence of an identifiable class of persons whose self-interest would

normally motivate them to vindicate the public interest in antitrust enforcement," *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988) (citing *AGC*, 459 U.S. at 540-45).  Plaintiffs here fail this test for standing.

As noted, the Amended Complaint describes purported injuries based on two categories of transactions:  (1) derivatives that "expressly reference ISDAfix" and (2) derivatives that "do not expressly incorporate ISDAfix."  (*See* AC ¶¶ 193, 198.)  With respect to the ISDAFIX-tied derivatives, the alleged injury stems from allegedly "artificial" ISDAFIX rates.  As described above, the ISDAFIX rate is solely the result of averaging a selection of noncompetitive bank submissions, and therefore the manipulation of that calculation cannot be a market restraint directly causing Plaintiffs' alleged injury.

But even if the Court were to treat "banging the close"—the only market-related conduct alleged in the Amended Complaint—as a market restraint, Plaintiffs still would not have standing because Plaintiffs were not counterparties to any of those transactions.  "Banging the close" allegedly occurred in solely *interdealer* trading—i.e., among parties like the Banks, not between the Banks and their customers.  To the extent that trades are reflected on Screen 19901,[29] only interdealer trades would have the effect of moving Screen 19901 and moving the reference points circulated to the Banks.  Therefore, at most, the alleged "banging the close" affected competition in a market in which Plaintiffs did not participate.  *See, e.g.*, *Davis v. AT&T Wireless Servs. Inc.*, No. CV 11-02674, 2012 WL 692413, at *2 (C.D. Cal. Mar. 1, 2012) ("[T]he plaintiff must be a 'participant in the same market as the alleged malefactors." (quoting *Glen Holly Entm't, Inc. v. Tekronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003)).  Nondefendant banks that actually participated

---

[29] The Amended Complaint alleges that the transactions subject to "banging the close" were published on Screen 19901.  (*See id.* ¶¶ 6, 72.)  Screen 19901 published the bid/offer rates of transactions "executed through ICAP" (*id.* ¶ 65), which brokers transactions between dealers only, not retail customers (*see id.* ¶¶ 1, 63).

in that interdealer trading would be more directly connected to the alleged misconduct than any of the Plaintiffs here.  *See AGC*, 459 U.S. at 545.  By Plaintiffs' own theory, these dealers would have paid "artificial" rates as a direct result of any "banging of the close."[30]  Plaintiffs' indirect injury does not support antitrust standing.

The other category of alleged injury—based on derivatives *not tied to ISDAFIX*—is even more remote and therefore even more clearly insufficient for antitrust standing.[31]  This remoteness is no surprise:  while all of the alleged conduct was aimed at manipulating ISDAFIX, this category of derivatives did not incorporate or depend on ISDAFIX at all.  Courts consistently reject antitrust standing for plaintiffs who merely allege that the product they purchased was somehow affected by a conspiracy involving some other product, regardless of how closely related the prices of the two products are alleged to be.  *See Laydon I*, 2014 WL 1280464, at *9 (purchasers of Euroyen TIBOR futures contracts alleged an injury too attenuated from alleged manipulation of LIBOR to support antitrust standing); *Laumann v. NHL*, 907 F. Supp. 2d 465, 484 (S.D.N.Y. 2012) (purchasers of a TV or Internet service who did not also purchase an out-of-market package lacked standing to bring antitrust claims relating to manipulation of out-of-market distributions); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403 (S.D.N.Y. 2011) (dismissing antitrust claims by purchasers of CDs who alleged that restrictions on Internet

---

[30] Furthermore, the effect of "banging the close" on Plaintiffs who purchased ISDAFIX-tied derivatives is necessarily indirect because it required subsequent "false" acceptances of the reference points in voluntary submissions in order to impact the final ISDAFIX rates.  *See id.* at 540-42.

[31] Plaintiffs generally do not specify whether the derivatives they each entered into were tied or not tied to ISDAFIX.  Instead, each Plaintiff alleges that it transacted in an ISDAFIX-tied derivative "or" in some derivative influenced by the purported manipulation of ISDAFIX.  (AC ¶¶ 23-27.)  But that elides a crucial distinction.  It is well-settled that where a plaintiff alleges competitive restrictions on one product which allegedly also affected the price of a second product, generally there is no antitrust standing for transactions in that second product.  Affording standing and the possibility of treble damages only to the purchasers of the first product, assuming it was the actual target of the conspiracy, provides more than sufficient deterrence.  *See AGC*, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general.").

music also inflated CD prices).[32]  Thus, even if the Court were to find that transactions in

ISDAFIX-tied derivatives were sufficiently close to the alleged antitrust violation under *AGC*,

the Court should still dismiss Plaintiffs' claims based on derivatives not tied to ISDAFIX for lack

of antitrust standing.

In the rare cases that have found antitrust standing for parties who did not purchase a

product in (or compete in) the market allegedly restrained, courts have required more than a mere

causal relationship between the alleged antitrust violation and the plaintiff's injury.  The injury

instead must be "inextricably intertwined with the injury the conspirators sought to inflict."  *Blue

Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).  In other words, the harm to plaintiff must

at least be "a necessary step in effecting the ends of the alleged illegal conspiracy."  *Id.* at 479;

*see also Ostrofe v. H.S. Crocker Co, Inc.*, 740 F.2d 739, 745 (9th Cir. 1984) (explaining that

*McCready* extended "the right to sue to persons whose injury is a 'necessary step' and the

'means' employed by the conspirators to achieve their anticompetitive ends").

Here, Plaintiffs' conclusory allegations merely assert that the purported manipulation of

ISDAFIX had some secondary effect on the price of derivatives not expressly tied to ISDAFIX.

Plaintiffs do not allege that Defendants manipulated those prices at all, let alone as a necessary

step to achieve their supposed anticompetitive end—i.e., manipulation of ISDAFIX.  *See, e.g.*, *In

re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481, 2015 WL 1378946, at *7, *13

---

[32] *See also Reading Indus. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) (copper scrap refiner lacked standing to bring antitrust claims based on manipulation in refined copper market because the "causal relationship between defendants' alleged violation and [plaintiff's] payment of high scrap prices is too remote"); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98 CIV. 4067, 1999 WL 1201701, at *3-4 (S.D.N.Y. Dec. 15, 1999) (denying standing to purchasers of physical copper in the U.S. cash market who alleged that manipulation of the LME futures market impacted COMEX prices, which impacted cash market prices, because "Defendants' allegedly unlawful activity principally involved a conspiracy to corner the futures market on the LME. [Plaintiff] does not allege that it trades on the LME or in the futures market."); *De Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 517-518 (S.D.N.Y. 1985) (purchaser of LME silver futures contracts lacked standing to assert antitrust claims based on manipulation of COMEX silver futures prices).

(S.D.N.Y. Mar. 26, 2015) (finding antitrust standing where plaintiffs' injury was "necessary and central" to the alleged antitrust violation).  Nor do they allege that any Defendant intended to affect the prices of these derivatives or profited from such effects.  Such secondary or incidental consequences do not create antitrust standing, especially where, as here, Plaintiffs are not "the first parties in the distribution chain to be affected by" the challenged conduct.  *Id*. at \*13.  Thus, claims relating to transactions in instruments not tied to ISDAFIX are too remote from the alleged manipulation, and should be dismissed for lack of antitrust standing.

In sum, derivatives expressly referencing ISDAFIX do not support antitrust standing because Plaintiffs' purported injuries stem from an alleged manipulation of a calculation, rather than a market restraint, and because Plaintiffs were not participants in the purely interdealer market in which the alleged misconduct occurred.  And derivatives that are not tied to ISDAFIX are *even more* remote from the alleged misconduct, such that any impact would be purely tangential and therefore well beyond the scope required for antitrust standing under *AGC*.

## III.   PLAINTIFFS FAIL TO PLEAD INJURY IN FACT OR DAMAGES

Beyond their failure to plead antitrust injury, Plaintiffs fail to plead adequately that they were injured at all, an infirmity that afflicts all of their claims.  Despite carrying out an analysis that allegedly enabled Plaintiffs to conclude that Defendants manipulated ISDAFIX on more than 1,700 days in the putative class period, Plaintiffs still fail to demonstrate that their own transactions actually were harmed.  Plaintiffs have not specified how, if at all, ISDAFIX affects the vast majority of transactions pleaded in Appendix A, all of which likely involve bespoke, individually-negotiated terms.

There is no dispute that an antitrust plaintiff must adequately plead injury in fact to establish standing under Article III of the Constitution and Section 4 of the Clayton Act.  *See* 15 U.S.C. § 15 (2012); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir.

2007).  Each of Plaintiffs' other claims also requires them to plead injury in fact or damages.[33]

To plead injury in fact, Plaintiffs must allege the "ways in which . . . [they are] in a 'worse

position' as a consequence of [Defendants'] conduct."  *Gatt Commc'ns*, 711 F.3d at 76.  Each

Plaintiff bears the burden of pleading its own particular injury or damages.  *See, e.g.*, *Simon v. E.*

*Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976); *W.R. Huff Asset Mgmt. Co. LLC v.*

*Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) ("[D]istrict courts should be

mindful that named plaintiffs in a class action 'must allege and show that they personally have

been injured, not that injury has been suffered by other, unidentified members of the class to

which they belong and which they purport to represent.'").

*Alaska Fund and GCERS.*  While Plaintiff Alaska Fund alleges the largest number of

transactions (1,242), it attempts to articulate harm for only a single plain vanilla swap—

unconnected to ISDAFIX—which it entered into on October 20, 2012.  Alaska Fund alleges that

there was "an anomalous suppression of 10-year swap rates" on that date, and that the

"anomalous activity had the effect of decreasing the fixed rate receivable by Plaintiff [Alaska

Fund] by up to 3.3 basis points."  (AC ¶ 206.)

GCERS, the Plaintiff with the second largest number of transactions (700), also attempts

to allege injury for only a single transaction—a physically-settled swaption entered into on May

24, 2007.  (*Id.* ¶ 208.)  The fixed rate receivable by GCERS in the underlying swap purportedly

was manipulated by suppressing five-year swap rates on the trade date.  (*Id.*)  GCERS alleges

that the suppression reduced the fixed rate "receivable" by GCERS over the five-year life of the

---

[33] *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (breach of contract); *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (breach of implied covenant of good faith and fair dealing); *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, No. 13-CV-7307, 2014 WL 4804465, at *9 (S.D.N.Y. Sept. 26, 2014) (tortious interference with contract); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 512 (S.D.N.Y. 2013) (unjust enrichment).

swap by two basis points.  (*Id.*)

For these two transactions, which are not expressly linked to ISDAFIX, Plaintiffs spin an *indirect* theory of injury that Defendants' supposed manipulation caused a "shock" to the entire interest rate swaps market that arose right before the 11 a.m. fixing window and persisted throughout the day.  (*Id.* ¶¶ 200-01.)  This convoluted theory of harm hinges on the time of day that a Plaintiff transacted.[34]  Even taking Plaintiffs' theory on its face, there could be no injury for a trade occurring before or after the limited period of time during which the Plaintiffs assert—without any factual support—a "shock" to the market affecting swap prices occurred. (*Id.* ¶ 201.)  Alaska Fund and GCERS fail, however, to allege that their transactions occurred during a period when market prices were supposedly distorted.[35]  *See Zola v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 84 CIV. 8522, 1986 WL 1163, at *2 (S.D.N.Y. Jan. 23, 1986) (dismissing claims where the plaintiff demanded return on his bonds *before* defendant made allegedly false statements).[36]

***New Britain.***  The Amended Complaint identifies eight transactions that Plaintiff New Britain entered into during the relevant time period (*see* AC ¶ 27, App. A), supposedly on one or more "days that have been identified as being subject to manipulation" (*id.* ¶ 27).  New Britain, however, never pleads that any of the eight transactions incorporated ISDAFIX into its terms or were settled at the ISDAFIX rate, nor does it plead the *direction* of the purported market

---

[34] Notably, Plaintiffs' analysis of the "shock" fails to indicate how long it lasted—the x-axis in the graph at AC ¶ 201 is unlabeled.

[35] Plaintiffs' alleged transactions even include an unspecified number of cash settlements that occurred days after the alleged manipulation.  (*See id.* ¶ 196.)  Plaintiffs cannot plausibly allege that Defendants manipulated ISDAFIX on a particular day with the intent of affecting the benchmark on a subsequent day.

[36] The recent *In re Aluminum* decision has no application here.  There, the court found injury in fact to have been sufficiently pleaded because the allegations that plaintiffs always paid higher prices were "concrete, particularized, and actual."  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *11.  Here, however, Plaintiffs allege a multidirectional, time-dependent conspiracy without alleging the facts necessary to infer they suffered injury.  This is clearly distinguishable from the allegations addressed in *In re Aluminum*.

manipulation on the days in which it transacted, or offer any other facts establishing injury.

Claims based on "day-to-day, trading based manipulation" fail where, as here, it is not possible to discern benefit or loss from the alleged multi-directional manipulation. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 460-61 (S.D.N.Y. 2014) ("*LIBOR III*") (absent pleading the direction of trades, alleged multi-directional manipulation renders damages "merely 'conceivable'"); *see also Laydon I*, 2014 WL 1280464, at *8 (plaintiff's allegations were insufficiently detailed with respect to, e.g., whether an increase or decrease in the futures contracts caused his alleged losses).[37]  Without knowing the direction of both the trades and the alleged manipulation, it is not possible to discern benefit or loss from the pleadings. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) ("*LIBOR II*").

***Washington County.***  The Amended Complaint identifies only one transaction by Plaintiff Washington County.  (*See* AC App. A.)  Washington County claims that Plaintiffs' experts identified some type of anomaly on "numerous" floating rate payment dates for a *physically*-settled payer swaption that it entered into with Defendant JPMorgan.  Washington County alleges that it was injured by "*any* downward manipulation by Defendants of the 10-year ISDAFIX rate on any of JPMorgan's floating rate payment dates."[38]  (*Id.* ¶ 195 (emphasis added).)  But it does not allege that downward manipulation *in fact* occurred on any of those

---

[37] *In re FX*, 2015 WL 363894, at *9, does not assist Plaintiffs here. Plaintiffs' experts have supposedly identified manipulation on 1,700 days, yet Plaintiffs do not plead specifics about the nature and direction of that supposed manipulation (except for the alleged fact that it happened).  Thus, unlike *In re FX*, where the court viewed defendants' injury in fact argument as a "demand for specifics that are not required and that Plaintiffs could not be reasonably expected to know, at the pleadings stage," Plaintiffs claim to have identified specific days of manipulation (up or down) on nearly every trading day over seven and a half years.  Plaintiffs here, unlike in *In re FX*, do not need discovery to know whether they were injured.  They possess that information and their failure to plead that they were injured with respect to specific transactions is telling.

[38] Plaintiffs' express reference to ISDAFIX with regard to this trade is notable; one can infer from the lack of reference to ISDAFIX for the other trades that they had no such reference or tie.

days.  Accordingly, Washington County's claimed harm is insufficiently pleaded.

*Montgomery County.*  Plaintiff Montgomery County similarly alleges hypothetical harm

arising from a single swap transaction.  (*Id.* ¶ 194 ("[T]his suppression led to a reduction in the

value of the ISDAfix-linked cash-flows *payable to* Montgomery County." (emphasis added)).)

Montgomery County fails to allege that it, in fact, was paid any reduced cash flows.

Montgomery County's claimed harm is thus insufficiently pleaded because its claim, like all of

the other Plaintiffs', depends on timing of the transactions and the relevant payment dates,

neither of which is provided.

The Court and Defendants are left guessing with respect to Plaintiffs' nearly two

thousand other transactions for which there are no specific allegations of harm from the supposed

manipulation.  *See Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419, 2015 WL 1515487, at *10

(S.D.N.Y. Mar. 31, 2015) ("*Laydon II*") (statistical analysis merely showing correlation not

sufficient to establish injury).

## IV.     PLAINTIFFS' CONTRACT-BASED CLAIMS AGAINST THE BANKS FAIL

### A.     Plaintiffs' Breach of Contract Claim Fails

To state a claim for breach of contract, a plaintiff must allege the existence of a contract,

breach of that contract, and damages flowing from the breach.  Where, as here, a plaintiff sues

multiple parties, the plaintiff must allege the existence of a contract with each defendant.

Plaintiffs have failed to meet even this minimal burden.  *See e.g.*, *LIBOR III*, 27 F. Supp. 3d at

*20.[39]

---

[39] New York's choice of law rules govern which state's substantive law will apply to Plaintiffs' common law claims. *See, e.g.*, *Klein v. ATP Flight Sch., LLP*, No. 14-CV-1522, 2014 WL 3013294, at *5 (E.D.N.Y. July 3, 2014).  But the Court need not reach this issue on this motion because Plaintiffs' allegations are insufficient regardless of which state's law applies.  *See, e.g.*, *Johnson & Johnson v. Guidant Corp.*, No. 06 Civ. 7685, 2010 WL 571814, at *6 (S.D.N.Y. Feb. 16, 2010); *Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09 Civ. 10607, 2014 WL 1285507, at *12 (S.D.N.Y. Mar. 31, 2014).

Although Plaintiffs list a series of transactions in Appendix A, they fail to allege sufficient facts about each of those transactions to allow Defendants to determine which of them will be a basis for Plaintiffs' claim.  *See e.g.*, *Langreich v. Gruenbaum*, No. 06CIV4931, 2009 WL 321253, at *4 (S.D.N.Y. Jan. 30, 2009).  The transactions at issue are bespoke, over-the-counter contracts (AC ¶¶ 63, 64, 67, 210) with customized provisions, and Plaintiffs do not identify which contracts had cash flows expressly tied to ISDAFIX or whether the exercise or settlement date of each was affected by any alleged manipulation.[40]  As a result, other than two specific examples attached to the Amended Complaint as Appendices S and T (*see id.* ¶¶ 194-95), Plaintiffs have not given Defendants notice of a single contract that a Defendant allegedly breached and have not alleged enough information to state a plausible contract claim.[41]

Plaintiffs allege generally that Defendants breached ISDA Master Agreements by manipulating ISDAFIX during dates on which the agreement called for cash flows by reference to ISDAFIX.  (*See id.* ¶ 258.)  But Plaintiffs do not specifically allege that any individual Bank manipulated ISDAFIX, or was even aware of manipulation by others, in any particular tenor on any particular date.  Nor do they explain how using ISDAFIX to settle contracts (*id.*)—which was an explicit requirement of those contracts (*id.* ¶ 254)—can constitute breach.  Without such allegations, Plaintiffs have not alleged that Banks with which Plaintiffs allegedly contracted ("Counterparty Banks")—the only Defendants against whom Plaintiffs assert contract-based claims (*see id.* ¶¶ 255, 265)—breached their contracts.[42]  Further, ISDAFIX has thirteen different

---

[40] Although Plaintiffs give the exercise date of each swaption in Appendix A, they do not state whether these swaptions were cash-settled (and thus potentially could have had cash flows affected by ISDAFIX).

[41] In particular, there can be no contract claim against Nomura because Plaintiffs have not alleged any transactions with this Defendant.

[42] Even with respect to the only specific contracts with cash flows linked to ISDAFIX that Plaintiffs allege (*see id.* Apps. S, T), Plaintiffs do not allege that their specific counterparties engaged in any manipulation of ISDAFIX that affected cash flows on those contracts, or were aware of any such manipulation.  (*See id.* ¶¶ 194-95.)  Their claim with respect to those contracts must therefore also be dismissed.

tenors, and Plaintiffs fail to tie the alleged manipulation to the specific ISDAFIX tenor relevant

to each transaction.  *See LIBOR II*, 962 F. Supp. 2d at 623 n.22 (distinguishing between different

tenors of LIBOR).  And, as discussed at length *supra* in Section III, Plaintiffs have not alleged

adequately that they were harmed or even affected by the alleged breach.

### B.    Plaintiffs' Breach of the Implied Covenant of Good Faith Claim Fails

Plaintiffs' claim for breach of the implied covenant of good faith fails for the same

reasons as their breach of contract claim.  Plaintiffs have failed to identify "specific actions on

the part of particular defendants that allegedly breached this duty." *Yucyco, Ltd. v. Republic of*

*Croatia*, No. 96 Civ. 5559, 1997 WL 728173, at *2 (S.D.N.Y. Nov. 19, 1997).  In addition to the

elements for breach of contract, Plaintiffs must further allege that the Banks acted with bad faith

or the intent to harm to state a claim for breach of the implied covenant of good faith.  *See Keene*

*Corp. v. Bogan*, No. 88 Civ. 0217, 1990 WL 1864, at *14-15 (S.D.N.Y. Jan. 11, 1990).

Plaintiffs do not allege that the Banks either acted in bad faith or with intent to harm

Plaintiffs with respect to specific transactions.  Allegations of the Banks' awareness of some

manipulation not targeted at any particular Plaintiff, transaction, or contract fall far short of

pleading breach of the covenant of good faith.  *See Pitcairn Props., Inc. v. LJL 33rd St. Assocs.,*

*LLC*, No. 11 Civ. 7318, 2012 WL 6082398, at *5 (S.D.N.Y. Nov. 20, 2012) ("the plaintiff must

allege facts which tend to show that the defendant sought to prevent performance of the contract

or to withhold its benefits from the plaintiff"), *aff'd in part, rev'd in part on other grounds*, 725

F.3d 184, 195-96 (2d Cir. 2013).  That is especially true where, as here, the Banks had legitimate

independent reasons for the challenged conduct.  *See supra* Section I.B.2.

Finally, Plaintiffs' implied covenant claim must be dismissed because it is duplicative of

Plaintiffs' breach of contract claim.  Both claims are based on precisely the same facts—that

certain Plaintiffs and certain Banks were parties to "ISDA Master Agreements," and that the

Banks' collective conduct improperly affected ISDAFIX rates on which those contracts' cash flows were based.[43]  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."[44]  *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

## V.   PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM FAILS

Plaintiffs allege for the first time in the Amended Complaint that Defendants tortiously interfered with Plaintiffs' interest rate derivative transactions throughout the purported class period by "manipulating ISDAfix."  (AC ¶¶ 278-85.)  This claim should be dismissed.  As an initial matter, Defendants' alleged conduct did not constitute a breach of the contracts at issue.  *See supra* Section IV.A; *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) ("In order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish . . . the actual breach of the contract[.]").

Under all potentially applicable state law, Plaintiffs must plead the following elements to state a claim for tortious interference with contract: (i) each Defendant's knowledge of the contract, (ii) each Defendant's intentional and improper procurement of a breach, and (iii) damages proximately caused by the Defendant's alleged conduct.[45]  Plaintiffs fail to do so.

---

[43] (*Compare* AC ¶¶ 256-58, *with* ¶¶ 266–67; *see also id.* ¶¶ 258, 260 (stating as basis of claim for breach of contract that Defendants "breach[ed] their duty of good faith" and breached their "duty to determine the Cash Settlement Amount . . . in good faith and in a commercially reasonable manner").)

[44] Pennsylvania and Connecticut also do not recognize a claim for breach of the implied covenant of good faith and fair dealing when a breach of contract claim based on the same facts is pleaded.  *See, e.g., King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 466-67 (E.D. Pa. 2001), *aff'd*, 117 F. App'x 173 (3d Cir. 2004) (Pennsylvania); *Casper v. Combustion Eng'g, Inc.*, No. CV 97-0570516S, 1998 WL 389215, at *8 (Conn. Super. Ct. June 23, 1998) (Connecticut).  Alaska law supports the dismissal of a breach of implied covenant claim when a breach of contract claim based on the same facts also has been dismissed.  *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1016 (Alaska 1999).  Michigan law does not recognize breach of the implied covenant of good faith and fair dealing claims at all.  *McCann v. U.S. Bank, N.A.*, 873 F. Supp. 2d 823, 848 (E.D. Mich. 2012).

[45] *See, e.g., BP Envtl. Servs., Inc. v. Republic Serv., Inc.*, 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013); *Knight Enters. v. RPF Oil Co.*, 299 Mich. App. 275, 279-80 (2013); *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d

*First*, Plaintiffs fail to plead that each Defendant had knowledge of the specific contract(s) between Plaintiffs and third parties subject to the alleged interference.[46]  (*See* AC ¶ 281 (merely alleging that Defendants were "aware that it was common for swaptions to reference ISDAFIX to determine the final cash flows at expiry").)  Pleading that a defendant has general knowledge of the plaintiff's business dealings with others,[47] or "should have known" about the contract's existence, is not enough.  *Qube Films Ltd. v. Padell*, No. 13-cv-8405, 2014 WL 3952931, *8 (S.D.N.Y. Aug. 12, 2014).  Generalized knowledge of products that may be available on the market does not constitute knowledge of individual contracts entered into by Plaintiffs with others.[48]  *See, e.g., Boehner v. Heise*, 734 F. Supp. 2d 389, 404 (S.D.N.Y. 2010).

*Second*, Plaintiffs fail to allege that Defendants specifically intended to procure the breach of any particular contract.  Nor is there any conceivable motive for Defendants to have harbored such an intent.  Plaintiffs' wholly conclusory allegations of specific intent are not sufficient.  (*See, e.g.,* AC ¶ 282 ("Defendants' unlawful conduct . . . was therefore an intentional interference with the ISDAfix-referencing contracts of Plaintiffs and members of the Class.").)

Far from plausibly alleging the requisite intent to procure breaches, by third parties, of Plaintiffs' contracts, Plaintiffs contend instead that Defendants manipulated ISDAFIX to

---

94, 98 (Pa. 2009); *K&K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 716 (2003); *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212-13 (Conn. 2000); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); *RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991); *Wood v. Herndon & Herndon Investigations, Inc.*, 186 Mich. App. 495, 499-500 (1990).

[46] *See, e.g., Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 626 (S.D.N.Y. 2014); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 728 (E.D. Pa. June 5, 2014); *Orange Landing Condo. Ass'n, Inc. v. White*, No. CV044000341S, 2004 WL 2397251, *2 (Conn. Super. Ct. Sept. 24, 2004); *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F. Supp. 1438, 1447 (E.D. Mich. 1992); *Bendix Corp. v. Adams*, 610 P.2d 24, 27 (Alaska 1980).

[47] *See, e.g., LightSquared Inc. v. Deere & Co.*, No. 13 CIV. 5543, 2015 WL 585655, *18 (S.D.N.Y. Feb. 5, 2015) (general knowledge "that conduct will injure the plaintiff's business dealings is insufficient to impose liability"); *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) ("[C]onstructive knowledge is inadequate to demonstrate Roche's knowledge for purposes of tortious interference.").

[48] Moreover Plaintiffs cannot assert a tortious interference claim against a Defendant with respect to that Defendant's own agreements.  *See, e.g., Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996).

increase Defendants' profits on *their own* derivatives portfolios.  (*See id.* ¶ 130 (alleging that

Defendants colluded to manipulate ISDAFIX to make it "favorable to Defendants"); *id.* ¶ 134

(alleging that Banks wanted "to move ISDAfix rates to whatever level benefitted their trading

books"); *id.* ¶¶ 138-39, 156 (alleging that Defendants stood to profit handsomely from their own

derivatives portfolios)).  Defendant ICAP's sole ascribed motive was to have earned

commissions in the interdealer market.  (*See id.* ¶¶ 137-38.)  Defendants' alleged intent,

therefore, was to benefit themselves—not to interfere with Plaintiffs' contracts.  At most, the

Amended Complaint alleges that any interference with Plaintiffs' contracts was incidental to

conduct impelled by different motivations, which is insufficient to state a claim for tortious

interference.  *See*, *e.g.*, *Beecher v. Feldstein*, 8 A.D.3d 597, 597 (2d Dep't 2004); *Ira G. Steffy &

Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 289 (2010).  "Whatever the Defendants might have

intended by their alleged wrongs, their goal was not to cause a breach of contractual relations

between" Plaintiffs and third parties.  *In re Refco Inc. Securities Litig.*, 826 F. Supp. 2d 478, 521

(S.D.N.Y. 2011).

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

To state a claim for unjust enrichment, a plaintiff generally must allege that "(1) the

defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances

were such that equity and good conscience require defendant to make restitution."  *Ferring B.V.*,

932 F. Supp. 2d at 512.[49]  Plaintiffs' unjust enrichment claim fails.

### A.    Plaintiffs' Unjust Enrichment Claim Against the Counterparty Banks Is
###        Duplicative of Their Breach of Contract Claim

It is well established that "[a] party may not recover in . . . unjust enrichment where the

---

[49] *See also State Dep't of Revenue v. Wetherelt*, 931 P.2d 383, 390 n.13 (Alaska 1997); *Am. Exp. Centurion Bank v. Head*, 115 Conn. App. 10, 16 (2009); *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 722 (E.D. Mich. 2005); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56, 88-89 (S.D.N.Y. 2013) (Pennsylvania law).

parties have entered into a contract that governs the subject matter" of their dispute.  *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012); *see also Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011).  Here, Plaintiffs' unjust enrichment claim against Counterparty Banks is predicated upon the Banks' breach of their contracts with Plaintiffs.  (*See* AC ¶ 210 (transactions purportedly "were documented under the ISDA Master Agreement"); *see also id.* ¶¶ 217, 218, 271.)  As the subject matter alleged by Plaintiffs—payments they were entitled to receive on their transactions—is purportedly governed by contracts with Counterparty Banks, their unjust enrichment claim against those Banks fails as a matter of law.

### B.      No Unjust Enrichment Claim Lies Against the Non-Counterparty Banks

To state a claim for unjust enrichment, Plaintiffs must allege they "had direct dealings or some sort of quasi-contractual relationship with each defendant."  *Jet Star Enters., Ltd. v. Soros*, No. 05 CIV. 6585, 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006).  Although Plaintiffs "need not be in privity with the [Non-Counterparty Banks] to state a claim for unjust enrichment," where, as here, Plaintiffs and Non-Counterparty Banks "simply had no dealings with each other, their relationship is too attenuated," and their unjust enrichment claim fails as a matter of law.[50] *LIBOR I*, 935 F. Supp. 2d at 737 (internal quotation marks omitted).  Whatever benefit the Non-Counterparty Banks are accused of acquiring could not have plausibly come from Plaintiffs with which they had no transactional relationship.

### C.      Plaintiffs' Conspiracy Allegations Cannot Save Their Otherwise Inadequately Pleaded Claims

Unjust enrichment "is not a catchall cause of action to be used when others fail," and it is "not available where it simply duplicates, or replaces, a conventional [legal] claim."  *La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659, 2013 WL 3357173, at *16

---

[50] As with their contractual claims, Plaintiffs fail to allege any direct dealings with Nomura.

(S.D.N.Y. July 3, 2013).  Thus, Plaintiffs cannot repackage flawed Sherman Act and tortious

interference claims as unjust enrichment.  To the extent Plaintiffs' Sherman Act or tortious

interference claims survive a motion to dismiss, the "unjust enrichment claim is duplicative;

[but] if [Plaintiffs'] other claims are defective," which they are, "an unjust enrichment claim

cannot remedy the defects."[51]  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012).

Further, Plaintiffs cannot avoid dismissal against the Defendants with which they had no

dealings by vaguely asserting a "conspiracy."  (AC ¶ 274.)  As Judge Buchwald stated in the

LIBOR actions, the "inadequate nexus between named plaintiffs and [] non-counterparty banks"

is a "fundamental infirmity with plaintiffs' . . . unjust enrichment claims" that cannot be salvaged

by their "attempt to plead that all defendant banks were part of a conspiracy."  *LIBOR III*, 27 F.

Supp. 3d at 478-79.  This Court should dismiss Plaintiffs' unjust enrichment claim for the same

reason:  "Even if a conspiracy between the banks did exist, an allegation of conspiracy would not

eliminate plaintiffs' requirement to plead the existence of some relationship between the parties."

*Id.* at 479-80.

## VII.   MANY OF PLAINTIFFS' CLAIMS ARE TIME-BARRED

### A.   Most of Plaintiffs' Sherman Act Claims Are Time-Barred

A Sherman Act claim is subject to a four-year statute of limitations that runs from the

date of injury.  *See* 15 U.S.C. § 15b; *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d

499, 519-20 (S.D.N.Y. 2009).  To plead fraudulent concealment—so as to toll the four-year

statute of limitations—an antitrust plaintiff must allege with the particularity required by Federal

Rule of Civil Procedure 9(b) "(1) that the defendant concealed the existence of the antitrust

---

[51] The recent *In re Aluminum* decision does not alter the fact that where, as here, unjust enrichment claims are completely duplicative of other claims meriting dismissal, they should be dismissed.  *Cf. In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *28.

violation; (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence." *Hinds Cnty.*, 620 F. Supp. 2d at 520.

Only two Plaintiffs, Alaska Fund and Washington County, have alleged trades with any Bank within the limitations period.  (AC App. A.)  All other alleged transactions occurred more than four years before September 4, 2014, the filing date of Plaintiffs' initial complaint.[52]  (*Id.*) Because Plaintiffs offer no plausible explanation for their delay and cannot meet any prong of the three-part fraudulent concealment test, all of Plaintiffs' antitrust claims[53] based on conduct occurring before September 4, 2010 are time-barred.[54]

### 1.    Plaintiffs Do Not Plausibly Plead That Defendants Concealed Any Alleged Conduct

Plaintiffs' conclusory allegations that Defendants "actively and effectively concealed" the purported conspiracy, that their conduct was "secretive and self-concealing," and that "reasonable due diligence could not have uncovered" the misconduct (AC ¶¶ 219, 220, 232) are insufficient to satisfy Rule 9(b) and are rebutted by the simple fact that nothing was hidden.

The conduct Plaintiffs complain about occurred in plain sight:  both the Banks'

---

[52] Plaintiffs' claims accrued no later than the entry date for swaps, and no later than the swaptions' exercise date. Indeed, Plaintiffs allege that the amount "a Defendant Bank has to pay to the purchaser of an in-the-money swaption typically depends entirely on the ISDAFix rate on the exercise date."  (*Id.* ¶ 191 n.67.)

[53] Plaintiffs also cannot rely upon the fraudulent concealment doctrine to extend the limitations period on any of the state-law claims discussed in Section VII.B.

[54] To the extent that the Amended Complaint purports to name or seeks to certify a Class that expands its universe beyond those who transacted in ISDAFIX-linked derivatives (e.g., swaptions), as alleged in the prior complaint, to include other derivatives such as plain vanilla swaps, such unnamed class members' claims are not tolled and would not relate back to the original date of filing (i.e., September 4, 2014).  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("The commencement of a class action suspends the applicable statute of limitations as to all *asserted members* of the class." (emphasis added)); *Laydon II*, 2015 WL 1515487, at *4-5 (proposed additional plaintiff not entitled to tolling or relation back where he "is not a member of the putative class defined in Plaintiff's prior pleadings, and his claim does not arise out of the same transactions that are the basis for Plaintiff's claims," and adding his claim "will have the effect of significantly expanding the class").  For any such expanded universe of unnamed class members, their claims would have continued to accrue up to the date of the filing of the Amended Complaint (February 12, 2015), and to the extent the relevant statute of limitations lapsed before that date, such claims are barred.

submissions and the ISDAFIX rates were always public.  Even accepting Plaintiffs' allegations

that swap rates around the 11 a.m. ISDAFIX polling window and the Banks' ISDAFIX quotes

exhibited "telltale signs" of obvious collusion (*id.* ¶ 128), such information was publicly

available since the beginning of the purported class period.  *See LIBOR I*, 935 F. Supp. 2d at 711

(no concealment when "[a] person of ordinary intelligence could have reviewed the submitted

quotes along with numerous articles analyzing these quotes and explaining why they were likely

artificial").  The claims here are very much like the ones in *LIBOR I*, where the court held that

defendants' alleged conduct was not self-concealing because the final LIBOR fix and individual

bank submissions were published daily by Thomson Reuters.  *See LIBOR I*, 935 F. Supp. 2d at

711; *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 188, 224-25

(E.D.N.Y. 2003) (contrasting the self-concealing nature of certain bid-rigging or price-fixing

conspiracies with the non-self-concealing nature of agreements that were "immediately disclosed

to the public").  Here too, the Banks' daily submissions were published by Thomson Reuters.[55]

Rather than these actions being concealed, Plaintiffs had contemporaneous access to

information about the purported swings in ISDAFIX and the purportedly anomalous trading

patterns that they allege prompted them to file this lawsuit.  For example, Plaintiffs have alleged

---

[55] *See ISDAFIX* (archived page dated June 30, 2012), ISDA, https://web.archive.org/web/20120630173533/
http://www2.isda.org/asset-classes/interest-rates-derivatives/isdafix (archived page last visited Mar. 2, 2015) ("In
order to increase the transparency of ISDAFIX, Thomson Reuters [] displays the rates contributed by individual
panel members.").  Plaintiffs' inaccurate and contradictory allegation that submissions were "not openly published"
(AC ¶ 232) should be disregarded.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir.
2011) (court was not required to accept conclusory allegations which were contrary to evidence cited in the
complaint).  The fact that the individual bank submissions were available through a subscription does not mean they
were not publicly available.  *See, e.g.*, 17 C.F.R. § 160.3(w)(2)(D)(iii) (2014) ("Publicly available information from
widely distributed media includes information from . . . a web site that is available to the general public on an
unrestricted basis.  A web site is not restricted merely because an Internet service provider or a site operator requires
a fee or password, so long as access is available to the general public."); *see also Certainteed Ceilings Corp. v.
Aiken*, No. 14-3925, 2014 WL 5461546, at *2 (E.D. Pa. Oct. 27, 2014) ("Various details about ongoing or upcoming
projects, which can include the text of the architect's specifications, are publicly available through subscription
databases like McGraw Hill's Dodge system.").  The Court may take judicial notice of the fact that the submissions
were published.  *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 756 n.8 (S.D.N.Y.
2011).

that sudden, sharp movements in swap rates around 11 a.m. on numerous days demonstrate "significant banging the close practice."  (AC ¶¶ 141, 147, 148.)  Plaintiffs could have seen this activity on Screen 19901, which had around 6,000 subscribers and "publicized the bid/offer rates of all swap transactions of the specified terms executed through ICAP."  (*Id.* ¶¶ 43, 65; s*ee BPP Ill.*, 2013 WL 6003701, at *10 (("once reports of possible LIBOR manipulation surfaced, a reasonable investigator could have easily discovered [the defendant's] role."); *LIBOR I*, 935 F. Supp. 2d at 706-07 (finding that plaintiffs could determine who was responsible for their alleged injury because the identity of the submitting banks was public).)  The fact that the *Financial Times* observed the publicly available market data and described the same statistical phenomena in 2010 forecloses Plaintiffs' claim that the alleged wrongdoing was concealed.  *See* Michael Mackenzie & Gillian Tett, *Frozen in Time*, Fin. Times, June 16, 2010, at 3-4.

Moreover, if, as Plaintiffs assert, their cash-settled swaptions became "out-of-the-money" due to a sudden market movement at 11 a.m. on the settlement date, that could not possibly have been concealed.  And, if, as Plaintiffs claim, this phenomenon occurred as part of a conspiracy operating "*every single day*" over more than seven years, comprising "*thousands* of instances of manipulation" (AC ¶ 192), Plaintiffs' alleged injuries would have been impossible to conceal, even had Defendants attempted to do so.

The quoted descriptions from certain of the Banks' public filings and various ISDA publications about how ISDAFIX was set do not constitute affirmative acts of concealment.  (*Id.* ¶¶ 222-28.)  Those filings and publications accurately represent how ISDA described the ISDAFIX setting process.  A failure to publicly confess alleged wrongdoing by adopting Plaintiffs' theories does not constitute an affirmative misrepresentation.  (*Id.* ¶ 222.)  Moreover, the descriptions of ISDA's reported methodology could not have concealed the real-time

submissions and trading data that Plaintiffs now allege so plainly demonstrate their injury.

### 2.    Plaintiffs' Lack of Diligence Precludes Equitable Tolling

Plaintiffs similarly do not, because they cannot, plead reasonable diligence.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) ("Reasonable diligence is a prerequisite to the applicability of equitable tolling.").  Plaintiffs offer only a boilerplate pleading that does not satisfy Rule 9(b), to wit: "Due to Defendants' efforts to conceal their collusive conduct, Plaintiffs could not, through the exercise of reasonable diligence, have learned of facts indicating that Defendants were colluding[.]" (AC ¶ 229.)  But Plaintiffs' admitted inaction is fatal to their fraudulent concealment argument.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (diligence inadequately pleaded where plaintiff  "ma[d]e no allegation of any specific inquiries of [the defendant], let alone detail when such inquiries were made, to whom, regarding what, and with what response"); *Hinds Cnty.*, 620 F. Supp. 2d at 522 (explaining that "a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception . . . [cannot] satisf[y] the Named Plaintiffs' burden under Rule 9(b)").

Plaintiffs blame their ignorance on the "prohibitive cost of the relevant data" as well as the impossibility before mid-2013 of conducting a comparison of pricing data pre- and post-2012.  (AC ¶¶ 230, 233.)  But, as discussed *supra*, the data on which Plaintiffs rely require no sophisticated analysis to observe and were publicly available to Plaintiffs on a real-time basis. Additionally, press reports illustrate that Plaintiffs, had they been exercising reasonable diligence, ought to have been aware of the conduct that they allege is the basis for their claims more than four years before they filed suit.  As noted *supra*, a 2010 *Financial Times* article reported on movements in "dollar swaps [] posted on Reuters screens," noting that in the preceding months, "controversy ha[d] grown around the behaviour of prices on the 19901 screen around the crucial 11am point each day," and one instance of an apparent, significant swing in

pre-11 a.m. submissions "fuel[ed] suspicions that some dealers [were] influencing price levels to achieve more favourable reference points."  Mackenzie & Tett, *Frozen in Time*, Fin. Times, June 16, 2010, at 3-4.  These suspicions are precisely what Plaintiffs now allege.

Plaintiffs unjustifiably contend that they could not have learned of Defendants' allegedly collusive conduct until April 2013, which is "when news of the ISDAfix conspiracy first broke." (AC ¶¶ 52, 229).  This assertion cannot salvage their claims.  Not only did one of the same authors who wrote *Frozen in Time* in 2010 also write the 2013 article on which Plaintiffs rely,[56] but the 2013 article—reporting only that the CFTC had subpoenaed various banks involved in the ISDAFIX rate-setting process—contained no new information that Plaintiffs would have needed to identify their claims beyond what had been reported three years earlier.   In other words, as between two articles on the same subject, by the same reporter, and in the same publication, Plaintiffs chose to cite to the 2013 version, despite the 2010 article's *more detailed* report on the same conduct.[57]  Plaintiffs' purported injuries were revealed to them no later than June 2010.

Finally, Plaintiffs' seeming failure to observe the swap markets around 11 a.m., to monitor their investments, despite having entered into hundreds of swap and swaption contracts. (AC App. A), is fatal to any diligence claim.

## B.      Many of Plaintiffs' State Law Claims Are Time-Barred

"A federal court exercising its supplemental jurisdiction over state law claims applies the choice of law rules of the forum state."  *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 628 (S.D.N.Y. 2005).  Under New York's "borrowing statute," "when a

---

[56] S*ee* AC ¶ 51 n.7 (Michael Mackenzie, Tom Braithwaite & Kara Scannell, *Swap traders' morning fix under scrutiny*, Fin. Times, Apr. 9, 2013).

[57] *Frozen in Time* was subsequently referenced in an April 2013 tweet by the *Financial Times*' U.S. Investment Reporter: "Traders subpoenaed over swaps fixing. CFTC should have read [*Frozen in Time*] THREE YRS ago." Stephen Foley, Twitter (Apr. 8, 2013, 1:00 PM EST), https://twitter.com/stephenfoley/status/321351791419740161.

nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); N.Y. C.P.L.R. § 202.

These causes of action accrued in the Plaintiffs' home states. "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999). Plaintiffs are domiciled in the following states: Alaska (Alaska Fund); Pennsylvania (Montgomery County and Washington County); Connecticut (New Britain); and Michigan (GCERS).[58]  (*See* AC ¶¶ 23-27.)

### 1.   Many of Plaintiffs' Breach of Contract and Implied Covenant of Good Faith Claims Are Time-Barred

While breach of contract claims are subject to a six-year statute of limitations in New York, N.Y. C.P.L.R. § 213(2), the statutes of limitations in the Plaintiffs' domiciles are the same or shorter: three years for Alaska Fund; four years for Montgomery County and Washington County; and six years for New Britain and GCERS.[59]  These limitations periods also apply to Plaintiffs' claims for breach of the covenant of good faith and fair dealing. *See, e.g.*, *Silvester v. Time Warner, Inc.*, 763 N.Y.S.2d 912, 919 (Sup. Ct. 2003); *Creeger Brick & Bldg. Supply Inc. v.*

---

[58] For substantially the same reasons discussed *supra* in Section VII.A.1-2, Plaintiffs' threadbare allegations of fraudulent concealment cannot save their otherwise time-barred common law claims under applicable state law.  In each relevant state, in order for fraudulent concealment to toll the limitations period, Plaintiffs generally must allege particularized facts showing that Defendants committed an affirmative act to conceal the cause of action, and that Plaintiffs' ignorance was not attributable to their own lack of reasonable diligence. *See, e.g.*, *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys.*, Inc., No. 3:10-cv-01539, 2014 WL 7270160, at *12 (D. Conn. Dec. 18, 2014); *Sarpolis v. Tereshko*, No. CIV.A. 13-5521, 2014 WL 2765088, *2 (E.D. Pa. June 17, 2014); *Hughes v. Patel*, No. 259174, 2006 WL 931568, at *1 (Mich. Ct. App. Apr. 11, 2006); *Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006).  Thus, as with their federal antitrust claims, *see supra* Section VII.A.1-2, Plaintiffs fail to adequately allege fraudulent concealment with respect to their common law claims.

[59] *See* Alaska Stat. § 09.10.053; 42 Pa. Cons. Stat. § 5525(a); Conn. Gen. Stat. Ann. § 52-576(a); Mich. Comp. Laws § 600.5807(8).

*Mid-State Bank & Trust Co.,* 385 Pa. Super. 30, 35 (1989).  Each claim accrued on the date of

the alleged breach—namely, the settlement date for a  swaption or the trade date for a swap.  *Ely-*

*Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993).

 Thus, on the face of the Amended Complaint, the following breach of contract and breach

of the covenant of good faith and fair dealing claims are barred:

- Alaska Fund's claims that accrued before September 4, 2011.

- Montgomery County's claims that accrued before September 4, 2010.

- GCERS's and New Britain's claims that accrued before September 4, 2008, which

    include *all* of New Britain's claims per Appendix A.

  **2.**  **Many of Plaintiffs' Tortious Interference Claims Are Time-Barred**

 Plaintiffs' tortious interference with contract claims accrued when Plaintiffs exercised

their swaptions and entered into the swaps listed on Appendix A.  *See Kronos, Inc. v. AVX Corp.*,

81 N.Y.2d 90, 94 (1993) (cause of action for tortious interference accrues when injury is

sustained).  The applicable statutes of limitations for Plaintiffs' tortious interference claims are as

follows:  two years for Montgomery County, Washington County, and Alaska Fund; and three

years for New Britain and GCERS.[60]  Thus, the following tortious interference claims are barred:

- The claims for Montgomery County, Washington County, and Alaska Fund that accrued

    prior to September 4, 2012.  As *all* of Montgomery County's and Washington County's

    claims accrued before this date, per Appendix A, all of their claims are time-barred.

- New Britain's and GCERS's claims that accrued before September 4, 2011, which

---

[60] 42 Pa. Cons. Stat. § 5524(3); Alaska Stat. § 09.10.070; Conn. Gen. Stat. § 52-577; Mich. Comp. Laws
§ 600.5805(10).  New York's statute of limitations for tortious interference claims is three years.  *Ferring B.V.*, 932
F. Supp 2d at 509; N.Y. C.P.L.R. § 214(4).  Accordingly, the shorter statutes of limitations in Pennsylvania and
Alaska apply to Montgomery County, Washington County, and Alaska Fund.  *See Stuart*, 158 F. 3d at 627; N.Y.
C.P.L.R. § 202.

include *all* of New Britain's claims, per Appendix A.

### 3. Many of Plaintiffs' Unjust Enrichment Claims Are Time-Barred

Plaintiffs assert an unjust enrichment claim against both Counterparty Banks and Non-Counterparty Banks.  (AC ¶ 274.)  The claims "accrue[d] 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.'"  *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 364 (2d Cir. 2013).

***Non-Counterparty Banks.***  Under New York law, the "statute of limitations for unjust enrichment claims is three years where a plaintiff seeks monetary relief and six years for equitable relief."  *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 478 (S.D.N.Y. 2014).  Because Plaintiffs primarily seek "restoration of [] monies" (AC ¶ 277) from the Non-Counterparty Banks rather than equitable relief,[61] Plaintiffs' claims against those Banks are subject to a three-year statute of limitations under New York law, which is equal to or shorter than the limitations periods for unjust enrichment claims in Plaintiffs' home states.[62] Accordingly, *all* of Plaintiffs' claims against Non-Counterparty Banks that accrued before September 4, 2011 are time-barred.[63]

***Counterparty Banks***.  In New York, the limitations period is six years for unjust enrichment claims—like Plaintiffs' claim against Counterparty Banks here—that are pleaded in the alternative to, and based upon the same facts as, breach of contract claims.  *See Maya NY,*

---

[61] To the extent Plaintiffs seek equitable relief in the form of a constructive trust and rescission (AC ¶ 273), it is inadequately pleaded.  *First*, Plaintiffs have not established the elements necessary to create a constructive trust.  In particular, Plaintiffs have not shown, or even pleaded, a confidential or fiduciary relationship between the parties. *See Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) ("Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of," among other factors, "a confidential or fiduciary relationship").  "Plaintiff[s'] failure to set forth facts from which the Court can infer that any of the Defendants stood in a confidential or fiduciary capacity with respect to Plaintiff[s] is fatal to [their] claim for a constructive trust."  *101 McMurray, LLC v. Porter*, No. 10-cv-9037, 2012 WL 997001, at *13-14 (S.D.N.Y. Mar. 26, 2012).  *Second*, Plaintiffs' request for rescission cannot apply to Non-Counterparty Banks for which there is no contract to unwind.
[62] *See supra* Section VII.B.
[63] *See Stuart*, 158 F. 3d at 627; N.Y. C.P.L.R. § 202.

*LLC v. Hagler*, 106 A.D.3d 583, 584-86 (1st Dep't 2013).  Further, pursuant to New York's borrowing statute, the following statutes of limitations apply to Plaintiffs' claims:  three years for Alaska Fund;[64] four years for Montgomery County and Washington County;[65] and six years for New Britain and GCERS.[66]  Applying these limitations periods, the following unjust enrichment claims are time-barred:

- Alaska Fund's claims that accrued before September 4, 2011.[67]

- Montgomery County's and Washington County's claims that accrued before September 4, 2010.

- GCERS's and New Britain's claims that accrued before September 4, 2008, which include *all* of New Britain's claims according to Appendix A.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

---

[64] *See Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 302 n.18 (Alaska 2006).

[65] *See Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007).

[66] *See Generation Partners, LP v. Mandell*, No. FSTCV095010537S, 2011 WL 3671966, at *3 (Conn. Super. Ct. July 22, 2011); *United States ex rel. Walter Toebe Const. Co. v. Guarantee Co. of N. Am.*, No. 14-cv-13398, 2014 WL 7211294, at *7 (E.D. Mich. Dec. 11, 2014).

[67] For example, 294 of Alaska Fund's alleged swaptions have exercise dates prior to September 4, 2011, and 102 of GCERS's alleged swaptions have exercise dates prior to September 4, 2008.  (AC App. A.)  To the extent those swaptions were cash-settled in-the-money—information that Plaintiffs have not provided (*id.*)—Plaintiffs' unjust enrichment claims accrued no later than the swaptions' exercise date.  (*See id.* ¶ 191 n.67.)  With respect to the alleged swaps, with one exception, Plaintiffs have not pleaded the maturity or payment dates for any of their transactions.  (*See id.* App. A.)  This missing information demonstrates that Plaintiffs have not pleaded sufficient facts to support their unjust enrichment claims.

DATED: April 13, 2015        SHEARMAN & STERLING LLP
ADAM HAKKI
RICHARD SCHWED
KEITH PALFIN

s/Adam Hakki

------------------------------------

ADAM HAKKI

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Fax: (646) 848-4000
ahakki@shearman.com
rschwed@shearman.com
keith.palfin@shearman.com

*Attorneys for Defendant Bank of America, N.A.*

DATED: April 13, 2015        SULLIVAN & CROMWELL LLP
DAVID H. BRAFF
MATTHEW A. SCHWARTZ
ALEXANDER J. WILLSCHER
BENJAMIN R. WALKER
MATTHEW J. PORPORA

s/ David H. Braff

------------------------------------

DAVID H. BRAFF

125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
braffd@sullcrom.com
schwartzmatthew@sullcrom.com
willschera@sullcrom.com
walkerb@sullcrom.com
porporam@sullcrom.com

DATED: April 13, 2015

BOIES, SCHILLER & FLEXNER LLP
JONATHAN D. SCHILLER
ANDREW Z. MICHAELSON

s/ Jonathan D. Schiller
JONATHAN D. SCHILLER

575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
jschiller@bsfllp.com
amichaelson@bsfllp.com

*Attorneys for Defendant Barclays Bank PLC*

DATED: April 13, 2015

PATTERSON BELKNAP WEBB & TYLER
JOSHUA A. GOLDBERG
WILLIAM F. CAVANAUGH, JR.
DEIRDRE A. MCEVOY

s/ Joshua A. Goldberg
JOSHUA A. GOLDBERG

1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
wfcavanaugh@pbwt.com
jgoldberg@pbwt.com
dmcevoy@pbwt.com

*Attorneys for Defendant B.N.P. Paribas SA*

DATED: April 13, 2015   COVINGTON & BURLING LLP
         ANDREW A. RUFFINO


         s/ Andrew A. Ruffino
         ANDREW A. RUFFINO

The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Fax: (212) 841-1010
aruffino@cov.com

COVINGTON & BURLING LLP
ALAN WISEMAN
THOMAS A. ISAACSON
ANDREW D. LAZEROW
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202) 662-6291
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com

*Attorneys for Defendant Citigroup Inc.*

53

DATED:  April 13, 2015

CAHILL GORDON & REINDEL LLP
DAVID G. JANUSZEWSKI
HERBERT S. WASHER
LANDIS C. BEST


<u>          s/ David G. Januszewski          </u>
DAVID G. JANUSZEWSKI

80 Pine Street
New York, NY 10005
Telephone: (212) 701-3000
Fax: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
lbest@cahill.com

*Attorneys for Defendant Credit Suisse AG, New York Branch*

DATED:  April 13, 2015

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
MOSES SILVERMAN
JAMES L. BROCHIN
AARON DELANEY


<u>          s/ Moses Silverman          </u>
MOSES SILVERMAN

1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Fax: (212) 757-3990
msilverman@paulweiss.com
jbrochin@paulweiss.com
adelaney@paulweiss.com

*Attorneys for Defendant Deutsche Bank AG*

DATED: April 13, 2015

CLEARY GOTTLIEB STEEN & HAMILTON
  LLP
THOMAS J. MOLONEY
GEORGE S. CARY
LEAH BRANNON
ELIZABETH VICENS

_____
s/ Thomas J. Moloney
THOMAS J. MOLONEY

One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999
tmoloney@cgsh.com
gcary@cgsh.com
lbrannon@cgsh.com
evicens@cgsh.com

*Attorneys for Defendant The Goldman Sachs
Group, Inc.*

DATED: April 13, 2015            LOCKE LORD LLP
                                 EDWIN R. DEYOUNG
                                 GREGORY T. CASAMENTO
                                 ANDREW L. FISH


                                      s/ Gregory T. Casamento
                                 GREGORY T. CASAMENTO

                                 Three World Financial Center
                                 New York, New York 10281-2101
                                 Tel.: (212) 415-8600
                                 Fax: (212) 303-2754
                                 edeyoung@lockelord.com
                                 gcasamento@lockelord.com
                                 afish@lockelord.com

                                 ROGER B. COWIE
                                 2200 Ross Avenue, Suite 2200
                                 Dallas, Texas 75201-6776
                                 Tel.: (214) 740-8000
                                 Fax: (214) 740-8800
                                 rcowie@lockelord.com

                                 *Attorneys for Defendant HSBC Bank USA, N.A.*

DATED: April 13, 2015        RICHARDS KIBBE & ORBE LLP
BRIAN S. FRASER
SHARI A. BRANDT
H. ROWAN GAITHER
RACHEL MECHANIC
ROBYN FRUMKIN

                    s/ Brian S. Fraser
                  BRIAN S. FRASER

200 Liberty Street
New York, NY 10281
Telephone: (212) 530-1800
Fax: (212) 530-1801
bfraser@rkollp.com
sbrandt@rkollp.com
rgaither@rkollp.com
rmechanic@rkollp.com
rfrumkin@rkollp.com

*Attorneys for Defendant ICAP Capital Markets LLC*

DATED: April 13, 2015        DAVIS POLK & WARDWELL LLP
ARTHUR J. BURKE
GREG D. ANDRES
JAMES I. McCLAMMY

                    s/ Arthur J. Burke
                  ARTHUR J. BURKE

450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Fax: (212) 701-5800
arthur.burke@davispolk.com
greg.andres@davispolk.com
james.mcclammy@davispolk.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED: April 13, 2015                    SKADDEN, ARPS, SLATE, MEAGHER &
                                           FLOM LLP
                                         JAY KASNER
                                         SHEPARD GOLDFEIN
                                         PAUL M. ECKLES
                                         THOMAS M. LEINEWEBER


                                                s/ Paul M. Eckles
                                         PAUL M. ECKLES

                                         4 Times Square
                                         New York, NY 10036
                                         Telephone: (212) 735-3000
                                         Fax: (212) 735-2000/1
                                         jay.kasner@skadden.com
                                         shepard.goldfein@skadden.com
                                         paul.eckles@skadden.com
                                         thomas.leineweber@skadden.com

                                         *Attorneys for Defendant Royal Bank of
                                         Scotland plc*

DATED: April 13, 2015

GIBSON, DUNN & CRUTCHER LLP
JOEL S. SANDERS
MARC J. FAGEL

<u>s/ Joel S. Sanders</u>

JOEL S. SANDERS
(*Admitted Pro Hac Vice*)
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Fax: (415) 393-8306
jsanders@gibsondunn.com
mfagel@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
PETER SULLIVAN
JEFFERSON E. BELL
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Fax: (212) 351-4035
psullivan@gibsondunn.com
jbell@gibsondunn.com

*Attorneys for Defendant UBS AG*

DATED: April 13, 2015     FRIEDMAN KAPLAN SEILER &
             ADELMAN LLP
            ERIC SEILER
            ANDREW W. GOLDWATER
            ANNE E. BEAUMONT
            ANDREW C. KOSTIC


              s/ Anne E. Beaumont
             ANNE E. BEAUMONT


            7 Times Square
            New York, NY 10036
            Telephone: (212) 833-1100
            eseiler@fklaw.com
            agoldwater@fklaw.com
            abeaumont@fklaw.com
            akostic@fklaw.com

            *Attorneys for Defendant Wells Fargo Bank,*
            *N.A.*


DATED: April 13, 2015     SHEARMAN & STERLING LLP
            JOSEPH J. FRANK
            BRIAN H. POLOVOY
            ETIENNE BARG-TOWNSEND


              s/ Brian H. Polovoy
             BRIAN H. POLOVOY


            599 Lexington Avenue
            New York, NY 10022
            Telephone: (212) 848-4000
            Fax: 646-848-4703
            Joseph.Frank@shearman.com
            Bpolovoy@shearman.com
            Etienne.Barg@shearman.com

            *Attorneys for Defendant Nomura Securities*
            *International, Inc.*

DATED: April 13, 2015                    MORGAN, LEWIS & BOCKIUS LLP
                                         JON R. ROELLKE
                                         ANTHONY R. VAN VUREN


                                              s/ Jon R. Roellke
                                         _____
                                              JON R. ROELLKE
                                          (*Admitted Pro Hac Vice*)
                                         2020 K Street, NW
                                         Washington, DC 20006
                                         Tel. (202) 373-6000
                                         Fax (202) 373-6001
                                         jon.roellke@morganlewis.com
                                         anthony.vanvuren@morganlewis.com

                                         *Attorneys for Defendant Morgan Stanley
                                          & Co. LLC*

                                         61