# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND; GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM; COUNTY OF MONTGOMERY, PENNSYLVANIA; COUNTY OF WASHINGTON, PENNSYLVANIA; and CITY OF NEW BRITAIN, CONNECTICUT, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>   vs.<br><br>BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; B.N.P. PARIBAS SA; CITIGROUP INC.; CREDIT SUISSE AG, NEW YORK BRANCH; DEUTSCHE BANK AG; THE GOLDMAN SACHS GROUP, INC.; HSBC BANK USA, N.A.; ICAP CAPITAL MARKETS LLC; JPMORGAN CHASE & CO.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; ROYAL BANK OF SCOTLAND PLC; UBS AG; and WELLS FARGO BANK, N.A.,<br><br>                Defendants. | Lead Case No.:  14-cv-7126 (JMF)<br><br>Consolidated Cases:<br><br>      14-cv-7907 (JMF)<br>      14-cv-8342 (JMF)<br>      14-cv-8365 (JMF)<br>      14-cv-8576 (JMF)<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ................................................................................................................4

I.     PLAINTIFFS PLEAD A PLAUSIBLE CONSPIRACY ....................................................4

     A.     Plaintiffs Allege Direct Evidence of the Conspiracy ................................................6

     B.     Plaintiffs Also Offer Compelling Circumstantial Evidence of the Conspiracy ........................................................................................8

          1.     Plaintiffs allege a common motive to conspire................................8

          2.     Plaintiffs allege interfirm communications.................................10

          3.     Plaintiffs allege acts against individual economic self-interest ................11

          4.     Plaintiffs allege Defendants *stopped* acting in parallel after receiving ISDAfix-related subpoenas .......................................12

          5.     That prices acted abnormally around the Fixing—until ISDAfix subpoenas were issued—further confirms Defendants were conspiring.....................................................14

          6.     Government investigations support the plausibility of the Complaint...............................................................19

               (a)     Facts regarding ISDAfix, specifically............................19

               (b)     Facts regarding other benchmark manipulation scandals .............25

II.     PLAINTIFFS HAVE "ANTITRUST STANDING" ........................................27

     A.     Plaintiffs Allege Antitrust Injury ........................................27

          1.     Plaintiffs' harm arises directly out of the anti-competitive consequences of Defendants' conduct .......................................28

               (a)     The facts here are more like FX than Libor ................................28

               (b)     The collusive hijacking of even a "cooperative" process is anti-competitive ........................................29

          2.     Price-fixing can occur without a reduction of supply................................33

3.      Defendants are not immunized by the fact they impacted "new" and "old" contracts alike ..................................................................34

4.      Plaintiffs' injuries are the kind the Sherman Act was created to protect ........................................................................................36

B.      Plaintiffs Are Efficient Enforcers ..........................................................36

III.    PLAINTIFFS PLEAD INJURY-IN-FACT ...........................................................39

A.      The Complaint Alleges Injury-in-Fact...................................................40

B.      The Complaint Answers Defendants' (Improper) Call for More .........41

C.      That the Complaint Alleges 1,900 Plaintiff Transactions Strengthens Rather than Undermines the Plausibility of the Complaint ...................42

IV.     PLAINTIFFS PLEAD COMMON-LAW CLAIMS AS WELL ........................44

A.      Defendants Breached their Express Agreements to Act in Good Faith and Follow the Law ...........................................................................................44

B.      Defendants Breached Their Implied Duties of Good Faith and Fair Dealing....................................................................................................46

C.      Defendants Were Unjustly Enriched, and are Jointly Liable Because They Acted as Part of a Conspiracy to Enrich Each Other .............................48

D.      Each Defendant's Manipulative Acts Tortiously Interfered With Contracts To Which It Was Not a Party....................................................................49

V.      ALL OF PLAINTIFFS' CLAIMS ARE TIMELY ..............................................52

A.      Plaintiffs Have Adequately Alleged Fraudulent Concealment ............52

1.      Plaintiffs allege the elements of fraudulent concealment .........53

2.      Defendants' attempts to override the Complaint are unavailing ..............56

B.      Defendants' Few Common-Law Specific Arguments are Also Without Merit........................................................................................................60

CONCLUSION.................................................................................................................60

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*7 West 57th Realty Co. v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ......................................................29

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144 (N.Y. 2002) ...................................................................................47

*ABKCO Music & Records Inc. v. Chimeron LLC*,
  517 F. App'x 3 (2d Cir. 2013) ...............................................................................52

*Adair v. England*,
  183 F. Supp. 2d 31 (D.D.C. 2002) .........................................................................15

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein*,
  393 A.2d 1175 (Pa. 1978) ......................................................................................51

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ....................................53, 54, 55

*Allen v. Dairy Farmers of Am., Inc.*,
  2014 WL 2610613 (D. Vt. June 11, 2014) .............................................................14

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ............................................ passim

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)................................................................................................30

*Anderson News, L.L.C. v. American Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).....................................................................................5

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987).....................................................................................5

*Arista Records LLC v. Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007).....................................................................6

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)................................................................................................33

*BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*,
  2015 WL 2215004 (2d Cir. May 13, 2015) ....................................................54, 60

*BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*,
  2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013)................................................59, 60

*Beecher v. Feldstein*,
  8 A.D.3d 597 (N.Y. App. Div. 2004) ....................................................................52

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................5

*Bendix Corp. v. Adams,*
    610 P.2d 24 (Ak. 1980)..........................................................................................51

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)...................................................................................52

*Blanchard v. Edgemark Fin. Corp.,*
    2000 WL 33223385 (N.D. Ill. May. 22, 2000) ......................................................52

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982)...............................................................................................39

*Boehner v. Heise,*
    734 F. Supp. 2d 389 (S.D.N.Y. 2010)....................................................................50

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com,*
    985 F. Supp. 2d 612 (S.D.N.Y. 2013)......................................................................6

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004)...................................................................................48

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)...............................................................................................33

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    2014 WL 5334053 (S.D.N.Y. Oct. 20, 2014) ........................................................52

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980).....................................................................................30, 31, 34

*Certainteed Ceilings Corp. v. Aiken,*
    2014 WL 5461546 (E.D. Pa. Oct. 27, 2014)..........................................................58

*Chem. Bank & Trust Co. v. Reynaud,*
    270 N.Y.S. 301 (N.Y. Sup. Ct. 1933) ....................................................................56

*In re Ciprofloxin Hydrochloride Antitrust Litig.,*
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...................................................................55

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974)...................................................................................55

*Cohen v. S.A.C. Trading Corp.,*
    711 F.3d 353 (2d Cir. 2013)...................................................................................56

*In re Coin Phones, Inc.,*
    203 B.R. 184 (S.D.N.Y. Bankr. 1996) ...................................................................46

*In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.,*
    2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) .......................................................15

*Conmar Corp. v. Mitsui & Co. (U.S.A.),*
    858 F.2d 499 (9th Cir. 1988) ...................................................................56

*Consol. Gold Fields PLC v. Minorco, S.A.,*
    871 F.2d 252 (2d Cir. 1989).....................................................................34

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962) ...................................................................................5

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007)........................................................................30

*Corsello v. Verizon N.Y., Inc.,*
    18 N.Y.3d 777 (N.Y. Ct. App. 2012) .......................................................49

*In re Credit Default Swaps Antitrust Litig.,*
    2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)..........................10, 49, 52

*In re Crude Oil Commodity Futures Litig.,*
    913 F. Supp. 2d 41 (S.D.N.Y. 2012).......................................................36

*In re DDAVP Direct Purchaser Antitrust Litig.,*
    585 F.3d 677 (2d Cir. 2009)...............................................27, 30, 36, 38

*Dahl v. Bain Cap. Partners,*
    589 F. Supp. 2d 112 (D. Mass. 2008) .....................................................34

*De Atucha v. Commodity Exchange, Inc.,*
    608 F. Supp. 510 (S.D.N.Y. 1985).........................................................38

*Diesel Props S.r.L. v. Greystone Bus. Credit II LLC,*
    631 F.3d 42 (2d Cir. 2011).......................................................................48

*In re Digital Music Antitrust Litig.,*
    812 F. Supp. 2d 390 (S.D.N.Y. 2011).....................................................39

*Don King Prods. v. Douglas,*
    742 F. Supp. 741 (S.D.N.Y. 1990) ..........................................................50

*In re Electronic Books Antitrust Litig.,*
    859 F. Supp. 2d 671 (S.D.N.Y. 2012).......................................................5

*In re Elevator Antitrust Litig.,*
    2006 WL 1470994 (S.D.N.Y. May 30, 2006) .......................................6, 24

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007).....................................................................6, 24

*Family Credit Counseling Corp.,*
    440 F. Supp. 2d 392 (E.D. Pa. 2006) .....................................................48

*Fantozzi v. Axsys Technologies, Inc.,*
    2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008)..........................................47

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015)...................................................................................39, 40

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...........................................................................25

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Penn. 1999) ..................................................................................38

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    2015 WL 363894 (S.D.N.Y. Jan. 8, 2015) ................................................................ passim

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001)............................................................................................15

*Gatt Commc'ns, Inc., v. PMC Associates, L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)..........................................................................................27, 28

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ................................................................52

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)...............................................................................................55

*Goldhirsh Grp. v. Alpert*,
    107 F.3d 105 (2d Cir. 1997)............................................................................................52

*Groton v. Connecticut Light & Power Co.*,
    662 F.2d 921 (2d Cir. 1981).............................................................................................5

*Gurfein v. Sovereign Grp.*,
    826 F. Supp. 890 (E.D. Pa. 1993) ...................................................................................15

*Harp v. Equilon Enters., L.L.C.*,
    2012 WL 975050 (Mich. Ct. App. Mar. 22, 2012) ..........................................................47

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    501 F. Supp. 848 (S.D.N.Y. 1980) ..............................................................................51, 52

*High Falls Brewing Co., LLC v. Boston Beer Corp.*,
    852 F. Supp. 2d 306 (W.D.N.Y. 2011) ...........................................................................51

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..........................................................................................31

*Hinds Cnty. v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 106 (S.D.N.Y. 2011)............................................................................19

*Hinds Cnty. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)............................................................................53

*Hinds Cnty. v. Wachovia Bank N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010)............................................................................15

*Hogan v. Metromail*,
  167 F. Supp. 2d 593 (S.D.N.Y. 2001)..................................................................15

*In re IPO Securities Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................40, 41

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
  253 F. Supp. 2d 262 (D. Conn. 2003)..................................................................31

*In re Interactive Network Sec. Litig.*,
  948 F. Supp. 917 (N.D. Cal. 1996) ......................................................................45

*Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*,
  7 A.3d 278 (Pa. Sup. Ct. 2010) ...........................................................................52

*In re Issuer Plaintiff IPO Antitrust Litig.*,
  2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ..................................................53, 55

*Kilburn v. Pineda*,
  137 Cal. App. 3d 1046 (Cal. Ct. App. 1982) ......................................................56

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)..............................................................................................53

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ...................................................................31, 32, 34

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991)...................................................................................1

*LaFlamme v. Societe Air Fr.*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ..................................................................24

*Langreich v. Gruenbaum*,
  2009 WL 321253 (S.D.N.Y. Jan. 30, 2009) ........................................................44

*Laumann v. NHL*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012)...................................................................39

*Laydon v. Mizuho Bank, Ltd.*,
  2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...........................................29, 39, 44

*Laydon v. Mizuho Bank, Ltd.*,
  2015 WL 1515487 (S.D.N.Y. Mar. 31, 2105) ..................................................44, 52

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..............................................................................................30

*In re Libor-Based Fin. Instr. Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................ passim

*In re Libor-Based Fin. Instr. Antitrust Litig.*,
  962 F. Supp. 2d 606 (S.D.N.Y. 2013)..............................................................45, 46

*In re Libor-Based Fin. Instr. Antitrust Litig.*,
   27 F. Supp. 3d 447 (S.D.N.Y. 2014)................................................................... passim

*LightSquared Inc. v. Deere & Co.*,
   2015 WL 585655 (S.D.N.Y. Feb. 5, 2015) ...........................................................50

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 (3d Cir. 1993)................................................................................50, 51

*Loeb Indus. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ..................................................................................38

*In re Magnetic Audiotape Antitrust Litig.*,
   2002 WL 975678 (S.D.N.Y. May 9, 2002) ...........................................................56

*Major Computer, Inc. v. Acad. Life Ins. Co.*,
   929 F.2d 1249 (8th Cir. 1991) ................................................................................50

*Maryland & Virginia Milk Producers Ass'n v. United States*,
   362 U.S. 458 (1960).................................................................................................14

*Mass. Mut. Life Ins. Co. v. Res. Funding Co.*,
   843 F. Supp. 2d 191 (D. Mass. 2012) ....................................................................15

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).................................................................................5, 8

*In re Med. X-Ray Film Antitrust Litig.*,
   946 F. Supp. 209 (E.D.N.Y. 1996) .........................................................................10

*In re Mercedes-Benz Antitrust Litig.*,
   157 F. Supp. 2d 355 (D. N.J. 2001) ........................................................................56

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*,
   23 F. Supp. 2d 439 (S.D.N.Y. 1998).......................................................................60

*In re Merrill Lynch Ltd. Partnerships Litig.*,
   154 F.3d 56 (2d Cir. 1998)......................................................................................56

*In re Merrill Lynch Ltd Partnerships Litig.*,
   7 F. Supp. 2d 256 (S.D.N.Y. 1997) ........................................................................56

*Metcalf Const. Co., Inc. v. U.S.*,
   742 F.3d 984 (Fed. Cir. 2014).................................................................................46

*In re Monosodium Glutamate Antitrust Litig.*,
   2003 WL 23022001 (D. Minn. Dec. 23, 2003)......................................................31

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof. Pub.*,
   63 F.3d 1540 (10 Cir. 1995)......................................................................................9

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   514 F. Supp. 2d 683 (E.D. Pa. 2007) ......................................................................14

*In re Nasdaq Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................27

*In re Nasdaq Market-Makers Antitrust Litig.*,
    894 F. Supp. 703 (S.D.N.Y. 1995) ...........................................................................5, 9

*National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988) ......................................................................................32

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) ...................................................................................35

*OBG Tech. Servs. v. Northrop Grumman Space & Mission Sys. Corp.*,
    503 F. Supp. 2d 490 (D. Conn. 2007)........................................................................60

*Ocean View Cap., Inc. v. Sumitomo Corp. of Am.*,
    1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ...........................................................38

*Ostrofe v. H.S. Crocker Co.*,
    740 F.2d 739 (9th Cir. 1984) .....................................................................................39

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010).....................................................................24

*Palmer v. Borg-Warner Corp.*,
    838 P.2d 1243 (Ak. 1992)..........................................................................................60

*Pappas v. Tzolis*,
    20 N.Y.3d 228 (2012) ................................................................................................48

*In re Parcel Tanker Shipping Svcs. Antitrust Litig.*,
    541 F. Supp. 2d 487 (D. Conn. 2008)........................................................................24

*People v. Vanreyendam*,
    2007 WL 1201832 (Mich. Ct. App. Apr. 24, 2007) ..................................................47

*Pitcairn Properties v. LJL 33rd Street Assoc.*,
    2012 WL 6082398 (S.D.N.Y. 2012)..........................................................................46

*Plymouth Dealers' Ass'n of N. Cal. v. U.S.*,
    279 F.2d 128 (9th Cir. 1960) .....................................................................................31

*In re Pool Products Distribution Market Antitrust Litig.*,
    988 F. Supp. 2d 696 (E.D. La. Dec. 2013) ............................................................8, 25

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...............................................53, 54, 55

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012).........................................................................................30

*Qube Films Ltd. v. Padell*,
    2014 WL 3952931 (S.D.N.Y. Aug. 12, 2014) ..........................................................50

*Rain Bird Corp. v. Nat'l Pump Co.*,
  2003 U.S. Dist. LEXIS 26792 (N.D. Miss. Dec. 23, 2003) ................................... 50

*Reading Indus. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980) ..................................................................................... 38

*In re Refco Inc. Securities Litig.*,
  826 F. Supp. 2d 478 (S.D.N.Y. 2011) ..................................................................... 52

*Reiter v. Sonotone*,
  442 U.S. 330 (1979) ............................................................................................... 35

*Rios v. Marshall*,
  100 F.R.D. 395 (S.D.N.Y. Dec. 12, 1983) .............................................................. 27

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*,
  992 F. Supp. 2d 213 (S.D.N.Y. 2013) ..................................................................... 50

*Ross v. Bank of Am., N.A. (USA)*,
  524 F.3d 217 (2d Cir. 2008) .............................................................................. 40, 43

*S.E.C v. Jones*,
  2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) ......................................................... 55

*S.E.C. v. Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) ....................................................................... 56

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) .................................................................................. 32

*Schaefer v. First Nat. Bank of Lincolnwood*,
  326 F. Supp. 1186 (N.D. Ill. 1970) ......................................................................... 32

*Schlick v. Penn-Dixie Cement Corp.*,
  507 F.2d 374 (2d Cir. 1974) .................................................................................... 45

*Shammami v. IndyMac Federal Bank, FSB*,
  2009 WL 3429654 (E.D. Mich. Oct. 21, 2009) ...................................................... 60

*Simon v. KeySpan Corp.*,
  694 F.3d 196 (2d Cir. 2012) ..................................................................................... 4

*Simonds v. Simonds*,
  380 N.E.2d 189 (N.Y. 1978) ................................................................................... 48

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
  947 F. Supp. 2d 88 (D.D.C. 2013) .......................................................................... 40

*In re Southeastern Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014) .................................................................................. 36

*St. John's Univ., New York v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) ..................................................................... 51

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d. Cir. 2010) ..................................................................................8, 10, 19

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................................25

*In re Static Random Access (SRAM) Antitrust Litig.*,
2008 WL 4447592 (N.D. Cal. Sep. 29, 2008) ....................................................................38

*State of New York v. Hendrickson Bros., Inc.*,
840 F.2d 1065 (2d Cir. 1988) ..........................................................................36, 53, 60

*In re Sumitomo Copper Litig.*,
120 F. Supp. 2d 328 (S.D.N.Y. 2000) ................................................................................53

*In re Tableware Antitrust Litig.*,
363 F. Supp. 2d 1203 (N.D. Cal. 2005) .............................................................................19

*Tenneco, Inc. v. F.T.C.*,
689 F.2d 346 (2d Cir. 1982) ................................................................................................5

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...............................................................................................8

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
2005 WL 724117 (E.D. Pa. Mar. 29, 2005) .......................................................................60

*UNR Industries v. Continental Ins. Co.*,
607 F. Supp. 855 (N.D. Ill. 1984) ................................................................................35, 36

*U.S. Gypsum Co. v. Indiana Gas Co.*,
350 F.3d 623 (7th Cir. 2003) .............................................................................................30

*U.S. v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ..........................................................................................31, 32, 33

*U.S. v. Steele*,
390 F. App'x 6 (2d Cir. 2010) ..............................................................................................6

*Verizon Commc'ns v. Law Offices of Curtis v. Trinko*,
540 U.S. 398 (2004) ...........................................................................................................30

*In re Vitamins Antitrust Litig.*,
2000 WL 1475705 (D.D.C. May 9, 2000) ....................................................................38, 53

*Waste Conversion Technologies, Inc. v. Midstate Recovery, LLC*,
2008 WL 5481231 (Conn. Sup. Ct., Dec. 3, 2008) ............................................................51

*Willner v. Manpower Inc.*,
2014 WL 2939732 (N.D. Cal. Jun. 30, 2014) ....................................................................52

*Zola v. Merrill Lynch, Pierce, Fenner & Smith*,
1986 WL 1163 (S.D.N.Y. Jan 23, 1986) ............................................................................41

## **Statutes and Rules**

Fed. R. Civ. P. 8(d) ................................................................................................47

Fed. R. Civ. P. 12(b)(6).............................................................................................5

Fed. R. Civ. P. 15(c) ...............................................................................................52

Fed. R. Evid. 201 .......................................................................................................1

## **Miscellaneous**

2A Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 391b (3d ed. 2010).....................36

Giuseppe Campolieti and Roman N. Makarov, *Financial Mathematics: A Comprehensive Treatment* 509 (1st ed. 2014)...............................................................17

*Herbert Hovenkamp & Christopher R. Leslie, The Firm as Cartel Manager,* 64 Vand. L. Rev. 813, 837-839 (2011)..........................................................................30

*Harm to Competition and the Competitive Process: A Circular Charade in the LIBOR Antitrust Litigation*, 10 B.Y.U. Int'l L. & Mgmt. Rev. 91 (2015).........................................32

N.Y. Prac., New York Law of Torts § 3:14 ..........................................................49, 50

Restatement (Second) of Torts § 766, cmt. (j)..............................................................51

## PRELIMINARY STATEMENT

Defendants, who dominate the market for interest-rate derivatives, colluded to manipulate benchmark US Dollar ISDAfix rates in order to extract supra-competitive profits.  Dkt. No. 164 ("Complaint," or "AC") ¶¶ 1, 2.[1]  That they did so is confirmed by the Commodity Futures Trading Commission's ("CFTC") May 20, 2015 Order on Barclays, which revealed that ***Barclays' employees admitted internally that "ISDAfix is manipulated."***  *See In the Matter of Barclays PLC, et al.*, Order Instituting Proceedings, CFTC Docket No. 15-25 ("Barclays Order") at 2.[2]  Far from being unilateral action, a Barclays trader referred to ***"everybody[] trying to bang the screen,"*** and the CFTC revealed ***regular cross-Defendant communications*** about undertaking such actions.  *Id.* at 7-13.

In their joint motion, Dkt. No. 173 ("Br."), Defendants consistently ignore that they manipulated ISDAfix in a *two-step* process—something that yet again is confirmed by the Barclays Order (at 7-8).  That Defendants used a *two-step* process widens the class of victims beyond those with ISDAfix-linked transactions, confirms Plaintiffs' harms arise from *anticompetitive* actions, and nullifies Defendants' attempts to spin the Complaint's robust and detailed allegations.[3]

---

[1]  Herein "ISDAfix rates" are intended to mean "USD ISDAfix" rates.

[2]  The Barclays Order was attached to Plaintiffs' May 22, 2015 letter.  *See* Dkt. No. 191-1.  The Court so-ordered the proposed stipulation.  *See* Dkt. No. 192.  Even if Defendants had not so-stipulated, the Court could consider the Barclays Order in its "plausibility" analysis, because what the order says is not subject to reasonable dispute and thus can be taken judicial notice of.  *See, e.g.*, Fed. R. Evid. 201; *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  Indeed, courts in other benchmark manipulation cases have relied on facts revealed by similar regulatory releases in upholding claims.  *See, e.g.*, *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2015 WL 363894, at *6 (S.D.N.Y. Jan. 8, 2015) ("*FX*") (taking judicial notice of "penalties and fines levied by regulators on defendants . . . . for the very conduct alleged in the Complaint"); *In re Libor-Based Fin. Instr. Antitrust Litig.*, 935 F. Supp. 2d 666, 681 (S.D.N.Y. 2013) ("*Libor I*").

[3]  As expounded upon below, the Fixing process began before 11 a.m., when ICAP would purportedly use information drawn from, among other things, the market for swaps.  AC ¶¶ 71-72.  ICAP would use this to create a "reference rate," which was provided to the panel bank Defendants.  *Id.*  Defendants were supposed to, in turn, provide ICAP with figures representing where that bank "would itself offer and bid a swap."  *Id.*  ISDAfix rates for various tenors were then calculated by ignoring the few highest and lowest submissions, and averaging the rest.  *Id.*

The Complaint's well-pled allegations show that, to ensure the Fixing process began where Defendants wanted it to, Defendants coordinated their execution strategies for "vanilla" (non-ISDAfix-linked) swaps to move the "reference rate" that began the ISDAfixing process. Accordingly, around the Fixing window, Defendants agreed to execute only the "right" transactions, in the "right" direction, and in the "right" volume. *E.g.*, AC ¶ 6. Just as in other market contexts where certain Defendants have *admitted to* doing this *exact same thing*, the pricing data demonstrates the presence of such coordinated trading activities. No matter how the data is sliced, prices for swaps move anomalously around the Fixing window *but only around that window*, day after day, year after year. *Id.* ¶¶ 128-61.

Defendants argue that Plaintiffs' injuries do not arise out of "anticompetitive" conduct. Br. at 19-26. But here we have Defendants, horizontal competitors in the market for "vanilla" swaps, acting as a trading bloc. Defendants argue that investors that do not hold ISDAfix-linked transactions have injuries that are too "remote" to have standing in this "ISDAfix" case. *Id.* at 28. But here we see *the first step in the scheme* was to manipulate prices *of non-ISDAfix-linked transactions*. Holders of such instruments were thus not "remote," but the very first victims.

The Fixing process began with the circulation by ICAP of a "reference rate" to the panel bank Defendants, based on the prices for swaps. But ISDAfix rates were based on a "poll." Each bank was supposed to respond with a rate where "that dealer would itself offer and bid a swap." AC ¶ 71. Thus, each bank was not supposed to hypothesize as to where the market "should" be, but rather to look to its own prices. An analysis of Defendants' actual submissions has revealed that Defendants responded to the poll *for years* by submitting the *same* rates—down to *five decimal places. Id.* ¶¶ 97-127.

This is powerful evidence of collusion that Defendants cannot sweep aside:  it is literally impossible, absent collusion, for fourteen competing banks to have the exact same prices for swaps of various tenors, day after day.  In other words, Defendants either must admit they were conspiring on prices, admit that their responses to the "poll" were inaccurate, or both.  But by leading the Court to the latter scenario of "just" inaccuracy, Defendants jump out of the frying pan and into the fire.  Only a conspiracy explains why fourteen banks would all decide to break (and then, later, simultaneously start abiding by) the submissions rules *in the exact same way*— putting themselves at reputational, criminal, and civil risk.

To avoid admitting that only a conspiracy explains the banks' lockstep submissions, Defendants argue that they were "permitted" to "accept" the "reference rate."  *E.g.* Br. at 1 n.2, 5, 7, 12, 23-24.  To the contrary, the CFTC found that, by signing off on rates that did not "reflect[] [its] honest view of the true costs of entering" swaps, Barclays made "false, misleading, or knowingly inaccurate submissions."  Barclays Order at 16.  Defendants' entire "plausibility" argument in fact rests on a premise that cannot be squared with the Complaint's well-pled allegations.  The submissions *by definition* were supposed to be where "that dealer would itself" price a transaction.  AC ¶ 71.  It was *specifically* emphasized by the International Swaps and Derivatives Association ("ISDA") to the Defendant Banks (and the investing public) that each bank's response "***should not be where the dealer sees mid-market away from itself***, but should be a function of its own bid/offer spread."  *Id*.  As if there were still any ambiguity, the Complaint directly alleges that "[a] Defendant Bank was to 'accept' ICAP's reference rate ***if and only if*** the reference rate ***exactly*** matched the mean of its own ***bank-specific***" prices.  *Id*. ¶ 73.  Again, Defendants cannot explain why all the panel banks chose to violate these rules for the same exact same period of time.  It is, at a minimum, plausible that they did so due to collusion.

That Defendants' *identical* submissions were not innocent, independent conduct is also confirmed by striking changes in that conduct.  Again, for *years*, Defendants impossibly claimed to have the *exact same* prices for "vanilla" swaps, 95% of the time or more.  In November 2012, the CFTC first issued subpoenas on the issue of whether "ISDAfix was rigged."  AC ¶ 83.  If deferring to the "reference rate" were truly a "common sense" practice, as Defendants now protest, then these developments should not have dissuaded them from continuing to do so.  But in fact, Defendants went from *matching* each other approximately 95% of the time, to *differing* almost 60% of the time.  *Id.* ¶¶ 115-16.  There is no plausible explanation for this change of behavior, other than the breaking of Defendants' conspiracy.

Even more damningly, the "rubberstamping" on the back-end of the Fixing process was not the only thing that changed once ISDAfix subpoenas were received.  So, too, did signs of "banging the close" on the front-end.  *E.g.*, *id.* ¶¶ 140-45, 161, 163, 167-84.  This confirms it was the same actors—*i.e.*, Defendants—behind both anomalies.  Which makes sense.  Panel banks would not respond to the "poll" by "accepting" a reference rate that had been made artificial by "banging the close" activities, unless there was something in it for them.  And nobody would bother trying to move the reference rate through manipulative trading unless they knew the back-end poll was a sham and thus would not wipe out the effects of the market movements.  Only a conspiracy, by these Defendants, explains the appearance *and then disappearance* of *both* "banging the close" and "rubberstamping" activities.

## ARGUMENT

### I.    PLAINTIFFS PLEAD A PLAUSIBLE CONSPIRACY

The Court must construe the Complaint in a light most favorable to Plaintiffs, and all inferences must be drawn in Plaintiffs' favor.  *Simon v. KeySpan Corp.*, 694 F.3d 196, 198 (2d Cir. 2012).  "The character and effect of a conspiracy are not to be judged by dismembering it

and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981) (noting that the "proper inquiry is whether, qualitatively, there is a 'synergistic effect'" attributable to the whole of defendants' conduct).

Defendants repeatedly proffer "noncollusive explanation[s]" for the facts identified in the Complaint.  Br. at 12-18.  But "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 714 (S.D.N.Y. 1995) (defendants' lawful explanations are "out of place in a motion to dismiss").  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Citing logic deployed on *summary judgment*, Defendants argue Plaintiffs' claims "should be more susceptible of direct proof."  Br. at 9 (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987)).  But it is well-recognized that a "smoking gun" is not required, including because "it can be hard to come by, especially at the pleading stage." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Indeed, circumstantial evidence is "the lifeblood of antitrust law." *Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 361 (2d Cir. 1982); *Anderson News*, 680 F.3d at 183-84.  "[C]onspiracies nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012).

As discussed below, the allegations of a conspiracy in this case are well-supported by a robust matrix of facts.  Defendants' repeated reliance on *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50-51 (2d Cir. 2007) and cases involving similarly threadbare allegations[4] is thus misplaced.  There, the district court found just *four paragraphs* as constituting the entirety of the supposed evidence of a worldwide conspiracy.  *See In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *2 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007).  The pages upon pages of facts provided here stand in stark contrast with a few "entirely general," "conclusory allegations."  *In re Elevator*, 502 F.3d at 51 n.5.

### A.   Plaintiffs Allege Direct Evidence of the Conspiracy

Defendants' repeated call for "direct" evidence ignores, as discussed below, the damning, specific factual allegations regarding how prices moved artificially (and uniquely) around the Fixing, Defendants' lockstep submissions to ICAP, and how both of those phenomenon dissipated once regulators issued subpoenas regarding ISDAfix.  Even if not categorized as "direct" evidence, these are not "theoretical possibilities" that could have been posited "without knowing any facts whatsoever," as Defendants cast the Complaint.  Br. at 10.

"[D]irect evidence" is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption."  *U.S. v. Steele*, 390 F. App'x 6, 15 (2d Cir. 2010).  The Complaint alleges that "[c]orrespondence produced by the Defendant Banks to the CFTC 'show[s] that traders at Wall Street banks instructed ICAP plc brokers to buy or sell as many interest-rate swaps as necessary to move the benchmark . . .' According to a source interviewed by Bloomberg, the Defendant Banks 'sought to change the price of the swaps

---

[4] *See Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 577 (S.D.N.Y. 2007) ("wholly conclusory" allegations failed to even explain the relationship between the conspirators); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013) (complaint did not allege the existence of an unlawful agreement, or that such an agreement was actually even discussed).

because the ISDAfix rate sets' swaptions prices."  AC ¶ 136.  According to a "witness interviewed by Bloomberg," Defendants' rate-swap traders would order ICAP to "execute an inordinately high volume of transactions."  *Id.* ¶ 137.  In addition, when transactions went the 'wrong' way, "[a]ccording to a former ICAP broker who witnessed the practice first hand . . . dealers [were able] to tell the brokers to delay putting trades into the system."  *Id.* ¶ 154.  These are clear instances of "direct" evidence.

As discussed below in Section I.B.6, the CFTC has confirmed the accuracy of these allegations.  It recently released transcripts of phone calls, chat rooms, and emails further confirming that the fixing process was being systematically undermined.  For instance, a Barclays trader emailed about the fact that "***ISDAFix is manipulated***."  *See* Barclays Order at 2 (emphasis added).  "As captured in emails and audio recordings," traders would discuss their "intent to move USD ISDAfix" to their benefit.  *Id.* at 3.  Far from being unilateral action, a Barclays trader referred to ***"everybody[] trying to bang the screen."***  *Id.* at 7 (emphasis added). In addition, the Barclays Order is replete with reference to ***cross-Defendant communications***, between Barclays and ICAP,[5] as "traders and brokers described the notional amounts traders were willing to spend to influence USD ISDAfix as 'ammo,' or as amounts the traders could 'burn,' 'waste,' or 'use' to 'get the print or 'affect' the 'fix.'"  *E.g.*, *id.* at 3, 8.  ICAP, in turn, kept Barclays informed of what others were doing.  *See id.* at 12 (referring to ICAP providing list of buyers in market that would make it difficult to move the rate down).

---

[5]   The Barclays Order does not expressly name ICAP, but rather refers to it as a "leading interest rate swaps broking firm."  Barclays Order at 2.  But as it is undeniable ICAP was the broker responsible for Screen 19901 and ISDAfix's calculation, it is clear Barclays' communications with "Swaps Broker" refers to communications with employees at co-Defendant ICAP.

B.   **Plaintiffs Also Offer Compelling Circumstantial Evidence of the Conspiracy**

The Court "need not decide whether the circumstantial evidence that we have summarized is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing, though standing alone it is not proof of it; and an industry structure that facilitates collusion constitutes supporting evidence of collusion.").[6]

### 1.   Plaintiffs allege a common motive to conspire

Defendants argue that "Plaintiffs articulate no rational motive for any Bank to join such a conspiracy because the scheme would confer no reliable net benefit on any particular Bank." Br. at 12. Defendants' improper request to ignore the Complaint and draw inferences in their favor is unavailing. The Complaint explains that all of the Defendants were jointly motivated by a desire to reap supra-competitive profits by rigging ISDAfix benchmark rates. *See, e.g.*, AC ¶¶ 2, 10, 74, 80, 122, 138, 156.[7] Indeed, the CFTC found that Barclays was motivated to manipulate ISDAfix to maximize profits in connection with swaption cash settlements, as well as occasional intrabank ISDAfix-linked trades. *See* Barclays Order at 6. As detailed in Sections I.B.5-6 below, "unilateral" interest in rigging ISDAfix could not explain the systemic problems alleged in the Complaint, as it would have been too costly and too risky—and ultimately pointless—for

---

[6]   Defendants suggest the Complaint rises or falls on whether it alleges "motive" or acts "against self-interest." Br. at 10-12. While those "plus factors" have been established here, "plausibility" can be established in *any* way, and, indeed, lists of "plus" factors "are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Citigroup*, 709 F.3d at 136 n.6; *see also, e.g., Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 (2d. Cir. 2010); *In re Pool Products Distribution Market Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. Dec. 2013).
[7]   For Defendant ICAP, the motivation was straightforward: by keeping the banks happy, ICAP got more business. *See, e.g.*, AC ¶¶ 63-64, 138.

8

one market participant to try to rig the rate, particularly when the back-end "poll" process should have negated any attempts to do so.  *See also id.* ¶¶ 186-91.

Defendants turn to argue that there could be no conspiracy unless the banks were perfectly aligned in their portfolios every day.  Br. at 2, 11.  But the Complaint explains that "[t]here were more profits to be earned for Defendants in maintaining the shared ability to manipulate ISDAfix over the long term than there were to be lost due to a divergence of interests on any particular trading day."  AC ¶ 10; *see also id.* ¶¶ 2, 191.[8]  This allegation is not undermined by Defendants' reference to the fact that the impact of the manipulation lasted beyond 11 a.m.  Br. at 11-12.  Longer-lasting impact only means that there was *more* "upside" in maintaining shared control.

More basically, Defendants' "not perfectly aligned" argument overlooks that a party to the conspiracy could know what price movements were coming—and thus enter into appropriate transactions to protect itself and profit.  As the court recognized in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2015 WL 363894, at *8 (S.D.N.Y. Jan. 8, 2015) ("*FX*"): "With collusion and free access to trade and price information, Defendants could line up their orders to maximize their profits[.]"  So, too, did *In re Aluminum Warehousing Antitrust Litigation*, 2015 WL 1378946, at *6 (S.D.N.Y. Mar. 26, 2015) allow the claim to proceed even where defendants "were not all doing the same thing but were united in obtaining benefits from their combined endeavors."  *See also id.* at *7 n.15 (benefits "unclear" but still "plausible"); *id.* at *20 (price "variations" may have been as beneficial to conspirators as "a price certain").

---

[8]   Courts recognize that "stand[ing] to increase their profits by virtue of the conspiracy" is a common motive.  *In re Nasdaq*, 894 F. Supp. at 714.  The idea that occasional short-term costs may be outweighed by long-term benefits is not a novel concept.  *See generally, e.g.*, *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof. Pub.*, 63 F.3d 1540, 1548 (10 Cir. 1995) (upholding price-fixing claim based on allegations of "short-term price cutting to secure long-term monopoly profits").  *See also* Barclays Order at 7 ("Barclays traders were willing to 'burn' or 'waste' trades because they expected to benefit their cash settlements to an extent that would likely exceed, but at least cover, any trading losses.").

Defendants' claim that a conspiracy to rig a benchmark is economically nonsensical is also out of touch with reality.  Many Defendants *have already admitted to conspiring to rig the Libor and FX benchmarks.  See, e.g.*, AC ¶ 191.  Defendants likely would claim to have just as much diversity amongst themselves in terms of their Libor-referencing and currency-exchange portfolios—but there was nonetheless plainly sufficient "reliable net benefit" to hold conspiracies together there.  This completely undermines Defendants' *ipse dixit* that hypothetical differences in financial portfolios render the benchmark manipulation conspiracy here *per se* "irrational."

### 2.    Plaintiffs allege interfirm communications

Defendants' suggestion that the Complaint is not specific with how the conspiracy was carried out ignores how the two-step conspiracy occurred.  Specifically, the Complaint explains that ICAP's "reference rate" was *itself* a tool for communication and coordination among Defendants.  Defendants did not have to call each participant each day, as everyone knew their task was to rubberstamp the reference rate that each panel bank received from Defendant ICAP. *See, e.g.*, AC ¶ 190; *see generally In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 221 (E.D.N.Y. 1996) (citing "the ease of interfirm communications" as a plus factor).[9]

Even setting aside such a subtle but important method of coordination, the Complaint also describes how Defendants carried out their conspiracy with telephone calls, emails, and private chats.  AC ¶¶ 13, 80, 81, 93, 100.  For example, "[i]n August 2013, based on recorded telephone calls and emails that had been reviewed, the CFTC reportedly concluded that the Defendant Banks had instructed ICAP brokers to facilitate as many interest rate swaps as

---

[9]    *See also, e.g.*, *Starr*, 592 F.3d at 326 (reversing dismissal of complaint where defendants used joint ventures "as a means to implement their anticompetitive agreements"); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *10 (S.D.N.Y. Sept. 4, 2014) (denying motion to dismiss based in part on defendants' gatherings "under the auspices of board or committee meetings" and "under the guise of phony entities lacking any legitimacy whatsoever").

possible to push ISDAfix to a predetermined level." *Id.* ¶ 13.  The U.K. Financial Conduct

Authority investigation into ISDAfix also turned up "emails, telephone records, and other

evidence showing bank traders and brokers working together with the express goal of moving the

ISDAfix rate in order to profit from their derivatives positions." *Id.* ¶ 80.  As discussed below in

Section I.B.6, the CFTC has recently released even more such evidence in the Barclays Order.

### 3.    Plaintiffs allege acts against individual economic self-interest

Defendants claim that the behavior described in the Complaint is consistent with the

"natural, unilateral reaction of each Bank."  Br. at 12.  But the Complaint says otherwise.  For

instance, the Complaint alleges Defendants shared commercially sensitive information with each

other.  AC ¶ 6.  Absent a conspiracy, Defendants had no reason to do so.

More fundamentally, day after day, Defendants responded to the ISDAfix "poll" with the

*exact same mid-market prices*—down to *five decimal places.  Id.* ¶¶ 9, 102; Barclays Order at 5.

As an initial matter, rubberstamping *all the time* likely harmed the bank on certain days, *i.e.*,

when a proper poll response may have moved the rate in the submitting bank's favor for that day.

Only by acting together over a period of time would Defendants realize sufficient upside to

offset that cost of routinely "accepting" the reference rate.[10]

Further, each bank that rubberstamped violated the ISDAfix rules in the process.  It thus

put at risk its reputation, its seat at the table of power, and opened itself up to civil and even

criminal liability—as Barclays can attest to, having been fined $115 million already.  This is

another way in which rubberstamping was itself an act against interest.  To suggest otherwise,

Defendants repeatedly assert that they were "permitted to accept" the reference rate provided by

ICAP.  Br. at 1 n.2, 5, 7, 12, 24.  Defendants base this on the fact that a self-serving letter,

---

[10]    In this light, Defendants' argument that there was no motive (because the banks were diverse)
contradicts its suggestion that they were not acting against self-interest (because "rubberstamping" helped set
ISDAfix inaccurately).

written apparently after regulatory investigations began, uses the phrase "may accept" in terms of
what the banks could do with the "reference rate."  *See* AC ¶ 72.  But that two-word excerpt does
not appear in a vacuum.  Rather, that same letter makes clear that submissions were to be made
"in accordance with the criteria set by ISDA," and it refers to the banks still providing "their . . .
rate" to ICAP.  *Id.*  "Accepting" the reference rate "in accordance with the criteria set by ISDA"
meant a bank could properly do so "***if and only if*** the reference rate ***exactly*** matched the mean of
its own ***bank-specific*** spreads."  *Id.* ¶ 73.

Defendants' motion simply ignores allegations as to the very *limited* circumstances in
which they were *actually* permitted to "accept" the reference rate.  Nor can Defendants retreat to
belatedly suggest that they fell into that exception to the rule 95% of the time.  Each bank was
supposed to be competing for USD swap business.  Each bank also represents a different default
risk for its own obligations.  The odds that fourteen banks would *actually* have the exact same
"bank-specific" prices, day after day, year after year, as the figure calculated by ICAP, are
infinitesimal.  This is not only clear as a matter of common-sense, but is confirmed by the
contrast between Defendants' bunching and the shotgun blast of other datapoints.  AC ¶ 103.  It
is also clear by data showing that, *outside the fixing window*, the Defendants' *actual* prices were
in fact dispersed.  *Id.* ¶ 110.  That the banks did not *actually* have "bank-specific" prices that
matched ICAP's "voice," Br. at 13, is also confirmed by their changed behavioral pattern starting
in December 2012, as expounded upon below.

### 4.   Plaintiffs allege Defendants *stopped* acting in parallel after receiving ISDAfix-related subpoenas

Whereas prior to December 2012 Defendants agreed with each other about 95% of the
time, by December 2013 they were doing so only 40% of the time.  AC. ¶ 115.  And Defendants'
disagreements became *four times larger*.  *Id.* ¶ 117.  As the market dynamics did not change, *id.*

¶¶ 123-27, this change further confirms the banks did not in fact have identical prices.  And as the submission rules did not change, this change further confirms blind "deference" to ICAP's "voice" was an improper practice.  What *did* change is that the CFTC sent subpoenas to the banks about ISDAfix in November 2012.  *Id.* ¶ 83.  And on November 29, 2012, ISDA wrote the letter to the European Commission that Defendants now (falsely) claim retroactively blessed the ISDAfix process.  *Id.* ¶¶ 72 n.20, 225.

That Defendants' abrupt change in group behavior coincided with the receipt of ISDAfix-related subpoenas is powerful evidence that Defendants were acting as part of a cartel. Defendants engage in sleight of hand here by suggesting that the relevant comparison should be drawn from an earlier point in time, due to developments in the Libor scandal.  Br. at 18.  But it was only at the end of 2012 that *ISDAfix* came under scrutiny.  The receipt of ISDAfix-related subpoenas represents an imminently logical "dividing line" when assessing Defendants' ISDAfix-related behaviors.[11]

Defendants also suggest that the break in the pattern was a coincidence of "ongoing control enhancements and resource management."  Br. at 18.  The ISDAfix rules, however, could not have been clearer—ISDA specifically emphasized that the submissions "should ***not*** be where the dealer sees mid-market away from itself."  AC ¶ 71.  The notion that it took "control enhancements" to understand *the very definition of ISDAfix* defies belief.  That the banks *all* missed the obvious for years, and all stumbled upon it at the same time, makes the assertion even more preposterous.  For many reasons, then, the consistent appearance *and sudden disappearance* of across-the-board "rubberstamping" confirms the plausibility of a conspiracy.

---

[11]   Even so, the chronology of the Libor scandal also confirms December 2012's importance.  December 2012 is the first time it was publically revealed that Libor manipulation went beyond intra-bank traders, and also involved collaboration between banks, and with third parties, such as interdealer brokers.  *See* AC ¶ 76.  It should also be noted that Defendants presuppose that drawing the statistical line slightly earlier would prove their innocence—a supposition that cannot be made in movants' favor.

**5.     That prices acted abnormally around the Fixing—until ISDAfix subpoenas were issued—further confirms Defendants were conspiring**

Attempting to manipulate US dollar swap prices was a highly risky, and ultimately hopeless, task for any market participant acting in isolation.  AC ¶¶ 11, 186-91.  That Defendants undertook to do so jointly is confirmed by the fact that prices around 11 a.m. exhibit *multiple*, *statistically significant* signs of market manipulation occurring with regularity.  *See, e.g.*, *id.* ¶¶ 163-67 (the "worst minutes" of the day for swap rates were disproportionately likely to occur around 11 a.m., until December 2012), 168 (anomalous movements occurred less frequently after December 2012), 169 (anomalous movements were smaller in size after December 2012), 170 (spreads for swaps dropped in December 2012, consistent with the stopping of delaying transactions until after the setting window), 171-76 (difference between ISDAfix and earlier swap prices narrowed significantly at the end of 2012, as ISDAfix rates become less of an outlier), 181-83 (direction of price movements around 11 a.m. unnaturally predicted direction of price movements the next day, until December 2012).  Defendants make various attempts to explain away this strong evidence that prices were being artificially manipulated, but all fail.

*First*, Defendants claim that "Plaintiffs themselves recognize, 'banging the close,' may 'be a proper trading strategy.'"  Br. at 14.  The CFTC, by way of its charging Barclays for manipulating ISDAfix including through such activities, clearly disagrees that "banging the close" is a legitimate activity.  Unsurprisingly, the Complaint does not concede otherwise, but merely points out that "*regardless*" of its legitimacy, it is improper to do so as a group.[12]  AC ¶ 134 n.37.  And, again, the Complaint alleges such conduct would not have occurred regularly absent collusion—the cost and risk would not be worth it, including because any successful

---

[12]  *See generally, e.g.*, *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 472 (1960) ("even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act") *quoted in In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 694 (E.D. Pa. 2007); *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *17 (D. Vt. June 11, 2014) (same).

movement would have been wiped out by the back-end "poll" process absent a conspiracy.  *Id.* ¶ 186.  The Complaint thus in no way concedes the price spikes were, or could have been, either legitimate or the result of unilateral activity.[13]

*Second*, Defendants argue that "two examples . . . cannot plausibly show a seven-and-half-year conspiracy."  Br. at 15.  This is a blatant mischaracterization of the Complaint, which alleges that signs of manipulation are seen in **thousands** of instances, including on many days specifically matched up with those on which Plaintiffs transacted.  *E.g.*, AC ¶¶ 7, 131 & App. A.  The identification of thousands of manipulation days are not "unsubstantiated" allegations, Br. at 15, but rather the result of statistical "screens."  AC ¶ 132.  The Complaint provides data and charts, derived from many different tests, on an *annualized* basis—*i.e.*, covering thousands of days.  *Id.* ¶¶ 141-145, 163, 170-76, 182 & App. B-Q.  The allegation that the result of the described "screens" was the mathematical identification of thousands of days is one that must be accepted as true, even without every calculation being spelled out in the body of the Complaint.

*Third*, Defendants take potshots at the statistical analysis.  Again, methodological disputes are not properly resolved at the pleading stage.[14]  But Defendants' criticisms are also meritless.  For instance, Defendants posit that the "financial crisis" explains the abnormal trading

---

[13]   Defendants here cite cases for the proposition that "manipulation claims" have been rejected when there was "no evidence that the trading strategy was manipulative, rather than a bona fide hedge."  Br. at 14 (citing *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) and *In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.*, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012)).  Neither of the cited cases has anything to do with whether "banging the close" in order to manipulate a benchmark measurement is an acceptable practice, either unilaterally or as a group.  In any event, Defendants' supposition here boils down to the unremarkable point that if a *legal* act was done *unilaterally* and for *legitimate* purposes, then there is nothing wrong about the situation.  That does nothing to demonstrate any of those prerequisites for non-liability are actually present on the facts here.

[14]   *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Res. Funding Co.*, 843 F. Supp. 2d 191, 202-04 (D. Mass. 2012) ("[A]rguments regarding the methodological flaws of [plaintiff's model] are premature at the motion to dismiss stage."); *Adair v. England*, 183 F. Supp. 2d 31, 56 (D.D.C. 2002) ("[D]efendants, in proffering their various protestations to the plaintiffs' statistics, seem to have forgotten that . . . the court must accept the plaintiffs' well-pleaded allegations as true"); *Gurfein v. Sovereign Grp.*, 826 F. Supp. 890, 907 (E.D. Pa. 1993); *see also, e.g.*, *Hinds County v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 360 (S.D.N.Y. 2010) (denying motion to dismiss based largely on plaintiffs' statistical analysis); *Hogan v. Metromail*, 167 F. Supp. 2d 593, 596 (S.D.N.Y. 2001) (denying motion to dismiss amended complaint based on plaintiff's addition of statistical evidence to initial complaint).

patterns.  Br. at 16.  Not only is this outside the pleadings, but it has no empirical support and is contradicted by the data before the Court.  Why would the "financial crisis" have altered the market's behavior around 11 a.m. but at no other time of day?  Why does the data show the same anomalies existing before the "financial crisis"?  Why does the data show the anomalies persisting for *many years* after?  And why did the anomalies abate the same time (December 2012) Defendants received ISDAfix-related subpoenas, *and* the same time Defendants' stopped "rubberstamping" the reference rate?  There are far too many logical holes for Defendants' conclusory reference to a "financial crisis" to carry the day.

Defendants also posit that one chart in the Complaint unfairly compares the absolute number of anomalies from an unequal number of years.  Br. at 16-17.  But the chart in question (AC ¶ 168) is labeled as comparing the "*relative* frequency," meaning it compares the *average* number of anomalies occurring *per year*.  And of course the Complaint uses far more than one chart to show a change in behavior in December 2012, as summarized above.

Defendants' last swipe occurs where Defendants cite the Complaint's observation that the government shutdown in October 2013 may have led to an increase in bid-offer spreads seen as a spike in one chart.  Br. at 17.  But explaining why *one* part of *one* chart relating to the performance of *one* test *may* have been impacted by a singular outside force at *one* point in time, is simply not a case-killing admission that *every other* anomaly in *every other* data from *every other* time are explained away by other, unidentified, innocent explanations.

*Fourth*, Defendants claim that it is "natural" for pricing anomalies to occur around 11 a.m., because of a "need to hedge risk from expiring swaptions."  Br. at 14.  This is another outside-the-record counter-hypothetical that would require the Court to accept a host of dubious propositions at the pleading stage.  As an initial matter, Defendants ask the Court to blindly

accept the supposition that Defendants *in fact* managed their US dollar swaption portfolios on a deal by deal basis—as opposed to the far more likely scenario that Defendants managed the interest rate risk in these portfolios on a portfolio basis and with dynamic hedging over the life of swaptions, which is much less likely to create a need to rush to transact around 11 a.m. on a cash settlement date.[15]

More fundamentally, a supposed need to hedge would not logically explain the consistent presence of spikes.  For example, reference to "hedging" fails to explain why price spikes abated in 2013.  Is it mere coincidence Defendants' need to "hedge" abated the same time they received subpoenas looking into manipulation of ISDAfix rates?  And arguing that the banks rushed to hedge prior to 11 a.m. against the setting of ISDAfix also presumes that the banks knew the rate at which ISDAfix would set more than fifteen minutes later, as to know exactly what needed "hedging."  *And* it presupposes that an uncoordinated rush to "hedge" would *consistently* cause a *disproportionate* push in one direction as to cause price spikes—as opposed to each banks' supposedly-diverse portfolios causing divergent "hedging" activities to cancel each other out. For many reasons, then, simply referring to "hedging" falls far short of showing the price spikes cannot fairly be seen as powerful evidence of a conspiracy in action.  Unsurprisingly, then, the CFTC found, "***[i]rrespective*** of whether the [Barclays] NY Options Desk and NY Swaps Desk traders had an interest in hedging, they engaged in attempted manipulation when they placed

---

[15]   The main support Defendants offer on the "need to hedge" explanation is 31 pages from the 1995 2nd edition of John Hull's "Introduction to Futures and Options Markets."  *Id.*  There is no support for the need to hedge USD interest-rate risk on an option-by-option basis, at expiration, in those 31 pages.  In fact, there is not a single mention of swaptions in those 31 pages, and Hull specifically explains how risk on a portfolio of options can be managed on a portfolio basis.  *Id.* at 333-34.  Indeed, the citation is facially odd given it is to an outdated edition and ignores other books by the same author on similar topics.  According to Professor Hull's information on the website, "[h]e is best known for his books, *Risk Management* and *Financial Initiation* (now in its 3rd edition), *Options, Futures, and Other Derivatives* (now in its 9th edition), and *Fundamentals of Futures and Options Markets* (now in its 8th edition)."  Defendants' citation to Giuseppe Campolieti and Roman N. Makarov, *Financial Mathematics: A Comprehensive Treatment* 509 (1st ed. 2014) is even odder, given it discusses options on unique shares of common stock—a situation having nothing to do with hedging interest rate risk which, as discussed above, Defendants were much more likely to have done on a dynamic portfolio basis.

bids and offers or executed trades around 11:00 a.m. with the improper intent to move the USD

ISDAfix rate in Barclays' favor." Barclays Order at 9 n.9 (emphasis added).

*Finally*, Defendants argue that the Complaint does not tie the price movements to any

particular participant. Br. at 13. Defendants jealously guard their individual data. AC ¶ 90. But

the Complaint explains why it *had* to be them—only they had the "ammo," opportunity, and

motive. *Id.* ¶¶ 184-91. This is particularly clear when the Complaint is viewed as a whole,

rather than strictly viewing the "banging the close" allegations in isolation. There would be no

point for any independent market actor to try to regularly move prices for swaps around 11 a.m.

*Id.* ¶¶ 11, 187. Even putting aside the allegations that the process of "banging the close" was too

costly and risky for *anyone* acting alone to undertake regularly because it would involve

routinely pushing through massive transactions on off-market rates, this is true because an honest

application of the ISDAfix submission process—*i.e.*, one in which each bank submitted its own

price information—would wipe out the effects of last minute, artificial swings. *Id.* ¶ 186. Thus,

nobody would bother to "bang the close" (alone or as a group) around 11 a.m. *unless they knew*

the ISDAfix banks would *all* look the other way. This confirms the conspiracy had to include

members of the ISDAfix panel. The logic works the other way as well. It makes no sense for

Defendants to violate ISDA submission rules by routinely rubberstamping, unless each panel

bank was getting something of value in exchange for its malfeasance. *Id.* ¶ 188.[16]

That rigging was undertaken by a conspiracy *and* that the conspiracy involved the same

actors in both steps—*i.e.*, the Defendants—is also confirmed by the fact that both signs of

manipulation abated on the same timeframe. *E.g.*, *id.* ¶ 189. Once rubberstamping was no

longer occurring, there was no reason to bother with manipulating prices at 11 a.m., and vice-

_____

[16]   This is particularly true given a "unilateral" false submission would accomplish little—the process
excluded outliers, and in any event one false submission among thirteen honest ones would likely change very little.

versa.  Thus, only the joint activities of these Defendants explains the *in-tandem disappearance* of *both* types of statistical anomalies identified in the Complaint.

### 6.    Government investigations support the plausibility of the Complaint

#### (a)    *Facts regarding ISDAfix, specifically*

Courts consider investigations into a defendant's conduct in evaluating the plausibility of the alleged conspiracy.[17]  In November 2012, the CFTC issued subpoenas on the issue of whether "ISDAfix was rigged."  *Id.* ¶ 83.  And in April 2013, it was first revealed to the public that the CFTC and other regulators were actively investigating Defendants' manipulation of ISDAfix.  *Id.* ¶¶ 13, 81.  The CFTC was reported to be sifting through over one million emails and instant messages, as it simultaneously interviewed current and former employees of Defendant Banks and ICAP.  *Id.*  Barclays, Citi, RBS, and UBS have all admitted being subject to these investigations in their regulatory filings, including having "ongoing obligations" to cooperate with authorities.  *Id.* ¶ 82.

In September 2014, the CFTC reportedly informed the DOJ that it had "***found evidence of criminal behavior*** following [its] investigation into banks' alleged manipulation of ISDAfix." AC ¶¶ 14, 83.  This led the DOJ and other regulators to launch their own investigations into Defendants' conduct for criminal violations of the antitrust laws.  *Id.*  In criminal matters, the government typically acts through a grand jury where the standard is probable cause of a criminal violation.  In other words, at the same time Plaintiffs are alleging here the same actors and conduct constitute a civil violation, elsewhere the federal government was stating its belief

---

[17]    *See, e.g.*, *Starr*, 592 F.3d at 324-25 (mere existence of government investigations into a defendant's conduct considered a plus factor); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) ("[G]overnment investigations may be used to bolster the plausibility of § 1 claims."); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005).

that there is sufficient evidence to show probable cause of a criminal violation.  This logically

supports the notion the Complaint is plausible.

Subsequent to the initial announcement of the CFTC's investigation of ISDAfix, ICAP

was stripped of its responsibility to administrate ISDAfix, and ICE, the new administrator,

announced that it would change how ISDAfix is calculated.  *Id.* ¶¶ 84-89.  The most reasonable

inference is that these dramatic changes were made to address illicit behavior.

On May 20, 2015, the CFTC fined Barclays $115 million based on the formal results of

its investigation.  *See* Barclays Order; *see also* CFTC Examples of Barclays' USD ISDAfix

Misconduct ("Barclays Examples").[18]  After reviewing thousands of documents and audio

recordings of internal communications, the CFTC concluded that from at least 2007 through

2012, Barclays traders "attempted to manipulate [ISDAfix] to benefit the Bank's derivatives

positions."  Barclays Order at 2.  This manipulation took two main forms:  (1) targeted

transactions around the 11 a.m. fixing window in a manner designed to alter prices; and (2)

responding to the ISDAfix "poll" with submissions that did not in fact match Barclays' actual

rates.  *Id.* at 7-8.  According to the CFTC, "[w]hichever the means employed, the goal was the

same—to move USD ISDAfix in the direction that favored Barclays on specific trading positions

at the expense of its counterparties and clients."  *Id.* at 8.

The CFTC released communications by Barclays traders explicitly discussing their intent

to manipulate ISDAfix.  *Id.*  For instance, a broker told an options trader "[i]f you want to affect

it at eleven, you tell me which way you want to affect it well, we'll attempt to affect it that way."

*Id.*  Similarly, a Barclays swaps trader said "I want a low ISDAfix in 2s" and "I don't want to

burn anything."  *Id.*  The CFTC also detailed the specific manipulative trading strategies

Barclays used to alter prices.  *Id.* at 8-13.  Barclays traders referred to transactions "executed for

---

[18]   The Barclays Examples are attached to Plaintiffs' May 22, 2015 letter.  *See* Dkt. No. 191-1.

the purpose of influencing USD ISDAfix as 'ammo' or amounts the traders were willing to

'spend,' 'burn,' 'waste,' or 'use' to 'get the print' or 'affect' the 'fix.'" *Id*. at 8.  Traders "were

willing to 'burn' or 'waste' trades because they expected to benefit their cash settlements to an

extent that would likely exceed, but at least cover, any trading losses.'" *Id*. at 9.  As a Barclays

options trader explained, "[i]f I've got ten billion 1-years . . . and I trade two and a half billion

and I move it a quarter [basis point] in my favor, how do you think that works out?  I'm willing

to spend a quarter of the, of the risk to get the print for the other three quarters, okay?" *Id*.

These trading activities were "carefully timed" "to be the last screen-moving event"

before the reference rate was set.  *Id*.  For example, a Barclays trading desk head told a broker

that "[a]t 11 o'clock, I have to get low print in 10-year spreads . . . when I say 'hit it,' right, you

can spend, um, two hundred fifty [million] 10-years in ammunition.  I really don't want to spend

it . . . but if you can keep it at 8 . . . it will be perfect."  In the seconds before 11 a.m., the trader

instructed, "do it now," and the broker immediately yelled out "10s down!  10s down!"  *Id*.

The CFTC provided many additional specific examples of communications of Barclays

traders relating to manipulation of ISDAfix.  For instance:

- In 2007, Barclays' Options Desk in New York had a cash settlement on a 5-year
  swaption of $635 million notional.  Barclays traders on multiple desks
  coordinated to employ three methods of manipulation in an attempt to maximize
  the amount paid to Barclays in the swaption cash settlement.  First, at
  approximately 10:50 a.m., a Barclays swaps trader contacted the Bank's broker on
  behalf of the Options Desk, and instructed the broker, "***don't let 'em go down***,"
  referring to 5-year swap spreads.  As 11:00 a.m. approached, the swaps trader told
  the broker: "for the eleven o'clock fix I need to lift 5s up," "I want to keep it up,"
  and "***[i]f it gets hit down, you hit it right back up, don't let it go down***."  The
  swaps trader then told the broker, "I can burn like, four, five hun-, four hundred
  [million notional]."  After trading only $200 million of 5-year swap spreads, and
  withdrawing his offer seconds before 11:00 a.m., he said to the broker:  "We got it
  right?  We got the fix, good job."  Second, in parallel, also in the minutes leading
  up to 11:00 a.m., a Barclays options trader emailed traders on Barclays' U.S.
  Treasuries desk:  "I have an exercise at 11 am this morning, I will need to sell 635
  5s, but ***I want to push the screens down at 11, as much as . . . you can***, so that I

can get a better 11 am print." Pushing the 5-year U.S. Treasuries price down
would increase the yield on those Treasuries and thereby increase the 5-year USD
ISDAfix. Lastly, another options trader emailed the USD ISDAfix submitter at
approximately 10:54 a.m., instructing, "We want higher 5s," referring to the
Bank's 5-year USD ISDAfix submission.

- In 2008, a Barclays swaps trader, then a supervisor of multiple trading desks, told
  the Bank's broker: "Okay, at eleven o'clock, we have an option settlement, okay,
  I have 200 10s of ammo . . . and *I need to get the screen as high as possible*."
  The swaps trader then instructed the broker to buy swap spreads at higher, rather
  than lower levels: "don't let him hit me down at a quarter," he told the broker, "I
  want at least a half middle," referring to the higher USD ISDAfix print he was
  seeking. On this day, Barclays stood to receive more in cash settlements from its
  counterparties the higher the 10-year USD ISDAfix.

- In 2008, as 11:00 a.m. approached, Barclays New York swap traders attempted to
  push down the 9-year and 10-year USD ISDAfix rates and to push up the 2-year
  USD ISDAfix rate, so that the New York Swaps Desk would pay lower rates and
  receive higher ones in an ISDAfix-linked deal. Later the same day, after the final
  rates were published, a third Barclays swaps trader, who had observed this trading
  activity by his colleagues, remarked to the broker who had received Barclays'
  instructions as to the 2-year tenor: "Yeah, you did well at the 11 o'clock fix,
  man," and it "*sounded like you were actually holding the spreads up with your
  hands*; like, it felt like you were bench pressing them over your head."

- In 2009, at approximately 10:16 a.m., a Barclays swaps trader told the Bank's
  broker: "I'm gonna have something to do on the ISDA fixing," and, referring to the
  10-year maturity, "as low as possible, okay." After engaging in trading
  activity consistent with the trader's expressed intent, the broker reported at
  approximately 11:01 a.m. that "it worked without having to waste anything."

- In 2010, there was a transaction that gave the Bank's Swaps Desk in New York
  incentive to push up the 10-year USD ISDAfix rate and push down the 2-year
  USD ISDAfix rate. At approximately 10:43 a.m., a Barclays swaps trader
  initiated the following conversation with the Bank's broker, making certain first
  that no one was listening on the line:

  > *Swaps Trader:* No one else is on the line, right?
  > *Broker:* No.
  > *Swaps Trader:* Alright, uh, I care about the elevens [11:00 a.m. fixings]
  > okay.
  > *Broker*: Oh, great. What, okay, what do you wanna do and how much do
  > you have to burn?
  > *Swaps Trader:* Yeah, so no one's on the line right?
  > *Broker:* No, not at all.

> *Swaps Trader:*  Alright, um.  So, I'm gonna want, uh, 10s higher and 2s lower, okay?  So –
> *Broker:*  Okay.
> *Swaps Trader:*  Um, just, your discretion, I care more about 10s, but would care about both of 'em.  Um, and have, uh, like two hundred [million] 10s and five hundred [million] 2-year spreads to use, okay?
> *Broker:*  Okay fine, you got it.

- In 2011, at approximately 10:59 a.m., a Barclays swaps trader told the Bank's broker that a Barclays options trader "***wants to keep 10-year spreads down***.  So, if you can, we don't have much ammo, like a hundred; don't let it go up to 9, hit it down."  The broker replied:  "I hear you.  ***I'm just gonna lock 'em down at 11***." On this day, Barclays stood to receive more from its counterparties, in multiple cash settlements, with a lower 10-year USD ISDAfix.

*See* Barclays Order at 10-13 (emphasis added).

       As seen in these examples, these were not merely weak *attempts* at manipulation.  Rather, many of these market activities *actually* impacted ISDAfix, eliciting responses like "[w]e got the fix, good job," "you did well at the 11 o'clock fix, man . . . sounded like you were actually holding the spreads up with your hands; like, it felt like you were bench pressing them over your head" and "it worked without having to waste anything."  *Id*.  **As Barclays traders acknowledged, "ISDAfix is manipulated."**  Barclays Order at 2 (emphasis added).

       As for the second form of manipulation—Defendants' "rubber-stamping" of ICAP's reference rates—the CFTC found that "Barclays traders specifically intended to affect the rate at which USD ISDAfix was set by making false, misleading, or knowingly inaccurate submissions . . . for inclusion in the calculation of the daily rates."  *Id*. at 16.  "[R]ather than submitting rates and spreads that reflected Barclays' honest view of the true costs of entering into a standard USD interest-rate swap in particular maturities, ***Barclays at times knowingly made submissions with the intent to move USD ISDAfix rates higher or lower in order to benefit Barclays' trading positions***."  *Id*. at 16 (emphasis added).  The CFTC concluded that Barclays violated several sections of the CEA that prohibit manipulation of commodity prices, ordered Barclays to take

extensive remedial actions on its ISDAfix and general business practices, and fined it $115 million. *Id*. at 13-23.

The CFTC's findings directly corroborate the core allegations of the Complaint. The Complaint alleges that Defendants used the *same* two-step process (manipulative trading around the Fixing Window, followed by false submissions to ICAP), with the *same* tools of manipulation (*e.g.*, "banging the close," "painting the screen," and other rapid-fire trades), for the *same* reasons that the CFTC found for Barclays. These findings also undermine Defendants' arguments that spikes in activity around the Fix were the result of innocent "hedging." And they undermine Defendants' supposition that their lockstep submissions in the ISDAfix poll were an acceptable practice. In other words, these findings help make the claim that ISDAfix rates were being manipulated plausible, if not probable. Defendants' citations do not deprive Plaintiffs of this inference at the pleading stage. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1010 (E.D. Mich. 2010) (distinguishing cases such as those cited by Defendants on grounds that they involved situations where there was no "link" between the investigation and the complained-of conduct).[19]

Defendants are likely to point out that the CFTC did not charge Barclays with a conspiracy. But, as above, there are many examples of *cross-Defendant* communications. With respect to *bank-to-bank* communications, the Complaint explains such was not routinely needed given (a) every bank knew its daily role was to just "rubberstamp," AC ¶ 101; and (b) Defendants could coordinate through ICAP, *see generally, e.g.*, Barclays Order at 12 (ICAP

---

[19]   In *LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010), the prior investigations regarded a different type of charge ("passenger" versus "air cargo" surcharges) that had been imposed "long before" the class period allegedly began. The plaintiffs in *In re Elevator* alleged their U.S. conspiracy claims were rendered plausible by regulatory investigations in Europe. The court disagreed because plaintiffs offered no allegations that the U.S. and European markets, market participants, or market conduct were linked. 502 F.3d at 52. In *In re Parcel Tanker Shipping Services Antitrust Litigation*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008), the government investigation was in a different market and considered different conduct than what was alleged in the civil complaint

listing for Barclays numerous buyers in the market).  In any event, the CEA provisions at issue

for the CFTC do not require the showing of a conspiracy.  It is not surprising a government

agency would not make public evidence unnecessary to the law being enforced—particularly

while investigations and negotiations with other banks are still underway.  Accordingly, the

absence of *inter-bank* communications in the CFTC's release in no way indicates such evidence

does not exist, and thus does undermine the Complaint's conspiracy allegations.

Indeed, Barclays would not have so often tried to move the "reference rate," unless *it

knew* that the back-end "polling" process would not immediately wipe out the effects of what

otherwise could be risky, costly endeavors.  *E.g.*, AC ¶ 187.  The fact that *both* the

rubberstamping *and* "banging the close" activities abated *at the exact same time* confirms this to

be true.  Thus, that Barclays was found to have "banged the close" so often is testament to the

presence of a conspiracy *regardless* of what phone calls the CFTC decided to make public.  *All*

attempts to move the reference rate are necessary and intentional byproducts of the

rubberstamping conspiracy, which allowed the Defendant Banks to share the benefits of control

by making clear any efforts to "bang the close" would be duly ratified and thus rewarded.

*(b)*     *Facts regarding other benchmark manipulation scandals*

As for facts regarding "other" benchmark manipulation scandals, unlike those in the

cases cited by Defendants, the Complaint here does not rest on the logic of "if it happened there,

it could have happened here."  Br. at 16.  Rather, as seen throughout this Section I, the

Complaint provides a robust set of facts in its own right.  The *additional* allegations regarding

'other' financial market scandals provide valid context and support.[20]  There is simply no way to

---

[20]  *See, e.g.*, *In re Pool Products*, 988 F. Supp. 2d at 711 ("Plus factors identified by courts and commentators include . . . involvement in other conspiracies . . ."); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149-50 (N.D. Cal. 2009) (weighing defendants' involvement in other conspiracies in denying motion to dismiss); *In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (same).

25

pretend that these Banks were not involved in rampant collusive manipulation of financial benchmarks during this period.

For instance, Defendants Barclays and UBS agreed to pay fines for "systemic problems with [Libor] rate-setting process," AC ¶¶ 75-77, and Defendant ICAP agreed to pay fines for having "knowingly disseminated false and misleading information" in respect of that benchmark, *id.* ¶¶ 78, 90. Defendants HSBC, Citibank, JP Morgan, RBS, and UBS have now been fined more than $6 billion for manipulating currency exchange rates.[21] It is now well-known that personnel from these banks directly communicated with each other using electronic chatrooms and other means to rig markets against investors and counterparties.

These facts directly belie Defendants' argument that it is implausible the banks would have sufficient common interest to work together to manipulate a benchmark. These allegations also place the "tools of the trade" alleged to be used here (banging the close, etc.) directly into Defendants' *known and well-used* "toolbox." And these allegations undermine Defendants' argument that they would never engage in a conspiracy to rig a benchmark when their "individual submissions" were (supposedly, but not actually) available for others to see. Br. at 13. It is perfectly appropriate to use similar instances of misconduct to directly negate Defendants' suggestion that what is alleged to have occurred here would *never logically happen*.

---

[21] The Complaint alleges $3 billion. AC ¶¶ 93-96. However, investigations into Defendants' many types of misconduct were and are still ongoing. For instance, Deutsche Bank is the latest to admit to colluding to manipulate Libor. *See, e.g.*, *In the Matter of Deutsche Bank AG*, CFTC Docket No. 15-20, Order Instituting Proceedings (Apr. 23, 2015). And Barclays, Citi, JPMorgan, RBS, and UBS were recently fined *another* $3 billion, and pled guilty to *criminal* conspiracy charges for manipulation of foreign exchange rates. *See U.S. v. Barclays PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. Citicorp*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. JPMorgan Chase & Co.*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. The Royal Bank of Scotland PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. UBS AG*, Plea Agreement (D. Conn. May 20, 2015); *In the Matter of Barclays Bank PLC*, CFTC Docket No. 15-24, Order Instituting Proceedings (May 20, 2015).

## II.   PLAINTIFFS HAVE "ANTITRUST STANDING"

To establish "antitrust standing," a plaintiff must allege:  (i) "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," and (ii) that it is an "efficient enforcer of the antitrust laws." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009).[22]

As an initial matter, it should be emphasized that the proposed class includes *only* those that entered into an interest-rate derivative "with a Defendant."  AC ¶ 235.  And the named Plaintiffs all did so—whether on their ISDAfix-linked transactions, or even in the "vanilla" swaps, standing on the other side of each Plaintiff's contract was a Defendant.  *Id.* ¶¶ 23-27, 235. In other words, Plaintiffs are *direct purchasers*, from Defendants, of the product whose prices (interest-rate derivatives) were alleged to have been fixed.  By all traditional standards, Plaintiffs fall squarely into the category of those the antitrust laws were designed to protect, and thus have antitrust standing.  Defendants' various attempts to confuse this should-be-simple inquiry should not be allowed to distract the Court from that core, fundamental fact.

### A.   Plaintiffs Allege Antitrust Injury

The Second Circuit employs a "three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury."  *Gatt Commc'ns, Inc., v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (denying antitrust standing to co-conspirator, but repeatedly observing the propriety of conferring antitrust standing to direct purchasers forced to pay higher prices as a result of the conspiracy).  Plaintiffs must "identify the practice complained of and the reasons such a practice is or might be anticompetitive."  *Id.*  Courts "identify the actual injury the

---

[22]   Defendants challenge the "antitrust standing" across the board.  They do not and cannot challenge Plaintiffs' right to seek recovery against *all* Defendants on the Sherman Act claim, even those that a particular Plaintiff did not contract with.  *See, e.g.*, *Rios v. Marshall,* 100 F.R.D. 395, 404 (S.D.N.Y. Dec. 12, 1983); *see also In re Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996).

plaintiff alleges."  *Id.*  Then they compare the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges."  *Id.*

### 1. Plaintiffs' harm arises directly out of the anti-competitive consequences of Defendants' conduct

Defendants argue that there can be no antitrust injury because the "alleged collusion occurred in an arena in which defendants never did and never were intended to compete."  Br. at 20-21.  This argument is based on the decision in *In re Libor-Based Financial Instruments Antitrust Litigation*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*Libor I*").  Here, Defendants claim that because ISDAfix rates were designed to be set by a "cooperative" process, their alleged collusion does not give rise to antitrust injury.  Br. at 20-24.  This, as the court held in *FX*, is wrong both factually and legally.

### (a) The facts here are more like FX than Libor

In setting Libor, actual transactions played no part in the setting process.  There is no Libor "reference rate."  Accordingly, in Libor, the banks were accused of 'only' responding inaccurately to the Libor "poll."   In contrast, Defendants can and did manipulate the ISDAfix rates by collaboratively executing a series of rapid-fire trades in an actual market around 11 a.m. that influenced the ICAP reference rates.  This undeniably reduced competition in the market for interest-rate derivatives, as these purported competitors were instead acting as a trading bloc in the real-world markets.  *E.g.*, AC ¶ 245.  This distinguishes this case from Libor, as recognized by the court in *FX*, 2015 WL 363894, at *11.

This should end the "antitrust injury" discussion.  Defendants suggest otherwise by arguing that the ISDAfix rate itself was calculated based on the back-end poll.  Br. at 23-24.  As to Plaintiffs that transacted in "vanilla" swaps, what happened in the poll would not change the fact they transacted at manipulated prices.  As to Plaintiffs with ISDAfix-linked contracts, that

Defendants committed a *second* wrong—ratifying the results of their price manipulation by way of "false" ICAP submissions—should not logically lead to a *reduction* in their liability.

Even that aside, the "poll" process here is factually distinguishable from that found "cooperative" in *Libor I*. As defined, the ISDAfix prices are supposed to be the result of "the mean of where [each] dealer would itself offer and bid a swap" in a competitive market. AC ¶ 71. Indeed, ISDA made clear that the submitted rate "***should not be where the dealer sees mid-market away from itself, but should be a function of its own bid/offer spread***." *Id.* Put plainly, Defendants are supposed to submit prices not based on speculation, but actual completed transactions and executable bids and offers. By rubber-stamping the ISDAfix reference rate instead of submitting "true" mid-market prices, Defendants prevented the published ISDAfix rate from reflecting true mid-market prices of interest rate swaps in a competitive market, altering the cash flows between the parties just as in any other price-fixing scheme. *Id.* ¶¶ 245, 247.

(b) *The collusive hijacking of even a "cooperative" process is anti-competitive*

Even if the Court ignored the factual features that make this case more like *FX* than *Libor*—which it should not, for the reasons discussed above—dismissal of the antitrust claims would still be inappropriate. Defendants err in adopting the reasoning in *Libor I*[23] that, because Defendants supposedly do not compete in setting the Libor rate, collusion to make false submissions and suppress that rate causes "no injury to competition." Br. at 21-22.

As an initial matter, it is a canon of antitrust law that trade groups and other associations are inherently conducive to price-fixing, and must be carefully scrutinized to prevent member

---

[23]   The antitrust-standing rulings of *Libor I* and related Libor cases are currently before the Second Circuit. *See, e.g.*, Joint Brief for Plaintiffs-Appellants, Case No. 13-3565-cv(L), Dkt. No. 342 (2d Cir. May 20, 2015).

Defendants tout *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*") and *7 West 57th Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015). Both of these Libor cases depend largely upon *Libor I* and thus provide no more support for Defendants' contentions than *Libor I* itself.

collusion.  *See, e.g.*, *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571

(1982) (cooperative organization can be "rife with opportunities for anticompetitive activity").[24]

Thus, if anything, the fact the Fixing process brought these competitors together each day should

invite increased scrutiny, not immunity.

Even that aside, Defendants' argument ignores the long-settled rule that "[a] complaint

that sufficiently pleads a *per se* violation"—*e.g.*, horizontal price-fixing—"need not separately

plead harm to competition."  *FX*, 2015 WL 363894, at *8; *see also In re Publ'n Paper Antitrust

Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) ("An agreement between competitors to fix prices, known

as a horizontal price-fixing agreement, categorically constitutes an unreasonable restraint, and,

accordingly, is unlawful *per se*.").[25]  It cannot be disputed that Plaintiffs' injuries—caused by the

paying of supracompetitive prices to Defendants—arose from that *per se* violation of a price-

fixing conspiracy.  *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107

n.12 (2d Cir. 2007) (question whether plaintiff that pays prices inflated by horizontal price-fixing

conspiracy suffers antitrust injury is "readily resolved" in the affirmative).[26]  Courts should thus

not be focused on whether the benchmark process was designed to be cooperative or not in

theory, but rather on the question of whether it was used as a tool to fix prices in actuality.

Put another way, price-fixing of *all* kinds, including the fixing of price components, is

condemned by the Sherman Act, and therefore "***the machinery employed by a combination for***

---

[24]  *See also* Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 VAND. L. REV. 813, 837-839 (2011) (cooperative activities by competitors "provide[] the structure for cartel decision making, the cover for why competitors are gathering, and may also foster a social climate conducive to collusion").

[25]  Indeed, price-fixing conspiracies are considered the "supreme evil" of the antitrust world.  *Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398, 408 (2004).  *See also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (*per se* violations "eliminate[e] the need to study the reasonableness of an individual restraint," and thus no need to separately plead harm to competition); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (collecting cases).

[26]  *See also In re DDAVP*, 585 F.3d at 688 (purchasers who pay cartel prices "plainly" suffer antitrust injury); *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627-28 (7th Cir. 2003) (buyers who pay higher price because of cartelization suffer antitrust injury).

**price-fixing is immaterial."** *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (citing *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)) (emphasis added); *see also Aluminum*, 2015 WL 1378946, at *14 (upholding conspiracy claim centering on Platts Midwest Premium benchmark because "defendants have engaged in a process that caused dysfunction in the price-setting process"); *FX*, 2015 WL 363894, at *2, 10-12; *In re Monosodium Glutamate Antitrust Litig.*, 2003 WL 23022001, at *1 (D. Minn. Dec. 23, 2003) (noting *per se* illegal conspiracy in which conspirators provided customers "with false or misleading explanations" for pricing).[27] Thus, that a benchmark-setting process *can* be used legitimately, does not insulate defendants from liability for forming a conspiracy to turn it into the "machinery" to fix prices. Plaintiffs here allege that Defendants agreed to hijack the process, whatever it was in the abstract, so they could earn supra-competitive profits (off of interest-rate derivatives) in a market where they competed (the market for interest-rate derivatives). Plaintiffs thus state a claim.

Defendants also refer to *Libor I*'s holding that one bank's failure to participate in the collusive scheme would invite no "competitive consequence" to that bank. This not only again ignores the *per se* rule, but fails to account for the fact that Defendants undeniably compete for products whose prices helped determine ISDAfix (US dollar interest rate swaps), or whose prices were determined by ISDAfix (ISDAfix-linked trades). Receiving supracompetitive profits in markets where defendants compete is, again, the quintessential antitrust violation. *See FX*, 2015 WL 363894, *11 (finding antitrust sanding and holding that simply because conduct can be legal,

---

[27]   *See also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (fixing of a "list price" that was only a "guide to likely transaction purchases" would constitute *per se* antitrust violation); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000) (conspiracy to manipulate benchmark for bulk cheese auction prices, which were used to determine the government-mandated minimum price for milk, caused antitrust injury to milk buyers); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (holding that a trade association's circulation of list prices for automobiles was *per se* illegal even when dealers used list prices "only as a starting point"); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 271-74 (D. Conn. 2003) (upholding conspiracy claim to manipulate the price of butter, which was a component of the price for milk and cream).

that "does not prevent it from becoming illegal if undertaken collusively—that is the essence of a conspiracy"); *In re Aluminum*, 2015 WL 1378946, at *14 (allegations that conspiracy based on manipulation of benchmarked price component "substituted supply and demand based-pricing with pricing driven by the . . . conspiracy . . . are sufficient to support antitrust injury").[28]

Defendants suggest all these cases are wrong or inapposite because the conduct at issue involves only "misrepresentations, rather than agreements to restrict competition."  Br. at 19-20. Putting aside the novelty of suggesting that wide-ranging fraud liability immunizes Defendants from antitrust liability, this reasoning again ignores that Defendants engaged in activity (acting as a trading bloc in the market for swaps around the time of the Fixing) apart from their "lying" to ICAP.  But even as to that step, the Supreme Court has made clear that "the machinery employed by a combination for price-fixing is immaterial."  *Socony-Vacuum*, 310 U.S. at 223. No case Defendants cite supports the sweeping conclusion that "misrepresentations" are a type of "machinery" that falls outside that rule.[29]  This is unsurprising, since a conspiracy to lie in order to fix prices is still, in every sense, (a) a conspiracy to (b) fix prices, and thus falls squarely within the aims of the antitrust laws.  *See also, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 990 (9th Cir. 2000) (antitrust injury where "defendants allegedly conspired successfully to subject plaintiffs (their suppliers) to artificially low prices by reporting fixed prices to an agency"); *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916-17 (2d Cir. 1988) (discussing publication of false and misleading letter as part of antitrust claim).

---

[28]  *See also generally Harm to Competition and the Competitive Process:  A Circular Charade in the LIBOR Antitrust Litigation*, 10 B.Y.U. INT'L L. & MGMT. REV. 91 (2015) (criticizing *Libor I* for creating "a new requirement that only those activities that are a product of a competitive process can harm competition").

[29]  In *Sanderson v. Culligan International Co.*, 415 F.3d 620, 623 (7th Cir. 2005), there was *no* allegation of a conspiracy, or that the alleged false marketing statements had *any* impact on prices or created a monopoly.  In *Schaefer v. First National Bank of Lincolnwood*, 326 F. Supp. 1186, 1191-92 (N.D. Ill. 1970), there was "no dispute" that the claim was "completely encompassed" by the 1934 Act, and so allowing antitrust claims on the facts there would have undermined the Act's statute of limitations.  Defendants fall far short of demonstrating that their wrongful conduct at issue here is "completely encompassed" by an alternative statutory construct, and nowhere explain how the unidentified alternative statutory regime would be undermined by allowing Plaintiffs' claims.

Finally, Defendants misread *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). In *Brunswick*, the Supreme Court confirmed that victims of horizontal price fixing have incurred the "injury in the type the antitrust laws were intended to present." *Id.* at 489. But in *Brunswick*, the plaintiff was a *competitor* bowling alley, suing another bowling alley for making a series of acquisitions that saved the alleys from going out of business. *Id.* at 480-41. The bowling public thus *benefitted* by having *more bowling alleys*. *Id.* at 486-88. Similarly, in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("*ARCO*"), the plaintiff was again a *competitor* (a rival gas station) complaining that there was *too much* competition. Here, Plaintiffs are direct victims of a price-fixing conspiracy that could not possibly have increased the competition for interest-rate derivatives. *See, e.g.*, *FX*, 2015 WL 363894, at *12 (rejecting Defendants' interpretation of *Brunswick* and *ARCO* because "a consumer's injury of having to pay supra-competitive prices as a result of a horizontal price-fixing conspiracy is the quintessential antitrust injury").

### 2.    Price-fixing can occur without a reduction of supply

With no support in the law, Defendants next contend that this is not a "[t]rue price-fixing scheme[]" because "Plaintiffs here . . . cannot identify any supply restriction."[30] Br. at 21, 23, 25-26. Defendants' argument misses the mark. Again, the "machinery employed . . . for price fixing is immaterial." *Socony-Vacuum*, 310 U.S. at 223. The notion that supply was not constricted and thus there was no harm to competition also again runs afoul of the fact that price fixing is "so inherently anticompetitive that [it] is illegal *per se* without inquiry into the harm it has actually caused." *FX*, 2015 WL 363894, at *9.

---

[30] Defendants even go so far as to argue they did a good thing by increasing "supply," *i.e.*, the number of transactions executed. Br. at 23, 25-26. But increasing the number of *price-fixed* transactions is hardly a good thing for the marketplace. It should also be noted that, though "banging the close" is used as shorthand, Defendants' coordinated activities did not just include increasing the number of transactions (*i.e.*, those that went the "right" way), but *decreasing* them as well (*i.e.*, those that would have gone the "wrong" way). AC ¶¶ 151-52.

Accordingly, price-fixing cases are routinely allowed even without a showing of a supply reduction.  For example, in the NASDAQ price-fixing case, the Department of Justice never asserted that NASDAQ traders *reduced the supply* of their market-making activities.[31]  Similarly, in *Dahl v. Bain Capital Partners*, 589 F. Supp. 2d 112, 114 (D. Mass. 2008), defendants engaged in a bid-rigging agreement to depress prices paid to shareholders in leveraged buyouts.  The plaintiffs did not assert that defendants reduced the number of buyouts on which they would bid.

Simply put, "competition-reducing" is not equivalent to quantity-reducing.  Cartels may elevate prices without reducing quantities.  A cartel may be on the supply side or the demand side, so that it may elevate or suppress the prices.  *See, e.g.*, *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257-58 (2d Cir. 1989) *amended*, 890 F.2d 569 (2d Cir. 1989) (holding that a plaintiff's "reduced profits" due to a reduction in "competition in the relevant market" is that kind of injury that is "precisely the type that the antitrust laws were designed to protect against").  Defendants collusively moved prices for swaps by acting as a trading bloc; orchestrated a scenario under which Defendants, but not their customers, knew which way prices would move before it happened; and rigged prices to their liking via the benchmark-setting process.  All of these activities are textbook examples of illegal anticompetitive conduct regardless of its effect on "supply."  *See Catalano*, 446 U.S. at 645-47; *Knevelbaard*, 232 F.3d at 987-89; *Aluminum*, 2015 WL 1378946, at *13-14; *FX*, 2015 WL 363894, at *2, 10-12.

### 3. Defendants are not immunized by the fact they impacted "new" and "old" contracts alike

Defendants argue that they do not "compete" based on ISDAfix, as evidenced by the fact that by the time it was set each Defendant already had in its portfolio pre-existing contracts.  Br. at 24-25.  This is just a repetition of the same flawed logic discussed above, in that it improperly

---

[31]   Justice Department Charges 24 Major NASDAQ Securities Firms with Fixing Transaction Costs for Investors, July 17, 1996 (available at http://www.justice.gov/archive/opa/pr/1996/July96/343-at.html).

narrows the focus to the ISDAfix process in the abstract, rather than considering the collective actions undertaken by Defendants.  The first step in the two-step conspiracy was to act as a trading bloc rather than competing in the real-world market for swaps, directly reducing price competition in "new" transactions.  Even the harm on "old" contracts (*i.e.*, pre-existing deals whose cash flows were linked to ISDAfix) stemmed from this reduction in competition, as that moved the reference rate that would then become (by design) the ISDAfix rate.  The fact ISDAfix-linked contracts' cash flows were impacted in the middle or at the end of their term rather than at the onset does not negate the fact the harm flowed from a price-fixing conspiracy.[32]

Defendants cite *UNR Industries v. Continental Insurance Co.*, 607 F. Supp. 855, 858 (N.D. Ill. 1984), but that case involved a denial of plaintiff's "right to full indemnification for and defense of asbestos-related claims under policies previously issued by the primary carriers." The *UNR* court found a "difference between an agreement not to compete and an agreement not to honor contracts."  *Id.* at 861.  Here, the Complaint plainly alleges an "agreement not to compete"—Defendants agreed to act as a trading bloc in the otherwise competitive market for swaps.  In any case, in terms of the closeness to the competitive marketplace, a conspiracy to hijack a financial benchmark *that was supposed to represent competitive pricing information* (which is why contracts referenced it in the first place) is far afield from a case discussing insurers refusing to honor liability cap provisions.[33]  Notably, Defendants' rule—that

---

[32]   *See generally Reiter v. Sonotone*, 442 U.S. 330, 339 (1979) ("A consumer whose money has been diminished by reason of an antitrust violation has been injured in his . . . property within the meaning of § 4 [of the Clayton Act]."); *Aluminum*, 2015 WL 1378946, at *4, 6 (upholding antitrust claim even though industry operated "pursuant to long-term contracts"; even if "no price was fixed" in the "traditional" sense, antitrust claim upheld where conspiracy "involved complicated interactions between participants who are alleged to have gained benefits primarily from trading activity").

[33]   *Newman v. Universal Pictures*, 813 F.2d 1519 (9th Cir. 1987), also cited by Defendants, misses the mark for similar reasons.  There, actor Paul Newman (and others) had entered into compensation contracts for movies in 1972.  Newman later sued, alleging that in 1981 Universal Pictures and other studios conspired as to how to interpret old contracts with respect to the emerging home video distribution channel.  *Id.* at 1521.  Thus, as with

35

competitors can collude as long as the conduct extracts supra-competitive profits from new and existing counterparties alike—would create severely perverse incentives.

### 4. Plaintiffs' injuries are the kind the Sherman Act was created to protect

Defendants argue that Plaintiffs' injuries "do not result from any competition-reducing effect of Defendants' alleged conduct." Br. at 26. This is yet another rehash of the same, ill-fated attempt to invoke the misplaced and flawed "Libor is cooperative" logic. "In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices or to receive artificially lower payments as a result of the defendants' anticompetitive conduct. Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'" *DDAVP*, 585 F.3d at 688; *see FX*, 2015 WL 363894, at *11.[34]

### B. Plaintiffs Are Efficient Enforcers

Plaintiffs and members of the class all entered into transactions affected by the conspiracy with a member of the conspiracy. AC ¶¶ 23-27, 235. Because they are the focus of a horizontal price-fixing conspiracy, direct purchasers of price-fixed products (like Plaintiffs) are "efficient enforcers." *See DDAVP*, 585 F.3d at 688.[35] Defendants argue this is not true because Plaintiffs' harm did not arise from "a market restraint." Br. at 27. Defendants' supposition that Plaintiffs' harm did not arise from a "market restraint" is fundamentally premised on the notion

---

*UNR*, the case has nothing to do with financial contracts that prospectively adopted a financial benchmark specifically because that benchmark was supposed to be reflective of competitive forces.

   [34] *See also, e.g.*, *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 285-86 (6th Cir. 2014); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012). That certain Plaintiffs received less than they should from Defendants, rather than "only" paying more, does not alter the analysis.

   [35] *See also New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act"); 2A Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 391b (3d ed. 2010) (noting that "[d]irect purchasers from cartels have long had standing to recover any collusive overcharges").

that hijacking the ISDAfixing process to fix prices was not a fundamentally anticompetitive act. As discussed above, it is.  That should end the inquiry.

But even if the Court adopts *Libor I*'s reasoning as to the supposed "cooperative" nature of the "poll," that still leaves the first step in the two-step ISDAfixing conspiracy:  Defendants' "banging the close" activities in the real-world market for swaps.  Here, Defendants try to put distance between *this* wrongdoing and Plaintiffs' harms by noting that "Screen 19901" (used by ICAP) purportedly only drew information from transactions executed between dealers.  Br. at 27. The suggestion that this matters for directness of harm ignores market realities, and goes far beyond what is proper to deduce at the pleading stage.  There is only one market for US dollar interest-rate swaps, and it is driven by a single mid-market price for each dealer.  While dealers may trade with one another at narrower bid/ask spreads *around* their mid-market prices, dealers trade with end users at wider spreads around their *same* mid-market prices.  ISDA itself refers to just one market when describing how ISDAfix is calculated:  "both sources of information [used to calculate the reference rate] reflect completed transactions and/or at-risk trading interest. ICAP considers them to be a useful . . . reference point for where *the market* may be."  AC ¶ 72.

It is thus not surprising that the Complaint's multi-year analyses found artificial price movements not by narrowly pulling data from "Screen 19901," but rather from sources that picked up pricing activity from transactions between two dealers and dealers and non-dealers alike.  It is irrelevant if the observed price movements, including those outside the dealer-to-dealer context, are the result of (a) Defendants banging the close on multiple platforms, (b) all prices moving because *all* US dollar interest rate swaps of a dealer trade off that dealer's single mid-market price, or (c) both.  Defendants manipulated the mid-market prices for such swaps. Plaintiffs entered into such swaps with Defendants.  Plaintiffs therefore are "efficient enforcers"

37

even if *Libor I* and its progeny are (erroneously) imported. *See generally Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 483-84 (7th Cir. 2002) (holding distinct and separately actionable inflated futures contracts in physical commodities markets subject to price manipulation); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *10 (D.D.C. May 9, 2000) ("[T]here is no requirement that the scope of an illegal conspiracy coincide with the scope of the relevant market."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2008 WL 4447592, at *3 (N.D. Cal. Sep. 29, 2008) (certifying class that included both fast SRAM used in computers and slow SRAM used in mobile phones because "[b]oth the fast and slow SRAM markets are alleged to be controlled by Defendants' price-fixing conspiracy").[36]

Moreover, as recognized by the court in *Aluminum*, the efficient enforcer inquiry is focused on who "suffered the alleged injuries . . . it is not concerned with which market participants are most proximate to the allegedly unlawful conduct itself." *See* 2015 WL 1378946, at *15; *see also DDAVP*, 585 F.3d at 688-89 (the proper standing inquiry is whether plaintiff is "*an* entity most motivated by self-interest, not *the* entity most motivated by self-interest" regardless of whether there are other plaintiffs who could also assert antitrust claims). Accordingly, *even if* Defendants' "banging the close" activities were physically limited to trades between dealers, and *even if* the later acts of "rubberstamping" in the "poll" were wholly outside of the antitrust case, Defendants or other dealers could not possibly be the only efficient

---

[36]   *See also In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Penn. 1999) (certifying class for antitrust conspiracy affecting architectural, automotive, and non-automotive commercial flat glass products because, "[t]he overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid").  Defendants' additional citations (Br. at 29 n.32) do not compel a different conclusion.  In both *Reading* and *Ocean View*, for example, the alleged price manipulation involved a complicated series of events that required independent decision making by a number of different parties from the point of manipulation to the final transaction.  *See Reading Indus. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701, at *3-4 (S.D.N.Y. Dec. 15, 1999).  Neither case involved plaintiffs in direct privity with members of the conspiracy, as here.  Neither case involved manipulation of a benchmark price.  *De Atucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985), is even more inapposite.  In that case, the causal relationship between the manipulation and harm was not at issue.  Instead, the court dismissed the plaintiff's claims because it was "an individual who traded, and was injured entirely outside of United States commerce." *Id.* at 518.

enforcers.  Indeed, to limit the scope of those who can recover to the *dealers themselves* lead to the absurd result that Defendants are liable primarily to themselves, leaving many victims of the scheme, which by design was to impact all ISDAfix contracts, without a remedy.

Having failed to show that *no* Plaintiff would be an efficient enforcer, Defendants try to whittle the case down by arguing that *at least* those with "derivatives not tied to ISDAfix" are too "remote."  Br. at 28.  On the *two-step* conspiracy as pled, this makes no sense.  The first step of the conspiracy was to act as a trading bloc with respect to "derivatives not tied to ISDAfix," *i.e.*, "vanilla" swaps.  Those that purchased or sold vanilla swaps were thus *quite literally* the "first parties" harmed by the conspiracy.  *See* Br. at 30 (citing *Aluminum*, 2015 WL 1378946, at *13).  And manipulation of the price for vanilla swaps was "inextricably intertwined" and "a necessary step" in the two-step scheme as alleged.  Br. at 29 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982) and *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745 (9th Cir. 1984)).  None of the cases cited by Defendants have anything to do with a situation where the plaintiffs were directly harmed by one of the *core tools* used by the conspirators.[37]

## III.    PLAINTIFFS PLEAD INJURY-IN-FACT

The Second Circuit recently confirmed that plaintiffs need only "provide a defendant with some indication of the loss and the causal connection."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 404 (2d Cir. 2015).  Here, the Complaint details the causation chain for each type of contract in the class.[38]  Defendants do *not* dispute those logical relationships.

---

[37]    *Laydon I*, 2014 WL 1280464, at *9 (manipulation of one benchmark (Euroyen Tibor) versus another (Yen-Libor)); *Laumann v. NHL*, 907 F. Supp. 2d 465, 484 (S.D.N.Y. 2012) (basic cable television packages versus out-of-market hockey and baseball programming); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403 (S.D.N.Y. 2011) (music CDs versus internet music).

[38]    *See, e.g.*, AC ¶¶ 194, 205-06 (describing impact of manipulation on class members who entered into fixed-for-floating rate swaps as fixed rate receivers using Plaintiffs' transactions as illustrative examples), 195, 204 (same, for those who were floating rate receivers), 196-97 (same, for those who entered into cash-settled payer swaptions and cash-settled receiver swaptions), 207-09 (same, for those who entered into physically-settled swaptions, using a Plaintiff's transaction as an illustrative example).

The Complaint also alleges that each Plaintiff was harmed by the manipulation. AC ¶¶ 23-27.
Accordingly, the injury-in-fact "point merits little discussion because, '[a]t the pleading stage,
general factual allegations of injury resulting from the defendant's conduct may suffice' to
establish standing." *Fin. Guar.*, 783 F.3d at 401.[39]

A.     **The Complaint Alleges Injury-in-Fact**

The *FX* court properly rejected the very same "injury in fact" arguments Defendants
make here. There, as here, the conspiracy involved benchmark manipulation that may have
changed directions each day. There, as here, the conspiracy was alleged to cross multiple
benchmarks (currency pairs/ISDAfix tenors). There, as here, the plaintiffs alleged they had
entered into a transaction with a defendant. There, as here, the plaintiffs alleged plainly that they
had been harmed.[40] There, as here, the banks argued those allegations failed because details
were not provided for each transaction 'matching' the 'right' time, direction, and rate to show net
harm. The court in *FX*, as this Court should do, rejected that argument:

> Plaintiffs have demonstrated that they have a concrete stake in the present action.
> Each named Plaintiff claims that it was injured by having to pay supra-
> competitive prices as a result of Defendants' manipulation of the Fix . . . .
>
> Defendants' argument based on injury in fact, like their argument based on
> plausibility, ultimately amounts to a demand for specifics that are not required,
> and that Plaintiffs could not be reasonably expected to know, at the pleading
> stage. Discovery may show that, for particular transactions, some Plaintiffs
> benefited instead of being harmed by the manipulation of the Fix, but the fact that
> an injury may be outweighed by other benefits . . . does not negate standing.

2015 WL 363894, at *9-10 (citations and quotations omitted). The *Aluminum* court, 2015 WL
1378946, at *11, also made clear that "[w]hether [an allegation of harm] is true is not an issue" at
the pleading stage. Similarly, in *In re IPO Securities Litigation*, 241 F. Supp. 2d 281, 350 n.80

---

[39]     *See also Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("Injury in fact is a low
threshold."); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 106 (D.D.C. 2013) (details on
the amount of damage are "not required in order to establish injury-in-fact at the pleading stage").
[40]     *Compare FX*, Case No. 13-cv-07789, Dkt. No. 172 (S.D.N.Y. Mar. 31, 2014) ("FX Amended
Complaint"), available at 2014 WL 1493022, ¶¶ 7, 9, 15-26, *with* AC ¶¶ 12, 207-09, 248.

(S.D.N.Y. 2003), the court refused to entertain counter-hypotheticals whereby certain plaintiffs may have not been harmed if they transacted at certain prices.

Defendants argue that *ISDAfix* Plaintiffs should be held to a higher-than-normal burden, because *this* Complaint is *so* detailed in its demonstration of manipulation. Br. at 33 n.37. Defendants cite no precedent for the notion that the pleading burden for injury *increases* for those plaintiffs who present *too-persuasive* a case for liability.

## B.   The Complaint Answers Defendants' (Improper) Call for More

Even if the Court were to hold Plaintiffs to a higher standard than courts routinely find appropriate, the Complaint here has risen to the occasion. Contrary to Defendants' presumption, Br. at 33 n.37, the Complaint *does* go far beyond the information provided in *FX*. For instance, the Complaint here provides the date, type, and counterparty details for *over one thousand* transactions Plaintiffs entered into. AC ¶¶ 23-27, App. A. And the Complaint here provides narrative examples of how specific transactions were negatively impacted. *Id.* ¶¶ 193-209.

For instance, the Complaint details how Alaska Electrical entered into a swap on October 20, 2010, a day whose already-identified pricing anomalies decreased the cash flows to Plaintiff by 3.3 basis points. *Id.* ¶ 206. Genesee County entered into a physically-settled swaption whose cash flows were decreased by 2 basis points by manipulation on May 24, 2007. *Id.* ¶ 208. Despite having matched the transaction type, specific days, direction, and even amount of manipulation together, Defendants posit *even more* is required—what "time of day" this all occurred. Br. at 32. Defendants cite no precedent for requiring such extremely granular details at the pleading stage.[41] In addition, the Complaint alleges that the conspiracy operated *every*

_____

[41]   The only case cited here is *Zola v. Merrill Lynch, Pierce, Fenner & Smith*, 1986 WL 1163 (S.D.N.Y. Jan 23, 1986). But that was not even an antitrust case, let alone a complex benchmark-manipulation one. The *Zola* court merely noted the unremarkable fact that a *fraud claim* could not be based on representations that were *admitted to have occurred after* the plaintiff claimed to have engaged in its act of reliance.

*day*, AC ¶ 192,[42] and that *the entire trading day* was distorted, *id.* ¶¶ 12, 245, making it all the more improper to put so much emphasis on the granular details as to a particular time of day.[43]

Washington County had a contract that would experience a loss if there was downward manipulation of ISDAfix on a payment date.  *Id.* ¶ 195.  Defendants posit that the Complaint "does not allege that downward manipulation *in fact* occurred on any of those days."  Br. at 33-34.  To the contrary, the Complaint alleges that the experts have already identified manipulation on "numerous such dates," which plainly refers to the previous sentence's reference to days of "downward manipulation."  AC ¶ 195; *see also id.* ¶ 26 (alleging this Plaintiff was harmed).

The Complaint also details a Montgomery County swap tied to ISDAfix, and how acts of suppression of 2.5 basis points "led to a reduction in the value of the ISDAfix-linked cash flows payable to Montgomery County."  AC ¶ 194.  Defendants posit that the Complaint "fails to allege that it, in fact, was paid any reduced cash flows."  Br. at 34.  Defendants apparently posit that maybe the counterparty paid more in cash than what was called for by a straightforward application of the ISDAfix rates.  The notion that Defendants rigged IDSAfix rates (to decrease the payable) but then paid this Plaintiff the 'fair' (unmanipulated) amount anyway (in cash) is so absurd that it only demonstrates the desperation and impropriety of Defendants' request to ignore the Complaint's plain allegation that this Plaintiff was injured.  AC ¶ 25.

**C.   That the Complaint Alleges 1,900 Plaintiff Transactions Strengthens Rather than Undermines the Plausibility of the Complaint**

As discussed in Section III.A above, general allegations of injury are *routinely* held to suffice, even in financial-benchmark litigation cases.  As discussed in Section III.B above, this

---

[42]  The Complaint alleges that, even though Plaintiffs could "only" identify *thousands* of trading days that showed statistically significant signs of artificial price movements, discovery will confirm that in fact the conspiracy operated on *every day*.  AC ¶ 192.  That it cannot be shown to a statistically significant degree against the market noise does not render the "daily manipulation" allegation implausible—particularly as it is buttressed by the fact Defendants' conspiracy provided "rubberstamps" to the reference rates on a *daily* basis.  *E.g.*, *id.* ¶ 9.
[43]  This is both because Defendants' scheme involved bunching around the fixing window transactions that would have occurred at other times of day, *and* because of the lingering effect of price "shocks."  AC ¶¶ 12, 245.

Complaint goes beyond what is required by also including detailed examples of transactions that were impacted.  Defendants' attacks on those examples are unavailing.  So, too, is their implicit suggestion that the Complaint fails because it does not flood the Court with similar narrative details for 1,900 other transactions.  This can be again seen in the fact that the *FX* complaint was upheld despite providing *no* details as to *any* transaction—not even a list of the dates on which the plaintiffs there traded, as is provided here.

Not requiring Plaintiffs to flood the Court with narrative details as to every one of their 1,900-plus transactions also comports with the nature of the class-action vehicle:  the scope of Defendants' liability is not defined by how much they owe the named Plaintiffs.  The injury-in-fact inquiry for named plaintiffs performs the far more limited function of ensuring they have a "concrete stake" in the case.  *See FX*, 2015 WL 363894, at *9; *see also Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008).  That "stake" is present as long as each Plaintiff was harmed at least once.

Indeed, Defendants' argument that the provision of an appendix listing out thousands of transactions undermines the strength of the Complaint's damage allegations gets it backwards. The Complaint alleges *every day*, *every tenor* was manipulated.  AC ¶¶ 9, 12, 192, 245.  The incredible odds against *1,900* transactions happening to fall on the "winning" side of such a systemic price manipulation as alleged here demonstrates the *improbability* of Defendants' suggestion that the Plaintiffs here do not have a "concrete stake" in the action.

The systemic nature of the manipulation makes this case far more like *FX*, and less like the portions of the Libor-related cases Defendants cite here.  The excerpts cited by Defendants are limited to a subset of claims where the plaintiff admitted that "Libor was allegedly artificial only for discrete days" and thus "plaintiffs may have transacted on many days when Libor was

'true.'"  *In re Libor-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) ("*Libor III*").  There was thus in the "trader-based" Libor context a much, much narrower target for the plaintiffs to hit, consisting of a finite list of days revealed by plea agreements. Here, as in *FX* and like the Libor plaintiffs who alleged *systemic* manipulation, the Complaint plausibly pleads there were *no* days in the relevant period where ISDAfix was "true."[44]

## IV.   PLAINTIFFS PLEAD COMMON-LAW CLAIMS AS WELL

### A.   Defendants Breached their Express Agreements to Act in Good Faith and Follow the Law

Defendants continue to demand an ever-increasing number of details by complaining that Plaintiffs have only given "two specific examples" of contracts.  Br. at 35.  But the Complaint makes clear that *all* of the contracts in this Count:  (a) are linked to ISDAfix, AC ¶ 254; (b) have as the counterparty a Defendant bank, *id.*; (c) are governed by ISDA Master Agreements, *id.* ¶ 210, 256, App. S, T; and (d) expressly required payment calculations be made in good faith, and expressly required the banks to stay within the law, *id.* ¶¶ 213-14, 216, 258-60.  Defendants need no further details to be on "notice" as to what this case is about.  This case is thus nothing like *Langreich v. Gruenbaum*, 2009 WL 321253, at *4 (S.D.N.Y. Jan. 30, 2009), where the complaint was so "muddled" the court could not even tell if oral or written terms were at issue.

Defendants next assert that Plaintiffs "do not allege that any individual Bank manipulated ISDAfix . . . in any particular tenor on any particular date."  Br. at 35.  Every part of that

---

[44]   The excerpt Defendants use (Br. at 33) from *Laydon I* was discussing *antitrust* injury, and so was decided on the theory that the injury was not because of harm "to competition."  2014 WL 1280464, at *8.  Plainly the plaintiff pled injury-in-fact, as the court upheld the Commodities Exchange Act claims.  Similarly, the decision in *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2105) ("*Laydon II*") misses the mark as it was focused on the *remoteness* of the injury, in RICO terms, where the plaintiff was trying to bring a claim based on a contract linked to one benchmark, when the complaint only alleged a completely separate benchmark was manipulated.  *Id.* at *10.  As discussed in Section II above, there is no "remoteness" problem here.

sentence is false.  The Complaint alleges they *all* participated in the conspiracy.[45]  *See, e.g.*, AC

¶¶ 6, 8, Section I *above*.  It persuasively alleges, based on statistical analyses, that *all* tenors were

manipulated.  *See id.* ¶¶ 115-17, 141, 145, 163, 171-76, 182-83, App. B-Q.[46]  And it alleges that

*every* day in the class period was impacted, as confirmed by the *daily* rubberstamping and the

*thousands* of days already identified, even without discovery, as demonstrating signs of price

artificiality.  *See id.* ¶¶ 9, 102, 131, App. A.

   Finally, Defendants wonder how they breached ISDAfix contracts if they made payments

based on the final, published ISDAfix rates.  Br. at 35.  It is the height of cynicism to suggest that

making "ISDAfix rate" based payments fulfills a good-faith requirement even where the paying

party is secretly manipulating ISDAfix rates.  Plaintiffs cite specific provisions of ISDA Master

Agreements that Defendants violated.  AC ¶ 257.  As Calculation Agents, Defendants had a duty

to determine the amounts of their own payments due under swaptions and other interest rate

derivatives that settled by reference to ISDAfix rates in good faith and in a commercially

reasonable manner.  Defendant Banks breached this express contractual duty when they

determined the amounts of their own payments with reference to an ISDAfix rate they knew was

regularly manipulated.  *Id.* ¶ 260.  Defendants' argument also overlooks that engaging in a

benchmark-rigging conspiracy also breached their agreement to stay within the law.

What Defendants did wrong is thus well-clear.

---

[45]   Defendants as "background" complain about various arms *within each bank* being treated together as being the same "bank."  Br. at 6.  If this is what Defendants mean by later asserting the Complaint fails to allege who was involved in the manipulation, this is far too oblique of an assertion and the argument should be deemed waived.  In any event, sorting out which division *within each bank* physically carried out the misdeeds is something that could only come with full discovery.  *See generally, e.g.*, *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974); *In re Interactive Network Sec. Litig.*, 948 F. Supp. 917, 920 (N.D. Cal. 1996).

[46]   Defendants cite *In re Libor-Based Fin. Instruments Antitrust Litigation*, 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*Libor II*") because that court "distinguished between different tenors of Libor."  Br. at 36.  As discussed in Section III.C above, that court's demand for specificity only came in the context of *sporadic* "trader-based" manipulation.  When instead a complaint brought a breach claim based on "persistent Libor suppression across tenors," Judge Buchwald rejected Defendants' calls for day-by-day details.  *See Libor III*, 27 F. Supp. 3d at 482.  The tenor-based argument would thus fail *even if* the Complaint here, alleging systemic problems, had not provided allegations and data as to every tenor—which, as discussed above, it does.

Indeed, in *In re Libor-Based Financial Instruments Antitrust Litigation*, 962 F. Supp. 2d 606, 632-33 (S.D.N.Y. 2013) ("*Libor II*"), the court found that a duty of good faith implied "a promise by defendants not to manipulate Libor," *and* that duty was breached by even a bank's *unilateral* refusal to make accurate Libor "poll" submissions.  Because the contracts at issue here (unlike those at issue in *Libor II*) had an *express* good-faith requirement, the same result is required for these express claims.

### B.    Defendants Breached Their Implied Duties of Good Faith and Fair Dealing

Even if the contracts had not *expressly* required the Defendant banks to act in good faith, Defendants do not dispute that the law implies such a duty in all instances.  That duty was breached for the same reasons laid out in Section IV.A above.

Defendants assert their misdeeds were "not targeted at any particular Plaintiff."  Br. at 36.  By definition, ISDAfix manipulation "targets" *every* ISDAfix-linked contract.  Plaintiff-specific animosity is not required for this claim.  *See, e.g.*, *Metcalf Const. Co., Inc. v. U.S.*, 742 F.3d 984, 993 (Fed. Cir. 2014) ("specific targeting is not a general requirement" for good faith and fair dealing claims).  Rather, a breach of the implied covenant can be shown by "reckless indifference to the rights of others such as gross negligence."  *In re Coin Phones, Inc.*, 203 B.R. 184, 211 (S.D.N.Y. Bankr. 1996); *see also Libor III*, 27 F. Supp. 3d at 483 (false Libor submissions constituted "reckless disregard of the detriment" to contractual counterparties, satisfying "intent" prong of implied-duty claim).[47]  The Complaint alleges that Defendants *knew* their ISDAfix manipulation would directly harm their contractual counterparties.  AC ¶¶ 267-68.  As confirmed by the Barclays Order, the core purpose of the manipulation was to "benefit [the

---

[47]    In *Pitcairn Properties v. LJL 33rd Street Associates*, 2012 WL 6082398, at *4-5 (S.D.N.Y. 2012), cited by Defendants, the claim was dismissed because the complained-of acts (exercise of an option) were plainly allowed by the text of the contract (which gave one party "sole absolute discretion" to do so).  Here, of course, Defendants can identify no contractual term authorizing them to manipulate ISDAfix.

banks'] derivatives positions, by increasing their payments from counterparties or decreasing payments to counterparties." Barclays Order at 6. This, of course, "would hurt the Bank's counterparties in cash settlement." *Id*. at 6-7.

Defendants also note that they had "legitimate reasons for the challenged conduct." Br. at 36. As discussed above in Section I, there was no "legitimate reason" to break the submission rules by routinely rubberstamping the reference rate. This, alone, and even without a conspiracy, would state a claim. *See Libor III*, 27 F. Supp. 3d at 479 (rejecting conspiracy argument), 483-84 (upholding breach and unjust enrichment claims anyway as submissions broke Libor rules). Even if that were not the case, as also discussed in Section I, the idea price spikes were caused by "legitimate" efforts to hedge—rather than attempts to rig the rate—is not credible.

Finally, Defendants argue the implied-duty claim is duplicative of the express-duty claim. Br. at 36-37. But Plaintiffs are allowed to plead these claims in the alternative. *See* Fed. R. Civ. P. 8(d); *Fantozzi v. Axsys Technologies, Inc.*, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008). Doing so here makes sense. Even though Plaintiffs' disagree, the Court (or the jury) could determine manipulating ISDAfix rates did not breach any express term because "ISDAfix rate" payments were still made. But the same Court (or jury) may well still determine that a promise not to intentionally distort rates was a promise that "a reasonable person in the position of the promisee would be justified in understanding [was] included" as to give rise to an implied-duty claim. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002).[48]

---

[48]   Defendants' assertion that Michigan "does not recognize breach of the implied covenant of good faith and fair dealing claims at all" is misleading. Br. at 37, n.44. Under Michigan law, the "covenant of good faith and fair dealing is an implied promise contained in every contract." *People v. Vanreyendam*, 2007 WL 1201832, at *2 (Mich. Ct. App. Apr. 24, 2007). While a breach of this covenant may not give rise to an *independent tort* action, it does constitute a breach of the parties' underlying agreement. *Harp v. Equilon Enters., L.L.C.*, 2012 WL 975050, at *6 (Mich. Ct. App. Mar. 22, 2012). Thus, whether considered a subset of Count II (breach of contract) or Count III (breach of the implied duty), it is clear even Michigan would recognize the right to recovery.

### C.   Defendants Were Unjustly Enriched, and are Jointly Liable Because They Acted as Part of a Conspiracy to Enrich Each Other

In the alternative to its contractual claims, Plaintiffs allege that the retention of money that should have flown to (or been kept by) Plaintiffs constitutes an unjust enrichment by those banks who so received and still hold Plaintiffs' funds.  AC ¶¶ 269-77.

*As to "Counterparty Banks*,*"* Defendants argue that it is duplicative with the contractual claims.  Br. at 39-40.  But (a) Plaintiffs are allowed to plead in the alternative, *see Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006); and (b) Defendants are seeking dismissal of the contract claims on the grounds they do *not* govern the "subject matter" of the dispute, *i.e.*, no express term obligated them to refrain from manipulating, *see* Br. at 35.[49]  It is thus premature—and unnecessary—to deem any of these claims to be duplicative of the other.  *See Libor III*, 27 F. Supp. 3d at 482 (allowing both claims to proceed).

*As to "Non-Counterparty Banks,"* Defendants argue that they cannot be liable where privity did not exist.  Br. at 40.  To the extent Defendants mean in the normal case Bank of America is not liable for money retained by JPMorgan,[50] it was not Plaintiffs' intent to suggest otherwise.  But because Defendants *conspired*, they can be held jointly liable even as to contracts where privity does not exist.  *See* AC ¶¶ 274-76.

---

[49]   In both of the cases Defendants cite, the unjust enrichment claim (a) was *not* pled in the alternative, and (b) was dismissed only because the court found that the parties' contract *did* govern the subject matter of the dispute.  *See Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012); *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011).  In fact, in *Pappas*, there was no accompanying breach of contract claim, and in *Diesel*, the contract was held to govern only *after a trial*.

[50]   Defendants' vague "background" reference to interbank divisions, Br. at 6, is another reason the issue of duplication of claims is premature.  Defendants may later (though the argument on these papers has been waived, and in any event is premature) argue that the contract claim fails if, hypothetically, it is later shown in discovery that one entity ("JPMorgan A") technically carried out the ISDAfix manipulations while another ("JPMorgan B") technically signed the contract and received the money.  Even if the Court agreed as to the contract claims, the unjust enrichment claims would still be viable against JPMorgan B, as it would be unjust to allow it to retain Plaintiffs' money that it received only because of the misdeeds of its corporate affiliate.  *See generally, e.g.*, *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978) (unjust enrichment does not require wrongdoing by the defendant).  None of this is currently before the Court, but is being used to show yet another reason why it is premature to dismiss claims on the notion they are "duplicative."

48

Defendants next present a false dichotomy, suggesting the unjust enrichment claim must either duplicate the antitrust claims or fail for the same reasons.  Br. at 40-41.  But the Sherman Act has unique requirements that distinguish it from the common-law.  For instance, Defendants urge dismissal of the antitrust count for lack of "antitrust injury"—which is not an element of an unjust enrichment claim.  Including a Sherman Act claim in the same pleading does not mean Plaintiffs sacrificed their right to establish the simpler tort of an unjust enrichment.  *See generally, e.g.*, *Aluminum*, 2015 WL 1378946, at *28 ("[A]lthough plaintiffs cannot ultimately recover under both the antitrust laws and state unjust enrichment law, there is no bar to pleading both claims simultaneously at the pleading stage"); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014) (same).[51]

> **D.** **Each Defendant's Manipulative Acts Tortiously Interfered With Contracts To Which It Was Not a Party**

The manipulation of ISDAfix rates, and indeed even "only" the back-end step of rubberstamping the reference rate, did not just distort the payment streams of a bank's own contracts, but also those Plaintiffs had with other banks.  The Complaint thus also states claims for tortious interference, seeking to hold Defendants liable regardless of whether they were in privity, or acting as part of a conspiracy.  AC ¶¶ 278-85.

Defendants argue that they did not have sufficient knowledge of the contracts they were interfering with.  Br. at 38.  But "[i]t is sufficient merely that defendant knew of . . . facts that would lead a reasonable person to believe a contract existed."  14 N.Y. Prac., New York Law of

---

[51]    *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (N.Y. Ct. App. 2012), cited by Defendants, had nothing to do with Sherman Act claims, but rather concerned only "conventional contract or tort claims."  Yet even that court recognized that unjust enrichment *is* available where the defendant "has not breached a contract nor committed a recognized tort," and accordingly dismissed the unjust enrichment count after *upholding* a related claim for inverse condemnation.  *Libor III* is also unavailing.  There, the court only dismissed the unjust enrichment claim *after* finding the conspiracy theory factually unpersuasive.  27 F. Supp. 3d at 479-80.  The subsequent detour as to the possible outcome "even if" a conspiracy were pled is thus mere *dicta*.

Torts § 3:14.[52]  And where many similar contracts were interfered with through the same

activity, as is the case here, plaintiffs need only allege that Defendants knew of "a particular

category of [plaintiffs'] contracts" that would be interfered with.  *Lightning Lube, Inc. v. Witco

Corp.*, 4 F.3d 1153, 1170 (3d Cir. 1993).  It would strain credulity to suggest that Defendants

remained ignorant that there were billions' worth of ISDAfix-linked contracts that would

immediately be impacted when they hijacked the ISDAfix process, given their *dominance* of the

interest-rate derivatives market, control over ISDAfix rates, and the fact ISDAfix terms are part

of the industry-standard documentation.  *See, e.g.*, AC ¶¶ 28-43, 53-54, 58-59.

Defendants counter-intuitively try to use the sheer size of their misdeeds as a shield.

Specifically, according to Defendants, they must have had *a specific person* in mind when they

turned the ISDAfix rate dial in order to profit from ISDAfix rate movements.  Br. at 38.  That is

not and cannot be the law.  This case is far beyond where defendants merely had "general

knowledge of products that may be available," Br. at 38, and so cases generically saying as much

are unavailing.[53]  Rather, this is a unique situation where Defendants had *perfect* knowledge that

*every* relevant contract in existence (*i.e.*, those governed by ISDA Master Agreements) would be

---

[52]  *See also Major Computer, Inc. v. Acad. Life Ins. Co.*, 929 F.2d 1249, 1252 (8th Cir. 1991) ("It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations"); *Rain Bird Corp. v. Nat'l Pump Co.*, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D. Miss. Dec. 23, 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract."); *Don King Productions v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) ("[A] plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue.").

[53]  *Qube Films Ltd. v. Padell*, 2014 WL 3952931, *8 (S.D.N.Y. Aug. 12, 2014), cited by Defendants, involved a claim for interfering with a specific escrow agreement, where the plaintiff only attempted to show knowledge by referring to various mailings made to people *other than* the defendant.  It thus did not involve a situation where the defendant was charged with having actual knowledge of an entire *category* of contracts, and intentionally acting to interfere with *all* of them.  Similarly, *Boehner v. Heise*, 734 F. Supp. 2d 389, 393 (S.D.N.Y. 2010), did not involve such a broadly aimed conspiracy whose entire profitability for Defendants was based on the group manipulation of contracts, but rather involved a company complaining about a libelous letter sent to a Senator. On *summary judgment*, the court found "no competent evidence" that the defendants knew the plaintiff had contracts with suppliers that would be interfered with when the letter was sent.  *Id.* at 403-04.  The threadbare allegations of "constructive knowledge" rejected in the other cases cited by Defendants are also far afield of the facts pled here. *See LightSquared Inc. v. Deere & Co.*, 2015 WL 585655, *18 (S.D.N.Y. Feb. 5, 2015) ("no more than conclusory statements" of intentional interference, lacking any factual support); *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) (purported "constructive knowledge" based solely on fact that copy of agreement was publicly filed).

*immediately* impacted in the *exact same* way—and indeed one where benefitting from that universal impact was *the entire reason* Defendants were (mis)behaving.[54]

As to the intent element, Defendants assert that one allegation is "conclusory."  Br. at 38. Viewing one paragraph in isolation ignores that the Complaint from beginning to end establishes that Defendants were manipulating ISDAfix rates because ISDAfix rates are benchmark rates used in ISDAfix-linked contracts.  Impacting ISDAfix contracts was thus not an unintended side-effect, but the focus of Defendants' behavior.  *See, e.g.*, Barclays Order at 7 (observing that manipulation "would hurt the Bank's counterparties in cash settlement, as well as any other market participants who had positions referencing USD ISDAFIX on a given day that were directionally equivalent to Barclays' counterparty in the same maturity").

Defendants next argue that the theory that their overall goal was to profit off of ISDAfix-linked contracts makes a finding of sufficient culpability impossible because it shows they had inward-looking motives ("Defendants' profits") rather than outward-looking animosity towards Plaintiffs.  Br. at 38-39.  But what was in Defendants' heart-of-hearts is not the question.  It is sufficient that the defendant knew its misconduct was substantially certain to interfere.  *See* Restatement (Second) of Torts § 766, cmt. (j).[55]  Indeed, as the Third Circuit in *Lightning Lube* recognized, even "if there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional."  4 F.3d at 1170; *Harper &*

---

[54]   In the alternative, Defendants should at least be liable to those Plaintiffs with whom they had ISDAfix contracts.  That gave a "face" to that Defendant as to who it was harming through its ISDAfixing manipulations. This is not for liability on the Defendants' own contracts, but those with others, as that bank should not have been naïve enough to presume it was the only bank providing ISDAfix-related contracts to that investor.

[55]   *See also High Falls Brewing Co., LLC v. Boston Beer Corp.*, 852 F. Supp. 2d 306, 311 (W.D.N.Y. 2011) ("deliberate or intentional interference may be shown where the defendant is certain, or substantially certain, that his actions will result in a breach of the contract"); *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 173 (E.D.N.Y. 2010); *Bendix Corp. v. Adams*, 610 P.2d 24, 28 (Ak. 1980); *Waste Conversion Technologies, Inc. v. Midstate Recovery, LLC*, 2008 WL 5481231, at *6 (Conn. Sup. Ct., Dec. 3, 2008); *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1182 n.13 (Pa. 1978).

*Row, Publishers, Inc. v. Nation Enters.*, 501 F. Supp. 848, 853 n.12 (S.D.N.Y. 1980) *aff'd*, 723 F.2d 195 (2d Cir. 1983) *rev'd on other grounds*, 471 U.S. 539 (1985) ("Malice—the intent to injure the plaintiff—is not a requirement of the tort").  Accordingly, even when courts frame the discussion in terms of "intent," they ask only whether a defendant "use[d] dishonest, unfair, or improper means." *Goldhirsh Grp. v. Alpert*, 107 F.3d 105, 109 (2d Cir. 1997).  A conspiracy to manipulate a benchmark rate clearly suffices, even if Defendants were doing so out of greed rather than animosity.[56]  *See Libor III*, 27 F. Supp. 3d at 470; *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2014 WL 5334053, at \*3 (S.D.N.Y. Oct. 20, 2014).

# V.   ALL OF PLAINTIFFS' CLAIMS ARE TIMELY

## A.   Plaintiffs Have Adequately Alleged Fraudulent Concealment

Defendants argue that antitrust claims "based on conduct occurring" before September 4, 2010 are time-barred, and attack the timeliness of certain common-law claims using similar language.[57]  Br. at 42.  If by that phrase Defendants contend that damages incurred *after* the asserted cutoff for each claim are somehow unavailable merely because Defendants' conspiracy began before then, they are wrong.[58]  But in fact, *all* claims are timely pursuant to the doctrine of

---

[56]   None of the cases cited by Defendants involve circumstances remotely resembling those present here.  In *Beecher v. Feldstein*, 8 A.D.3d 597 (N.Y. App. Div. 2004), there was *no* allegation that defendant's acquisition of an automotive dealership was improper or driven by *any* improper motive.  *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 289 (Pa. Sup. Ct. 2010), did not concern a collusive scheme to manipulate prices, but rather a single foreclosure proceeding brought only after the borrower defaulted.  And in *In re Refco Inc. Securities Litigation*, 826 F. Supp. 2d 478, 521 (S.D.N.Y. 2011), there was no direct link between the alleged wrong (defendants' misappropriation of company funds) and the contract (an unrelated management agreement).

[57]   Defendants claim different dates govern class members "added" by amendment.  Br. at 42 n.54.  The gap between the filing of the two complaints is irrelevant, due to Defendants' fraudulent concealment.  But in any event, the amended complaint, including its class definition, "relates back" to the filing of the initial one where, as here, the circumstances giving rise to the claims are the same, and defendants have not established prejudice.  *See* Fed. R. Civ. P. 15(c); *Willner v. Manpower Inc.*, 2014 WL 2939732, at \*4-6 (N.D. Cal. Jun. 30, 2014); *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at \*23-25 (E.D.N.Y. Sept. 19, 2005); *Blanchard v. Edgemark Fin. Corp.*, 2000 WL 33223385, at \*6-9 (N.D. Ill. May. 22, 2000).  In Defendants' sole authority, *Laydon II*, 2015 WL 1515487, at \*5, the failed amendment involved different acts of manipulation (Yen-USD Libor rates and Euroyen Tibor rates).  In contrast, all pleadings here have focused on efforts to rig ISDAfix rates.

[58]   *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) (conduct element "may be satisfied by wrongful action occurring before the limitations period"); *In re Credit Default Swaps*, 2014 WL 4379112, at \*15 ("[I]t is the date of plaintiffs' injury, not the date of defendants' conduct, that matters.").  This flows

fraudulent concealment.  "[A] plaintiff need only plead fraudulent concealment, as opposed to affirmatively proving it."  *Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *50 (E.D.N.Y. Jan. 4, 2011) *r&r adopted* (Aug. 13, 2012).  Courts routinely recognize that the issue is "intimately bound up with the facts" and thus "not properly decided on a motion to dismiss."  *Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. 2010).[59]  Indeed, the Second Circuit found dismissal was given "too hastily" in the Libor context, even though what was available there was far beyond that presented by Defendants here.  *See BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*, 2015 WL 2215004 (2d Cir. May 13, 2015) (summary order).  And the court in *FX*, despite the same "prices were available" arguments made here, asked the defendant banks there to simply withdraw the timeliness challenge at oral argument—which, they did.  2015 WL 363894, at *4 n.8.

### 1.     Plaintiffs allege the elements of fraudulent concealment

***Concealment*** can be established "by showing *either* that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing."  *In re Issuer Plaintiff IPO Antitrust Litig.*, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004); *see also State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  The Second Circuit has recognized that bid-rigging and price-fixing conspiracies, such as that at issue here, are inherently self-concealing.  *See id.* at 1084.

The *Precision Associates* court observed that while "some courts" nonetheless require more than the "self-fulfilling allegation that the conspiracy was self-concealing," any such

---

from the fact that "each sale to the plaintiff[] starts the statutory period running again."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).  The same is true for the common-law claims.  *See ABKCO Music & Records Inc. v. Chimeron LLC*, 517 F. App'x 3, 5-6 (2d Cir. 2013).

    [59]  *See also, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *16 (E.D.N.Y. Sept. 22, 2010) *r&r adopted* (Nov. 1, 2010); *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000); *In re Vitamins*, 2000 WL 1475705, at *8.

(improper, in Plaintiffs' view)[60] additional burden is satisfied by allegations that there were

"private meetings" and "cover" used to obscure the true nature of defendants' behavior.  2011

WL 7053807, at *51.  Here, Defendants' conspiracy was not just "secret" by nature, but was

carried out through "non-public methods of communications."  AC ¶¶ 100, 220.  The Complaint

also explains how the manipulation of the "reference rate" was used to "cover" Defendants'

tracks.  *Id.* ¶ 221.  Plaintiffs here, like those in *Precision Associates*, had no reason to suspect

that prices were not "the natural result of market forces."  2011 WL 7053807, at *51.  This is

particularly true given the opaque nature of the over-the-counter market at issue.  AC ¶ 67.

Such acts not only reflect the self-concealing nature of Defendants' conspiracy, but also

constitute acts of affirmative concealment.  Though not required, the Complaint alleges more.

Here, Defendants rely primarily on the argument that "[t]he quoted descriptions from certain of

the Banks' public filings and various ISDA publications about how ISDAfix was set do not

constitute affirmative acts of concealment."  Br. at 44.  However, flooding the marketplace with

false descriptions about how ISDAfix was being calculated, *see* AC ¶¶ 222-31, "go[es] beyond

mere silence or a failure to 'own up' to illegal conduct" and so is sufficient to establish

concealment.  *See In re Air Cargo Shipping Serv. Antitrust Litig.*, 2010 WL 10947344, at *16

(E.D.N.Y. Sept. 22, 2010).  In other words, Defendants' concealment, in part, took the form of a

series of "explanations [] designed to lull purchasers into believing that [ISDA benchmark swap

rates] were the normal result of competitive market forces."  *Id.*  Defendants' promises to

Plaintiffs to act "in good faith and in a commercially reasonable manner" also served to conceal

their conspiracy to manipulate ISDAfix rates.  *See* AC ¶¶ 258, 266-68.  These allegations all

---

[60]  *Precision Associates* recognized that "some courts have held that simply alleging that a price-fixing conspiracy is self-concealing is sufficient."  2011 WL 7053807, at *51.

sufficiently "serve to provide some factual heft" to Plaintiffs' allegations of concealment.  *In re Air Cargo*, 2010 WL 10947344, at *16.

**<u>Lack of knowledge</u>** has also been pled.  AC ¶¶ 229, 232-33.  Contrary to Defendants' suggestion, the governing standard is *not* whether there was a mention of "suspicions" somewhere.  Br. at 46.  Rather, a plaintiff must have "actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974); *S.E.C v. Jones*, 2006 WL 1084276, at *4 (S.D.N.Y. Apr. 25, 2006) (quoting *Grinnell*).  As discussed in Section V.A.2 below, Defendants repeatedly (and falsely) refer to the availability of data.  But the relevance of that data, standing alone, even if it was available, and even if investors had reason to go looking for it, is undermined by the fact that, just as more than parallel conduct is needed to state a claim, so too is more than knowledge of parallel conduct needed to defeat one. *Precision Assoc.*, 2011 WL 7053807, at *53.[61]  Only much later—when the behavioral patterns broke and subpoenas were made public—did the fact that this was far more than innocent parallel behavior became reasonably clear.

**<u>As to diligence</u>**, in *Precision Associates*, the court noted that "[t]he only relevant allegations in the Complaint indicate that the conspiracy was both hidden from the public and wrapped in a cloak of legitimacy."  2011 WL 7053807, at *54.  The Complaint makes similar allegations here.  *See, e.g.*, AC ¶¶ 229, 232.  There, as here, this suffices, because Plaintiffs'

---

[61]  *See also In re Issuer*, 2004 WL 487222, at *5 ("The issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants").  Defendants cite *In re Ciprofloxin Hydrochloride Antitrust Litigation*, 261 F. Supp. 2d 188, 223 (E.D.N.Y. 2003), to suggest that the agreements at issue here were "immediately disclosed to the public."  Br. at 43.  That case, however, involved a situation where the *physical agreements* between the defendants were *literally* publically available.  Here, of course, Defendants make no claim that the physical contracts between them that governed their conspiracy have ever been placed in the public domain.

failure to uncover the conspiracy was not unreasonable.[62]  As discussed in Section V.A.2 below,

the conspiracy was not hiding in "plain sight," but rather lurking in market noise that nobody had

reason to go sifting through until later.[63]  In such a setting, courts recognize the diligence

requirement is essentially met by alleging that the plaintiff remained ignorant.  *See In re*

*Magnetic Audiotape Antitrust Litig.*, 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) ("Without

a tip-off . . . plaintiffs had no reason to exercise due diligence").[64]

## 2.    Defendants' attempts to override the Complaint are unavailing

Defendants' response to each of the three concealment prongs is to restate the notion that

the conspiracy "occurred in plain sight."  Br. at 42-46.  The notion that the conspiracy was

obvious in 2010 cannot be squared with common sense.  If it was so obvious that Defendants

were rigging ISDAfix rates, the market for ISDAfix-linked investments would have collapsed,

and investigations would have been launched.[65]  But it was not until 2013 that changes in the

Fixing began.  AC ¶¶ 81, 85.  Even these fundamental problems aside, Defendants' improper

attempts to use *hindsight*[66] to conclude the conspiracy was 'obvious' are unavailing on their own

merit, and thus Defendants' attempt to override the Complaint's allegations should be rejected.

---

[62]   *See, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 373 (D. N.J. 2001) (rejecting argument that "reasonably diligent" purchasers would have price-shopped to discover defendants' price-fixing).

[63]   Defendants cite *In re Merrill Lynch Limited Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir. 1998), to claim Plaintiffs were required to make "specific inquiries" of the banks.  Br. at 45.  But that is certainly not true where there was no reason to even think to ask.  Plaintiffs there complained that they were falsely promised, orally, a "guaranteed" rate of return—but the written offering materials contained "specific warnings" about risks that could alter the cash flows.  *In re Merrill Lynch Ltd Partnerships Litig.*, 7 F. Supp. 2d 256, 269-70 (S.D.N.Y. 1997).  In that context, the court found unavailing allegations that defendants "discouraged" "inquiries" about the partnership. *Id.* at 273.  Here, there were never "specific warnings" in interest-rate derivatives offering materials or contracts about the potential for ISDAfix manipulation until *much later* than 2010.  *See* AC ¶ 82 n.25.

[64]   *See also, e.g.*, *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 504 (9th Cir. 1988) ("The requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."); *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 111 & n.129 (S.D.N.Y. 2011) (noting that if fraud is concealed, a plaintiff logically cannot say more about diligence).

[65]   *See generally Chem. Bank & Trust Co. v. Reynaud*, 270 N.Y.S. 301, 304 (N.Y. Sup. Ct. 1933) ("It is clear that, if these published charges had in fact led careful and prudent investors to dispose of the bonds, the market would have gone to smash.").

[66]   *See generally Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) ("While hindsight shows that the fraud *could* have been discovered, that fact does not support the conclusion that, on reasonable

***Price movements at 11 a.m.***  Defendants assert that movements in prices could be observed by those who subscribed to the right financial service.[67]  Br. at 44, 46.  While the movements at issue here have been found to be statistically significant, the daily movements at issue are subtle.  And the price movements were not uniformly in one direction.  Given the subtlety of the movements at issue, it simply cannot be said, as a matter of law, that someone looking at prices at 11 a.m. would divine that a conspiracy was afoot.

Rather, the Complaint uses a *pattern* that emerged when pricing data—at great expense, and using special access not routinely given, such as to *historical* prices, AC ¶ 230—was amassed and analyzed for *thousands* of trading days.  Small price movements on a given day may be market noise.  Only when thousands of days of historical pricing data are retrieved and analyzed can movements of such subtlety be extracted and shown to be statistically significant and continuous.  There was no reason for any reasonable investor to be undertaking such efforts in 2010.  Even if they had done so, it was only in 2013, when the data patterns began to *change* and investigations were launched, that the *nefariousness* of those patterns became clear.

***Individual ISDAfix submissions.***  While ISDAfix *itself* was openly published, the banks' *individual submissions* were not.  AC ¶ 232.  In fact, Plaintiffs had to spend tens of thousands of dollars, *and* get special permission from both Thomson Reuters *and* ICAP,[68] before the submission data used in the Complaint was made available.  Those are not steps reasonable investors would have taken in 2010.  Defendants ask the Court to ignore the Complaint's allegations by citing to a website that vaguely refers to submissions being "published" on

---

inquiry, the fraud *would* have been discovered"); *Kilburn v. Pineda*, 137 Cal. App. 3d 1046, 1049 (Cal. Ct. App. 1982) (defendant's "statement of hindsight does not put a [plaintiff] on notice" of its claim).

[67]   Defendants relatedly assert that the fact a swaption ended "in" or "out of the money" "could not possibly have been concealed."  Br. at 44.  But, plainly, what matters is not whether it was known where a swaption settled at, but whether prices were being manipulated to change that calculation.

[68]   Plaintiffs understand others have since been denied that access, after the Complaint was filed.

"screens" ISDA10-ISDA61.  Br. at 45.  There are far too many questions left open by that one word from one website to take "judicial notice" of anything.[69]  Could non-dealers subscribe?  Was historic data made available (to compare patterns)?  At what cost?  Did the license include restrictions on the use of the data?

Even if the Court were to find that one word on one website trumped the Complaint's plain allegations of secrecy, Defendants' "plain sight" argument is still fatally flawed.  There was in fact nothing to suggest to a reasonable investor that she should look into such data in search of a conspiracy, let alone to do so day after day to reveal a pattern of misdeeds.  And again, the pattern of behavior may have not appeared to be as nefarious—given there was nothing to compare it against—until the pattern broke in December 2012.  AC ¶¶ 76, 229, 231, 233.  (*Plaintiffs even then* would not have known what to attribute the pattern-breaking to, given the existence of the 2012 subpoenas was not made public until later.)

___**Finally, Defendants suggest a single news article**___ should have been the triggering event that sent investors and regulators alike scrambling to comb through data to uncover their conspiracy.  Br. at 44, 46.  The attempt to portray the 2010 article as a "more detailed" version of what would later be run by the same publication in 2013 fails, as numerous facts are absent from

---

[69]   This case is thus nothing like *Certainteed Ceilings Corp. v. Aiken*, 2014 WL 5461546, at *1-2 (E.D. Pa. Oct. 27, 2014), cited by Defendants.  Br. at 43 n.55.  The issue there was not even concealment, timeliness, or pleading.  It was whether, *after discovery had taken place*, an injunction should be granted to enforce a non-disclosure agreement.  That a declaration, deposition, and stipulated factual record there determined that an architectural database was available to "everyone in the industry" has nothing to do with the relative availability of data at issue here, or the relevance of that to fraudulent concealment.  Similarly, that a federal regulation notes that a website is not "not restricted," for unrelated regulatory purposes, "*merely*" because a "fee or password" is required, *id.*, does not establish as a matter of law that the data here was in fact "public."  Nor does it say anything about how the purported relative availability should be interpreted and applied where the question is, on the issue of timeliness, what reasonable investors should have done or known.

the 2010 piece.[70]  So, too, does the suggestion that Plaintiffs' Complaint is derivative of *either*

article—the Complaint includes pages upon pages of analysis not even hinted at in *either*.

   The bulk of the 2010 article is spent discussing generic things like "opacity."  It does note

a "divergence" between "ICAP" rates and "other" rates at exactly 11 a.m.  But this is *contrary* to

the data presented by the Complaint, which used pricing data *other than from Screen 19901* to

show that *all* prices were moving *together* around the Fixing.  And while the 2010 article claims

prices "can" gyrate around 11 a.m., it cites a single day.  But even then, it nowhere suggests that

to be the result of any conspiracy—and notes that "it is hard for non-bankers to assess what is or

is not going on."  Strikingly, *the article nowhere suggests the Defendants were not accurately*

*responding to the ICAP "poll."*  Thus, even if prices did "gyrate" on that day, there would be no

reason for a reader of this article to think ISDAfix rates would have been impacted at all—given

the honest response to that poll would have wiped out any such price "gyration."

   As in other areas, Defendants here rely extensively on Libor-related cases.  As this Court

is aware, however, those plaintiffs acknowledged that warnings about Libor's reliability began in

*2007.  See BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*, 2013 WL 6003701, at *7

(S.D.N.Y. Nov. 13, 2013).  It was *only after* "significant *and repeated*" warnings that this Court

felt comfortable drawing a May *2008* line.  *Id*.  This Court also knows that the Libor record did

not just include more articles, but ones that were far more detailed (as the Libor articles used a

*variety* of statistical tools to assess Libor) *and* explicit (in directly suggesting a manipulation was

occurring).  *See, e.g.*, *id*.  Indeed, the public's interest in Libor had grown to such a pitch that the

---

   [70]  This includes:  (i) ICAP's financial interest in publishing ISDAfix; (ii) the investigation of the ISDAfix rate setting process by the CFTC; (iii) a statement from the U.K.'s Market Conduct Authority that ISDAfix was "an area of concern"; and (iv) multiple comparisons of ISDAfix and Libor based on what had been learned about Libor's manipulation in the preceding years (including who was responsible).  *Compare* Michael Mackenzie, Tom Braithwaite & Kara Scannell, *Swap traders' morning fix under scrutiny*, Fin. Times (Apr. 9, 2013) *with* Michael Mackenzie & Gillian Tett, *Frozen in Time*, Fin. Times (June 16, 2010).

British Bankers Association had reportedly begun investigating complaints—after which time the pattern of Libor submissions (temporarily) abated.  *See id.* at *8.  By contrast, nobody was investigating ISDAfix, and the pattern of anomalies did not break, until 2012 or later.  The Second Circuit's reversal of *BPP Illinois* confirms the inappropriateness of Defendants' request to resolve the timeliness question on the far-less-robust record here.

### B. Defendants' Few Common-Law Specific Arguments are Also Without Merit

To the extent Defendants' footnote referring to "affirmative acts" is meant to suggest the common-law has rejected the notion of self-concealing misdeeds, Br. at 47 n.58, they are wrong.[71]  In any event, as above, such acts have been pled.[72]  Accordingly, all claims are timely.

### CONCLUSION

For the reasons set forth above, Plaintiffs request that Defendants' Joint Motion be denied or, in the alternative, that Plaintiffs be provided leave to amend.

DATED:  June 2, 2015

  /s/ Daniel L. Brockett
Daniel L. Brockett
Daniel Cunningham
Marc L. Greenwald
Steig D. Olson
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100

  /s/ David W. Mitchell
Patrick J. Coughlin
David W. Mitchell
Brian O. O'Mara
Randi D. Bandman
Lonnie Browne
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058

  /s/ Christopher M. Burke
Christopher M. Burke
Walter W. Noss
Kristen M. Anderson
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Fax: (619) 233-0508

---

[71]  *See, e.g.*, *Hendrickson*, 840 F.2d at 1083; *OBG Tech. Servs. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 506 (D. Conn. 2007); *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 2005 WL 724117, at *3 (E.D. Pa. Mar. 29, 2005); *see generally Shammami v. IndyMac Federal Bank, FSB*, 2009 WL 3429654, at *4 (E.D. Mich. Oct. 21, 2009); *Palmer v. Borg-Warner Corp.*, 838 P.2d 1243, 1251 (Ak. 1992).

[72]  Defendants also contend that a different period for unjust enrichment applies to "counterparties" and "non-counterparties."  Br. at 49-50.  But as discussed in Section IV.C above, the "unjust enrichment" claims against non-counterparties are actually for *conspiracy*, for which the limitations period runs with that for the underlying wrongdoer.  *See generally, e.g.*, *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 449-50 (S.D.N.Y. 1998).  In any event, for the reasons outlined above, all unjust enrichment claims are timely no matter whether a three- or six-year period applies.

danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
marcgreenwald@quinnemanuel.com
steigolson@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Counsel for Alaska Electrical Pension
Fund; County of Washington,
Pennsylvania; and City of New Britain,
Connecticut*

Fax: (619) 231-7423
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com
randib@rgrdlaw.com
lbrowne@rgrdlaw.com

*Counsel for Alaska Electrical
Pension Fund; County of
Washington, Pennsylvania; and
City of New Britain, Connecticut*

cburke@scott-scott.com
wnoss@scott-scott.com
kanderson@scott-scott.com

David R. Scott
Sylvia M. Sokol
Donald A. Broggi
Thomas K. Boardman
The Chrysler Building
405 Lexington Ave, 40th Floor
New York, New York 10174-4099
Telephone: (800) 404-7770
Fax: (212) 223-6334
david.scott@scott-scott.com
dbroggi@scott-scott.com
ssokol@scott-scott.com
tboardman@scott-scott.com

*Counsel for Alaska Electrical
Pension Fund; County of
Washington, Pennsylvania; and
City of New Britain, Connecticut*

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
570 Lexington Ave., 19th Floor
New York, New York 10022
Telephone:  (212)-702-7059
Fax:  (212)-681-0300
lnussbaum@nussbaumpc.com

*Counsel for County of Montgomery,
Pennsylvania*

Stanley D. Bernstein
Ronald J. Aranoff
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414
Fax: (212) 779-3218
bernstein@bernlieb.com
aranoff@bernlieb.com

*Counsel for Alaska Electrical
Pension Fund; County of
Washington, Pennsylvania; and
City of New Britain, Connecticut*

James E. Cecchi
**CARELLA, BYRNE, CECCHI,
   OLSTEIN, BRODY &
   AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcarella@carellabyrne.com

*Counsel for County of Montgomery,
Pennsylvania*

Gregory S. Asciolla
Jay L. Himes
David J. Goldsmith
Robin A. Van Der Meulen
Matthew J. Perez
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Fax:  (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
dgoldsmith@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Counsel for Genesee County
Employees' Retirement System*

Shelly L. Friedland (SF-2449)
**TRIEF & OLK**
150 East 58th Street
34th Floor
New York, NY 10155
Telephone: (212) 486-6060
Fax: (212) 317-2946
sfriedland@triefandolk.com

*Counsel for Plaintiffs*

Michael C. Dell'Angelo
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net

*Counsel for Plaintiffs*

R. Bryant McCulley
**McCULLEY McCLUER PLLC**
2113 Middle Street
Suite 208
Sullivan's Island, SC 29482
Telephone: (205) 238-6757
Fax: (662) 368-5806
bmcculley@mcculleymccluer.com

*Counsel for Plaintiffs*

Stuart H. McCluer
**McCULLEY McCLUER PLLC**
1223 Jackson Avenue East
Suite 200
Oxford, MS 38655
Telephone: (662) 550-4511
Fax: (662) 368-5806
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs*

Matthew Duncan
**FINE, KAPLAN AND BLACK, R.P.C.**
1 South Broad St. 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Fax: (215) 568-5872
md@finekaplan.com

*Counsel for Plaintiffs*