UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/28/2016
```

----------------------------------------------------------------------X
                                                    :

ALASKA ELECTRICAL PENSION FUND, et al.,     :

                                                  :

                    Plaintiffs,           :           14-CV-7126 (JMF)

                                                  :

                -v-                        :         OPINION AND ORDER

                                                    :

BANK OF AMERICA CORPORATION, et al.,     :

                                                  :

                  Defendants.          :

                                                    :

----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        These consolidated putative class actions are the latest in a series of cases in recent years

to allege a longstanding conspiracy by some of the world's largest banks to manipulate a

benchmark interest rate.  In the other cases, plaintiffs allege efforts to fix the London InterBank

Offered Rate ("LIBOR"), *see, e.g.*, *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 935 F. Supp.

2d 666 (S.D.N.Y. 2013) ("*LIBOR I*"), and the leading benchmark interest rate for the foreign

exchange market, *see In re Foreign Ex. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581

(S.D.N.Y. 2015) ("*FX*").  In these cases, Plaintiffs allege a scheme to manipulate U.S. Dollar

ISDAfix ("ISDAfix"), which is a benchmark interest rate incorporated into a broad range of

financial derivatives.  Defendants are (1) fourteen banks that dominate the market for interest

rate derivatives and set ISDAfix (collectively, "the Banks" or "Defendant Banks"); and (2) ICAP

Capital Markets LLC ("ICAP"), an inter-dealer broker that served as the administrator in charge

of setting the ISDAfix rates until January 26, 2014.  Plaintiffs, several institutional investors,

allege that Defendants abused their respective roles in the rate-setting process to manipulate

ISDAfix in order to extract higher profits from outstanding interest rate swaps and "swaptions"

(essentially, options on interest rate swaps).  Plaintiffs' Amended Complaint raises an antitrust

claim under the Sherman Act as well as various state-law claims.

Defendants now move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to

dismiss all of Plaintiffs' claims.  Defendants' motion raises several questions, one of which —

whether manipulation of a benchmark interest rate by defendants who are supposed to cooperate

(albeit at arms' length) in setting that rate causes "antitrust injury" to those harmed by

investments tied to the benchmark — has divided courts in this District and is currently under

consideration by the Second Circuit.  For the reasons stated below, the Court holds that such

collusion in manipulating a benchmark rate that is then incorporated into the price of financial

instruments can indeed result in antitrust injury.  For that reason and others discussed below,

Defendants' motion to dismiss Plaintiffs' Sherman Act claim is DENIED; their motion to

dismiss Plaintiffs' state-law claims is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts — taken from the Amended Complaint, documents referenced

therein, and matters of which the Court can take judicial notice — are assumed to be true for

purposes of this motion and viewed in the light most favorable to Plaintiffs as the non-moving

parties.  *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

### A.  Interest Rate Derivatives

Derivatives are financial instruments, "the value of which depends on the value of

another underlying asset."  (Consolidated Am. Class Action Compl. (Docket No. 164) ("AC")

¶ 47).  Derivatives "permit market participants to manage and transfer risk by allowing parties to

separate out and trade individual risk components, such as interest rate risk."  (*Id.*).  The largest

derivatives market is the interest rate derivatives market; the most common type of interest rate derivative is the interest rate "swap." (*Id.* ¶ 48).  An interest rate swap is an agreement between two counterparties to exchange interest rate payments on an agreed notional amount over a set period of time.  (*Id.*).  "Typically, one party will pay based on a 'fixed' interest rate on the notional amount that does not vary from one payment to the next, while the other party will pay based on a variable 'floating' interest rate that is tied to an independent benchmark such as LIBOR." (*Id.*).  Such a "fixed-for-floating rate swap allows parties with floating rate debt to hedge their interest rate exposure by receiving a variable rate on the notional amount in exchange for paying a fixed rate on that same notional amount." (*Id.* ¶ 49).

Another (related) interest rate derivative instrument is a "swaption," which is a contract pursuant to which a buyer pays a seller a premium for the option to enter into an interest rate swap at a specified rate on some set future date.  (*Id.* ¶¶ 55-56).  When entering a swaption, "the parties may choose whether the swaption is to be *physically settled*," which means the parties actually enter into the swap if exercised, "or *cash settled*," which means the seller pays the buyer the value of the swap on the exercise date.  (*Id.* ¶¶ 56-57).  In most cases, ISDAfix is used to determine the settlement value of a cash-settled swaption on its exercise date.  (*Id.* ¶¶ 58-59, 61).  If the fixed rate specified in the swaption is more favorable than the ISDAfix rate, the option is "in the money," meaning the swaption has value and the buyer can claim a cash payment from the seller.  (*Id.* ¶¶ 57, 61).  If the ISDAfix rate is less favorable than the fixed swaption rate, the option is "out of the money" and will simply expire without being exercised.  (*Id.*).  In that instance, the seller of the swaption profits by retaining the premium paid up front when the buyer purchased the swaption.  (*See id.* ¶¶ 55, 57).  "[A]ccurate calculation and reporting of the

ISDAfix rate is critical to the fair settlement of swaptions, and even the smallest movement of ISDAfix can drastically affect the value of a cash-settled swaption." (*Id.* ¶ 61).

Over the past thirty years, the market for interest rate derivatives in general (and interest rate swaps in particular) has grown dramatically. (*Id.* ¶ 51). According sources cited in the Amended Complaint, the collective nominal amounts on outstanding interest rate swaps has grown from about $2.3 trillion in 1990 to about $342 trillion as of June 2012, including $164 trillion of U.S. dollar swaps alone. (*Id.*). The value of swaption contracts outstanding as of July 2013 was $29.5 trillion as measured by notional amount. (*Id.* ¶ 55). The Defendant Banks collectively dominate the market for interest rate derivatives. (*Id.* ¶ 53). Indeed, over the course of the putative class period — from January 1, 2006, to June 30, 2013 (*see id.* ¶ 235) — the collective interest rate holdings of the Defendant Banks represented over ninety percent of the total reported notional amounts of interest rate derivatives held by U.S. dealers. (*Id.* ¶ 53).

## B.  The ISDAfix Benchmark Interest Rate

ISDAfix is the most common interest rate benchmark used to determine the value upon expiration of cash-settled interest rate swaptions. (*Id.* ¶ 58). The ISDAfix rate purports to "represent the average fixed interest rate that an over-the-counter derivatives market dealer would bid or offer for a swap of a certain tenor and currency in exchange for a specified floating LIBOR rate." (*Id.* ¶ 71). Different ISDAfix rates are calculated each day for transactions of varying tenors (that is, lengths) in different currencies. (*Id.* ¶ 68). During the class period, ICAP was responsible for compiling ISDAfix benchmark rates. Every morning at 11:02 a.m., ICAP would circulate to the Defendant Banks a set of reference points generated using (1) the rates offered in completed inter-dealer trades and executable inter-dealer bids at 11:00 a.m. and (2) information "reflecting executed trades and executable bids and offers at 11 a.m. for US

Treasury securities from ICAP's" inter-dealer electronic trading platform.  (*Id.* ¶ 72).  ICAP then asked each Defendant Bank to submit, for each maturity, the midpoint of where "that dealer would itself offer and bid a swap" in that maturity for a set notional amount "to an acknowledged dealer of good credit in the swap market."  (*Id.* ¶¶ 71, 224).  Banks could accept the reference rate provided at 11:02 a.m., submit a different value, or take no action.  (*Id.* ¶ 72).  Thomson Reuters would then compile the day's ISDAfix rates by eliminating a set number of the highest and lowest rates submitted through ICAP and then averaging the remainder.  (*Id.*).

## C.  Plaintiffs' Allegations of Wrongdoing

Plaintiffs allege that Defendants took advantage of their respective roles in the ISDAfix rate-setting process to manipulate the daily ISDAfix benchmarks for their own financial gain.  In particular, they contend that the Defendant Banks manipulated daily ISDAfix rates to benefit their own trading positions and that ICAP assisted in that manipulation in order to earn brokerage commissions.  (*Id.* ¶¶ 137-139).  The Amended Complaint identifies a number of practices that Defendants used to perpetrate their manipulation.  First, Plaintiffs allege that Defendants agreed to rubberstamp the reference rate posted by ICAP each day in contravention of ICAP's publicly disseminated submissions rules, which indicated that the Defendant Banks should not submit a rate "where the dealer sees the mid-market away from itself, but should be a function of its own bid/offer spread."  (*Id.* ¶¶ 8-9, 71).  Second, Plaintiffs allege that the Defendant Banks manipulated the reference rate itself by flooding the inter-dealer swap market just before 11 a.m. with transactions designed to move ICAP's reference rate to whatever point the Defendant Banks desired — a process known as "banging the close."  (*Id.* ¶¶ 134, 136-37).  To facilitate this strategy, Defendants allegedly shared information with one another in order to coordinate their trading activities.  (*Id.* ¶¶ 6, 130).  Finally, Plaintiffs contend that, when

"banging the close" failed to move the reference rate to the desired level, "ICAP could and would also simply set the reference rate at the predetermined level" irrespective of the state of the market. (*Id.* ¶ 130 n.45). According to Plaintiffs, this manipulation of ISDAfix took place on nearly every trading day during the class period — and abruptly came to an end only when government agencies began investigating the ISDAfix benchmark process in the wake of well-publicized revelations that banks were conspiring to fix LIBOR. (*Id.* ¶¶ 7, 80-81). In or about November 2012, the Commodity Futures Trading Commission ("CFTC") issued a first round of subpoenas relating to ISDAfix. (*Id.* ¶ 81-83). In September 2014, the CFTC reportedly told the U.S. Department of Justice that it had "found evidence of criminal behavior following" its investigation of "banks' alleged manipulation of ISDAfix." (*Id.* ¶ 82-83).

Plaintiffs are various institutions that "transacted in interest rate derivatives expressly tied to ISDAfix or directly impacted by Defendants' manipulation of ISDAfix" with one or more Defendant Banks on "days that have been identified as being subject to manipulation." (*Id.* ¶¶ 23-27). More specifically, the Amended Complaint alleges that "Plaintiffs' swaptions and other interest rate derivatives that settled by reference, or otherwise had cash flows tied to ISDAfix rates were made less profitable" for Plaintiffs (and more profitable to the Defendant Banks) "than they would have been in the absence of manipulation." (*Id.* ¶ 262; *see id.* ¶¶ 192-209). In the Amended Complaint, they bring antitrust claims under the Sherman Act, 15 U.S.C. § 1, *et seq.*, as well as state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference with contract.

## LEGAL STANDARDS

Defendants' motion is brought pursuant to Rules 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to hear the case. "A case is properly

dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted), *aff'd*, 561 U.S. 267 (2010).  Moreover, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

**DISCUSSION**

Defendants move to dismiss Plaintiffs' claims on various grounds.  First, they contend that all of Plaintiffs' claims should be dismissed for lack of subject-matter jurisdiction because Plaintiffs do not have standing under Article III of the Constitution.  Second, they seek to dismiss Plaintiffs' antitrust claims on the grounds that the Amended Complaint fails to plausibly allege a conspiracy to restrain trade and that Plaintiffs lack "antitrust standing."  Third, they claim that each of Plaintiffs' state-law claims fails as a matter of law.  And finally, they assert that many of Plaintiffs' claims are time barred.  The Court considers the challenge to Plaintiffs' constitutional standing first, *see, e.g.*, *Ross v. Bank of Am. N.A.*, 524 F.3d 217, 222 (2d Cir. 2008) ("Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." (internal quotation marks omitted)), and then turns to Defendants' other arguments.

**A.  Constitutional Standing**

Defendants' argument that Plaintiffs lack standing under Article III can be swiftly rejected.  To ensure that federal courts resolve only "those disputes in which the parties have a concrete stake," Article III requires a plaintiff seeking relief in federal court to show an "injury-in-fact, that is, the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' . . . not 'conjectural or hypothetical.'"  *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "Injury in fact," however, "is a low threshold," which the Second Circuit has held "'need not be capable of sustaining a valid cause of action.'"  *Ross*, 524 F.3d at 222 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).  Plaintiffs cross that "low threshold" here.  As discussed more fully below, Plaintiffs plausibly allege that each Defendant participated in a conspiracy to manipulate ISDAfix rates.  Plaintiffs also allege that they "transacted in interest rate derivatives

expressly tied to ISDAfix or directly impacted" by that alleged manipulation.  (AC ¶¶ 23-27).

Defendants do not seriously contest that a plaintiff could establish injury-in-fact if it were to

demonstrate that, because of an artificially induced shift in ISDAfix on a given day, it paid more

than it should have (or was paid less than it should have been) under the terms of a particular

transaction.  That sort of "paid too much" or "received too little" harm is classic economic

injury-in-fact.  Of course, discovery may well show that, for some Plaintiffs on some days, the

alleged ISDAfix manipulation actually resulted in a benefit.  But the mere fact "that an injury

may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does

not negate standing."  *Ross*, 524 F.3d at 222 (internal quotation marks omitted).  At this stage,

the appropriate question is whether the alleged manipulation of ISDAfix plausibly caused each

Plaintiff to suffer *some* loss under the terms of *some* derivative at *some* point during the years the

conspiracy allegedly took place.  *See FX*, 74 F. Supp. 3d at 595 ("[A]ny particular transaction

that a particular Plaintiff entered into with a particular Defendant on a day that the Fix was

manipulated to that Plaintiff's detriment would sufficiently demonstrate injury in fact as to that

Plaintiff.").  Given the sheer volume of transactions identified by Plaintiffs in the Amended

Complaint (*see* AC, App. A), it is not hard to conclude that the answer to that question is yes.

## B.  The Antitrust Claims

Plaintiff's principal claim is brought under Section One of the Sherman Act, which

declares illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or

commerce."  15 U.S.C. § 1.  Section Four of the Clayton Act, in turn, provides a private right of

action, with recovery of treble damages, to "any person who [has been] injured in his business or

property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a).  "To survive

a motion to dismiss, a Sherman Act claim must (1) define the relevant geographic market, (2)

allege an antitrust injury, and (3) allege conduct in violation of antitrust laws." *Concord Assocs.,*
*L.P. v. Entm't Props. Trust*, — F.3d —, 2016 WL 1075947, at *3 (2d Cir. Mar. 18, 2016)
(internal quotation marks omitted).  Here, Defendants argue that Plaintiffs' Sherman Act claim
must be dismissed for either of two reasons.  First, they contend that Plaintiffs fail to allege
conduct in violation of the antitrust laws because the Amended Complaint does not plausibly
allege a conspiracy to restrain trade.  Second, relying almost exclusively on *LIBOR I*, Defendants
assert that Plaintiffs lack "antitrust standing."  The Court will address each argument in turn.

### 1. Conspiracy To Restrain Trade

Section One of the Sherman Act prohibits only restraints of trade "effected by a contract,
combination, or conspiracy," so Plaintiffs must allege that Defendants entered into an agreement
or conspiracy — be it "tacit or express" — to state a claim.  *Twombly*, 550 U.S. at 553 (internal
quotation marks omitted).  Significantly, direct evidence is not required, as concrete, "smoking
gun" proof of an illegal conspiracy between sophisticated actors "can be hard to come by,
especially at the pleadings stage."  *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709
F.3d 129, 136 (2d Cir. 2013).  Instead, "circumstantial facts supporting the *inference* that a
conspiracy existed" are sufficient.  *Id.*; *see also United States v. Snow*, 462 F.3d 55, 68 (2d Cir.
2006) ("[C]onspiracy by its very nature is a secretive operation, and it is a rare case where all
aspects of a conspiracy can be laid bare in court with . . . precision."); *In re Elec. Books Antitrust
Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) ("[C]onspiracies nearly always must be proven
through inferences that may fairly be drawn from the behavior of the alleged conspirators.").
More specifically, a horizontal agreement or conspiracy, the sort of pact alleged here, "may be
inferred on the basis of conscious parallelism when such interdependent conduct is accompanied
by circumstantial evidence and plus factors."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir.

2001).  Such "'plus factors' may include: a common motive to conspire, evidence that shows the

parallel acts were against the apparent individual economic self-interest of the alleged

conspirators, and evidence of a high level of interfirm communications."  *Mayor of Baltimore*,

709 F.3d at 136 (internal quotation marks omitted).  That list, however, is "neither exhaustive

nor exclusive, but rather illustrative of the type of circumstances which, when combined with

parallel behavior, might permit a jury to infer the existence of an agreement."  *Id.* at n.6.  The

ultimate question is whether allegations of parallel conduct are "placed in a context that raises a

suggestion of a preceding agreement, not merely parallel conduct that could just as well be

independent action."  *Twombly*, 550 U.S. at 557.

      Applying those standards here, and drawing all reasonable inferences in Plaintiffs' favor,

the Court concludes that the Amended Complaint plausibly alleges that a conspiracy among

Defendants existed.  For starters, the Amended Complaint contains extensive allegations of

parallel conduct.  According to the Amended Complaint, the Defendant Banks "claimed to have

the exact same bid/ask spread" for "nearly every day for multiple years" (AC ¶¶ 9, 102) and

coordinated open-market trades before 11 a.m. to "bang the close" (*see, e.g.*, *id.* ¶¶ 133-34).

Additionally, the Amended Complaint includes several "plus factors" that "raise[] a suggestion"

of illegal agreement rather than mere independent action.  First, Plaintiffs allege that Defendants

had a common motive to conspire — namely that Defendants were major players in the market

for interest rate derivatives who were jointly motivated by a desire to maximize profits by

manipulating the ISDAfix benchmark rates.  (*See, e.g.*, AC ¶¶ 2, 10, 74, 80, 122, 138, 156).  The

plausibility of that motive is reinforced by other allegations in the Amended Complaint.  For

example, the very nature of ISDAfix suggests that any attempt to unilaterally control ISDAfix

would be risky and likely futile, as any individual bank's submission to ICAP would be drowned

out in the polling process by which ISDAfix was set each day.  Defendants counter that a conspiracy to move ISDAfix "makes no economic or logical sense" unless the Defendant Banks' positions "were aligned throughout the putative class period."  (Defs.' Mem. Law Supp. Joint Mot. To Dismiss Consolidated Class Action Compl. (Docket No. 173) ("Defs.' Mem.") 11).  But that is not the case.  The Amended Complaint plausibly alleges that "[t]here were more profits to be earned for Defendants in maintaining the shared ability to manipulate ISDAfix over the long term than there were to be lost due to a divergence of interest on any particular day."  (AC ¶ 10).  And contrary to Defendants' suggestion (Defs.' Mem 11-12), it appears that that sort of rate manipulation can be economically sensible and feasible given that many banks (including some Defendants) have admitted that, in approximately the same period of time, they conspired to rig similar benchmark rates — namely, LIBOR and the leading benchmark interest rate for the foreign exchange market — in order to maximize profits.  (*See, e.g.*, AC ¶ 91).

Additionally, Plaintiffs allege that Defendants' parallel conduct required them to act against their own economic self-interest.  For example, the Amended Complaint alleges that, in order to facilitate their parallel submissions, Defendants shared commercially sensitive information with one other.  (AC ¶ 6).  It also alleges that the Defendant Banks' process of rubberstamping the ISDAfix reference rate violated ISDA's rules, exposing them to scrutiny and penalties (both civil and criminal) if their behavior became public.  (*See, e.g.*, *id.* ¶¶ 71-73).  And as Defendants themselves point out, rubberstamping the reference rate and "banging the close" every day almost certainly harmed some banks on some days given that Defendants' swap and swaption positions could not have been perfectly aligned throughout the putative class period. (*See* Defs.' Mem. 11-12).  Finally, the Amended Complaint alleges ongoing government investigations into manipulation of ISDAfix.  The mere existence of such investigations is a

circumstance that, "when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Mayor of Baltimore*, 709 F.3d at 136 n.6; *see also Starr v. Sony BMG Enmt't*, 592 F.3d 314, 324-25 (2d Cir. 2010).  Moreover, Plaintiffs here allege not only that government investigations are pending, but also that those investigations have actually turned up "evidence of criminal behavior" relating to the Defendant Banks' manipulation of ISDAfix.  (AC ¶¶ 14, 83).  Significantly, Plaintiffs also allege that Defendants abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with government investigations (*see, e.g., id.* ¶¶ 112, 115, 117, 140-41), strengthening substantially the inference that a conspiracy existed.

To be sure, Defendants offer plausible non-collusive explanations for many of the facts alleged in the Amended Complaint.  But "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  Instead, the sole question for the Court is whether Plaintiffs put forward "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  Taking all of Plaintiffs' allegations together, as the Court must, *see, e.g., Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and drawing all reasonable inferences in their favor, the Court concludes that they have.

## 2. Antitrust Standing

Next, Defendants contend that Plaintiffs' Sherman Act claim must be dismissed because Plaintiffs lack "antitrust standing" — a concept that is distinct from standing under Article III. *See, e.g., Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990) ("*ARCO*").  To establish antitrust standing, a plaintiff must plausibly allege two things: "(a) that it suffered 'a

special kind of antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Comm., Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007)).  With respect to the former, "[i]t is not enough for the actual injury to be causally linked" to the alleged violation; instead, "in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (internal quotation marks and alteration omitted).  That requirement helps ensure "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *ARCO*, 495 U.S. at 342; *see, e.g.*, *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."); *Blue Shield of Va., Inc. v. McCready*, 457 U.S. 465, 477 (1982) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damage for the injury to his business or property.").

### a.  Antitrust Injury

Relying primarily on *LIBOR I*, Defendants argue first that Plaintiffs cannot establish antitrust injury because the setting of ISDAfix "is based on a cooperative process" rather than "the product of competition to win Plaintiffs' business."  (Defs.' Mem. 21).[1]  The facts in *LIBOR I* and the facts in these cases are indeed similar.  In *LIBOR I*, as here, the plaintiffs alleged that

---

[1]      *LIBOR I* is on appeal to the Second Circuit, which held oral argument on November 13, 2015.  *See In re: LIBOR-Based Financial Instruments Antitrust Litig.*, No. 13-3565 (Docket No. 567) (2d Cir. Nov. 13, 2015).

banks participating in a process to set a benchmark interest rate under the auspices of a trade association manipulated that rate in ways that negatively affected financial instruments in which the plaintiffs had invested.  Concluding that the plaintiffs failed to allege antitrust injury, the Court dismissed the plaintiffs' Sherman Act claims.  "[T]he process of setting LIBOR," the Court reasoned, "was never intended to be competitive.  Rather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the [trade association] each day to facilitate the [trade association's] calculation of an interest rate index."  935 F. Supp. 2d at 688 (citation omitted).  Even if the defendants "subverted this process by conspiring to submit artificial estimates instead of estimates made in good faith," the Court continued, "it would not follow that plaintiffs have suffered antitrust injury.  Plaintiffs' injury would have resulted from defendants' misrepresentation, not from harm to competition."  *Id.*

Much like the Court in *FX*, 74 F. Supp. 3d at 596-98, this Court declines to follow *LIBOR I* here for two independent reasons.  First, these cases are factually distinguishable from *LIBOR I* in one critical respect: The Amended Complaint here alleges not only that Defendants manipulated ISDAfix through the ICAP reference-rate process — a process that was arguably intended to be a "cooperative endeavor" akin to the LIBOR-setting process — but also that Defendants conspired to move prices for swaps in the inter-dealer market by acting as a trading bloc (specifically, by "banging the close").  (*See* AC ¶¶ 134, 136-137).  That is, whereas "the LIBOR-setting process was a 'cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs . . . to facilitate the . . . calculation of an interest rate index,'" ISDAfix was set, at least in part, "by actual transactions in a market where Defendants [were] supposed to be perpetually competing by offering independently determined bid-ask spreads."  *FX*, 74 F. Supp. 3d at 596 (quoting *LIBOR I*, 935 F. Supp. 2d at 688).

15

Notably, Defendants do not (and could not) dispute that the inter-dealer market for swaps is itself competitive or that the Defendant Banks were horizontal competitors in that market. Instead, they argue that, although coordinating behavior to "bang the close" involves market activity, it cannot give rise to antitrust injury because it is not competition-reducing behavior. To reach that surprising conclusion, Defendants emphasize the fact that Plaintiffs allege that the Defendant Banks "introduce[ed] more — not fewer — transactions into the inter-dealer interest rate swap market around 11 a.m." (Defs.' Mem. 26). Arguing that "[a] hallmark of price fixing is an agreement to elevate price by restricting supply," they contend that "banging the close" can never be anticompetitive because it involves increasing, rather than restricting, supply. (*See id.*). The Court disagrees. Restricting supply may be "a hallmark" of much anticompetitive behavior, but Defendants cite no authority for the proposition that it is a prerequisite to showing antitrust injury. Plaintiffs allege that, instead of competing in the inter-dealer market, the Defendant Banks conspired and agreed to artificially flood the market with transactions to manipulate ISDAfix. That sort of coordinated action in a supposedly competitive market is precisely the sort of anticompetitive behavior the antitrust laws "were intended to prevent." *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (internal quotation marks omitted).

Second, and more broadly, the Court respectfully disagrees with the *LIBOR I* Court's legal conclusion that engaging in a "cooperative endeavor" to manipulate prices (or components thereof) insulates "otherwise-competing" entities from antitrust liability to parties harmed by that manipulation. As an initial matter, the Supreme Court has long held that "the machinery employed by a combination for price-fixing is immaterial" to the antitrust laws. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). And far from viewing cooperative endeavors with favor, the Court has expressly cautioned that cooperative organization is "rife

with opportunities for anticompetitive activity." *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982); *see also, e.g.*, *MCI Telecommc'ns. Corp. v. AT&T Co.*, 512 U.S. 218, 233 (1994) ("The Court itself has policed trade associations and rate bureaus under the antitrust laws precisely because the sharing of pricing information can facilitate price fixing . . . ."); *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 339-40 (1982) (applying the Sherman Act to a non-profit "association" of doctors "organized for the purpose of promoting fee-for-service medicine and to provide the community with a competitive alternative to existing health insurance plans"); *cf. Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-09 (1988) ( "[P]rivate standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits. . . . [T]he hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition."). If anything, therefore, the fact that "otherwise-competing" entities acted together as part of a "cooperative endeavor" is reason for more scrutiny, not less — and certainly not a basis for immunity from antitrust liability altogether.

More fundamentally, Defendants' argument ignores the gravamen of Plaintiffs' antitrust claim. According to the Amended Complaint, Defendants were not engaged in a "cooperative endeavor" in any meaningful sense of that phrase. To be sure, the Defendant Banks "cooperated" with one another by providing rate information to ICAP, which then used the information to calculate the benchmark. But that benchmark was intended "to represent the going rate in a fully competitive market." (AC ¶ 248; *see also id.* ¶ 4 ("From start to finish, ISDAfix was supposed to be set based on real transactions and prices drawn from a competitive

market.")).  To that end, the Defendant Banks were "required . . . to make submissions to ICAP based on their *own*, personal bid/offer spreads" in a competitive market.  (AC ¶ 72 (emphasis added)).  Viewed in that way, Defendants' "cooperation" was merely an efficient conduit for their competition in the interest rate market.  Put differently, Plaintiffs do not argue that the antitrust laws barred Defendants from cooperating in any respect to arrive at a benchmark rate.  If each of the Defendant Banks had actually shared with ICAP the average of where it "would itself [have] offered and bid a swap" in a competitive market, as it was supposed to do, Plaintiffs would presumably have no claim.  (AC ¶ 71).  Instead, Plaintiffs contend that Defendants' cooperation extended beyond that relatively minimal level to actual collusion on the rate — and that, by doing so, Defendants earned (at Plaintiffs' expense) supra-competitive profits from financial instruments that incorporated that rate as a component of price.  (*See* Pls.' Mem. Law Opp'n Defs.' Joint Mot. To Dismiss Am. Consol. Class Action Compl. (Docket No. 194) ("Pls.' Mem.") 31 ("Plaintiffs here allege that Defendants agreed to hijack the process, whatever it was in the abstract, so they could earn supra-competitive profits (off of interest rate derivatives) in a market where they competed (the market for interest rate derivatives).").  In other words, Plaintiffs contend that they had "to pay supra-competitive prices as a result of a horizontal price-fixing conspiracy" to fix a component of the price of financial instruments that they purchased in an otherwise competitive market.  *FX*, 74 F. Supp. 3d at 598.  That is "the *quintessential* antitrust injury."  *Id.* (emphasis added).

Notably, this Court and the *FX* Court are not alone in concluding that collusion in the setting of a benchmark rate (or its functional equivalent) that is then used as a component of price results in antitrust injury.  *LIBOR I* — and two cases that adopted its reasoning, *7 West 57th Street Realty Co. v. Citigroup, Inc.*, No. 13-CV-981 (PGG), 2015 WL 1514539, at *15-20

(S.D.N.Y. Mar. 31, 2015), and *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 (GBD), 2014 WL

1280464, at *7-8 (S.D.N.Y. Mar. 28, 2014) — aside, courts have long held that such collusion

gives rise to a claim under the Sherman Act by purchasers of the affected products.  *See, e.g.*,

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000) (holding that a

conspiracy to manipulate the benchmark for bulk cheese auction prices, which were then used to

determine the government-mandated minimum price for milk, caused antitrust injury to milk

buyers); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 443 (S.D.N.Y. 2015)

(holding that a conspiracy to raise the "Platts Midwest Premium" benchmark, which was

commonly used as a component of price in contracts for the purchase of aluminum, caused

antitrust injury to aluminum buyers); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F.

Supp. 2d 262, 272-74 (D. Conn. 2003) (holding that a conspiracy to inflate the price of butter,

which was used as a component of minimum milk prices, caused antitrust injury to milk buyers);

*see also, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)

(holding that fixing a "list price" would constitute a *per se* antitrust violation even if the list price

was only a "guide to likely transaction purchases"); *Plymouth Dealers' Ass'n of N. Cal. v. United*

*States*, 279 F.2d 128, 132 (9th Cir. 1960) (holding that a trade association's circulation of list

prices for cars was *per se* illegal even though dealers used the list prices "only as a starting

point"); 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2022a (3d ed. 2010) ("The

per se rule generally governs not only explicit price fixing but also agreements to fix a 'price

element.'").

       Contrary to Defendants' contentions (Defs.' Mem. 21), and the conclusions of the *LIBOR*

*I* Court, *see* 935 F. Supp. 2d at 688, the fact that conspiracy alleged in these cases involved

misrepresentations about the ISDAfix rate-setting process does not mean that Plaintiffs' injuries

sound in tort rather than antitrust.  It is the rare price fixer indeed who truthfully discloses his or her illegal conduct to consumers.  Instead, it should go without saying that most antitrust conspiracies involve misrepresentations, if not outright falsehoods.  *See, e.g.*, *National Ass'n. of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916-17 (2d Cir. 1988) (discussing the publication of a false and misleading letter as part of an antitrust claim); *In re Monosodium Glutamate Antitrust Litig.*, No. 00-MD-1328 (PAM), 2003 WL 23022001, at *1 (D. Minn. Dec. 23, 2003) (discussing an antitrust conspiracy in which the co-conspirators provided customers "with false or misleading explanations" for pricing); *see also, e.g.*, *Knevelbaard Dairies*, 232 F.3d at 990 ("The result for purposes of antitrust injury analysis should be no different than if the cheese makers had conspired to report a fictitious NCE price in order to depress the milk price, *which clearly would cause direct injury to the milk producers*." (emphasis added)).  It would be perverse to grant such wrongdoers immunity from liability under the antitrust laws to those harmed by their anticompetitive conduct merely because, in addition to engaging in that misconduct, they took steps to conceal it through misrepresentations.

In short, the Amended Complaint in these cases alleges that Plaintiffs "are purchasers" of Defendants' products "who allege being forced to pay supra-competitive prices as a result of [Defendants'] anticompetitive conduct.  Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'"  *DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688 (quoting *Brunswick Corp.*, 429 U.S. at 489).[2]

---

[2]      The Supreme Court's decisions in *ARCO* and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) — the principal authorities upon which the *LIBOR I* Court relied, *see* 935 F. Supp. 2d at 689-92, and upon which Defendants rely (although not as heavily) here (Defs.' Br. 26) — do not call for a different conclusion.  As the *FX* Court explained, those cases "were brought by competitors against their rivals, not by consumers alleging the *per se* wrong of horizontal price-fixing against colluding competitors."  74 F. Supp. 3d at 598.  The cases thus stand for the uncontroversial proposition that a competitor cannot use the antitrust laws to

### b.  Efficient Enforcers

As noted above, "antitrust injury is necessary, but not always sufficient, to establish standing."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 409, 443 (2d Cir. 2005) (internal quotation marks omitted).  Plaintiffs must also show that they are "efficient enforcer[s] of the antitrust laws."  *Balaklaw v. Lovell*, 14 F.3d 793, 798 n.9 (2d Cir. 1994).  To determine whether a putative antitrust plaintiff is an "efficient enforcer" of the antitrust laws, courts in this Circuit consider: "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."  *Gatt Comm.*, 711 F.3d at 78 (quoting *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006)).  One factor that "raises particular standing concerns" is "the presence of other efficient antitrust enforcers 'whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'"  *Daniel*, 428 F.3d at 443-44 (quoting *Assoc. Gen. Contractors*, 459 U.S. at 542).  In these cases, Defendants focus their argument on that factor, arguing that there is another class of antitrust plaintiffs that would be more "efficient enforcers" — namely, non-defendant banks that

---

recover lost profits as a result of being confronted with an *increase* in competition.  They do not stand for the proposition that a plaintiff fails to show antitrust injury if it "could have suffered the same harm under normal circumstances of free competition."  *LIBOR I*, 935 F. Supp. 2d at 689; *see In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 912 (6th Cir. 2003) (rejecting an argument that where a "defendant could have in theory caused the same injury without engaging in an antitrust violation, the plaintiff has not suffered an 'antitrust injury,' even if in fact it was the antitrust violation that caused the actual injury in a particular case"); *see also, e.g.*, *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245-46 (2d Cir. 1992) ("The possibility that [the defendant] might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law.").

participated in the inter-dealer market.  (Defs.' Mem. 27-28).  But based on the allegations

contained in the Amended Complaint, the Court has no reason to believe that the non-defendant

banks suffered any financial injury at all from Defendants' manipulation of that market, and

therefore cannot conclude that those banks could serve as a more "efficient enforcers" than

Plaintiffs.  In any event, the other three factors all favor the conclusion that Plaintiffs are

"efficient enforcers": Plaintiffs have alleged that they were directly harmed by Defendants'

anticompetitive conduct by having to pay higher prices (or earning lower profits) from

instruments tied to ISDAfix, there is nothing particularly speculative about the injury alleged,

and the damages at issue are tied to particular transactions and contracts, obviating the danger of

duplicative recovery.  Given those factors, the Court has no basis to doubt that Plaintiffs are

"efficient enforcers" whose financial injury will adequately "motivate them to vindicate the

public interest in antitrust enforcement."  *See Daniel*, 428 F.3d at 443-44.  It follows that they

have "antitrust standing" to pursue the claim under the Sherman Act.

**C.  The State-Law Claims**

In addition to their antitrust claim, Plaintiffs allege state-law claims (against all

Defendants other than ICAP) for breach of contract, breach of the implied covenant of good faith

and fair dealing, unjust enrichment, and tortious interference with contract.  The Court considers

each of those claims in turn.[3]

---

[3]      Applying New York choice-of-law rules, *see Follman v. World Fin. Network Nat'l Bank*,
721 F. Supp. 2d 158, 161 (E.D.N.Y. 2010), Plaintiffs' state-law claims may be governed by the
law of New York, Alaska, Pennsylvania, Connecticut, or Michigan (the last four of which are
where Plaintiffs are domiciled (*see* AC ¶¶ 23-27)).  The parties do not brief choice of law;
instead, they appear to agree (if not explicitly, *see* Defs.' Br. 34 n.39, then implicitly), that the
Court need not reach choice-of-law questions at this stage because the results would be the same
under any applicable law.  *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414
F.3d 325, 331 (2d Cir. 2005) ("[W]here the court has determined that the result would be the

1.  **The Contract and Quasi-Contract Claims Against Nomura Securities**

Before turning to Plaintiffs' claims generally, however, the Court addresses their claims

against Defendant Nomura Securities ("Nomura") in particular.  In supplemental memoranda,

Defendant Nomura argues that all contract and quasi-contractual claims against it — namely, the

claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and

unjust enrichment — should be dismissed because Plaintiffs fail to allege "any transaction,

contract, or relationship between *any* plaintiff and Nomura."  (Supp. Mem. Def. Nomura

Securities International, Inc. Supp. Mot. To Dismiss (Docket No. 175) 1).  The Court agrees.  An

essential element of each contractual and quasi-contractual claim Plaintiffs raise is the existence

of some relationship between the plaintiff and the defendant.  *See, e.g.*, *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) ("*LIBOR III*") ("While

parties need not be in privity with one another to sustain an unjust enrichment claim, a plaintiff

must still plead that it had *some* relationship with a defendant."); *id.* at 478 ("[I]t is clear that the

law requires an agreement between the parties for a defendant to be liable for a breach of

contract.").  Here, although Appendix A to the Amended Complaint lists almost 2,000

transactions between Plaintiffs and the Defendant Banks, *none* of those transactions is with

Nomura.

Notably, Plaintiffs point to no authority (and indeed make no argument) suggesting that

their claims against Nomura should survive despite their failure to allege any relationship,

contractual or otherwise, with the bank.  The fact that members of the putative class may have

engaged in transactions with Nomura (*see* AC ¶ 38) is plainly not enough to keep the claims

---

same under either jurisdiction's law, it need not decide which to apply." (emphasis omitted)).  In
light of that, the Court leaves choice of law to another day.

alive. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) ("[T]o establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim *directly* against that defendant . . . ." (emphasis added)); *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). And although some Circuits have allowed such claims to proceed pursuant to the "juridical link" doctrine, *see Payton v. Cty. of Kane*, 308 F.3d 673, 678-82 (7th Cir. 2002), Plaintiffs point to no case in this Circuit where that doctrine has been applied, *see McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 315 (S.D.N.Y. 2011) ("[The plaintiff] does not cite to any case where the juridical link doctrine was found to cure a named plaintiff's lack of Article III standing, and other courts in the Second Circuit have dismissed this same argument."). In fact, as Plaintiffs concede (Pls.' Mem. Law Opp'n Def. Nomura Securities International, Inc.'s Suppl. Mem. Law (Docket No. 195) 1 n.1), the Second Circuit has expressly disavowed at least one version of the juridical link doctrine. *See, e.g.*, *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012). The Court therefore concludes that the juridical link doctrine does not save Plaintiffs' contractual and quasi-contractual claims against Nomura and that those claims must be dismissed.

## 2. Breach of Contract

To state a claim for breach of contract, a plaintiff must allege (1) an agreement, (2) breach by the defendant, and (3) damages. *See, e.g.*, *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).[4] Defendants challenge all three elements of Plaintiffs'

---

[4]     A plaintiff must also prove "adequate performance by the plaintiff." *Fischer & Mandell, LLP*, 632 F.3d at 799. That element is not at issue here.

contract claim here.  First, Defendants complain that, although Plaintiffs list a series of almost

2,000 contracts in Appendix A to the Amended Complaint, "they fail to allege sufficient facts

about each of those transactions to allow Defendants to determine which of them will be a basis

for Plaintiffs' claim."  (Defs.' Mem. 35).  Plaintiffs could certainly have done a better job of

identifying the precise contracts Defendants allegedly breached.  But Defendants provide no

authority to suggest that such a list is required to survive a motion to dismiss.  The only cases

Defendants cite in support of their argument are *Langreich v. Gruenbaum*, No. 06-CV-4931

(BSJ) (MHD), 2009 WL 321253, at *4 (S.D.N.Y. Jan. 30, 2009), where the Court dismissed a

"muddled" breach-of-contract claim under Rule 8(a) of the Federal Rules of Civil Procedure

because it could not even discern whether the plaintiff was alleging breaches of oral contracts,

written contracts, or both, and *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03-CV-

3120 (LTS) (THK), 2005 WL 1902780, at *20 (S.D.N.Y. Aug. 9, 2005), where the Court was

similarly unable to identify what specific provisions of the "myriad alleged oral and written

agreements" defendants had allegedly breached.  In these cases, by contrast, the Amended

Complaint explains that (1) Plaintiffs' breach-of-contract claims are based only on contracts with

the Defendant Banks "whose cash flows were expressly tied to USD ISDAfix" (AC ¶ 254); (2)

that those contracts were each "governed by ISDA Master Agreements" (*id.* ¶¶ 210, 256); and

(3) that each contract expressly required the Defendant Banks to act "in good faith" and in

accordance with the law (*id.* ¶¶ 213-14, 216).  Those allegations provide Defendants with

"sufficient information to permit [them] to have a fair understanding of what [Plaintiffs are]

complaining about and to know whether there is a legal basis for recovery," which is all that is

required at this stage of the litigation.  *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000)

(internal quotation marks omitted).

Defendants' other contentions — that the Amended Complaint fails to allege that they breached the contracts and fails to allege that Plaintiffs "were harmed or even affected by the alleged breach" (Defs.' Mem. 35-36) — are similarly unpersuasive.  First, as discussed above, Plaintiffs allege that each Defendant engaged in a conspiracy to artificially manipulate ISDAfix throughout the class period in violation of antitrust laws.  (*See, e.g.*, AC ¶¶ 6, 8, 115-17, 141, 145, 163, 171-76).  Plaintiffs also allege that Defendants knowingly misrepresented the nature of ISDAfix, affirming that ISDAfix was an objective, market-based rate even though all Defendants knew ISDAfix to be artificially manipulated throughout the putative class period.  Those allegations are plainly sufficient to state a claim that Defendants breached their commitment to make calculations and payments in good faith and in accordance with the law.  Second, Plaintiffs plausibly allege that the whole point of Defendants' conspiracy to manipulate ISDAfix was to maximize profits for the Defendant Banks on certain instruments by decreasing revenues or increasing prices for the counterparties to those instruments.  And, at least according to the Amended Complaint, which the Court must treat as true, Defendants were ultimately successful in that endeavor: "Plaintiffs' swaptions and other interest rate derivatives that settled by reference, or otherwise had cash flows tied to ISDAfix rates were made less profitable" for Plaintiffs (*i.e.*, more profitable to the Banks) "than they would have been in the absence of manipulation."  (AC ¶ 262).  Given the nature of the alleged conspiracy between Defendants, that allegation is entirely plausible.  The fact that some Plaintiffs on some days may have benefitted from the manipulation of the ISDAfix rates under their contracts does not alter the fact that Plaintiffs plausibly allege that they were harmed by Defendants' agreement to manipulate ISDAfix in a way that would favor the Banks (and, by implication, harm Plaintiffs).  The Amended Complaint therefore adequately makes out a claim for breach of contract.

**3. Breach of the Implied Covenant of Good Faith and Fair Dealing**

In addition to their breach-of-contract claim, Plaintiffs raise a claim for breach of the implied covenant of good faith and fair dealing.  "An implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract."  *Grant & Eisenhofer, P.A. v. Bernstein Libehard LLP*, No. 14-CV-9839 (JMF), 2015 WL 1809001, at *4 (S.D.N.Y. Apr. 20, 2015) (internal quotation marks omitted).  Here, Plaintiffs' implied-covenant claim is based on precisely the same allegations as their breach-of-contract claim — namely, that Plaintiffs and certain of the Defendant Banks entered into ISDA Master Agreements, which required the Banks to act in good faith and in accordance with the law, and that the Banks breached that duty when they calculated cash settlement amounts with reference to an ISDAfix rate they knew to be manipulated.  (*Compare* AC ¶¶ 260-61, *with id.* ¶¶ 266-67).  Plaintiffs only response is that they permissibly plead two theories of recovery in the alternative, which "makes sense" here because the Court or a jury might ultimately reject the breach-of-contract claim.  (Pls.' Mem. 47).  But an implied-covenant claim is not a valid alternative theory of recovery "when [it is] based on the exact same allegations" as a breach-of-contract claim, as it is here.  *Grant & Eisenhofer*, 2015 WL 1809001, at *4 (internal quotation marks omitted).  Plaintiffs' implied-covenant claim must therefore be dismissed.[5]

---

[5]     The Court would reach that conclusion regardless of what state's law is to be applied. The law of every relevant state either does not recognize breach of the implied covenant of good faith and fair dealing as a separate cause of action, *see Casper v. Combustion Eng'g, Inc.*, No. CV 97-0570516S, 1998 WL 389215, at *8 (Conn. Super. Ct. June 23, 1998) ("Notwithstanding that our Supreme Court has recognized the covenant of good faith and fair dealing as a rule of contract construction, the covenant is widely misused and pled as a separate cause of action which generally does nothing more than restate a breach of contract claim."); *McCann v. U.S.*

### 4. Unjust Enrichment

Next, Plaintiffs raise an unjust enrichment claim against all the Defendant Banks.  For this claim, the choice of law does appear to be relevant.  Under the laws of Connecticut, Pennsylvania, and Michigan, plaintiffs are routinely allowed to bring alternative claims for unjust enrichment and breach contract.  *See Stein v. Horton*, 914 A.2d 606, 613 (Conn. App. Ct. 2007) ("Parties routinely plead alternative counts alleging breach of contract and unjust enrichment, although in doing so, they are entitled only to a single measure of damages arising out of these alternative claims."); *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009) (holding that plaintiffs may "plead . . . breach of contract in the alternative with a cause of action under a theory of unjust enrichment"); *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176, 182 (Mich. Ct. App. 1999) (holding that "plaintiff was entitled to plead alternative" claims of contract and quasi-contract).[6]  By contrast, New York law provides that a party can pursue alternative claims for unjust enrichment and breach of contract only "[w]here there is a bona fide dispute as to whether" an express contract governs the subject matter of the disagreement, which — given the Court's conclusions with respect to Plaintiffs'

---

*Bank, N.A.*, 873 F. Supp. 2d 823, 848 (E.D. Mich. 2012) ("Michigan law does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." (internal quotation marks omitted)); *King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 466-67 (E.D. Pa. 2001) (concluding that "the courts of Pennsylvania would not entertain [plaintiff's] good faith and fair dealing claim as a separate cause of action" where based on the same allegations as a breach of contract claim), or appears to recognize it as an independent cause of action only in limited circumstances not present here, *see Reed v. Mun. of Anchorage.*, 782 P.2d 1155, 1158 (Ala. 1989) (explaining that the implied duty of good faith and fair dealing creates an enforceable cause of action in the context of employment contracts).

[6]     The state of Alaska law on this question is less clear, but it appears that Alaska also allows separate claims for unjust enrichment and breach of contract to be brought in the alternative.  *See Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 664 (Alaska 2002) (reviewing a special jury verdict involving alternative claims of express contract and unjust enrichment claims without suggesting the claims cannot be pursued in the alternative).

implied-covenant claim — may not be the case here.  *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014); *see also LIBOR III*, 27 F. Supp. 3d at 483 ("[T]he predicate for dismissing quasi-contract claims is that the contract at issue clearly covers the dispute between the parties.").  But because the parties did not brief the issue of choice of law, *see supra* note 3, and at least some Plaintiffs' unjust enrichment claims would likely survive based on the more permissive law in their domiciles, the Court sees little reason at this point to parse the question of whether there is a "bona fide dispute as to whether" an express contract governs the subject matter of the parties' disagreement.  Instead, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is therefore denied without prejudice to renewal on summary judgment.

### 5.  Tortious Interference

Finally, the Court turns to Plaintiffs' claims for tortious interference with contract.  Under any potentially applicable state law, such a claim generally requires Plaintiffs to plead (1) each Defendant's knowledge of the contract, (2) each Defendant's intentional and improper procurement of a breach of that contract, and (3) damages proximately caused by the Defendant's conduct.  *See, e.g.*, *RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991); *Smith v. Brown*, No. CV91288536S, 1992 WL 219300, at *1 (Conn. Super. Ct. Aug. 28, 1992); *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002); *Ullmannglass v. Oneida, Ltd.*, 927 N.Y.S.2d 702, 705 (N.Y. App. Div. 2011); *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 97-98 (Pa. Super. Ct. 2009), *aff'd*, 610 Pa. 371 (2011).  Here, Plaintiffs fail to plead actual intent to interfere with known contracts, so their tortious-interference claim must be dismissed.  Plaintiffs attempt to muddy the water on this point by arguing that "[i]mpacting ISDAfix contracts was . . . not an unintended side-effect, but the focus of Defendants' behavior."  (Pls.' Mem. 51).  Although that is undoubtedly true on one

level — according to the Amended Complaint, Defendants hoped to impact ISDAfix contracts to

which *they themselves were party* — it is not enough.  Instead, Plaintiffs must plead a specific

intent to injure a known contractual relationship *with another*.  *See, e.g.*, *RAN Corp.*, 823 P.2d at

648 (holding that a plaintiff in Alaska must show that "the defendant . . . knew of the contract

and intended to induce a breach"); *Smith*, 1992 WL 219300, at *1 (noting that a claim for

tortious interference under Connecticut law requires a plaintiff to establish, *inter alia*, "the

existence of a contractual relationship," "a third party's knowledge of this relationship" and "a

third party's intent to interfere with that contract" (citing *Solomon v. Aberman*, 196 Conn. 359,

364 (1985))); *CMI Int'l*, 649 N.W.2d at 812 (holding that, under Michigan law, tortious

interference with a contract requires a plaintiff to allege that the defendant acted "for the purpose

of invading the contractual rights" of another); *Ullmannglass*, 927 N.Y.S.2d at 705 (holding that

to "sustain a claim for tortious interference with a contract" under New York law "it must be

established that a valid contract existed which a third party knew about, the third party

intentionally and improperly procured the breach of the contract and the breach resulted in

damage to the plaintiff" (internal quotation marks omitted)); *Walnut St. Assocs.*, 982 A.2d at 98

(observing that the "necessary elements" of a claim for intentional interference in Pennsylvania

include "(1) the existence of a contractual relationship between the complainant and a third

party" and "(2) an intent on the part of the defendant to harm the plaintiff by interfering with that

contractual relationship").  As Plaintiffs do not do so, they fail to state a claim for tortious

interference.

**D.  Timeliness**

   Finally, Defendants contend that many of the claims in Plaintiffs' Amended Complaint

— which relates back, in most if not all respects, to Plaintiffs' original complaint, which was

filed on September 4, 2014 (*see* Complaint (Docket No. 1); *see also* Defs.' Br. 42 & n.52) — are time-barred.  Plaintiffs' Sherman Act claim is subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b.  To determine the statute of limitations for Plaintiffs' breach-of-contract and unjust enrichment claims — the only state-law claims that survive in light of the Court's rulings above — the Court would have to apply New York's choice-of-law rules.  *See, e.g.*, *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 628 (S.D.N.Y. 2005).  Under New York law, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of actions accrued."  *Stuart v. Am Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); *see* N.Y. C.P.L.R. § 202.  Breach-of-contract and unjust enrichment claims are subject to a six-year statute of limitations in New York.  *See* N.Y. C.P.L.R. § 213(2).  But the statutes of limitations in the states where Plaintiffs' claims accrued are the same or shorter: three years in Alaska, *see* Alaska Stat. § 09.10.053; four years in Pennsylvania, *see* 42 Pa. Cons. Stat. § 5525(a), and Connecticut, *see* Conn. Gen. Stat. § 52-576(a); and six years in Michigan, *see* Mich. Comp. Laws § 600.5807(8).

The Court need not decide which statute of limitations applies at this stage, however, because Plaintiffs plausibly allege that Defendants fraudulently concealed their conspiracy.  In every relevant jurisdiction, the statute of limitations is tolled where a plaintiff shows that a defendant committed fraudulent acts intended to conceal its misconduct and that the plaintiff's ignorance of the concealed misconduct was not a product of its own lack of reasonable diligence.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (federal law); *Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006); *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (Connecticut law); *Doe v. Roman Catholic Archbishop of*

*Archdiocese of Detroit*, 692 N.W.2d 398, 404-05 (Mich. Ct. App. 2004); *Simcuski v. Saeli*, 44

N.Y.2d 442, 448-50 (1978); *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 420 (E.D. Pa. 2014).

Applying those doctrines here, Plaintiffs plausibly allege that the running of the potentially

applicable statutes of limitations was tolled at least through September 4, 2011 — three years

prior to the filing of their initial complaint — which is all they need to do to for all remaining

claims to survive Defendants' motion to dismiss.  *See Santos v. Dist. Council of N.Y. City &*

*Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 619 F.2d 963, 967 n.4 (2d

Cir. 1980) (providing that a statute of limitations defense "may be raised in a pre-answer motion

pursuant to Fed. R. Civ. P. 12(b)(6)" only "if it appears on the face of the complaint that the

cause of action has not been brought within the statute of limitations").

 First, the alleged conspiracy in these cases was secretive and covert by its very nature —

it was an agreement that was "designed to endure over a period of time" and, "[i]n order to

endure, it [had to] remain concealed" from the market.  *State of N.Y. v. Hendrickson Bros., Inc.*,

840 F.2d 1065, 1084 (2d Cir. 1988).  Additionally, Plaintiffs explicitly allege that Defendants

committed affirmative acts of concealment.  For example, Plaintiffs contend that, throughout the

putative class period, Defendants falsely maintained that ISDAfix was an accurate, market-based

rate through public statements describing the process by which ISDAfix was set.  *Cf. Palmer v.*

*Borg-Warner Corp.*, 838 P.2d 1243, 1249 (Alaska 1992) (discussing and relying on prior Alaska

case law that held there was "no reason for a reasonable person to doubt the truth of the

representations made" by a defendant where evidence calling those representations into doubt

would only have been available through "extensive testing").  Indeed, the Amended Complaint

identifies several statements made during the putative class period by ISDA — a trade

association with which all Defendants were involved — that allegedly amounted to affirmative misrepresentations regarding how ISDAfix was calculated.  (AC ¶¶ 222-28).

Defendants contend that Plaintiffs cannot avail themselves of the fraudulent concealment doctrine because they failed to exercise reasonable diligence in investigating their claims. (Defs.' Mem. 45-46).  But requiring Plaintiffs, "at the motion to dismiss stage, to make a showing of reasonable diligence" would be "premature."  *BPP Ill., LLC v. Royal Bank of Scotland Grp., PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order) (internal quotation marks omitted).  In any event, Plaintiffs plausibly allege that they did not know about Defendants' conduct until after September 4, 2011, and that their failure to uncover the conspiracy earlier was not due to a lack of diligence on their part.  Among other things, the trends identified in the Amended Complaint are subtle and required the aggregation of massive quantities of data.  (*See* Pls.' Mem. 57).  And perhaps the most important data — the Defendant Banks' individual submissions to ICAP — were (at least according to the Amended Complaint, which must be taken as true) not publicly available at all.  (AC ¶ 232; *see id.* ¶ 69 ("While the final ISDAfix rates are published, the Defendant Banks' individual submissions are not.")). Contrary to Defendants' contentions (Defs.' Mem. 45-46), the fact that there was a single article published in 2010 that raised "suspicion[s]" about the ISDAfix rate-setting process does not call for a different result at this stage of the litigation.  *See* Michael Mackenzie & Gillian Tett, *Markets: Frozen in Time*, Fin. Times (June 16, 2010).  Nothing in that article made clear that the Defendant Banks were making false submissions to ICAP or that ICAP and the Defendant Banks had in any way agreed to manipulate ISDAfix.  *Id.*  In fact, if anything, the article only underscores that the rate-setting process was opaque and difficult to meaningfully evaluate without substantial investments of time, money, and energy.  *See id.* (describing the ISDAfix

rate-setting process as "opaque" and quoting then-CFTC Chairman Gary Gensler as stating that many of the transactions in the swap market were "internali[zed]" and "not made publicly available"). In any event, a single article raising suspicions about the rate-setting process is not enough to establish, on a motion to dismiss, that Plaintiffs failed to exercise reasonable diligence. *See BPP Ill., LLC*, 603 F. App'x at 59 (holding that the district court had "acted too hastily" in dismissing claims relating to the fixing of LIBOR as time-barred despite multiple articles detailing the alleged rate fixing).

In short, Plaintiffs plausibly allege that Defendants fraudulently concealed their conspiracy until after September 4, 2011. It follows that, whether the applicable statute of limitations is three years or longer, Plaintiffs' remaining claims cannot be dismissed as untimely.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Specifically, Plaintiffs' tortious interference and breach-of-implied-faith claims are dismissed in their entirety, as are Plaintiffs' breach-of-contract and unjust enrichment claims against Nomura. Plaintiffs' remaining claims — namely, their antitrust claim against all Defendants and their breach-of-contract and unjust enrichment claims against all Defendants other than Nomura (and ICAP, against whom they were not brought) — survive.

One issue remains: In the final line of their opposition, Plaintiffs ask for leave to amend their complaint for a second time in the event that the Court grants Defendants' motion in any part. (Pls.' Mem. 60). Under Rule 15 of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has held that a Rule 15(a) motion — as the Court construes Plaintiff passing request — "should

be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (internal quotation marks omitted); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("leav[ing] unaltered" prior case law on denial of leave to amend, including the rule that "leave may be denied where amendment would be futile").  Nevertheless, "the grant or denial of an opportunity to amend is within the discretion of the District Court."  *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (internal quotation marks omitted).

Applying those principles here, the Court concludes that leave to amend is not warranted here because further amendment would be futile.  First, the problems with Plaintiffs' implied-covenant and tortious interference claims are "substantive" and "better pleading will not cure" them.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Second, although Plaintiffs could cure the defects in their contract and quasi-contract claims against Nomura simply by naming transactions involving Nomura, it is safe to assume that they would have done so if they could have done so.  That is, with respect to the claims against Nomura that are dismissed, Plaintiffs fail to give "any indication that [they are] in possession of facts that would cure the problems identified in this opinion."  *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014).  The fact that Plaintiffs already amended their complaint once in an attempt to cure the deficiencies raised in Defendants' initial motion to dismiss — a motion that, notably, raised many of the same arguments as the motion addressed in this Opinion and Order (*see* Docket No. 151) — and that they were expressly cautioned that they would "not be given another opportunity to amend their complaint to address the alleged deficiencies identified in" Defendants' earlier motion (Docket No. 154), underscores the futility of further amendment.

*See, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's

denial of leave to amend in part because of the previous opportunities that the plaintiff had

received to amend the complaint).  Plaintiffs' request for leave to amend is therefore denied.

      The Clerk of Court is directed to terminate Docket No. 172.

      SO ORDERED.

Date:  March 28, 2016
       New York, New York

                                              JESSE M. FURMAN
                                    United States District Judge