UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                   :

ALASKA ELECTRICAL PENSION FUND, et al.,    :

                        Plaintiffs,    :

                                                 :

                -v-    :

BANK OF AMERICA CORPORATION, et al.,    :

                        Defendants.    :

                                                 :
------------------------------------------------------------------------X

14-CV-7126 (JMF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/02/2018

JESSE M. FURMAN, United States District Judge:

      In this putative class action, familiarity with which is presumed, Plaintiffs — several institutional investors — allege that Defendants, some of the world's largest banks, illegally manipulated the U.S. Dollar ISDAfix ("ISDAfix"), a benchmark interest rate incorporated into a broad range of financial derivatives. *See generally Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016).[1] Defendants previously moved to dismiss Plaintiffs' claims pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. In an Opinion and Order entered on March 28, 2016, the Court largely denied that motion, dismissing only a narrow slice of Plaintiffs' state-law claims. *See id.* Most relevant for present purposes, the Court held that Plaintiffs had standing to bring their claims under the Sherman Act, 15 U.S.C. § 1 *et seq.* —

---

[1]     Plaintiffs have reached settlements with ten of the banks they sued. (*See* Docket Nos. 228, 337, 492, 521). (Two banks — HSBC Bank USA, N.A., and UBS AG — settled after the present motions were filed. (Docket No. 492).) Unless otherwise noted, therefore, "Defendant Banks" refers to the non-settling banks: BNP Paribas SA, N.A., Morgan Stanley & Co. LLC, Nomura Securities International, Inc. ("Nomura Securities"), and Wells Fargo Bank, N.A. ("Wells Fargo").

specifically, "antitrust standing."  *See id.* at 56-61.  Thereafter, Plaintiffs filed the Second

Consolidated Amended Class Action Complaint.  (Docket No. 387 ("SAC")).

Defendants now bring another Rule 12(b)(6) motion.  (Docket No. 396).  Relying

primarily on two Second Circuit decisions decided after this Court's prior Opinion, Defendants

contend that Plaintiffs lack antitrust standing with respect to a subset of the antitrust claims

alleged in the SAC.  (*See* Docket No. 397 ("Defts.' Joint Mem."), at 1-4).  Two Defendants —

Nomura Securities and Wells Fargo — move separately to dismiss Plaintiffs' state-law breach-

of-contract and unjust-enrichment claims against them.  (Docket Nos. 398 & 401).  Finally,

responding in part to Nomura Securities's motion, Plaintiffs move to amend their complaint to

add Nomura Global Financial Products, Inc. ("NGFP") as a Defendant.  (Docket No. 417 ("Pls'

Mot. to Amend")).  For the reasons discussed below, Defendants' joint motion to dismiss is

DENIED; Nomura Securities's motion is GRANTED; Plaintiffs' motion to amend is also

DENIED; and Wells Fargo's motion is DENIED in part and GRANTED in part.

## BACKGROUND

The relevant background is set forth at length in the Court's prior Opinion and Order, *see

Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 50-52, and will not be repeated here.  To the

extent these motions implicate additional facts, laid out below, those facts are taken from the

SAC, documents referenced therein, and matters of which the Court can take judicial notice.  For

purposes of this motion, the SAC's allegations are assumed to be true and are viewed in the light

most favorable to Plaintiffs as the non-moving parties.  *See, e.g.*, *Kleinman v. Elan Corp.*, 706

F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

In brief, Plaintiffs bring claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, and, under

state law, for breach of contract and unjust enrichment.  They allege that Defendants — large

banks that dominate the market for interest-rate derivatives and set ISDAfix rates (collectively, the "Defendant Banks"), and ICAP Markets LLC ("ICAP"), an interdealer broker that served, until January 26, 2014, as the administrator in charge of setting the ISDAfix rates — engaged in a longstanding conspiracy to manipulate ISDAfix rates so as to extract higher profits from interest rate swaps and "swaptions." (*See* SAC ¶¶ 1-25). Specifically, Plaintiffs allege that the Defendant Banks conspired by (1) agreeing to "rubberstamp" the ISDAfix reference rate posted daily by ICAP at 11:02 a.m. (*id*. ¶¶ 14-15, 115); (2) manipulating the reference rate itself by flooding the swaps market with interdealer transactions just before 11 a.m. to achieve the desired rate — a process known as "banging the close" (*id.* ¶¶ 158, 160-61); and (3) having ICAP simply set the reference rate at a predetermined level when "banging the close" failed to achieve the desired rate. (*Id.* ¶¶ 150 n.70).

As noted, Defendants previously moved to dismiss Plaintiffs' claims under Section One of the Sherman Act, 15 U.S.C. § 1. (Docket No. 173). To the extent relevant here, Defendants argued that Plaintiffs lacked "antitrust standing" — specifically, that they failed to allege "antitrust injury" and to demonstrate that they are "efficient enforcers" of the antitrust laws. (*Id.* at 19-30). The Court rejected those arguments, *see Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 56-61, and, based on that ruling, Defendants do not challenge here the sufficiency of Plaintiffs' antitrust allegations with respect to two categories of transactions in the SAC: ISDAfix transactions (defined as all transactions whose payment or value is linked to ISDAfix rates (SAC ¶ 1 n.1)); and "vanilla swaps" traded in the "interdealer market," which the Defendant Banks allegedly used to "bang the close." (*See* Defts.' Joint Mem. 8 n.4, 8-10).[2]

---

[2]  "The basic interest rate swap, known as a 'plain vanilla' swap, involves one party paying a fixed rate of interest, while the other party assumes a floating rate of interest based on the amount of the principal of the underlying debt." *K3C Inc. v. Bank of Am.*, *N.A.*, 204 F. App'x

Instead, relying on the Second Circuit's decisions in *In re Aluminum Warehousing Antitrust Litigation* ("*Aluminum I*"), 833 F.3d 151, 158 (2d Cir. 2016), and *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 771 (2d Cir. 2016), Defendants move to dismiss Plaintiffs' antitrust claims with respect to a purported "third category" of transactions: vanilla swaps transacted *outside* the "interdealer market" — or "non-interdealer swaps." (*Id.* at 10-12). In addition, Nomura and Wells Fargo move to dismiss Plaintiffs' state-law claims for breach of contract and unjust enrichment, alleging that Plaintiffs fail to allege any contract or counterparty relationship with them. (*See* Docket Nos. 398, 399 ("Wells Fargo Mem."), 401, 402 ("Nomura Mem.")).

## LEGAL STANDARD

The Defendant Banks' motions are brought pursuant to Rule 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the

---

455, 458 (5th Cir. 2006). In this context, a "vanilla" swap is one where the floating rate is "tied to an independent benchmark," such as the London Interbank Offered Rate ("LIBOR"), rather than a less common ("exotic") benchmark rate, such as ISDAfix. (SAC ¶ 60). For purposes of this motion, Defendants define the "interdealer market" as "the market for medium-term swaps matched through Defendant ICAP." (Defts.' Joint Mem. 1 n.1). Plaintiffs, note, however, that the term "interdealer market" does not "normally have the same 'at ICAP' restriction Defendants" apply here. (Docket No. 408 ("Pls' Opp'n to Joint MTD"), at 7 n.7).

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## JOINT MOTION TO DISMISS

The Court begins with the Defendants' joint motion to dismiss. Plaintiffs' core claim arises under Section One of the Sherman Act, which declares illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To survive a motion to dismiss such a claim, a plaintiff must establish "antitrust standing." *See Gatt Comm'cns, Inc. v. PMC Assocs.*, 711 F.3d 68, 75 (2d Cir. 2013). To do so, a plaintiff must plausibly allege two things: "(a) that it suffered 'a special kind of antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Id.* at 75 (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007)). With respect to the former, "[i]t is not enough for the actual injury to be causally linked" to the alleged violation; instead, "in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (internal quotation marks and alterations omitted). That requirement helps ensure "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990); *see, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."); *Blue Shield of Va., Inc. v. McCready*, 457 U.S. 465, 477 (1982) ("It is reasonable to assume that Congress did not intend to allow every

person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.").

Here, as noted, the Court previously held that Plaintiffs had adequately alleged that they suffered "antitrust injury" and that they were efficient enforcers of the antitrust laws.  *See Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 56-61.  Relying on the Second Circuit's subsequent decision in *Aluminum I*, Defendants now contend that Plaintiffs fail to allege antitrust injury with respect to "vanilla swaps transacted outside the interdealer market."  (Defts.' Joint Mem. 1-3).  And relying on the Second Circuit's subsequent decision in *Gelboim*, Defendants assert also that Plaintiffs are not efficient enforcers with respect to non-interdealer swaps.  (*Id.* at 3-4).  The Court will address each argument in turn.[3]

## A.  Antitrust Injury

To suffer antitrust injury, a plaintiff "must be a participant in the very market that is directly restrained.  Usually, that market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant."  *Aluminum I*, 833 F.3d at 158.  "[S]ometimes," however, "the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."  *Id.*  Here, there is no dispute (at least for purposes of this motion) that Plaintiffs plausibly allege antitrust injury with respect to transactions whose payment or value is linked to ISDAfix rates, as the market for such instruments is alleged to be the actual target of Defendants' conspiracy.  Nor is there any dispute (again, at least for purposes

---

[3]     Whether Defendants' arguments are properly made in light of the Court's previous ruling is a close question, as *Aluminum I* and *Gelboim* did not necessarily change the legal principles relevant to Plaintiffs' claims here.  Nevertheless, the Court need not and does not answer that question, as it concludes that Defendants' arguments fail on the merits.

of this motion) that Plaintiffs plausibly allege antitrust injury with respect to vanilla swaps traded

between dealers ("interdealer swaps"), as the SAC alleges that Defendants corrupted the market

for interdealer swaps (by "banging the close") so as to achieve their illegal ends.  Instead, the

parties' dispute turns on whether *non-interdealer* swaps are part of the same market as

interdealer swaps or part of a different market.  That is, Plaintiffs tacitly concede that their claims

with respect to non-interdealer swaps would (or at least could) fail if such swaps were deemed to

be part of a separate market, as that market would be one step removed from the actual targets of

Defendants' alleged scheme.  (Docket No. 408 ("Pls' Opp'n to Joint MTD"), at 14).  By contrast,

Defendants tacitly concede that their argument with respect to non-interdealer swaps would fail

if such swaps were deemed to be part of the same market as interdealer swaps.  (Defts.' Joint

Mem. 13-16, 20).  Thus, the dispositive question here is whether the SAC plausibly alleges that

interdealer and non-interdealer swaps are part of the same market.

      In defining the relevant market for antitrust purposes, a court's goal is "to identify the

market participants and competitive pressures that restrain an individual firm's ability to raise

prices or restrict output."  *United States v. Am. Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016)

(citation and internal quotation marks omitted).  For that reason, market definition is "a deeply

fact-intensive inquiry" and "courts hesitate to grant motions to dismiss for failure to plead a

relevant product market."  *Todd v. Exxon Corp.*, 275 F.3d 191, 191-200 (2d Cir. 2001).

Nevertheless, "[t]here is . . . no absolute rule against the dismissal of antitrust claims" for failure

to properly define the relevant market.  *Id.* at 200 (citing *Queen City Pizza, Inc. v. Domino's

Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).  "The basic principle is that the relevant market

definition must encompass the realities of competition."  *Am. Express Co.*, 838 F.3d at 197

(quoting *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994)).  To evaluate the realities of

competition that delineate a market, courts assess the "interchangeability of use or the cross-elasticity of demand for potential substitute products." *Todd*, 275 F.3d at 201 (internal quotation marks omitted). "Cross-elasticity of demand" exists if consumers would respond to a slight increase in the price of one product by switching to another product. *Id.* at 201-02 (internal quotation marks omitted).

As hard data on cross-elasticity of demand are rare, courts often look at "practical indicia" to determine the boundaries of a relevant market. *See, e.g.*, *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993); *see also, e.g.*, *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Such practical indicia include: (1) "industry or public recognition of the [market] as a separate economic entity"; (2) "the product's peculiar characteristics and uses"; (3) "unique production facilities"; (4) "distinct customers"; (5) "distinct prices"; (6) "sensitivity to price change"; and (7) "specialized vendors.'" *Klickads, Inc. v. Real Estate Bd. of New York, Inc.*, No. 04-CV-8042 (LBS), 2007 WL 2254721, at *7 (S.D.N.Y. Aug. 6, 2007) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). This list is neither mandatory nor exhaustive. That is, "the presence of some, and absence of others, is not dispositive." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 614 (8th Cir. 2011).

Assuming the truth of Plaintiffs' allegations and drawing all inferences in their favor, the Court concludes that the SAC alleges sufficient facts to raise an inference "above the speculative level" that there is a single market for interdealer *and* non-interdealer swaps. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). First, "[c]ourts consistently find sensitivity to price changes to be a critical factor in evaluating an alleged market." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 358 (S.D.N.Y. 2009); *see also, e.g.*, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1077-

78 (D.D.C. 1997) (demarcating the relevant market by finding that the superstore defendant had changed its price zones in response to the entry of superstores, but not to the entry of other types of retailers). Here, Plaintiffs allege that all vanilla swaps — including those entered by non-dealers — were sensitive to the price changes that resulted from the Defendant Banks' alleged "banging the close." (*See* SAC ¶¶ 231-36). And in support of that allegation, the SAC describes a convergence during 2013 (the end of the alleged conspiracy) of the ISDAfix rate and the overall market swap rate. (*See id.* ¶ 195). In response, Defendants claim that Plaintiffs demonstrate "that ISDAFIX rates during the Class Period" were in fact "disjointed from 'market swap rates,'" thereby proving that interdealer and non-interdealer swaps exist in separate markets (because "a market cannot diverge from itself"). (Docket No. 425 ("Defts.' Joint Reply"), at 6 (citing SAC ¶ 195)). But Plaintiffs do not allege that the swaps market and ISDAfix rates simultaneously diverged from each other, as Defendants imply. Instead, they allege that there was a "consistent gap" in rates calculated between the "market rate leading up to 11:00 a.m." and the ISDAfix rate, which was set just before or during the first two minutes of the polling window (11:00 to 11:02 a.m.). (SAC ¶¶ 145, 161, 195). In a normally "competitive market," swap rates calculated two to five minutes before the polling window should presumably have been consistent with the ISDAfix rate. The fact that the rate calculated at 10:55 a.m. consistently diverged from the ISDAfix rate is arguably evidence, therefore, that the swap rates were manipulated — through "a series of rapid-fire trades" (*id.* ¶ 158) or by ICAP itself (*id.* ¶ 150 n.69) — just before or during the first two minutes of the polling window (*id.* ¶ 161).

Other factual allegations in the SAC help explain why non-interdealer swap prices would be sensitive to changes in interdealer swap prices. First, although Plaintiffs could not "'switch' to the interdealer market, which was limited to banks," (Defts.' Joint Reply 6), the banks

themselves could switch between interdealer and non-interdealer swaps on either the buy or sell side (*see* SAC ¶¶ 62, 77 n.25; Defts.' Joint Reply 3).[4]  Under the Second Circuit's "hypothetical monopolist test," a court must ask "whether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers to switch to other producers."  *Am. Express Co.*, 838 F.3d at 198 (internal quotation marks omitted).  One can infer that if sellers of interdealer swaps imposed a "significant non-transitory increase in price ('SSNIP')," many prospective buyers would be "able and inclined to switch away" to non-interdealer swaps "in sufficiently high numbers to render the SSNIP unprofitable."  *Id.* at 199.  It follows that the proposed "interdealer market" definition "is likely too narrow and should be expanded."  *Id.*  Additionally, the SAC alleges that "around 6,000 companies, financial firms, and other market participants" subscribed to Screen 19901, which "publicized the bid/offer rates of all swap transactions of the specified terms executed through [the interdealer broker] ICAP, and was updated periodically throughout the day."  (SAC ¶ 78).  Screen 19901 provided information to those trading in non-interdealer swaps about the value of interdealer swaps, helping to prevent the values from becoming too disjointed.  (*Id.*; *see also* Pls' Opp'n to Joint MTD 7).

Defendants' principal argument in support of dismissal is that Plaintiffs' allegations with respect to non-interdealer swaps fail the "inextricably intertwined" test established by the

---

[4]      The exclusion of non-banks from dealing in interdealer swaps might suggest that interdealer swaps had a distinct customer base from non-interdealer swaps.  But it is inaccurate to characterize Plaintiffs as "customers" and Defendants as "sellers," as any party is able to act as either a "buyer" (*i.e.*, the "payer" of the fixed rate) or a "seller" (*i.e.*, the "receiver" of the fixed rate) in interest-rate swaps.  (*See* SAC ¶ 61).  *See also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 443-44 (S.D.N.Y. 2017) (providing an overview of how "bids" and "asks" work in the interest rate swaps market).

Supreme Court in *McCready*, and reaffirmed by the Second Circuit in *Aluminum I*. *See McCready*, 457 U.S. at 484; *Aluminum I*, 833 F.3d at 160-61. But the "inextricably intertwined" doctrine is at issue where a plaintiff seeks to hold a defendant liable for the effects of alleged manipulation in a market other than the one in which the defendant participates. *See id.* at 158. Here, the SAC alleges that Defendants participated in *both* the market in ISDAfix transactions and the market in vanilla swaps. Accordingly, there is no need for Plaintiffs to resort to the "inextricably intertwined" doctrine. Relatedly, *Aluminum I* — upon which Defendants principally rely in bringing their new motion — does not speak to the question of how to define the relevant market, which is the critical question here. To the contrary, the plaintiffs in that case had "disavow[ed] participation in any of the markets in which the defendants operate." *Id.* at 161. Here, by contrast, Plaintiffs expressly allege that Defendants were price-fixing vanilla swaps and that they participated in the same market when they bought such swaps from Defendants. Whether or not the evidence supports Plaintiffs' claims in this case, those claims, as pleaded, are much more straightforward than the claims were in *Aluminum I* and easily analyzed under traditional antitrust injury requirements. *See Gatt*, 711 F.3d at 76.

Defendants' other arguments likewise fall short. For instance, Defendants suggest that interdealer and non-interdealer swaps do not share a market because vanilla swaps involve "contract[s] whose terms are dictated by a number of factors" and are therefore not fungible. (Defts.' Joint Mem. 10). Taken to its logical conclusion, however, that argument would suggest that there is no market for *any* kind of vanilla swaps, which is nonsensical. Additionally, the only relevant non-fungible factor distinguishing interdealer from non-interdealer swaps contracts that Defendants identify is the effect of "counterparty risk" on their terms. (*See id.*). To be sure, "counterparty risk" may well result in the addition of a "risk premium" in non-interdealer

contracts, (Pls' Opp'n to Joint MTD 8), but "courts have repeatedly rejected efforts to define markets by price variances or product quality variances." *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628 (RMB) (MHD), 2009 WL 3241401, at *11 (S.D.N.Y. Sept. 30, 2009) (brackets omitted); *see also Se. Mo. Hosp.*, 642 F.3d at 615 ("The Supreme Court has repeatedly said that for identical items, a price differential alone does not establish two separate product markets." (citing *Brown Shoe Co.*, 370 U.S. at 326)). Finally, Defendants argue that interdealer and non-interdealer swaps occupy separate markets because "[s]waps traded outside the interdealer market had no impact on the [ISDAfix] reference rates." (Defts.' Joint Reply 6). But Defendants provide no explanation for why the relevant market for antitrust purposes is comprised of only those swaps used to calculate a reference rate that is meant to reflect — but not completely capture — the market. (*See* SAC ¶¶ 3-4). *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 552 (S.D.N.Y. 2016) (questioning why the Silver Fixing, "an artificially-constructed private 'auction' that was instituted . . . to set a market-wide benchmark," should be considered the relevant antitrust market).[5]

In short, treating Plaintiffs' allegations as true and drawing all inferences in their favor, the Court concludes that the SAC plausibly alleges that there is a single market for interdealer *and* non-interdealer swaps. It follows that Plaintiffs adequately allege antitrust injury.

---

[5]     Defendants also point to the fact that, in a different case, Plaintiffs' counsel describes separate "dealer-to-client and interdealer markets." (Defts.' Joint Reply 2, 4). As Plaintiffs argue, however, the relevant market "will vary with the part of commerce under consideration," *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999), which is the mid-market price in this case and the difference between interdealer and non-interdealer bid-ask spreads in the other case. (*See* Docket No. 430 ("Pls' Sur-Reply"), at 1-2).

## B. Efficient Enforcers

In addition to antitrust injury, Plaintiffs must also show that they are "efficient enforcer[s] of the antitrust laws." *Gatt*, 711 F.3d at 76 (internal quotation marks omitted). To determine whether a putative antitrust plaintiff is an "efficient enforcer," courts in this Circuit consider:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Id.* at 78 (quoting *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006)); *see also Gelboim*, 823 F.3d at 772, 778. The ultimate question is "whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gelboim*, 823 F.3d at 780 (internal quotation marks omitted); *see, e.g.*, *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 536 ("It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.").

"Directness in the antitrust context means close in the chain of causation," *Gatt,* 711 F.3d at 78, which is "essentially a proximate cause analysis," *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476 (DLC), 2014 WL 4379112, at *8 (S.D.N.Y. Sept. 4, 2014); *see also In re London Silver Fixing*, 213 F. Supp. 3d at 552-53; *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014). Here, Plaintiffs' theory of injury — that Defendants' efforts to manipulate the swaps market in order to move the ISDAfix rate in the desired direction resulted in higher payments for Plaintiffs, (SAC ¶¶ 225-33) — would seem to apply equally to both interdealer and non-interdealer swaps, and Defendants concede that Plaintiffs who traded in interdealer swaps were "directly affected" by the alleged conspiracy. (*See* Defs.' Joint Mem. 22). That Plaintiffs are limited to those who transacted directly with the Defendant Banks, (*see*

SAC ¶ 262), only bolsters a finding of direct injury for non-interdealer swaps. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262 (NRB), 2016 WL 7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (finding that "[o]ne consideration in determining causation is whether plaintiffs transacted with defendants directly," in which case defendants secured "illegal benefit at [the plaintiffs'] expense" (alteration in original)). Thus, the Court finds that Plaintiffs satisfy the first factor. For similar reasons, Plaintiffs satisfy the second factor. When push comes to shove, Defendants provide no rationale for why one who transacted in non-interdealer swaps would be any less motivated to vindicate the public interest than one who transacted in interdealer swaps except for the conclusory statement that the former's injuries are "more remote." (*See* Defts.' Joint Reply 9).

That leaves only the question of whether damages for non-interdealer swaps would nonetheless be overly speculative or duplicative. Defendants argue that damages would be too speculative because vanilla swaps are "individually negotiated." (Defts.' Joint Mem. 23). Yet Defendants cite no case law holding that individual negotiation of a financial instrument renders damages unduly speculative, and Judge Buchwald recently held otherwise in the *LIBOR* litigation. *See In re LIBOR*, 2016 WL 7378980, at *17-20. Nor do Plaintiffs' claims founder on the question of duplicativeness. Defendants allege that "vanilla swaps transacted outside the interdealer market substantially overlap with transactions that are the subject of at least two other lawsuits in this district." (Defts.' Joint Reply 9). Whether or not that is the case, what matters is whether the *injuries* alleged in each lawsuit are the same. *See McCready*, 457 U.S. at 474-75 (describing how concerns about duplicative injuries arise when "every person along a chain of distribution [claims] damages arising from a single transaction"). They are not. *In re Interest Rate Swaps* concerns an alleged conspiracy to inhibit the emergence of electronic trading

platforms in the non-interdealer swaps market, followed by a boycott of such platforms, resulting in wider bid-ask spreads for non-interdealer swaps. 261 F. Supp. 3d at 442-44. The *LIBOR* litigation, meanwhile, involves an alleged conspiracy to falsely report inter-bank borrowing costs to the LIBOR administrator, resulting in the suppression of the LIBOR rate, thereby affecting the floating leg of interest rate swaps. 2015 WL 6243526, at *5-7. Defendants also advert to ongoing government and regulatory investigations and suits, (*see* Defts.' Joint Mem. 23-24), but as this Court previously held, "the damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery." *Alaska Elec. Pension*, 175 F. Supp. 3d at 61. It follows that Plaintiffs who transacted in non-interdealer vanilla swaps plausibly allege antitrust injury and "efficient enforcer" status and, thus, have "antitrust standing" to pursue their claims, at least for now.

## NOMURA SECURITIES' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Next, Nomura Securities moves to dismiss Plaintiffs' state-law claims for breach of contract and unjust enrichment, on the ground that they fail to allege the existence of any contract or counterparty relationship between a named plaintiff and Nomura Securities. (Nomura Mem. 1). In its March 28, 2016 Opinion, the Court dismissed Plaintiffs' contract and unjust enrichment claims against Nomura Securities on just that ground: that "Plaintiffs fail[ed] to allege any transaction, contract, or relationship between *any* plaintiff and Nomura." *Alaska Elec. Pension*, 175 F. Supp. 3d at 61 (internal quotation marks omitted). In the SAC, Plaintiffs attempt to cure that defect, but they identify one — and only one — transaction between any Plaintiff (namely, Portigon AG) and "Nomura": a $100,000,000 swaption entered into on June 6, 2011 and settled on October 5, 2012. (SAC ¶ 223; Nomura Mem. 3; Docket No. 411 ("Pls' Opp'n to Nomura"), at 2 n.2). The problem for Plaintiffs is that Nomura *Securities* — the named

Defendant here — was concededly *not* a party to that transaction. (Pls' Opp'n to Nomura 1, 2 n.2, 6). Instead, the ISDA Master Agreement associated with the transaction (which is incorporated by reference into the SAC and, thus, may be considered here, (*see* SAC ¶¶ 223, 277-279, 281), reveals that NGFP, an affiliate of Nomura Securities, was party to the transaction. (Docket No. 403 ("Polovoy Decl."), Exs. 1, 2, 3). Nomura Securities may have acted as an agent for NGFP in connection with the transaction, but it was not a party to the transaction or to any contract associated with the transaction. (Pls' Opp'n to Nomura 4).

Plaintiffs do not dispute that, as a general matter, "a party who is not a signatory to a contract cannot be held liable for breaches of that contract." *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009); *see EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). Nor do they challenge the proposition that corporate affiliates such as Nomura Securities and NGFP are "legally distinct entities" and that "a contract under the corporate name of one is not treated as that of both." *Carte Blanche (Singapore) Pte. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993). Instead, they contend that their contract claim is valid because Nomura Securities "expressed an intent to be bound by the ISDA Master Agreement." (Pls' Opp'n to Nomura 1, 2 n.2, 6). But that contention borders on frivolous. It is well established that an agent, such as Nomura Securities, "will not be personally bound" by a contract "unless there is clear and explicit evidence of the agent's intention to substitute . . . [its] personal liability for . . . that of [its] principal." *Israel v. Chabra*, 537 F.3d 86, 97 (2d Cir. 2008) (citation omitted). And here, the SAC contains no allegations whatsoever to establish that Nomura Securities had such an intention. In fact, the SAC does not mention NGFP at all, let alone include any allegations concerning the relationship between NGFP and Nomura Securities.

Plaintiffs' memorandum of law does include some allegations concerning NGFP and its relationship with Nomura Securities. (Pls' Opp'n to Nomura 2-5). But, putting aside the fact that a party cannot amend its pleadings through a brief, *see, e.g.*, *Kleinman*, 706 F.3d at 153, even those allegations fall woefully short. Courts have found that a non-signatory "manifested an unequivocal intent to be bound" by a contract where the non-signatory represented that it would be the prospective purchaser and was the "key decision-maker" in contract negotiations, *RUS, Inc. v. Bay Indus., Inc.*, No. 01-CV-6133 (GEL), 2004 WL 1240578, at *21 (S.D.N.Y. May 25, 2004), or where it "attended meetings . . . and participated in the negotiations and drafting" of the contract, *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73-74 (S.D.N.Y. 1999). Courts have also held a non-signatory to the terms of a contract where it "'micro-managed' performance under the [c]ontract," stated that it was "the real party in interest," and made payments on behalf of the signatory. *Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc.*, No. 05-CV-7776 (KMK), 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007). Plaintiffs, however, make no allegations of these sorts. At most, they allege that Nomura Securities and NGFP had a close relationship, maintaining "the same principal executive offices," sharing "*identical* management teams," and having "almost *identical* principals." (Pls' Opp'n to Nomura 2-3). But absent allegations suggesting that Nomura Securities was an alter ego of NGFP — and Plaintiffs' allegations come nowhere near that threshold, *see, e.g.*, *Atari, Inc. v. Games, Inc.*, No. 04-CV-3723 (JSR), 2005 WL 447503, at *3 (S.D.N.Y. Feb. 24, 2005) ("[T]he alter ego test is a stringent one, requiring, *inter alia*, that the non-signatory have no real identity independent of the signatory, not simply that the entities are closely related.") — the mere fact that Nomura

Securities and NGFP were "intertwined" in various ways does not support Plaintiffs' contract claim. *See, e.g.*, *MBIA Ins. Corp*, 706 F. Supp. 2d at 396-97.[6]

For similar reasons, Plaintiffs' unjust enrichment claim against Nomura Securities fares no better. To state a claim for unjust enrichment, Plaintiffs must show that (1) Nomura Securities "was enriched" at Portigon AG's "expense," and that (2) "equity and good conscience require" recovery. *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009). "While a plaintiff need not demonstrate that he is in privity with the defendant, a plaintiff still must show that there is a sufficiently close relationship with the defendant that could have caused reliance or inducement by the plaintiff." *In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 315 (S.D.N.Y. 2017) (internal quotation marks omitted). Plaintiffs fail to do so here. At most, they allege — and, again, only in their unsworn memorandum of law opposing the present motion — that a Nomura Securities broker, Daniel Higgins, was listed on the deal ticket for the relevant swaption. (Pls' Opp'n to Nomura 7-8). But that does not establish that Nomura Securities itself played a role in the transaction, let alone that it played any role beyond agent of NGFP. Notably, there is no mention of Nomura Securities on the deal ticket at all; and, if anything, the positioning of Higgins's name — in parentheses next to "Nomura Global Financial Products Inc." — implied that he worked for NGFP. (Polovoy Decl., Ex. 3). On top of that,

---

[6] Plaintiffs' other allegations are similarly unavailing. It is true that the name of a Nomura Securities registered broker, Daniel Higgins, appears on the deal ticket for the swaption at issue, (*see* Pls' Opp'n to Nomura 6; Polovoy Decl., Ex. 3; Docket No. 412 ("Mitchell Decl."), Ex. 5), but Plaintiffs do not allege that Higgins participated in the swaption's negotiations and drafting. And while Nomura Securities is listed as a "Specified Entity" in the ISDA Master Agreement, that is not sufficient to establish that it actually "serve(d) as a guarantor of the signatory's contractual obligations," (Pls' Opp'n to Nomura 6), particularly since the ISDA Master Agreement provides for a Credit Support Provider "in a separate category," (*see* Mitchell Decl., Ex. 6, at 54), and designates "Nomura Securities Co., Ltd." (a separate entity from Nomura Securities International) as such. (*See* Polovoy Decl., Ex. 1, at 4, 10).

Plaintiffs fail to plausibly allege that Nomura Securities received "a specific and direct benefit" from Portigon AG. *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 676 (S.D.N.Y. 2016); *accord Nat'l Westminster Bank plc v. Grant Prideco, Inc.*, 261 F. Supp. 2d 265, 275 (S.D.N.Y. 2003). Plaintiffs assert that Nomura Securities was enriched because it was "intertwined" in various ways with NGFP. (Pls' Opp'n to Nomura 6 n.13). But, as discussed above, absent a basis to treat Nomura Securities as NGFP's alter ego, that is not enough. *See iPayment, Inc. v. 1st Americard, Inc.*, No. 15-CV-1904 (JMF), 2017 WL 727538, at *3 (S.D.N.Y. Feb. 23, 2017).

Perhaps recognizing the weakness of their contract and unjust enrichment claims against Nomura Securities, Plaintiffs request by letter leave to amend the SAC to add NGFP as a new Defendant. (*See* Pls' Mot. to Amend 1). Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court "should freely give leave" to amend "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). A district court, however, "has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Additionally, although not acknowledged by Plaintiffs, Rule 15 is not the only applicable Rule in this case: Because the Court set a deadline for "[a]ny motion to amend or join additional parties," (Docket Nos. 224, 328), and Plaintiffs' request was filed several months after that deadline, they must also show "good cause" under Rule 16(b)(4). *See, e.g.*, *Homes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009); *see also, e.g.*, *Oppenheimer & Co. v. Metal Mgmt., Inc.*, No. 08-CV-3697 (LTS) (FM), 2009 WL 2432729, at *2 (S.D.N.Y. July 31, 2009) (citing cases). Significantly, the "primary consideration" in determining whether such good cause exists is "whether the moving party can demonstrate diligence." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). "Specifically, the moving party must demonstrate that it has been diligent in its efforts to

meet the Court's deadlines, and that despite its having exercised diligence, the applicable

deadline could not have been reasonably met." *Brown Rudnick, LLP v. Surgical Orthomedics,*

*Inc.*, No. 13-CV-4348 (JMF), 2015 WL 363674, at *2 (S.D.N.Y. Jan. 28, 2015) (internal

quotation marks omitted). "A party fails to show good cause when the proposed amendment

rests on information that the party knew, or should have known, in advance of the deadline."

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012)

(internal quotation marks omitted).

Plaintiffs cannot establish "good cause" for their delay in this case. Portigon AG has

known for approximately *twenty-one years* that it is party to an ISDA Master Agreement with

NGFP, not Nomura Securities. (Docket No. 427 ("Nomura Reply"), at 3). And Portigon AG has

known for almost *seven years* that the one "Nomura" transaction referenced in the SAC was with

NGFP, not Nomura Securities. (*Id.*). It follows that Plaintiffs were plainly in a position to

include claims against NGFP before the deadline to join new parties. Notably, Plaintiffs "do not

even attempt to proffer an explanation — let alone an objectively reasonable one — for why they

could not have amended their pleadings to bring" claims against NGFP before the Court's

deadline. *Brown Rudnick*, 2015 WL 363674, at *3. The closest they come is asserting that

"trade data ha[d] to be analyzed" before they added Portigon AG as a plaintiff, (Docket No. 370,

at 3), and that "the affiliate issue only arose after" they did so. (Pls' Mot. to Amend 2). By

Plaintiffs' counsel's own admission, however, they spent substantial time before the amendment

deadline auditing Portigon AG's trades. (*See* Docket Nos. 370, at 3; 218, at 2).[7] That was ample

---

[7]     Plaintiffs seem to suggest that it was the burden of counsel for Nomura Securities to
identify the proper party against whom they might assert state-law claims, noting that, when the
original complaint named "Nomura Holdings, Inc." as the Nomura entity that participated in
setting ISDAfix rates, defense counsel had advised Plaintiffs' counsel that the correct entity was
actually Nomura Securities. (Pls' Opp'n to Nomura 1; Pls' Mot. to Amend 2). That suggestion

time in which to determine that Portigon AG's one and only "Nomura" trade was with NGFP, not Nomura Securities — particularly since the Court's prior Opinion had highlighted the necessity, for purposes of the state-law claims, of including a transaction involving Nomura Securities. Having failed to demonstrate that they were diligent in their efforts to meet the Court's deadline, Plaintiffs cannot amend their Complaint again to add claims against NGFP. *See, e.g.*, *Brown Rudnick*, 2015 WL 363674, at *3 (denying leave to amend after the amendment deadline where the plaintiffs had been "privy to at least some of the evidence underlying the proposed [new claims] for more than three years" and had "themselves produced some of the relevant evidence in discovery); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11-CV-3489 (JMF), 2013 WL 1830416, at *5 (S.D.N.Y. May 1, 2013) (denying leave to amend where the moving party had a copy of the document upon which its proposed new claim was based "since at least the beginning of discovery" and had "itself produced the [document] in discovery").[8]

## WELLS FARGO'S MOTION TO DISMISS

Finally, Wells Fargo also seeks to dismiss the state-law claims against it for breach of contract and unjust enrichment, on the ground that Plaintiffs fail to plead factual allegations establishing any ISDAfix Transaction between Wells Fargo and a named plaintiff. Wells

---

is, of course, absurd. Moreover, because the original complaints did not identify any contract whatsoever between a plaintiff and any Nomura entity (and Portigon AG was not named as a plaintiff until later), there was apparently "no discussion of what Nomura entity plaintiffs could plead a breach of contract claim against." (Nomura Reply 4 n.1).

[8]     Given the foregoing, it is immaterial whether Nomura Securities and NGFP could establish prejudice. *See, e.g.*, *Gullo v. City of N.Y.*, 540 F. App'x 45, 47 (2d Cir. 2013) (summary order) ("That defendants suffered no prejudice does not change the fact that plaintiffs failed to pursue amendment with diligence."). But Nomura Securities and NGFP could do so in any event, as granting Plaintiffs' motion would plainly cause substantial delay in what has already been a protracted litigation.

Fargo's arguments are not without force, as Plaintiffs' allegations in the SAC are far from specific, (*see, e.g.*, SAC ¶ 39 ("Portigon AG and/or EAA transacted in vanilla swaps and/or ISDAfix Transactions directly impacted by Defendants' manipulation of ISDAfix, and transacted with one or more of the following Defendant Banks: Nomura, UBS, HSBC, Wells Fargo, Morgan Stanley, and BNP Paribas."), and the confirmations for the only two Wells Fargo swaptions identified in the SAC's Appendix allegedly indicate that they were not tied to ISDAfix. (*See* SAC, Appendix A, lines 637, 1543; Wells Fargo Mem. 9). Nevertheless, the Court disagrees with Wells Fargo's assertion that it may consider the confirmations at this stage of the litigation. (*See* Wells Fargo Mem. 1, 9 n.6). Plaintiffs do not incorporate the confirmations by reference into the SAC, as they make passing reference to "confirmations" only three times and in generalized terms. (*See* SAC ¶¶ 237-38, 280). *See, e.g.*, *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (summary order) ("A mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))). Nor is it clear that Plaintiffs relied "on the terms and effect of [the confirmations] in drafting" the SAC. *Chambers*, 282 F.3d at 153. And additionally, it is not even "clear on the record that no dispute exists regarding the authenticity or accuracy of the document[s]" or "that there exist no material disputed issues of fact regarding the relevance of the document[s]." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Indeed, Plaintiffs dispute whether at least one of the confirmations demonstrates that the swaptions were physically rather than cash settled. (*See* Docket No. 409, at 4 n.4). And Wells Fargo itself concedes that the terms of confirmations are not "always followed" and that "parties may deviate from the settlement mechanism called for in

a confirmation," making clear that the confirmations themselves do not even settle the matter. (Wells Fargo Mem. 9 n.7; *see also* Docket No. 424 ("Wells Fargo Reply"), at 4 n.3).

On the other hand, to the extent that Plaintiffs other than Portigon AG and EAA seek to bring unjust enrichment or contract claims against Wells Fargo, their claims must be dismissed. As Wells Fargo argues, and Plaintiffs do not really dispute, to sustain a claim of unjust enrichment or breach of contract, a plaintiff must allege at least some relationship with Wells Fargo. (Wells Fargo Mem. 12-13; Wells Fargo Reply, 4 n.2, 8). Portigon AG and EAA are the only named Plaintiffs that have done so with respect to Wells Fargo. And while a claim may be asserted on behalf of a class so long as "at least one named plaintiff" asserts "a claim directly against that defendant," *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012), the claim of one named plaintiff does not support claims of other named plaintiffs absent an allegation of at least "some relationship between [the other] plaintiff[s] and the defendant," *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 61; *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 548 (S.D.N.Y. 1995) ("As this Court has noted before, a plaintiff may not use the procedural device of a class action to bootstrap himself into standing he lacks under the express terms of the substantive law.").

Accordingly, Wells Fargo's motion to dismiss is denied as to Portigon AG and EAA (without prejudice to renewal on summary judgment) and granted as to all other Plaintiffs.

## CONCLUSION

For the reasons stated above, Defendants' joint partial motion to dismiss is DENIED, Nomura Securities' partial motion to dismiss is GRANTED, and Wells Fargo's partial motion to dismiss is DENIED as to Portigon AG and EAA and GRANTED as to all other Plaintiffs' state-law claims. Finally, Plaintiffs' motion to amend is DENIED.

The Clerk of Court is directed to terminate Docket Nos. 396, 398, 401, 417, and 429.

SO ORDERED.

Dated: February 2, 2018
       New York, New York

_____
JESSE M. FURMAN
United States District Judge