**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALASKA ELECTRICAL PENSION FUND,
et al.,

                              Plaintiffs,

      v.

BANK OF AMERICA, N.A., et al.,

                              Defendants.

Lead Case No.:  14-cv-7126 (JMF)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH TEN DEFENDANTS, FINAL APPROVAL OF <u>PLAN OF DISTRIBUTION, AND CERTIFICATION OF SETTLEMENT CLASS</u>**

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION .................................................................................. 1

SUMMARY OF THE SETTLEMENTS AND NOTICE......................................... 3

    A.    Certification Stipulation and Monetary Payment ................................... 4

    B.    Confirmatory Discovery ........................................................................ 5

    C.    Release of Claims and Termination....................................................... 5

    D.    Class Notice ........................................................................................... 6

ARGUMENT ........................................................................................................... 9

I.    THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE.................................................................................................... 9

    A.    The Settlements Are Presumptively Fair, Reasonable, and Adequate................... 9

    B.    The *Grinnell* Factors Support Final Approval of the Settlements ....................... 11

        1.    Complexity, Expense, and Likely Duration of the Litigation.................. 12

        2.    Reaction of the Class to the Settlements.................................................. 14

        3.    Stage of the Proceedings ......................................................................... 15

        4.    Risks of Establishing Liability and Damages ......................................... 18

        5.    Risks of Maintaining a Class Action Through Trial................................ 19

        6.    Ability of Settling Defendants to Withstand a Greater Judgment ........... 19

        7.    Reasonableness of the Settlements in Light of the Best Possible Recovery and Attendant Litigation Risks ................................................ 20

II.    NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS.................... 23

    A.    The Class Received the Best Practicable Notice Under the Circumstances......... 24

    B.    The Notice Fairly Apprised Potential Settlement Class Members of the Settlements and Their Options.............................................................. 27

III.    THE PLAN OF DISTRIBUTION SHOULD BE GRANTED FINAL APPROVAL ........................................................................................... 28

i

IV.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................. 34

CONCLUSION........................................................................................................................ 34

## TABLE OF AUTHORITIES

**Page**

### Cases

*Allen v. Dairy Farmers of Am., Inc.*,
2011 WL 3361233, at *6 (D. Vt. Aug. 3, 2011) .................................................... 14

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ........................................................................ 15

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ................................................................. 11, 21, 22

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ................................................................................... 9

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ............................................................................................ 24

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984) ..................................................................... 20

*In re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987) ................................................................................ 33

*In re Adelphia Commc'ns Corp. Sec. & Derivatives Litig.*,
271 F. App'x 41 (2d Cir. 2008) .......................................................................... 24

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ................................................ 9, 15

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................ 29

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ........................................................ 15

*In re Austrian and German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) .................................................................... 9

*In re Automotive Refinishing Paint Antitrust Litig.*,
2004 WL 1068807 (E.D. Pa. May 11, 2004) ...................................................... 22

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................................ 12

*In re Corrugated Container Antitrust Litig.*,
659 F.2d 1322 (5th Cir. 1981) ............................................................................ 21

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ............................ 27, 28, 29, 32, 34

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .................................................... 28

*In re Elec. Books Antitrust Litig.*,
No. 11-md-2293 (S.D.N.Y. Nov. 21, 2014) ....................................................... 19

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .................................................... 34

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................... 15, 17, 35

*In re High-Tech Employee Antitrust Litig.*,
    2013 WL 6328811 (N.D. Cal. Oct. 30, 2013) ....................................................... 20

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ........................................................... 11, 32

*In re Initial Public Offering Sec. Litig.*,
    243 F.R.D. 79 (S.D.N.Y. 2007) ....................................................................... 13

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................ 23

*In re Lloyds' Am. Trust Fund Litig.*,
    2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ................................................... 34

*In re Med. X-Ray Film Antitrust Litig.*,
    1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ........................................................ 22

*In re Michael Milken and Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ....................................................................... 11

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ............................................................... 13, 19

*In re Nissan Radiator/Transmission Cooler Litig.*,
    2013 WL 4080946 (S.D.N.Y. May 30, 2013) .................................................... 15

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................... 20, 28, 30

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) .............................................................. 13

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ...............................................................19

*In re Sinus Buster Prods. Consumer Litig.*,
    2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014) .................................................... 15

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ................................................................ 9

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ................................................ 19, 32

*In re Vitamin C Antitrust Litig.*,
    2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) .......................................... 12, 26, 27

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985) ...............................................................18-19

*In re Worldcom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................. 30

*Jermyn v. Best Buy Stores, L.P.*,
    2010 WL 5187746 (S.D.N.Y. Dec. 6, 2010) ..................................................... 24

*Maley* v. *Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) .............................................................. 14

*Massiah v. MetroPlus Health Plan, Inc.*,
    2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) ....................................................... 20

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015) ....................................................... 11, 14, 21

*Morris v. Affinity Health Plan, Inc.*,
    859 F. Supp. 2d 611 (S.D.N.Y. 2012) ....................................................... 9

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ....................................................... 20

*In re Packaged Ice Antitrust Litig.*,
    2010 WL 3070161 (E.D. Mich. Aug. 2, 2010) ....................................................... 17

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) ....................................................... 23

*Ross v. Am. Express Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014) ....................................................... 12

*Ross v. Citigroup, Inc.*,
    630 F. App'x 79 (2d Cir. 2015) ....................................................... 12

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ....................................................... 14

*Sykes v. Harris*,
    2016 WL 3030156 (S.D.N.Y. May 24, 2016) ....................................................... 28

*U.S. Commodity Futures Trading Comm'n v. Rolando*,
    2008 WL 5225851 (D. Conn. Dec. 10, 2008) ....................................................... 34

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ....................................................... 29

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ....................................................... 11

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ....................................................... 9, 13, 14, 15, 20, 23, 27

*Weber v. Gov't Emps. Ins. Co.*,
    262 F.R.D. 431 (D.N.J. 2009) ....................................................... 19

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ....................................................... 15

## Statutes and Rules

Fed. R. Civ. P. 23(a) ....................................................... 35

Fed. R. Civ. P. 23(b) ....................................................... 35

Fed. R. Civ. P. 23(c) ....................................................... 24, 26, 27

Fed. R. Civ. P. 23(e) ....................................................... 9, 24, 27

Fed. R. Civ. P. 23(f) ....................................................... 13

## **Miscellaneous**

2 McLaughlin on Class Actions §6:23 (12th ed.) ........................................................................ 35

*Manual for Complex Litigation (Fourth)* §21.312 (2004) ........................................................ 35

Newberg on Class Actions §11.41 (4th ed.) ............................................................................... 15

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs respectfully submit this Memorandum of Law in Support of their Motion for Final Approval of Settlement Agreements with Ten Defendants, Final Approval of Plan of Distribution, and Certification of Settlement Class.

## SUMMARY OF THE ACTION

The ten Settlements at issue were reached after months of arm's-length negotiations between experienced counsel, and are an excellent result for the Settlement Class.  The earliest Settlements came after considerable investigative work by Lead Counsel and over a year and a half of hard-fought litigation.  The Settlements are fair and reasonable and amply satisfy the criteria for final approval.  The detailed Plan of Distribution described below is recommended by Lead Counsel who have litigated this case for three and a half years.  It easily has the necessary "reasonable, rational basis" necessary for final approval.  Accordingly, Plaintiffs respectfully request that the Court grant this motion and enter judgment to provide the Settlement Class with the substantial relief that Lead Counsel worked so hard to obtain.

In September 2014, Plaintiffs brought this action against fourteen banks that dominate the market for interest rate derivatives and ICAP, an interdealer broker.  Plaintiffs alleged that Defendants entered into an unlawful agreement to manipulate ISDAfix, a global benchmark reference rate used in interest rate derivatives.  Defendants allegedly conspired to rig the USD ISDAfix rate-setting process to the detriment of Defendant Banks' counterparties as well as the broader market for interest rate swaps.  To redress harms to investors, Plaintiffs asserted federal antitrust claims and state law claims for breach of contract and unjust enrichment.

Prior to filing the original complaint, Lead Counsel carried out an extensive, months-long investigation, initiating the case only after uncovering allegedly substantial evidence of wrongdoing.  Notably, the original complaint was filed *before* news broke that the CFTC had

1

referred ISDAfix-related conduct to the U.S. Department of Justice, upon uncovering evidence of possible criminal wrongdoing.[1]  In connection with counsel's pre-suit investigation, Lead Counsel retained renowned economists who analyzed trading patterns and ISDAfix submissions and concluded that they revealed indicia of collusion.  Lead Counsel also consulted with industry insiders with knowledge about ISDAfix and financial instruments tied to ISDAfix.  Lead Counsel's investigation went far beyond the public record and resulted in initial complaints that were well-developed and supported by economic and other evidence.  *See also* Dkt. No. 125 at 11-14 (details of pre-suit investigation).  The results of this wide-ranging investigation were set forth at length in the pleadings.

Plaintiffs filed their Consolidated Amended Complaint in February 2015, Dkt. No. 164, and Defendants moved to dismiss, Dkt. Nos. 172-75.  On March 28, 2016, the Court issued its Opinion largely denying Defendants' motion to dismiss.  Dkt. No. 209.  The Court denied the motion as to the antitrust claims against all Defendants and the state law breach of contract and unjust enrichment claims against all Defendants other than Nomura (and ICAP, against which they were not brought).  *Id*. at 34.

In Plaintiffs' view, the extensive discovery to date confirms that Defendants repeatedly sought to, and did, manipulate ISDAfix throughout the Class Period pursuant to a rigged and corrupted system that Defendants collusively established.  Discovery commenced shortly after the Court's ruling.  The parties conducted voluminous document discovery, with Defendants (both settling and non-settling) producing over 21 million pages of documents.  The parties took more than 40 fact depositions, with over 30 of these taken by Plaintiffs.  Plaintiffs also subpoenaed documents from non-party ISDA and deposed its corporate designee and former

---

[1]  The CFTC has, to date, entered into settlements with Defendants Barclays, Deutsche Bank, Goldman Sachs, Citibank, and RBS arising out of ISDAfix-related misconduct.

president.  Plaintiffs themselves produced tens of thousands of documents and their corporate

designees were deposed.[2]  On February 7, 2017, Plaintiffs filed their Second Consolidated

Amended Complaint.  Dkt. No. 387.  The Non-Settling Defendants again moved to dismiss (Dkt.

Nos. 396-403), and on February 2, 2018, the Court again largely denied the motions.  Dkt. No.

568.

Following the June 2017 deadline for the completion of fact discovery relating to class

certification, Plaintiffs moved for class certification in July 2017, and filed expert reports in

support of that motion.  Dkt. No. 498.  After deposing Plaintiffs' experts, Non-Settling

Defendants filed their opposition in November 2017 and moved to exclude Plaintiffs' experts.

Dkt. Nos. 524-27.  Plaintiffs deposed Non-Settling Defendants' experts, and then filed their class

certification reply and opposition to Non-Settling Defendants' motions to exclude in January

2018.  Dkt. No. 551.  Defendants filed their reply in support of their motions to exclude in

February 2018.  Dkt. No. 579.

## SUMMARY OF THE SETTLEMENTS AND NOTICE

Plaintiffs and Settling Defendants entered into Settlements (Dkt. Nos. 222-1, 222-2, 222-

3, 222-4, 222-5, 222-6, 222-7, 331-1, 490-1, 490-2), providing for a total payment of $408.5

million to the Settlement Class.[3]  Settling Defendants have also provided valuable cooperation,

transaction data, documents, and attorney proffers to aid in Plaintiffs' ongoing litigation against

Non-Settling Defendants.

Plaintiffs moved for preliminary approval of the ten settlements in May 2016 (Bank of

America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, JPMorgan, and RBS) (Dkt. Nos.

---

[2]  The details of discovery are provided in Lead Counsel's Motion for Award of Attorneys' Fees and
Payment of Litigation Expenses, filed contemporaneously herewith, as well as the Joint Declaration of Lead Counsel
submitted in support thereof.

[3]  As the class definition is identical across the Settlements, Plaintiffs use the singular.

220-22), December 2016 (Goldman Sachs) (Dkt. Nos. 329-31), and July 2017 (HSBC and UBS) (Dkt. Nos. 488-90).  The Court granted each motion.  Dkt Nos. 228, 337, 492.  The Court also approved the plan of notice and preliminarily approved the Plan of Distribution.  Dkt. No. 521.  The deadline for any objections or exclusions is April 30, 2018, and the fairness hearing is scheduled for May 30, 2018.

With the exception of the monetary component, the terms of each Settlement Agreement are substantially identical, allowing for an omnibus motion for final approval of the ten Settlements and a single notice to the Settlement Class (which is an efficient approach for class members).  Upon the Effective Date of the Settlement Agreements, Plaintiffs and members of the Settlement Class that do not exclude themselves will release their claims against Settling Defendants and Released Bank Parties.  Stips., §§7.1, 7.2; *see also* Stips. Exhibit B, ¶¶9, 11.[4]

### A.    Certification Stipulation and Monetary Payment

Each of the Settlement Agreements is made on behalf of an identical proposed Settlement Class.  Subject to specified exclusions, the Class is defined as "all Persons or entities who entered into, received or made payments on, terminated, transacted in, or held an ISDAfix Instrument during the Settlement Class Period [January 1, 2006 through January 31, 2014]."  Stips., §1.46; *see also* §1.47.

The Settlement Amount being paid by each Defendant is set out below:

| | | | | |
|---|---|---|---|---|
| Bank of America | $ 50,000,000 | | Goldman Sachs | $ 56,500,000 |
| Barclays | $ 30,000,000 | | HSBC | $ 14,000,000 |
| Citigroup | $ 42,000,000 | | JPMorgan | $ 52,000,000 |
| Credit Suisse | $ 50,000,000 | | RBS | $ 50,000,000 |
| Deutsche Bank | $ 50,000,000 | | UBS | $ 14,000,000 |
| | | | **Total** | **$ 408,500,000** |

---

[4]   Capitalized terms not defined herein have the same meanings as supplied in Plaintiffs' motions for preliminary approval.  *See* Dkt. Nos. 221, 330, 489.

The Settlement Agreements are all non-recapture, meaning that as of the Effective Date, Settling Defendants have no right to the return of the settlement fund for any reason.  Stips., §10.3.

### B.        Confirmatory Discovery

The Settlement Agreements obligate Settling Defendants to provide confirmatory discovery, including, subject to Court Orders and any applicable laws, privileges, and other protections:  (a) production of reasonably available transaction data involving ISDAfix Instruments during the Settlement Class Period; (b) production of documents produced to the CFTC (and other regulators, to the extent not duplicative) relating to potential wrongdoing related to ISDAfix Benchmark Rates; (c) attorney proffers relating to Plaintiffs' allegations; and (d) up to three witness interviews (per Settling Defendant) of current employees relating to allegations.  Stips., §11.4(a)-(d).  These obligations were triggered by the entry of the Preliminary Approval Order.  Stips., §11.4.  The documents and data obtained pursuant to these cooperation provisions has played a valuable role in informing Plaintiffs' understanding of the nature of Defendants' conspiracy—its scope, mechanics, and effects.

### C.        Release of Claims and Termination

The Settlement Agreements all provide that upon the Effective Date, the Action, all claims asserted in the Action, and all Released Class Claims belonging to Plaintiffs and Releasing Class Parties will be dismissed with prejudice as against each Settling Defendant. They also provide that Plaintiffs and each of the Settlement Class Members will be permanently barred and enjoined from asserting any of the Released Class Claims against each Settling Defendant and Released Bank Party in any action or proceeding.  Stips., Exhibit B, ¶¶9, 11; *see also* Stips., §§7.1, 7.2.  Consistent with the law governing the release of class action claims, the releases cover only those claims "arising from or relating to the factual predicate of the Action." Stips., §1.39; Goldman Stip., §1.40.

To the extent that there are Opt-Outs from the Settlements, the Settlement Agreements provide that Defendants may elect to invoke certain procedures relating to reductions or termination under certain specified circumstances and conditions.  Stips., §10.4 (a)-(d).[5]

### D.    Class Notice

Pursuant to the Court's October 24, 2017 Order ("Notice Order"), Plaintiffs instructed the Court-appointed Claims Administrator, Epiq Systems Inc. ("Epiq" or the "Claims Administrator"), to give reasonable notice to potential Settlement Class Members.  Lead Counsel also oversaw the distribution of notice to foreign counterparties by Rust Consulting ("Rust"), and worked with certain Settling Defendants to disseminate notice to any remaining Persons directly. The robust notice plan preliminarily approved by the Court, and effectuated as set forth herein, included direct notice by mail, printed publication notice, and notice via the Internet.  A dedicated Settlement Website, telephone information line, and email address were also established for potential Settlement Class Members.

Direct Notice By Mail:  Plaintiffs, through Epiq, Rust, and certain Settling Defendants, provided direct notice by mail to potential Class Members identifiable through reasonable efforts.  *First*, as of January 29, 2018, Epiq mailed direct notice to a total of 36,854 potential Settlement Class Members based on name and address information that was primarily obtained from the Settling Defendants' business records.  Decl. of Cameron R. Azari on Implementation and Adequacy of Settlement Class Notice Program ("Azari Decl.") ¶9.  This "Notice Packet" includes the Notice of Proposed Settlement of Class Action (the "Notice" or "Long Form Notice") and the Proof of Claim and Release Form (the "Claim Form"), which were

---

[5]   In their follow-up filing on exclusions and objections, Plaintiffs will inform the Court whether there were any terminations or reductions pursuant to the termination provisions.

preliminarily approved by the Court. *See* Notice Order ¶¶3-5.[6] As of January 29, 2018, the

Claims Administrator mailed the Notice Packet to a total of 1,398 banks, brokers, and other

nominees that may have executed relevant transactions on behalf of potential Settlement Class

Members. Azari Decl. ¶36; *see also* Notice Order ¶5.

*Second*, on January 29, 2018, Rust, as agent of the Settling Defendants (except Deutsche

Bank and UBS), directly provided the Notice Packet to 17,947 potential Settlement Class

Members that required special handling due to foreign privacy law concerns asserted by Settling

Defendants. Decl. of Jason Rabe Regarding Mailing of the Notice and Claim Form to Certain

Settlement Class Members ("Rabe Decl.") ¶10; *see also* Notice Order ¶8. Third-party claims

administrator agent, KCC, provided notice to certain foreign counterparties due to foreign

privacy law concerns asserted by Settling Defendant Deutsche Bank.[7] Finally, six of the ten

Settling Defendants—Barclays, Citibank, Credit Suisse, HSBC, JPMorgan, and UBS (the

"Direct Notice Defendants")—provided direct notice to certain of their own counterparties that

they asserted required further consideration, primarily to accommodate foreign privacy laws.[8]

*See* Direct Notice Defs.' Decls.; *see also* Notice Order ¶8.

---

[6] The Notice Packet also contains a full page insert stating in English, as well as in 12 other relevant languages, that translated versions of the Notice and Claim Form are available on the Settlement Website in these languages. The Settlement Agreements provide for Plaintiffs' right to request attorneys' fees, payment of litigation expenses in connection with prosecuting the Action, and/or incentive awards. Stips., §§9.1, 9.2. The Court-approved Notice informs the Settlement Class of counsel's intent to seek attorneys' fees, payment of litigation expenses, and incentive awards, subject to Court approval.

[7] *See* Decl. of Patrick J. Ivie Regarding Mailing of the Notice of Proposed Settlement of Class Action ("KCC Decl."). *See also* Notice Order ¶8.

[8] *See* Decl. of Abigail Deering Regarding Distribution of the Settlement Notice and Proof of Claim Form to Mexican-Domiciled Class Members ("Deering Decl."); Decl. of Marc Leuzinger Regarding Mailing of the Settlement Notice and Proof of Claim Form to Certain Potential Members of the Settlement Class ("Leuzinger Decl."); Decl. of Audrey Ng Regarding Mailing of the Settlement Notice and Proof of Claim Form to Certain Potential Members of the Settlement Class ("Ng Decl."); Decl. of Manuel F. Gomez Regarding Mailing of the Notice of Proposed Settlement of Class Action and Proof of Claim and Release Form to Potential Class Members ("Gomez Decl."); Decl. of Sandra Adams Regarding Self-Mailing of Class Notice by Certain Foreign HSBC Affiliates ("Adams Decl."); Decl. of Michael T. Lee Regarding Mailing of the Settlement Notice and Proof of Claim Forms ("Lee Decl."); and Decl. of Matthew Popowsky Regarding Mailing of the Settlement Notice and Proof of Claim Form ("Popowsky Decl.," and, collectively, the "Direct Notice Defs.' Decls.").

Printed Publication Notice:  Between January 19 and 22, 2018, Epiq caused the Court-approved Summary Notice to be issued in numerous publications.  Azari Decl. ¶¶39-40; *see also* Notice Order ¶7.  These publications included *Risk Magazine* (global edition); *Financial Times* (global edition); *Wall Street Journal* (United States edition); *The New York Times* (United States edition); *The Daily Telegraph* (London, England); *South China Morning Post* (Hong Kong, China); *The Straits Times* (Singapore).  *Id.*  The Claims Administrator also issued a press release on January 19, 2018 through PR Newswire.  *Id.* ¶¶46-47; *see also* Notice Order ¶7.

Notice via the Internet:  The Claims Administrator also published digital banner advertisements on the global edition websites of *FinancialTimes.com* and *WSJ.com* beginning on January 19, 2018.  Azari Decl. ¶¶41-42; *see also* Notice Order ¶7.  Each Internet display, which linked any user that clicked on the banner advertisement to the Settlement Website, was posted for a period of 31 days.  *Id.* ¶42.  Epiq also caused sponsored links to the Settlement Website to be listed through various Internet search engines, and will continue these postings through the April 30, 2018 deadline to opt out of or object to the Settlements.  *Id.* ¶¶43-45.

Website, Telephone Number, and Email Address:  On January 18, 2018, Epiq launched the Settlement Website at www.IsdafixAntitrustSettlement.com to enable potential Settlement Class Members to obtain information about the Settlements and to file a claim electronically.  Azari Decl. ¶48.  As of March 23, 2018, the Settlement Website has had 7,776 visitors (and individual pages of the Settlement Website were loaded 20,859 times), the notice has been downloaded 1,144 times, and 193 claims have been submitted.  *Id.* ¶49.  Plaintiffs also established a dedicated toll-free telephone information line and an email address to which inquiries or other requests could be sent to the Claims Administrator.  *Id.* ¶¶50-51.  As of March

23, 2018, Epiq had mailed an additional 15 Notice Packets requested via the toll-free telephone number or other correspondence.  *Id.* ¶37.

## ARGUMENT

I.   **THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE**

Final approval is appropriate where the court determines that a class action settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).[9]  Public policy favors the settlement of disputed claims among private litigants, particularly class actions.  *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005).  In assessing final approval, courts consider both procedural and substantive fairness.  *See id.* at 116.

### A.   **The Settlements Are Presumptively Fair, Reasonable, and Adequate**

"To determine procedural fairness, courts examine the negotiating process leading to the settlement."  *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012).  Where a settlement is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation," the settlement enjoys a "presumption of fairness."  *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom., D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).  *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396, at *7 (E.D.N.Y. Sept. 25, 2009).  Courts grant "'great weight' [] to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008).

Here, the Settlement Agreements are the product of intensive negotiations that took place over the course of many months among counsel (on both sides) well-versed in complex class

---

[9]   Unless otherwise noted, all emphases are added and all quotations and citations are omitted.

actions.  Discussions began in summer 2015 with Barclays and consisted of a series of face-to-face meetings and phone calls.  After Barclays and Plaintiffs reached an agreement in principle on the structure of a settlement in August 2015, Lead Counsel contacted other Defendants or, in some cases, received communications from other Defendants, regarding their interest in possible resolution of the Action.  With respect to Bank of America, Barclays, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, and RBS (the first eight Settling Defendants), these communications and negotiations were conducted between Lead Counsel and counsel for Settling Defendants.  Discussions with HSBC and UBS (the last two Settling Defendants), were conducted both directly between counsel, and with the assistance of a mediation session and additional mediation assistance from prominent ADR practitioner the Hon. Layn Phillips (Ret.).

In both the direct and mediation-assisted negotiations, the Settlements were reached only after detailed and protracted discussions regarding multiple issues of relevance or concern to the parties.  These issues included the parties' views on the likelihood of Plaintiffs succeeding past motion to dismiss; the likelihood of Plaintiffs achieving class certification; the strength of Plaintiffs' evidence of a given Settling Defendant's culpability in respect of Plaintiffs' allegations of wrongdoing; the strength of Plaintiffs' antitrust claims (and the likelihood of Defendants being jointly liable for any wrongdoing); the extent of a given Settling Defendant's share of the market for interest rate derivatives (including derivatives expressly linked to ISDAfix) in comparison to other Settling and Non-Settling Defendants; the degree of non-monetary cooperation that a given Settling Defendant was willing to offer; whether a given Settling Defendant received a "first-mover discount" for being willing to settle ahead of other Defendants; and whether a given Settling Defendant had been subject to penalties imposed by a government regulator.  Joint Decl. ¶¶40-45 ("History of Settlement Negotiations").

The negotiations with each Settling Defendant were hard-fought, at times very contentious, and always at arm's-length.  Ultimately, the settlements were the result of extended negotiations with experienced defense counsel, and—in Lead Counsel's view—represent the best settlements that could have been achieved under the circumstances.  Lead Counsel believe Plaintiffs' claims have substantial merit, but acknowledge the expense and uncertainty of continued litigation against Settling Defendants.  Lead Counsel have taken into account the uncertain outcome and risks of further litigation and believe the Settlements confer significant benefits on the Settlement Class in light of the circumstances here.  Based on these considerations, there is "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

### B.      The *Grinnell* Factors Support Final Approval of the Settlements

The Second Circuit has identified nine factors courts should look to when considering whether to finally approve a proposed class settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  Not every factor must weigh in favor of approval; instead, courts consider "'the totality of these factors in light of the particular circumstances'" in making an ultimate final approval determination.  *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012).  Here, each factor weighs in favor of final approval.

### 1.      Complexity, Expense, and Likely Duration of the Litigation

"Antitrust class actions 'are notoriously complex, protracted, and bitterly fought.'"

*Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015); *see also Virgin Atl.*

*Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual

complexities of antitrust cases"); *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *4

(E.D.N.Y. Oct. 23, 2012) (noting that "federal antitrust cases are complicated, lengthy," and

"costly").  This case is no different, and is especially complex given the global nature and size of

the interest rate derivatives market, the number of Defendants, and the length of the conspiracy

alleged.  "[T]he more complex, expensive, and time consuming the future litigation, the more

beneficial settlement becomes as a matter of efficiency to the parties and the Court."  *In re*

*Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381-82 (S.D.N.Y. 2013).

Absent the Settlements, Plaintiffs would have had the burden to undertake substantial

additional discovery of the Settling Defendants, each of which instead voluntarily provided

significant confirmatory discovery under their respective cooperation obligations.  *See Ross v.*

*Am. Express Co.*, 35 F. Supp. 3d 407, 438 (S.D.N.Y. 2014), *aff'd sub nom., Ross v. Citigroup,*

*Inc.*, 630 F. App'x 79 (2d Cir. 2015).  As demonstrated by this litigation to date, such an

undertaking would have been formidable to say the least.  Plaintiffs have reviewed millions of

pages of documents from just Non-Settling Defendants.  Plaintiffs have also taken nearly 40

depositions, a number that would have grown exponentially had the Settling Defendants

continued to litigate.

The Settling Defendants would also have fiercely contested every issue at every juncture.

This includes, among other issues, whether Defendants manipulated ISDAfix, whether each

joined an illegal antitrust conspiracy, whether the class could be certified, and whether Plaintiffs

could prove damages.  This much is clear by the hundreds of pages filed by the Non-Settling

Defendants in connection with class certification briefing and expert reports, as well as the *Daubert* motions to exclude certain expert opinions.  Indeed, Defendants have strenuously contended throughout that this case is uniquely complex and difficult to prove.

Lead Counsel had to master issues related to complex financial instruments in order to be able to effectively litigate questions of plausibility, antitrust standing, tolling, and contract interpretation.  Some of the key evidence in this case such as trade data and communications between trader and brokers often required careful, detailed interpretation and analysis.  The case demanded that Lead Counsel master the intricacies of sophisticated financial products and derivatives in order to understand and marshal evidence, effectively take depositions, build a damages model, and brief dispositive, discovery, and class certification motions.  These and other unique features presented risks and challenges at each stage of the litigation.

Class certification has proven to be a heated battle, with Non-Settling Defendants vigorously contesting nearly every element under Rule 23.  Settling Defendants surely would have aggressively challenged class certification too.  And after the Court makes its class certification ruling, the losing party may seek interlocutory review under Rule 23(f), which could further extend the litigation and increase risks to the Class.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 222 n.13 (E.D.N.Y. 2013) ("In the *Wal-Mart* case, twenty months elapsed between the order certifying the class and the Second Circuit's divided opinion affirming that decision.").

With ten additional major banks defending this case, the pre-trial motion practice would be even more extensive and protracted.  As would summary judgment and motions *in limine*. Trial would also be lengthy, with the losing party almost certain to appeal any adverse jury verdicts.  Given this risk, "[t]here can be no doubt that this class action would be enormously

13

expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998); *see also In re Initial Public Offering Sec. Litig.*, 243 F.R.D. 79, 93 (S.D.N.Y. 2007) ("The prospect of an immediate monetary gain may be more preferable to class members than the uncertain prospect of a greater recovery some years hence."); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting that "in light of the time value of money," "future recoveries" can be "less valuable" than present recovery).

Settling Defendants also undoubtedly possess the resources to appeal any adverse ruling or verdict.  In short, the possibility of protracted litigation with its attendant uncertainty was significant, and the Settlements provide class members with the certainty of substantial relief. As such, settlement provides a resolution that powerfully promotes efficiency and minimizes substantial risks. *See Meredith Corp.*, 87 F. Supp. 3d at 663 ("The greater the complexity, expense and likely duration of the litigation, the stronger the basis for approving a settlement.").

### 2.   Reaction of the Class to the Settlements

"It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 3361233, at *6 (D. Vt. Aug. 3, 2011); *Maley* v. *Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("the lack of objections may well evidence the fairness of the [s]ettlement").  To date only one request for exclusion has been received, Azari Decl. ¶54, out of tens of thousands of potential Settlement Class Members, signaling widespread approval of the Settlements.[10]  *Wal-Mart*, 396 F.3d at 118 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").  While the deadline to

---

[10]   The single opt-out is the hand-written letter from Ms. Biton (*see* Dkt. No. 573).  Lead Counsel has confirmed our interpretation of Ms. Biton's request with her as being to opt-out.

object or request exclusion has not yet passed, the comprehensive notice program began in late January, and there have been no objections and no substantive requests for exclusion.[11]  Plaintiffs will provide the Court with a copy of all exclusion/objection requests (the deadline for which is April 30) in their reply papers.

### 3.      Stage of the Proceedings

"[C]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere."  *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474 (S.D.N.Y. 2013).  The relevant inquiry is "whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement."  *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("[T]he question is whether the parties had adequate information about their claims.").  This factor does not require extensive discovery—or indeed any formal discovery at all—"as long as '[class counsel] have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement.'"  *AOL Time Warner*, 2006 WL 903236, at *10.[12]

---

[11]   While some objections "are to be expected in a class action with an extensive notice campaign and a potentially large number of class members[, i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."  *Air Cargo*, 2009 WL 3077396, at *8 (quoting Newberg on Class Actions §11.41 (4th ed.)); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *7 (S.D.N.Y. Sept. 4, 2014) (small number of objections, especially if they only target the plan of allocation, "strongly supports final approval").

[12]   *See also In re Nissan Radiator/Transmission Cooler Litig.*, 2013 WL 4080946, at *7 (S.D.N.Y. May 30, 2013) (granting final approval where "plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement"); *In re Sinus Buster Prods. Consumer Litig.*, 2014 WL 5819921, at *9 (E.D.N.Y. Nov. 10, 2014) (granting final approval where plaintiffs "conducted meaningful pre-trial discovery," including "an extensive investigation" prior to filing).

Here, Lead Counsel is uniquely situated to evaluate the strengths and weaknesses of Plaintiffs' claims. Lead Counsel conducted an extensive and costly pre-suit investigation and engaged in considerable preparation for settlement negotiations, briefing, and discovery to inform their views on the strength of Plaintiffs' claims and Defendants' possible arguments against liability, certification, and damages. Prior to filing the original complaint, Lead Counsel went well beyond reviewing publicly available facts by retaining economists and industry experts to perform analyses of trading patterns and ISDAfix submissions. These expert analyses have also informed Lead Counsel's views on how often ISDAfix was allegedly manipulated and what instruments were affected. Such early investments (and the pleadings they helped to produce) not only informed Plaintiffs regarding the scope, extent, strengths, and weaknesses of their case, but also drove the Settling Defendants to the negotiating table.

In connection with settlement negotiations, Lead Counsel specifically tasked their experts with conducting a preliminary liability analysis for the purpose of assessing the range of each Settling Defendant's potential exposure. This study was carried out by Compass Lexecon ("Compass"), a renowned blue-chip economic consulting firm. Experts at Compass conducted research and performed various assessments to determine Defendants' respective shares of the market for interest rate derivatives—including, where possible, Defendants' shares of the market for interest rate derivatives that were expressly-linked to the ISDAfix benchmark.

This assessment was performed for each Defendant and for each of the years in the class period by using and comparing market share data from multiple sources. The resulting figures allowed Lead Counsel to assess the relative degrees of motive, opportunity, and potential impact of each Defendant's conduct with respect to Plaintiffs' allegations of wrongdoing.

Through formal and informal settlement negotiations, the Settling Defendants were then presented with—and availed themselves of—opportunities to dispute Lead Counsel's data sources, analyses, and conclusions, which led to further discussions between Lead Counsel and each Settling Defendant.  The final Settlements reflect these negotiations, and Lead Counsel's data-driven approach to determining each Settling Defendant's appropriate degree of liability.

Defendants' motions to dismiss raised multiple defenses to liability.  Had the litigation progressed further against the Settling Defendants, Plaintiffs were likely to face these arguments again at another (if not several other) procedural postures, be it summary judgment, trial, or on appeal.  The motion to dismiss briefing therefore supplemented Lead Counsel's already considerable knowledge of the strengths of Plaintiffs' claims and the defenses they are likely to face.  Lead Counsel were also informed by the relevant settlements with regulators, which shed further light on the type of evidence the CFTC had been able to uncover through its own discovery.  *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161, at *6 (E.D. Mich. Aug. 2, 2010) (approving settlement based in part on negotiations that were "informed by government investigations").

The current stage of the proceedings is more advanced than at the time these settlements were reached, providing Lead Counsel with another opportunity to understand the benefits and risks of certain claims and defenses.  Since the settlements were preliminarily approved, Plaintiffs have engaged in lengthy discovery and motion practice against the Non-Settling Defendants.  This subsequent litigation has reinforced and confirmed the value of the settlements in Lead Counsel's estimation.  Accordingly, Lead Counsel's well-informed views of the strength of claims and likely defenses weigh in favor of final approval.

####    4.    Risks of Establishing Liability and Damages

In assessing this factor, "the Court should balance the benefits afforded the Class, including the **immediacy** and **certainty** of a recovery, against the continuing risks of litigation." *Payment Card*, 986 F. Supp. 2d at 224.  In so doing, the Court need not "adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."  *Glob. Crossing*, 225 F.R.D. at 459.

The Court is well aware that Defendants have contested virtually every aspect of this case.  As noted, Defendants filed motions to dismiss, arguing, *inter alia*, that Plaintiffs failed: (i) plausibly to allege a violation of Section 1 of the Sherman Act; (ii) adequately to allege injury-in-fact and damages as to all claims; (iii) adequately to plead a breach of contract; and (iv) to assert their claims in time.  It is likely Settling Defendants would have joined Non-Settling Defendants' second round of motions to dismiss had they continued litigating.

Plaintiffs' contentions as to predominance and other Rule 23 elements would also have been challenged by Settling Defendants.  Just as Non-Settling Defendants have done, the Settling Defendants would have vehemently opposed Plaintiffs' efforts to establish class-wide and individual class member damages.  Further, just as the Non-Settling Defendants have done, the Settling Defendants likely would have moved to exclude Plaintiffs' experts' opinions and argued that Class Plaintiffs failed to demonstrate class-wide impact.

Plaintiffs would also face the complexities inherent in proving class-wide antitrust damages to the jury.  Trial damages issues would inevitably involve a "battle of experts" in which "it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors . . . ."  *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735,

744-45 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986).  Thus, there is an inherent risk that a jury might accept one or more of Defendants' damages arguments and award nothing at all or award much less than the $408.5 million that, if approved, would be available to the Settlement Class.  "Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *NASDAQ*, 187 F.R.D. at 476.

Each Settling Defendant is well-financed and represented by able lawyers from some of the most skilled law firms in the world.  Settling Defendants were prepared, and had the wherewithal, to vigorously contest the existence and extent of liability, impact, and damages—at class certification, summary judgment, trial, and on appeal.  Thus, when weighing the risks of establishing liability and damages against the certainty of the significant recoveries achieved by the Settlements, the balance weighs strongly in support of final approval.

### 5.   Risks of Maintaining a Class Action Through Trial

As discussed, the inherent risks in maintaining an antitrust class action through trial are undeniably present in this case.  This factor, too, weighs heavily in favor of final approval.

### 6.   Ability of Settling Defendants to Withstand a Greater Judgment

"[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Weber v. Gov't Emps. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009).[13]  Moreover, "the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to

---

[13]   Courts routinely observe that the ability to withstand a greater judgment "does not carry much weight in evaluating the fairness of the Settlement."  *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *14 (S.D.N.Y. Nov. 7, 2007); *In re Elec. Books Antitrust Litig.*, 11-md-2293 (DLC), Dkt. No. 686 at 13:22-24 (Tr. of Nov. 21, 2014 Final Approval Hr'g) (granting approval where defendant's ability to withstand greater judgment was undisputed).

withstand a larger judgment." *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008).

In addition to substantial monetary sums, the Settlements require Settling Defendants to provide confirmatory discovery. This discovery—including transactional data, Bloomberg chats, e-mails, PowerPoint presentations to regulators, internal memoranda, and policies and procedures—has proven useful to Plaintiffs in pursuing their case against Non-Settling Defendants by further developing Lead Counsel's understanding of the scope and methods of Defendants' manipulation. That there were greater judgments that Settling Defendants could have withstood does not undermine the reasonableness of the Settlements.

### 7. Reasonableness of the Settlements in Light of the Best Possible Recovery and Attendant Litigation Risks

The last two factors take into account "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion[.]" *Wal-Mart*, 396 F.3d at 119 (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984). This assessment does not result in a "mathematical equation yielding a particularized sum." *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *5 (E.D.N.Y. Nov. 20, 2012).[14] Rather, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997).

---

[14] "The adequacy of the amount achieved in settlement is not to be judged in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Meredith Corp.*, 87 F. Supp. 3d at 665-66. As one prominent case observed, because "the essence of a settlement is compromise[, a] just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981); *see also Grinnell*, 495 F.2d at 455 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

Given the posture of the litigation at the time of each settlement, the payment of $408.5 million in cash, plus cooperation, is an extraordinary result.  Notably, Plaintiffs have not compromised the ability to recover the entire amount of antitrust damages resulting from the conspiracy from each of the Non-Settling Defendants (after an offset post-trebling for the settlement amounts) under joint and several liability.  *See In re High-Tech Emp. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) ("the Non-Settling Defendants remain jointly and severally liable for all damages caused by the conspiracy, including damages from the Settling Defendants' conduct").

The reasonableness of the settlements is confirmed by Plaintiffs' estimates of the range of potential damages should the case proceed to trial.  There are, of course, many steps remaining between here and a verdict.  This includes the normal risks inherent in any case, such as an adverse finding by the Court or jury on issues such as whether there was a conspiracy, causation, or statute of limitations.  This case also will involve such demand-changing variables as whether the Court accepts and the jury finds persuasive arguments that manipulation in one tenor could move rates in other tenors, and what instances of manipulation (and supposed corrective disclosures) are even discovered and then found persuasive by the jury.

Just as they did before entering into the settlements, however, Plaintiffs as part of this motion performed yet more analyses to ensure they still believe in the strength of the settlements achieved.  If anything, the insights gained in the ensuing multi-year battle that still rages on has strengthened their conviction.  Counsel availed themselves of all information currently available to them, including, without limitation, the data produced by all Defendants; the arguments, briefs, and expert opinions submitted to date; and rate movements and other market-wide data.  Based on an assessment of such information, along with statistical analyses performed by

Compass, it is currently estimated that Plaintiffs would likely have demanded between $689 million and $1.435 billion (before trebling) if the case had gone to trial.  The $408.5 million in settlement proceeds thus represents approximately 28% to 59% of the currently expected trial demand.  It is important to again note, however, that these are just estimated *demand* figures. Actual recovery at trial—*if any*—would be subject to the risks outlined above and many others.

These comparisons show the Settlements meet and exceed the pertinent standards for final approval.  *See Grinnell*, 495 F.2d at 455 n.2; *see also In re Med. X-Ray Film Antitrust Litig.*, 1998 WL 661515, at *5-6 (E.D.N.Y. Aug. 7, 1998) (granting final approval to antitrust class action settlement representing "approximately 17% of the estimated 'best possible' recovery"); *id.*, at *6 (collecting cases, including those granting final approval of settlements for "less than 2%" and "6.4-11%" of potential recovery); *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (preliminarily approving partial settlements, noting the settlement amounts "represent[ed] approximately two percent of [settling defendants'] sales," and 4.2% of sales in the four years during the class period when the respective defendants registered their highest sales).

In response to the Court's inquiry as to the UBS and HSBC settlements relative to the size of the others, *see* Dkt. No. 492 at 8, Plaintiffs note that the perceived variance was driven by multiple factors, including those set out above (*e.g.*, the then-current posture of the case, including the available documentary and testimonial evidence against each Defendant). Plaintiffs also note that those two Defendants—along with the first-settling bank Barclays—were estimated by Compass to have by far the smallest three market shares in the relevant instruments among all the Settling Defendants.

In addition to their monetary value, the Settlements also provide additional value in the form of confirmatory discovery. Because each "Settlement Agreement obligates the settling defendants to provide significant cooperation to class plaintiffs in pursuing their case against the non-settling defendants," this assistance "is a substantial benefit [] and strongly militates toward approval" of the Settlement Agreements here. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (granting final settlement approval).

Settling Defendants' confirmatory discovery has informed Plaintiffs' discovery efforts with respect to Non-Settling Defendants, who remain jointly and severally liable, and has been a substantial benefit to the Settlement Class, including by demonstrating the tools and methods of both Non-Settling and Settling Defendants' manipulation, and by providing direct evidence of Non-Settling Defendants' manipulation. Joint Decl. ¶¶39-54 ("Lead Counsel Negotiate Settlements and the Production of Settling Defendants' Transaction Data and Documents"). This contribution to the ongoing lawsuit against the five Non-Settling Defendants weighs in favor of approval of the Settlement Agreements. *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2013 WL 4525323, at *9 (E.D.N.Y. Aug. 27, 2013) ("cooperation adds considerable value to the Settlement and must be factored into an analysis of the overall reasonableness").

## II.   NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS

The notice disseminated to potential Settlement Class members pursuant to the Notice Order satisfies Rule 23 and due process. Rule 23(c)(2)(B) requires the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). Under Rule 23(e)(1), notice must also be "reasonable," meaning it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options

23

that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114.  Actual

notice to every class member is not required; rather, counsel need only act "reasonably in

selecting means likely to inform the persons affected." *Jermyn v. Best Buy Stores, L.P.*, 2010

WL 5187746, at *3 (S.D.N.Y. Dec. 6, 2010); *see also In re Adelphia Commc'ns Corp. Sec. &*

*Derivatives Litig.*, 271 F. App'x 41, 44 (2d Cir. 2008) (due process requires reasonable efforts to

effect notice).

### A.    The Class Received the Best Practicable Notice Under the Circumstances

Pursuant to the Court's October 24, 2017 Notice Order, the Claims Administrator, other

third-party agents, and certain Settling Defendants mailed the Notice Packet to all reasonably

known potential Settlement Class Members.  As of March 23, 2018, a total of over 59,000 Notice

Packets had been disseminated to potential members of the Settlement Class.[15]  This direct

distribution was supplemented by an extensive notice plan, which included, as described above,

publication of Summary Notice in numerous sources, notice via the Internet and a press release

over PR Newswire, the establishment of a Settlement Website, and a dedicated telephone line

and email address for those seeking further information.  *See* Azari Decl. ¶¶39-51.

As to direct notice via mail (or the equivalent):  (i) Epiq, the Court-appointed Claims

Administrator, mailed Notice Packets to U.S.-domiciled potential Settlement Class Members;

(ii) alternate agent Rust sent Notice Packets primarily to those domiciled outside of the United

States; (iii) KCC disseminated Notice Packets to foreign counterparties on behalf of Settling

Defendant Deutsche Bank; and (iv) the six Direct Notice Defendants distributed Notice Packets

---

[15]  *See* Azari Decl. ¶9 (Long Form Notice and Claim Form sent to total of 36,854 Settlement Class
Members); Rabe Decl. ¶16 (total of 19,827 Notice Packets mailed as of March 23, 2018); KCC Decl. ¶¶3-4, 6
(Notice mailed to 400 potential Settlement Class Members); Deering Decl. ¶¶5-6 (26 Notice Packets sent);
Leuzinger Decl. ¶5 (14 Notice Packets sent); Ng Decl. ¶5 (Notice Packets sent to 2 potential Settlement Class
Members); Gomez Decl. ¶¶4, 6 (Notice Packets sent to 41 potential Settlement Class Members); Adams Decl. ¶¶2-3
(Notice Packet sent to 1,378 potential Settlement Class Members); Lee Decl. ¶2 (38 Notice Packets mailed);
Popowsky Decl. ¶7-9 (Notice Packets mailed to 653 potential Settlement Class Members).

to any remaining potential Settlement Class Members located in jurisdictions with privacy restrictions.  Azari Decl. ¶¶31-38, 52; Rabe Decl. ¶¶1, 3, 10-16; KCC Decl. ¶2; Direct Notice Defs.' Decls.

Lead Counsel oversaw and/or coordinated the dissemination of Notice Packets by Epiq, Rust, KCC, and the Direct Notice Defendants, to ensure a uniform notice and claims process for all potential Settlement Class Members, regardless of domicile.  Through this comprehensive process, the entire population of potential Settlement Class Members identifiable through reasonable efforts were directly sent the Notice Packet.  Azari Decl. ¶9; Rabe Decl. ¶¶10-16; Direct Notice Defs.' Decls.

In late January 2018, Epiq also sent the Notice Packet to brokers, banks, and other nominees who may have engaged in relevant ISDAfix transactions on behalf of potential Settlement Class Members.  Azari Decl. ¶¶35-36.  The packet was accompanied by a cover letter instructing the nominees to either mail the Notice Packet to any such beneficial owner(s) or provide the Claims Administrator with a list of names and addresses of any beneficial owners so that Epiq may distribute the Notice Packet accordingly.  Azari Decl., Attachment 2, at 1–3; *see also* Notice Order ¶9.  As of March 23, 2018, Epiq mailed an additional 14 Notice Packets to potential Settlement Class Members based on addresses received from any such broker, bank, or other nominee.  Azari Decl. ¶36.

From January 19 to 22, 2018, Epiq caused the Summary Notice to be published as described above, and digital banner advertisements were also placed on various prominent news websites, sponsored links to the Settlement Website were listed through various Internet search engines, and a dedicated website was established.  Azari Decl. ¶¶39-48; *see also* Notice Order ¶7.  At the Settlement Website, any potential Class Members can access important Court filings

and other documents, including the Long Form Notice and Claim Form (in English as well as 12 other translated languages); view a summary of important dates and deadlines; and find various methods for contacting the Claims Administrator with any questions.  Azari Decl. ¶48.

Lead Counsel also directed the Claims Administrator to establish a telephone information line, which, as of January 18, 2018, could be accessed toll-free both inside the United States and internationally.  Azari Decl. ¶50.  Live agents were trained by the Claims Administrator, in consultation with Lead Counsel, and have been available to speak to any caller wishing to reach a person to ask questions or for further information.  *Id.*  The Settlement Website and phone line information were displayed on each page of the Long Form Notice and Claim Form mailed to potential Settlement Class Members, as well as in the published Summary Notice.  Epiq also set up and monitored an email address, info@ISDAfixAntitrustSettlement.com, for any requests or inquiries from potential Settlement Class Members.  Azari Decl. ¶51.

This comprehensive approach of direct mailing of the Notice Packet, supplemented by widespread print and Internet publication notice, transmission of a press release over a newswire, and a dedicated settlement website, toll-free telephone helpline, and email address, constitutes "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).  Such multi-faceted notice programs combining direct mail and publication are routinely approved. *See, e.g.*, *Vitamin C*, 2012 WL 5289514, at *8 ("The notice was also distributed widely, through the internet, print publications, and targeted mailings. . . . [T]he distribution of the class notice was adequate."); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *5 ("*CDS*") (S.D.N.Y. Apr. 26, 2016) (notice adequate where counsel mailed notice "to each of 13,923 identified Class members," published the summary notice, and launched a settlement website which posted key relevant information).

**B.     The Notice Fairly Apprised Potential Settlement Class Members of the Settlements and Their Options**

The contents of a class notice must (i) "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and (ii) be written as to "be understood by the average class member." *Wal-Mart*, 396 F.3d at 114.   "There are no rigid rules to determine whether a settlement notice satisfies constitutional or Rules [sic] 23(e) requirements . . . ." *In re Vitamin C*, 2012 WL 5289514, at *8 (quotation omitted).   Courts typically consider:  (i) "whether there has been a succinct description of the substance of the action and the parties' positions;" (ii) "whether the parties, class counsel, and class representatives have been identified;" (iii) "whether the relief sought has been indicated;" (iv) "whether the risks of being a class member, including the risk of being bound by the judgment have been explained;" (v) "whether the procedures and deadlines for opting out have been clearly explained;" and (vi) "whether class members have been informed of their right to appear in the action through counsel." *Id.*

The Long Form Notice contains all the information required by Rule 23(c)(2)(B).  This includes a plain language explanation of:  (i) the nature of the case, Plaintiffs' allegations, and the Class definition; (ii) the background of the Settlements, and how the Settlement Fund will be allocated upon final approval; (iii) the right to opt out of the Settlement Class, object to the Settlements, and appear at the Fairness Hearing, as well as the processes and deadlines for doing so; and (iv) the binding effect of judgment on those who do not exclude themselves from the Settlement Class, and the effect of the Court's final approval of the Settlements.

The Long Form Notice also contains other important information, such as Lead Counsel's intent to request fees and expenses.  It prominently features various modes of contact information for the Claims Administrator and Lead Counsel.  It also provides recipients with

instructions on how to submit a Claim Form.  On its own, and particularly when supported by publication and other means of notice, the Notice directly sent to potential claimants "provide[s] sufficient information for [Settlement] Class Members to understand the Settlement and their options."  *Sykes v. Harris*, 2016 WL 3030156, at *10 (S.D.N.Y. May 24, 2016).

## III.    THE PLAN OF DISTRIBUTION SHOULD BE GRANTED FINAL APPROVAL

Courts do not demand perfection of a plan of distribution in complex antitrust cases, including at settlement.[16]  *PaineWebber*, 171 F.R.D. at 133 ("[I]t is obvious that in the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision[.]").  Courts hold plans of distribution—especially in antitrust cases—to realistic standards given practical limitations.  *See CDS*, 2016 WL 2731524, at *9 (granting final approval and noting that "[t]he challenge of precisely apportioning damages to victims is often magnified in antitrust cases, as damage issues in antitrust cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts").

To secure final approval, a plan of distribution need only

meet the standards by which the settlement is scrutinized—namely, it must be fair and adequate.  A plan need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.  A principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund.

*CDS*, 2016 WL 2731524, at *9.  The Plan of Distribution described below, an earlier version of which the Court preliminarily approved (Dkt. No. 521), satisfies these requirements.

---

[16]   *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("[A]ntitrust jurisprudence . . . expressly refuses to impose extraordinary burdens on a plaintiff to construct the but-for price . . . [T]he wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

Lead Counsel has worked extensively with experts, including Dr. Christopher Fiore of Compass,[17] to develop the Plan of Distribution. The plan preliminarily approved by the Court (Dkt. No. 521) was the result of months of collaborative work among Lead Counsel and economists at Compass, who assisted in evaluating, *inter alia*, the comparative sensitivities of the various instruments and their relative size. Compass also devised a "multiplier" model to fairly account for those (and other) factors. Epiq was also consulted with respect to the costs and burdens (including to Settlement Class Members) in administrating the plan. Following the filing of the preliminary approval papers, this work continued, with the team holding calls on a weekly basis to discuss their ongoing efforts. The results are reflected in an updated plan posted to the Settlement Website, which provides further detail and is also attached as Exhibit A (the "Detailed Plan").[18]

Lead Counsel, who have litigated this case for years and who are highly experienced in antitrust class actions and banking litigation, are confident that the Detailed Plan presents a fair and reasonable method to equitably allocate the common fund. "As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight." *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001).

*Use of "pools."* The Detailed Plan (at 7-21), like the preliminary plan, divides the settlement proceeds into recovery pools based on the type of instrument is at issue. Fiore Decl. ¶¶7-16. Providing a different recovery pool for different instrument types is reasonable for many reasons, most notably because each type did not face the same litigation risk. When cognizable

---

[17]   As noted in the Declaration of Christopher Fiore in Support of Motion for Order Providing for Notice to the Settlement Class and Preliminarily Approving the Plan of Distribution) (Dkt. No. 514, the "Fiore Decl."), Dr. Fiore has extensive experience in legal matters involving market manipulation, including in developing plans of distributions for class action settlements. *See* Fiore Decl. ¶1.

[18]   The Detailed Plan was posted to the Settlement Website on March 29, 2018.

differences exist between the "likelihood of ultimate success" for different claims, "'it is appropriate to weigh distribution of the settlement[.]'" *PaineWebber*, 171 F.R.D. at 133; *see also In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) ("Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.").

For instance, the litigation classes being pursued against the Non-Settling Defendants seek to recover damages to instruments tied to the USD ISDAfix rate, vanilla swaps, and physically settled swaptions. *See* Dkt. Nos. 387 ¶262, 501 at 1-2.  Those instruments make up Pools A and B.1 here.  As is common, however, Settling Defendants negotiated a release that extended beyond this set of instruments, to resolve all claims arising from the conduct challenged in this litigation.  Pools B.2, B.3, and B.4 consist of transaction types that are not part the litigation class.

Creating different recovery pools is also reasonable because Compass has determined that the transaction types that make up Pools B.2, B.3, and B.4 have substantially greater volume (in terms of notional value), than those that make up Pools A and B.1.  For example, Treasuries futures and Eurodollar futures (which are part of Pools B.2 and B.3, respectively) trade at significantly greater volumes than cash-settled swaptions and vanilla swaps (which are part of Pools A and B.1, respectively).  Accordingly, a plan that did not differentiate between instrument types would thus be unjust, as the higher-volume-but-weaker claims would drown out the lower-volume-but-stronger ones.

*Amount in each pool.*  The Detailed Plan (at 21-23) specifies how much will go into each pool.  It puts more of the settlement funds into Pools A and B.1.  For similar reasons as discussed

above, it was reasonable to do so given Pools B.2, B.3, and B.4 appear to have *very limited to no* prospects for recovery in *any* litigation concerning ISDAfix manipulation.

**Economic Multipliers.**  As discussed below, the Detailed Plan (as the preliminary one did) ultimately provides for a *pro rata* distribution.  But each class member's share is adjusted in light of economic differences between instruments, as for example, a longer-tenor swap being more sensitive to interest rate movements than a shorter-tenor swap.  This is done by way of an "Economic Multiplier."  *See* Fiore Decl. ¶¶18-19, 22-24.  The Detailed Plan (at Tables 1-3) fills in the details on what the Economic Multipliers are going to be, and in so doing is changing the data template class members will use to submit their claims.

The Detailed Plan simplifies the claims process.  Under the preliminary plan, the Economic Multipliers were going to be applied on a transaction-by-transaction basis, requiring class members to gather *multiple* data points for *each* of their transactions.[19]  In contrast, the Detailed Plan (at 9-16) asks class members only to provide a summary *total* notional value for transactions falling into a small number of categories.  Each category is made up of very similar investments—for instance, all ten-year vanilla swaps with a Defendant[20] will be in the same category for data-submission and Economic Multiplier purposes.  The data that class members need to gather and enter into the data template is thus significantly reduced.  The reduced need for data will also reduce the costs of administration, as Epiq will spend less time assisting class members in getting their data in the right form and less time running the more complex calculations that would be required to establish transaction-by-transaction comparisons.

---

[19]  Such data gathering is necessary for the settlement class because it is broader than the litigation class. For instance, as discussed above the settlement class covers instruments entered into with counterparties other than the Defendants here, and also covers additional instrument types.

[20]  Swaps with a Defendant and with a non-Defendant counterparty are in different categories for claim purposes so that the privity-based Litigation Multiplier can be applied.

The Economic Multipliers are now applied on a category-level, based, for instance, on the relative average sensitivity to rate movements of a one-year swap as compared to the average rate sensitivity of a two-year swap, as calculated by Compass.[21]  This category-driven approach is reasonable because the significant burden-reducing effects to class members and the administrative-cost savings more than justifies any (minimal) differences in relative claim size as compared to a transaction-by-transaction approach.

As noted, a principal goal of devising a plan is the "timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund." *CDS*, 2016 WL 2731524, at *9.  The Detailed Plan serves that important goal.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192-93 (S.D.N.Y. 2012) (rejecting objection which "criticizes the plan of allocation because it assigns a uniform inflation value" because the rationale for allocation "need not overwhelm . . . all competing theories of damages" but instead "need only be reasonable and rational"); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *14 (S.D.N.Y. Nov. 7, 2007) (holding that allocation plan fairly allocated settlement proceeds "among the class members who submit valid claims, with a minimum of complication, ensuring efficiency in claims administration.").

***Litigation Multiplier.***  As described in the preliminary plan, claim amounts within a pool will also be adjusted to account for differing litigation risk vis-à-vis other transactions in the same pool.  *See* Fiore Decl. ¶¶18-19, 25.  As set forth in the Detailed Plan (at 9-16), there is a Litigation Multiplier for transactions in Pools A and B.1 that adjusts for the fact that the ongoing case against the Non-Settling Defendants only seeks damages for transactions arising out of transactions with Defendants.  *See* Dkt. Nos. 387 ¶262, 501 at 1-2.

---

[21]   Economic Multipliers are also used, for instance, to account for the basic, easily calculated econometric differences in transaction types by way of the Swaption Adjustment Multiplier, the Treasury Option Adjustment Factor, and the Eurodollar Option Adjustment Factor.

*Pro rata allocation within each pool.*  Once all class members' claims are adjusted by way of the Multipliers and totaled for each pool, the preliminary and Detailed Plan (at 21-23) both provide that each class member will be allocated a pro rata share of that pool.  This is a standard, reasonable, rational way of allocating a common fund.  *See, e.g.*, *CDS*, 2016 WL 2731524, at *4; *U.S. Commodity Futures Trading Comm'n v. Rolando*, 2008 WL 5225851, at *3 (D. Conn. Dec. 10, 2008) ("[a]s a general matter, courts have favored pro rata distribution of assets where victims were similarly situated"); *In re Lloyds' Am. Trust Fund Litig.*, 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) ("pro rata allocations . . . are not only reasonable and rational, but appear to the fairest method of allocating" settlement funds).

*Claims falling below a cost-threshold.*  There is a chance that the cost of fully administering a submitted claim would result in more administrative costs than the value of that claim.  The Detailed Plan (at 22) includes a "safety valve" should this occur.  It does this by means of an alternative minimum payment to class members whose potential claims are likely to fall below a certain threshold.  Courts routinely approve plans that provide for flat *de minimis* allocations.  *See, e.g.*, *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *9-10 (E.D.N.Y. Apr. 19, 2007) (*de minimis* threshold would "save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs"); *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (approving a *de minimis* threshold because "[c]lass counsel are entitled to use their discretion . . . to avoid excessive expense to the class as a whole").[22]

---

[22]  The participation rate for the various pools is not yet known, and estimating the distribution of claims is hampered by the fact Defendants' data does not cover all products in the settlement class.  Determinations as to the *de minimis* line will be made after the claim deadline.  *See Manual for Complex Litigation (Fourth)* §21.312 (2004) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved."); 2 McLaughlin on Class Actions §6:23 (14th ed.) ("The methodology or formula for the calculation of a claimant's share should be described.  This is all that is required . . . .").  It is impracticable for each class member to know with precision what its payment will be prior to making a decision about whether to remain a class member.  *See In re*

## IV.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Court's Preliminary Approval Orders preliminarily certified the Settlement Classes.

Dkt. Nos. 228, 337, 492.  For all of the reasons detailed in Plaintiffs' Preliminary Approval

Motions (*see* Dkt. Nos. 221, 330, 489) and the Court's Preliminary Approval Orders, the

Proposed Settlement Class satisfies all requirements of Rule 23(a)—numerosity, commonality,

typicality, and adequacy—as well as the predominance and superiority requirements of Rule

23(b)(3).  The preliminarily certified Settlement Class should therefore be granted final

certification for settlement purposes under Rules 23(a) and 23(b)(3).

## CONCLUSION

Based on the foregoing, Plaintiffs request that the Court certify the Settlement Class,

grant final approval to the Settlements, and grant final approval of the Plan of Distribution.

Proposed orders entering judgment and dismissing claims against the Settling Defendants will be

submitted with Plaintiffs' May 14, 2018 reply papers, after the April 30, 2018 deadline for opt-

outs and objections has passed.

Dated:  March 30, 2018

| | | |
|---|---|---|
| /s/ Daniel L. Brockett | /s/ Patrick J. Coughlin | /s/ Christopher M. Burke |
| Daniel L. Brockett | Patrick J. Coughlin | Christopher M. Burke |
| Daniel Cunningham | David W. Mitchell | Julie A. Kearns (*pro hac vice*) |
| Marc L. Greenwald | Brian O. O'Mara | **SCOTT+SCOTT,** |
| Steig D. Olson | Steven M. Jodlowski | **ATTORNEYS AT LAW, LLP** |
| Jonathan B. Oblak | Lonnie Browne | 707 Broadway, Suite 1000 |
| Toby E. Futter | **ROBBINS GELLER RUDMAN** | San Diego, CA 92101 |
| **QUINN EMANUEL URQUHART &** | **& DOWD LLP** | Telephone: 619-233-4565 |
| **SULLIVAN, LLP** | 655 West Broadway | Fax: 619-233-0508 |

*Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987) ("To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished.").

51 Madison Avenue
22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
marcgreenwald@quinnemanuel.com
steigolson@quinnemanuel.com
jonoblak@quinnemanuel.com
tobyfutter@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street
10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com
sjodlowski@rgrdlaw.com
lbrowne@rgrdlaw.com

cburke@scott-scott.com
jkearns@scott-scott.com

David R. Scott
Beth A. Kaswan
Peter A. Barile III
Thomas K. Boardman
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Fax: 212-223-6334
david.scott@scott-scott.com
bkaswan@scott-scott.com
pbarile@scott-scott.com
tboardman@scott-scott.com

Amanda A. Lawrence
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Fax: 860-537-4432
alawrence@scott-scott.com