UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA N.A., et al., <br><br> Defendants. | Lead Case No.: 14-cv-7126 (JMF) |

**NOTICE OF INTENT TO APPEAR AT FAIRNESS HEARING AND
OBJECTION TO LEAD COUNSEL'S MOTION FOR
ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS**

Class members Dublin Properties LLC and Dr. Fred Moorman ("Objectors") object to Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses and Incentive Awards ("Fee Application") related to the Proposed Settlement (Dkt. No. 696) on the basis that the request for 30% of the $504 million common fund, *i.e.* $151,350,000, is excessive under the circumstances of the case and the six-factor standard in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).

Objectors intend to appear at the Fairness Hearing through counsel and will rely on the pleadings and filings in this case. Objectors are class members based on rate swaps with Defendant Bank of America, N.A. in effect during the class period and as evidenced by receipt of multiple class notices from the class administrator. *See* Declaration of Dr. William Fred Brigham Moorman.

## INTRODUCTION

Lead Counsel seek a $151,350,000 fee from settlements with fifteen Wall Street banks that rigged the ISDAFix benchmark. Awarding such a fee would be a windfall where Lead Counsel merely cleaned up behind government regulators and the majority of defendants settled for 75% of the total recovery shortly after the denial of their motions to dismiss.

The case was filed in September 2014, eighteen months after the first reports that the Commodity Futures Trading Commission (CFTC) was investigating the defendants' manipulation of the index. The ISDAFix investigation followed payment of multi-billion dollar sanctions and settlements by the same financial institutions for manipulation of Libor and other rate indexes.

Almost simultaneously with the filing of plaintiffs' complaint, the CFTC referred the investigation to the Department of Justice for potential criminal prosecution. The defendants

with the highest exposure either paid or were negotiating nine-figure settlements with the CFTC before answering the Complaint. Lead Counsel began settlement discussions in August 2015 and eight of the defendants had settled with the Plaintiffs by April 2016 – about a month after the Court denied motions to dismiss. Goldman Sachs followed six months later. Those early settlements for $380.5 million effectively eliminated all financial risk from the case. Lead Counsel request a 30% award ($114,500,000) from the 2016 settlements by reference to the hours expended litigating the case as a whole.

It is Lead Counsel's burden to establish that investigating, filing and amending the complaint, defeating motions to dismiss, and then settling is worthy of a nine-figure fee from those early settlements. Lead Counsel cannot carry that burden. Significantly, the heavily back-loaded lodestar cannot be attributed to the settlement classes on whose behalf the lion's share of the settlements was recovered prior to the work being performed. Because Lead Counsel cannot meet their burden to show that a 30% fee from the 2016 settlements is reasonable under *Goldberger*, the Court should deny the Fee Application.

Objectors respectfully submit that a fee award of no more than $85,000,000 (roughly equivalent to 17% of the gross settlement fund, or a blended 14% of the 2016 settlements and 25% of the 2017/218 settlements) is consistent with awards in similar mega fund settlements and would adequately compensate Lead Counsel.

## BACKGROUND

In April 2013, the financial press initially reported on a CFTC investigation of manipulation of the ISDAFix benchmark. Bloomberg broke the news that "the [CFTC] has issued subpoenas to ICAP Plc brokers and as many as 15 Wall Street banks as part of an investigation into possible price manipulation of benchmark interest rate swaps." *CFTC Said to*

*Subpoena ICAP Brokers, Dealers on Swap Prices*, April 8, 2013, https://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to-probe-icap-treasure-island-brokers-on-swap-prices. By May, Bloomberg reported CFTC investigators were "poring over 1 million e-mails and instant messages as part of their price-manipulation probe of a swaps benchmark." *CFTC Said Preparing ISDAfix Probe Talks in Weeks*, May 21, 2013, https://www.bloomberg.com/news/articles/2013-05-20/cftc-said-to-review-1-million-e-mails-in-isdafix-investigation. According to the Financial Times, the probe marked a widening of the investigation into rigging of other global benchmark rates, most prominently Libor, for which several of the same financial institutions had paid $2.6 billion in fines and sanctions by April 2013. *Brokers at ICAP in CFTC rate swaps probe*, April 9, 2013, https://www.ft.com/content/c19afd04-a08b-11e2-88b6-00144feabdc0.

Lead Counsel assert in their joint declaration that "this case is not a follow-on action where Plaintiffs piggybacked on the efforts of government regulators and law enforcement." Joint Decl., ¶ 6 (Dkt. No. 682). But, without diminishing the quality of Lead Counsel's representation, that is exactly what it is. Lead Counsel do not claim to have been in the middle of their own investigation when the financial press first reported on the CFTC investigation. More likely is that those reports triggered Lead Counsel's own investigation. Nor do Lead Counsel mention that Barclays settled with CFTC for $115 million in May 2015 over charges that it rigged the ISDAFix. Or that Citibank settled similar claims with the CFTC in May 2016 for $250 million, *i.e.* in the same timeframe as the civil settlement with plaintiffs. The CFTC's involvement deserves a significantly greater share of the credit than Lead Counsel allow.

With respect to the request for a fee from the 2016 settlements, Lead Counsel do not provide the Court with any specific lodestar data. Rather, Lead Counsel provide only their

3

**overall** lodestar of 138,000,000 hours.  Based on the general information provided (attorney names, billing rates, and total hours billed through 2018), the Court has no way of segregating the hours attributable to the 2016 settlements for the purpose of applying the *Goldberger* factors to Lead Counsel's request for a $114,500,000 fee from those settlements.

Lead Counsel's description of the main tasks that they carried out identifies nineteen bullet points.  Joint Decl., ¶ 19.  Many of those tasks have no application to the 2016 settlements, such as "[e]ngaging in extensive discovery and settlement negotiations, as well as numerous meet-and-confer discussions, resulting in Defendants' production of approximately 4.89 million documents, amounting to more than 21.4 million printable pages"; "[r]eviewing nearly all documents produced to date, including listening to or reviewing written transcripts of approximately 161,648 audio files"; "[c]ollecting, reviewing, and then producing over 2.1 million documents, amounting to a total of approximately 5.9 million printable pages, on behalf of Class Plaintiffs, and then preparing for and defending their depositions"; "[t]aking 37 depositions of Defendants' current and former employees and corporate representatives, and non-parties"; and "[e]ngaging in extensive briefing and expert discovery in respect of Plaintiffs' motion for class certification."  *Id.*  These tasks relate to the ongoing litigation with the remaining defendants (which eventually settled in 2017/2018) and cannot properly be attributed to Lead Counsel for the purpose of considering the Fee Application as to the 2016 settlements.

## LEGAL STANDARD

Under *Goldberger*, in evaluating the Fee Application, the Court must weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Id*. at 50.

Lead Counsel bear the burden of submitting documentation sufficient to establish entitlement to the requested award. *Restivo v. Hessemann*, 846 F.3d 547, 589 (2d Cir. 2017); *Rudman v. CHC Grp. LTD*, No. 15-cv-3773 (LAK), 2018 U.S. Dist. LEXIS 122657, at *5 (E.D.N.Y. July 23, 2018). The Second Circuit "encourage[s] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50. In addition, the reasonableness of the lodestar "can be tested by the court's familiarity with the case." *Id.* There is a "strong presumption that the lodestar is sufficient, without an enhancement multiplier." *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 876 (E.D.N.Y. 2018) (*citing Perdue v. Kenny A.*, 559 U.S. 542, 546, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010).

## ARGUMENT

### I. The Fee Application seeks windfall fees in violation of *Goldberger*.

#### a. The Court should separately evaluate the fee requests from the 2016 settlements and the 2017/2018 settlements

Lead Counsel characterize this case as a single $504 million settlement reached after 158,000 hours of work to disguise the windfall that a $151 million fee represents, based on early settlements with nine of the fifteen defendants. Fee Application [D.E. 697 at 31-32]. Objectors object to consideration of Lead Counsel's fee request from the 2016 settlements by reference to time and effort spent litigating matters unrelated to those settlements.

Considering the reasonableness of the fees request with respect to the 2016 settlements is not a difficult exercise because the settlements were reached in distinct groups in April 2016 ($324 million – 8 defendants); October 2016 ($56.5 million – 1 defendant); June 2017 ($28,000,000 – 2 defendants); and June 2018 ($96,000,000 – 5 defendants). The settlements

5

roughly coincide with the beginning of discovery (2016), the end of discovery (July 2017), and a ruling on the plaintiffs' motion for class certification (July 2018). By October 2016, Lead Counsel had already obtained **75%** of the total settlement value ($380.5 million) for the class, before discovery really got going. The issue is that Lead Counsel obscured the timing of their efforts by characterizing their fee request based on lodestar information for the entire case without detail as to when or with respect to which defendants the work was performed. It is inappropriate to consider the fee request in connection with the 2016 settlements based on work performed litigating the case as a whole. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 88404 at *90-91 (E.D.N.Y. September 25, 2009).

To be clear, Objectors do not suggest that the Court must consider the reasonableness of the Fee Application as applied to each of the fifteen individual settlements. Objectors agree that work performed through preliminary approval of the first group of eight settlements in May 2016 can be deemed to collectively benefit each of those settlement classes. The Goldman Sachs settlement can also be fairly included as it occurred in the same general point in the lifespan of the litigation. Discovery and class certification motions against the non-settling defendants should not be included because the 2016 settlement classes received no benefit from those efforts.

Thus, two logical break points where the Court should consider if a 30% fee is reasonable with respect to the early settlements are May 2016 ($97,000,000 fee request prior to any discovery) and October 2016 ($114,500,000 fee request after very limited discovery). Objectors submit that granting the Fee Application and awarding such fees would violate *Goldberger*, as explained in the next section. In contrast, the 30% fee from the $124.5 million in settlements in 2017 and 2018 (on which Lead Counsel seem to have spent the bulk of their 138,000,000 billable

6

hours) may well be justified, except that Lead Counsel have prevented the Court from conducting that analysis by submitting undifferentiated lodestar data.

### b. A nine-figure fee from the 2016 settlements is a windfall.

Lead Counsel fail to meet their burden of establishing that a $97,000,000 fee from the first eight settlements (or $114,500,000 from the first nine) reached shortly after the Court denied motions to dismiss is not a windfall. It is. The Fee Application should be denied on this ground.

Under *Goldberger*, the Court must weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id*. at 50. Objectors specifically object to the Fee Application on the basis that the request for a 30% fee from the initial eight settlements fails to satisfy the first, third, fifth, and sixth *Goldberger* factors.

As to the first *Goldberger* factor, Lead Counsel submit no evidence, and make no argument, that the time and labor expended to consummate the 2016 settlements justifies a nine-figure fee from *those* settlements. *In re Air Cargo Shipping Servs.*, 2009 U.S. Dist. LEXIS 88404 at *90-91 (finding it "inappropriate to grant a fee request in connection with a single defendant by reference to the total number of hours expended on the litigation as a whole"); *cf. In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 392 (E.D.N.Y. 2013) (striking from lodestar time spent on discovery after settlement reached). That burden cannot be met. Objectors submit that the requested 30% fee is so obviously out of line with the work and time involved in reaching the 2016 settlements that it must be rejected under *Goldberger* regardless of how the other factors come out.

As to the third factor, the litigation was not especially risky up to the point of the initial settlements (and especially not after) given the open government investigation and early settlements of enforcement actions by several of the defendants which foretold the eventual settlements in this case.

As to the fifth factor, the requested percentage fee is higher than usual, in percentage terms, for a mega fund case, as Lead Counsel's expert confirms. *See also, e.g. In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS), 2011 U.S. Dist. LEXIS 155622, at *10, *14 (E.D.N.Y. Dec. 30, 2011) (noting awards below 8% of large settlements, and awarding 12% of $627 million settlement); *In re Merrill Lynch & Co., Inc. Sec, Derivative & ERISA Litig*, No. 07 Civ. 9633 (JSR), 2009 WL 2407551, at *1 (E.D.N.Y. Aug. 4, 2009) (granting 7.8% of $475 million settlement fund); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 414 (D. Conn. 2009) (granting 16% of $750 million settlement fund, resulting in lodestar multiplier of 1.56); *In re HealthSouth Corp. Stockholder Litig.*, No. 03 Civ. 1500, Doc. No. 1617, at 1 (N.D. Ala. June 12, 2009) (18.49% award, resulting in multiplier of 0.44).

The reasonableness of Lead Counsel's fee request from the 2016 settlements gets short shrift in the Fee Application. Lead Counsel effectively dodge the issue by suggesting that the Court consider the reasonableness of the fee request from the recovery as a whole based on their work "over the life of the case, as all work undertaken by Lead Counsel relates to our efforts on behalf of Plaintiffs and the Class." Fee Application at 32. Lead Counsel have no authority for this approach, which divorces the actual benefits received by the settlement classes from the lodestar.

The benefit to the class for the lodestar related to litigation with the defendants that settled in 2017/2018 was $124 million – not $504 million. Lead Counsel's work performed

8

subsequent to the 2016 settlements litigating claims against other defendants does not justify a higher fee from those settlements because there was no commensurate benefit to the class. The settlement sequence and timing cannot be ignored to justify a windfall fee from the 2016 settlements. Taken to the logical extreme, ignoring the lodestar related to the 2016 settlements in evaluating the reasonableness of a 30% fee from those settlements would mean that a minimal lodestar investment toward the 2016 settlements (for example, 10,000 hours) combined with a huge lodestar investment later in the case would justify a nine-figure fee from the 2016 settlements. That cannot be the rule.

      The district court orders cited by Lead Counsel as support for a "single settlement" approach are inapposite. *Id.* All but one of the orders are instances where courts awarded fees based on counsel's submission of lodestar data without objection, reasoning, or analysis. Fee Application at 32-33 (Dkt. No. 697). The exception is an Eastern District of Michigan order with the reverse sequences of facts to those presented here, *i.e.* the district court declined to exclude lodestar connected with *earlier* settlements when analyzing a fee application associated with a later settlement. *In re Auto. Parts Antitrust Litig.*, 2017 WL 3525415, at *4 n.2 (E.D. Mich. July 10, 2017). That makes sense. Lead Counsel's approach of justifying fees from earlier settlements with unrelated work performed later does not.

      Unhinging a percentage fee award from the work performed would create a conflict between the class and their lawyers in multi-settlement cases by incentivizing counsel to engage in unproductive, unnecessary, or excessive billing, secure in the knowledge that the class would be made to pay from the early settlements. Because Lead Counsel cannot meet their burden of showing that a 30% fee from the 2016 settlements is reasonable under the *Goldberger* test, the Fee Application should be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Fee Application. Consistent with *Goldberger* and other mega fund cases, Objectors respectfully submit the Court should award Lead Counsel no more than $85 million in fees.

Dated: October 12, 2018		Respectfully Submitted,


		*s/* Sonia Farber
		Sonia Farber
		Kluk Farber Law PLLC
		166 Mercer Street, Suite 6B
		New York, NY 10012
		Telephone: (917) 890-0384

		Adam L. Hebbard
		The Law Offices of Adam L. Hebbard LLC
		320 E. Clayton Street # 407
		Athens, Georgia 30601
		Telephone: (706) 549-9010
		adam@hebbardlaw.com

		(*pro hac vice application to be filed*)

		*Attorneys for Dublin Properties LLC and Fred Moorman*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF system participants indicated on the Manual Notice List.

Dated:          October 12, 2018            *s/* Sonia Farber
                                            Sonia Farber