UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A., et al., <br><br> Defendants. | No. 14-cv-7126 (JMF) |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR ENTRY OF AN ORDER APPROVING DISTRIBUTION OF THE NET SETTLEMENT FUNDS**

Of the 31,119 claims handled as part of administering the settlements at issue, only one claimant has objected to its treatment. Fortinbras Asset Management GmbH f/k/a Prospero Beteiligungsverwaltung GmbH ("Fortinbras") opposes the requested entry of the distribution order, which would ratify the recommendation of the Claims Administrator to reject the overwhelming majority of Fortinbras' claim. (ECF No. 753 ("Opp.").) Plaintiffs, by and through their Counsel, Quinn Emanuel Urquhart & Sullivan, LLP, Robbins Geller Rudman & Dowd LLP, and Scott+Scott Attorneys at Law LLP ("Class Counsel"), respectfully submit this reply in support of their request for an order allowing a partial distribution of the net settlement funds.

**I.     INTRODUCTION**

Our obligation to Fortinbras as a purported class member is to allow claims based on all of its qualifying transactions – but no more. An overly lax approach could unfairly dilute the claims of other class members. Accordingly, the Claims Administrator, in consultation with Class Counsel and the economic consulting firm, Compass Lexecon, determined it could not allow Fortinbras' $3.3 trillion notional swap claims absent Court guidance.

To be clear, thanks in part to Fortinbras' engagement during the audit process, we have no reason to doubt that: (a) Fortinbras and Credit Suisse created "strategy-linked products" that were sold to third parties;[1] (b) some of those products were linked to a particular "Index";[2] (c) that Index, in turn, was calculated in a way to track the performance of a "Three Factors Model" algorithmic swaps trading strategy;[3] (d) the Index thus required daily work, performed by Fortinbras as the

---

[1]     See Fortinbras ISDAfix Class Action Handbook, Version 4.0, April 28, 2019, Declaration of Ricky Borges ("Borges Reply Decl."), Ex. B at 5.

[2]     *Id.*

[3]     *Id.* at 6.

"Index Advisor,"[4] to determine what a portfolio of swaps managed pursuant to the algorithmic strategy would otherwise be doing; and (e) the relevant calculations involved ISDAfix rates.  The only dispute is thus whether Fortinbras has sufficiently established that, as part of these processes, it entered into real, risk-transferring, legally binding swap transactions with Credit Suisse as a counterparty in the ordinary sense of such terms.  The swap claims at issue were rejected because it appears that Fortinbras was merely using Credit Suisse's systems to essentially "manage" a *hypothetical* swap portfolio in order to fulfill Fortinbras' administrative duty as the Index Advisor.

If Fortinbras was engaging in hypothetical transactions rather than putting money at risk the way a normal trader or investor does, it would be unfair to allow Fortinbras to recover on such hypothetical transactions.

## II.   LEGAL STANDARD

Under the Distribution Plans and as set forth in the Claim Forms, claimants were required to submit documentation of claimed transaction to the extent required and requested by the Claims Administrator.  (*See* ECF Nos. 512-3 at 34; 602-1 at 6; 681-1 at 6; 692 at 254.)  It follows that a failure to adequately do so can justify the rejection or reduction of a claim.  *See In re Chicken Antitrust Litig.*, 560 F. Supp. 1006, 1008-09 (N.D. Ga. 1982) (as the party seeking to participate in the settlement fund, the claimant bears the burden of showing it is part of the settlement class).

"Federal Rule of Civil Procedure 23(e) mandates that courts oversee the distribution of class settlement funds." *In re Citigroup Sec. Litig.*, 2014 WL 2445714, at *1 (S.D.N.Y. May 30, 2014).  Accordingly, when this Court granted its approval of the Settlements, it also retained "continuing and exclusive jurisdiction over," among other things, implementation of the

---

[4]   *See* Index Rules for Credit Suisse Fortinbras USD Total Return Three Factor Model Index ("Index Rules"), ECF No. 754-6 at 2.

settlements and any awards therefrom. (*See, e.g.*, ECF No. 648.) "So long as there is no 'abuse of discretion,' the district court's decision on distribution details is binding." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1402 (E.D.N.Y. 1985), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 179 (2d Cir. 1987).

### III.   ARGUMENT

#### A.   Fortinbras Has Not Provided Sufficient Evidence of Real – as Opposed to Hypothetical – Swap Transactions

An analysis of the disputed claims should begin with the fact that there appears to be no evidence of Fortinbras swaps in any of the data produced in this case. (Borges Reply Decl., ¶16.) In an abundance of caution, Class Counsel contacted counsel for Credit Suisse, who stated: "Based on a reasonable search, Credit Suisse has not been able to identify any transactions with Fortinbras/Prospero that are linked to ISDAfix." (*Id.*, ¶16 & Ex. C.)

In addition, the Claim Form outlined examples of documents that could instead be used to corroborate a claim, such as bank confirmations by individual trade, bank transaction reports or statements, trading venue transaction reports or statements, prime broker reports or statements, custodian reports or statements, or daily or monthly account statements. (ECF Nos. 512-3 at 34 and 692 at 254.) Other class members subject to the audit were able to provide these or similar documents to confirm the transactions actually occurred; Fortinbras has not. (Borges Reply Decl., ¶23.)

We agree with Fortinbras' assertion that ISDA Master Agreements, where in force, allow for swaps to be executed without being tied to "any one specific form." (Opp. at 5.) And the Claim Form itself made clear that "[o]ther documents" would in appropriate circumstances suffice. (ECF Nos. 512-3 at 34 and 692 at 254.) But none of the attempts to corroborate the swap claims through alternative means is, in our view, sufficient to overcome the omissions noted above.

3

*First*, Fortinbras relies on the report of Dr. Kolb,[5] claiming that it "provides independent confirmation that the Fortinbras Swaps were carried out as described by Fortinbras." (Opp. at 8.) If the current dispute were over how the data should be tabulated, Dr. Kolb's report might be relevant; but as the dispute is over the "swaps" were real transactions in the normal sense of those wards, it is not. The report "make[s] no representation as of accuracy, completeness, correctness, suitability, or validity of any information in this or its supporting documents." (Kolb Report, ECF No. 754-3 at 6.) The report also provides that Dr. Kolb was "not able to verify the information obtained as it is proprietary to [Fortinbras] and other parties." (*Id.*) Dr. Kolb's report thus simply re-tabulates the figures at issue using a spreadsheet and the Index Rules, and does not answer the question whether the swaps at issue were real or hypothetical. (*See id.* at 4.)

*Second*, Fortinbras refers to the "Index Rules" and their relationship with the "Three Factor Model" trading strategy it attempts to explain. (Opp. at 4-9.) But the crux of this dispute is whether (a) Fortinbras actually entered into a swap-counterparty relationship with Credit Suisse, or whether instead (b) Fortinbras was, as the evidence indicates, simply undertaking a hypothetical exercise to tabulate an Index. Explaining a trading strategy does not indicate whether or not that strategy was actually deployed. And the Index Rules, if anything, suggest that the trading strategy was not actually deployed through actual trades between Fortinbras and Credit Suisse. Indeed, the title itself suggests Fortinbras and Credit Suisse were not in a trading counterparty relationship: "Index Rules" suggests a document that governs how a calculation will be performed (to arrive at an "Index") by an administrative actor (Fortinbras as the "Index Advisor") for the benefit of the actual parties to the program (Credit Suisse as sponsor and third parties as investors).

---

[5] Fortinbras also offers the opinion of Dr. Crooks. (Opp. at 3-4.) But that opinion only discusses how Credit Suisse relied on ISDAfix rates to determine "market convention." As discussed below, Plaintiffs do not dispute those findings. However, the point is moot, of course, if the purported swaps did not actually exist in the first place. Fortinbras does not, and cannot, argue that Dr. Crooks' report is relevant to that more fundamental question.

4

In addition, the Index Rules designate Fortinbras as the "Index Advisor" tasked with designing and administering an algorithm before communicating the results to the "Index Calculation Agent," Credit Suisse, for which it is paid a fee. (*See* ECF No. 754-6 ("Index Rules") at 2-3; Borges Reply Decl., Ex. A at 10.) Credit Suisse could unilaterally terminate Fortinbras' role, which is inconsistent with being a swap counterparty. (*Id.* at 8.) Credit Suisse as the "Sponsor" seemingly has the financial obligations to third-party investors. (*Id.* at 2, 9.) And it is thus Credit Suisse whose financial state could cause an "Index Disruption Event" to the program. (*Id.*)[6]

*Third*, Fortinbras' explanations of its daily interactions with Credit Suisse are all fully consistent with what Fortinbras would need to do to merely assist in the calculation of the Index. (Opp. at 5-6.) Fortinbras provides a screenshot of how various drop-down boxes could be used to input information into a website, and how doing so would later result in a "confirmation" from Credit Suisse. (*Id.* at 6-7.) These explanations and screenshots do not advance the proposition that the end-result of the system's machinations was a real swap-counterparty relationship, rather than a hypothetical exercise to be used by Credit Suisse in its obligations to third parties as the program sponsor.

In sum, Fortinbras has established that it regularly interacted with Credit Suisse, running calculations to determine how a swaps portfolio managed pursuant to the Three Factor Model strategy would have performed, and what that algorithmic strategy would dictate what happens next. But it has not established that doing so required, or actually involved, the creation for

---

[6] Similarly, the "Termsheet" Fortinbras relies on repeatedly puts Fortinbras in the role of supporting cast, while focusing investors on the "creditworthiness of the issuer" – Credit Suisse – when deciding whether to invest. (*See* Term Sheet, ECF No. 754-7, at 5.)

5

Fortinbras of a swap-counterparty relationship in any sense that would make it fair or appropriate to accept the $3.3 trillion notional value in claims, which would dilute those of other claimants.

Fortinbras has provided none of the traditional indicia that that process resulted in the entry of real, legally binding swaps that Credit Suisse did, could, or ever would actually have sought to enforce. However, even if the validity of the "underlying swaps" referred to in the documentation were to be presumed, Fortinbras' Opposition leaves unanswered many significant questions:

- When the value of the swaps portfolio went down, did Fortinbras itself lose money, or were the losses taken by Credit Suisse or third-party investors?

- When the value of the swaps portfolio went up, did Fortinbras itself gain money, or were the gains taken by Credit Suisse or third-party investors?

- If Fortinbras decided to stop rolling over the portfolio on Tuesday, would Credit Suisse have been left with the ability to legally enforce swap-payment rights on the resulting open positions left from Monday's trading?[7]

- Under what situation, if any, would the performance of the swaps portfolio result in Fortinbras paying cash to Credit Suisse, or vice-versa?

- Does Fortinbras intend to keep the Pool A claims proceeds for itself, or would they be paid to third parties (who may have already submitted claims) or Credit Suisse (who cannot properly receive the funds pursuant to the class definitions)?

All of which is to say, because by Fortinbras' own description the "swaps" were intimately intertwined with a program where the financial interests were primarily as between Credit Suisse and third-party investors, Fortinbras' general description of its supposed "trading strategy" fails to justify the propriety or fairness of allowing its Pool A claims.

---

[7] When asked whether Credit Suisse could have sued to enforce the "swaps," Fortinbras' counsel referred to Credit Suisse's right to ensure Fortinbras followed through with the program. This, again, seems consistent with Fortinbras as a mere Index Advisor working for a fee, rather than Fortinbras as a swap counterparty trading for an at-risk profit.

6

### B. If the Swap Claims Are Allowed, We Recommend They Be Against Pool A – but Would Request Additional Time to Determine the Exact Amount

For the reasons set forth above, Fortinbras' swap claims should be rejected in their entirety. But if the Court disagrees, the question that must then be asked is into which "Pool" should these Claims be put. The Distribution Plans provide for Pool A Claims as follows:

> Pool A includes ISDAfix Instruments in which the cash flows of that instrument are directly linked to one or more ISDAfix Benchmark Rates. Pool A includes transactions in (a) cash-settled swaptions, and (b) ISDAfix Instruments with payments linked to ISDAfix during the Settlement Class Period.

(ECF Nos. 602-1 at 6 and 681-1 at 6.) Fortinbras admits that its documentation refers only to the use of a "market convention" process used by Credit Suisse, but argues that Dr. Crooks' study shows such high correlation that Credit Suisse must have in practice merely been using ISDAfix rates. (ECF No. 753 at 10.)

We agree that the definition above does not limit Pool A claims to contracts that literally use the phrase "ISDAfix rates" on their face. We also agree Dr. Crooks has shown that Credit Suisse's "market convention" was, in fact, to use ISDAfix rates. Accordingly, *if* claims relating to the swaps here are allowed, we would recommend they be put into Pool A. However, the Claims Administrator is not yet prepared to recommend ***how much*** such claims would be for. This is because the parties have focused on the more fundamental debate of whether the swaps existed at all. Additional efforts would be needed to finalize issues, including, but not limited to, evaluating whether Fortinbras' Claim Form double-counts its transactions. (Borges Reply Decl., ¶25.)

### C. The Parties Appear to Now Agree the May Data Cannot Support a Claim

The parties appear to agree the "May Data" cannot support a claim. Fortinbras has explained that it is not claiming that certain data provided in May provides the basis for a claim. (Opp. at 11-12.) Because Fortinbras is not requesting that that limited dataset be turned into a claim amount, the Claims Administrator will, of course, not do so. (Borges Reply Decl., ¶26.)

V. **CONCLUSION**

Plaintiffs respectfully request that their motion for an order allowing the initial distribution of funds be granted, ratifying the Claims Administrator's rejection of Fortinbras' Pool A claims in their entirety for the reasons set forth above, while allowing Fortinbras' claims against Pools B.3 and B.4.  (*See* Borges Reply Decl., ¶27.)

For the reasons set forth in Section IV.B above, should the Court rule in Fortinbras' favor with respect to the legitimacy of its swap claims, but would otherwise be inclined to grant the distribution motion, Plaintiffs respectfully request they be provided a reasonable time to engage Fortinbras with respect to the scope and the nature of its allowed Pool A claims.

Dated: December 13, 2019

*s/ Daniel L. Brockett*
Daniel L. Brockett
Marc L. Greenwald
Steig D. Olson
Jonathan B. Oblak
Toby E. Futter
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100
danbrockett@quinnemanuel.com
marcgreenwald@quinnemanuel.com
steigolson@quinnemanuel.com
jonoblak@quinnemanuel.com
tobyfutter@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile:  (213) 443-3100
jeremyandersen@quinnemanuel.com

*s/ David W. Mitchell*
David W. Mitchell
Patrick J. Coughlin
Brian O. O'Mara
Steven M. Jodlowski
Lonnie Browne
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
davidm@rgrdlaw.com
patc@rgrdlaw.com
bomara@rgrdlaw.com
sjodlowski@rgrdlaw.com
lbrowne@rgrdlaw.com

 *s/ Christopher M. Burke*
Christopher M. Burke
Hal Cunningham (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
cburke@scott-scott.com
hcunningham@scott-scott.com

David R. Scott
Beth A. Kaswan
Kristen M. Anderson
Peter A. Barile III
Thomas K. Boardman
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
david.scott@scott-scott.com
bkaswan@scott-scott.com
kanderson@scott-scott.com
barile@scott-scott.com
tboardman@scott-scott.com

8

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

                                *s/ Christopher M. Burke*
                                Christopher M. Burke