UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                             :
ALASKA ELECTRICAL PENSION FUND, et al.,                      :
                                                             :
                            Plaintiffs,                      :
                                                             :          14-CV-7126 (JMF)
             -v-                                             :
                                                             :          MEMORANDUM OPINION
BANK OF AMERICA, CORPORATION, et al.,                        :          AND ORDER
                                                             :
                            Defendants.                      :
                                                             :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

  In this long-lasting and complex class action, institutional investors alleged that many of

the world's largest banks illegally manipulated the U.S. Dollar ISDAfix ("ISDAfix"), a

benchmark interest rate incorporated into a broad range of financial derivatives.  *See generally*

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016).  After

more than three years of litigation, Plaintiffs reached settlements with each Defendant, all of

which were approved by the Court, along with proposed plans of distribution.  *See* ECF Nos.

648-57, 738.  Pursuant to the Court's Orders, the claims administrator, Epiq Systems, Inc.

("Epiq"), published notice of the settlements and received and reviewed individual claims.  ECF

No. 748 ("First Borges Decl."), ¶¶ 4-33.  Class Counsel now moves for Court approval to make

distributions of net settlement funds to claimants with valid claims.  ECF No. 746.  Only one

claimant — Fortinbras Asset Management GmbH f/k/a Prospero Beteiligungsverwaltung GmbH

("Fortinbras") — has filed an objection, on the ground that Epiq wrongfully rejected certain of

its claims.  *See* ECF No. 753 ("Fortinbras Obj.").  For the reasons described here, Lead

Counsel's motion is granted and Fortinbras's objection is overruled.

## THE PROPOSED DISTRIBUTION FRAMEWORK

Rule 23(e) of the Federal Rules of Civil Procedure "mandates that courts oversee the distribution of class settlement funds." *In re Citigroup Inc. Sec. Litig.*, Nos. 09-MD-2070 (SHS), 07-CV-9901 (SHS), 2014 WL 7399039, at *1 (S.D.N.Y. Dec. 29, 2014).  In carrying out that mandate, "district court[s] ha[ve] broad supervisory powers with respect to the administration and allocation of settlement funds." *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 185 (2d Cir. 2005) (per curiam).  As in other contexts, courts must exercise such powers to ensure that "the best interests of the class as a whole" are safeguarded. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 182 (2d Cir. 1987); *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972) ("Until the fund created by the settlement is actually distributed, the court retains its traditional equity powers . . . to protect unnamed, but interested persons.").

Upon review of Class Counsel's motion papers, the Court is satisfied that the proposed distribution framework — to which no one objects — is fair and reasonable.  First, the record makes plain that the notice and claim review process was diligently and effectively completed.  Following the settlements, Epiq distributed more than 59,000 notice packets to potential class members advising them of the settlement.  ECF No. 602, at 24 n.15.  Epiq ultimately received more than 31,000 claims before the filing deadlines set by the settlements.  First Borges Decl. ¶ 30.  Of those claims, Epiq determined that 2,369 should be rejected in full and that 28,750 are eligible for payment. *See id.* ¶¶ 31-33.  Epiq valued 23,413 of those claims at equal to or less than $100; of the remaining authorized claimants, 5,124 are eligible to receive payments averaging $64,897.32 total from both settlement funds, and 213 are eligible to receive payments averaging $6,289.21 from the later settlement fund only. *See id.* ¶¶ 38-39.

Class Counsel proposes multiple rounds of distributions to claimants with valid claims. In the initial distribution, claimants with valid claims equal to or less than $100 in value would receive an "alternative minimum payment" of $100 in order to "preserve the value of the Settlement Funds" by incentivizing claimants to cash their checks, which reduces the costs incurred by the claims administrator.  ECF No. 747 ("Class Mem."), at 5-6.  The other claimants with valid claims would receive, in the first instance, *pro rata* distributions of 92% of the balance of the settlement funds — that is, after the alternative minimum payments (which total less than 1% of the funds) are deducted.  *Id.* at 6-7.  The remaining 8% of the settlements would be held in reserve "to address any contingencies that may arise with respect to" the initial distribution or to pay costs incurred in the administration of the settlement funds, as later authorized by the Court. *Id.* at 7.  If any funds remained after such costs were deducted, they would be distributed to claimants unless Epiq and Class Counsel determine that further distribution would not be cost-effective, in which case Class Counsel would seek the Court's permission to approve a final distribution to a non-profit organization.  *Id.* at 8.

As noted, there are no objections to this plan or to the manner in which the settlements have been administered.  Upon review of Class Counsel's submissions, the Court finds that this is for good reason:  Because the proposed distributions are in the best interests of the class.  First, as others have noted, "[c]laimants who are entitled to receive only small settlement amounts . . . are less likely to cash their checks," which "impose[s] additional costs on the settlement fund" — namely, costs incurred with contacting such claimants and urging them to cash their checks and reallocating unclaimed funds to other class members in additional distributions.  *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004).  Rather than precluding such claimants' recovery, as other settlements have done, *see, e.g.*, *id.*, Class Counsel proposes to

award $100 to all claimants whose claims are worth that amount or less.  Class Mem. 5-6.  This serves the interests of the class by balancing the right of *all* class members to recover while simultaneously minimizing administrative costs and reducing other class members' payments by, at most, a *de minimis* amount.  Second, holding funds in reserve is a reasonable precaution for contingencies and costs that may arise later.  *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 2014 WL 7399039, at *1.  Moreover, unless the Court approves a request by Class Counsel to do otherwise, the reserve will be distributed to valid claimants later; thus, neither the fact nor the size of the reserve provides a basis to withhold approval.  Finally, courts routinely approve *cy pres* awards to non-profit organizations when distributions to the class would not be feasible. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 199 F. Supp. 3d 845, 848 (S.D.N.Y. 2016) ("[C]*y pres* designations should be made only when it is not feasible to make further distributions to class members." (internal quotation marks omitted)).  Moreover, whether or to what extent such an award may be appropriate here is an issue for another day.

  In short, the general framework of Class Counsel's proposed distributions is fair and reasonable, and the Court thus grants Class Counsel's motion for approval.

## FORTINBRAS'S OBJECTION

  That leaves only the objection filed by Fortinbras — which is not to the distribution plan, but instead to Epiq's rejection of certain of its claims.  Notably, despite the fact that 31,119 claims were submitted, Fortinbras is the only claimant that has challenged Epiq's determinations. Fortinbras complains that Class Counsel's proposal improperly excludes from distribution certain claims relating to alleged trades of interest rate swaps that incorporated the ISDAfix rate. *See* Fortinbras Obj. 8-11.  Class Counsel, for their part, agrees with Epiq's conclusion — following a year-long audit — that the disputed claims should be excluded because Fortinbras

has not provided sufficient evidence that the trades giving rise to Fortinbras's claims actually occurred.  *See* ECF No. 755 ("Reply"), at 3-6; ECF No. 759, at 1.

Fortinbras claims that the documents it submitted to Epiq — and, now, to the Court — demonstrate that, between June 24, 2008 and January 31, 2014, it executed trades with Credit Suisse which had a total notional value of more than $3.3 trillion.  Fortinbras Obj. 1-2, 6. Specifically, Fortinbras claims that it engaged in six transactions with Credit Suisse every day: long or short interest rate swaps with tenors of one year, two years, and five years, and an unwinding of each of the previous day's transactions.  *See* ECF No. 754-3 ("Kolb Rep."), at 1-2. These transactions allegedly formed part of Fortinbras's "Three Factor Model" strategy.  *See* Fortinbras Obj. 4.  To establish these transactions, Fortinbras relies on several documents: (1) an expert report drafted by Dr. Johannes Kolb, which explains the trades, *see* Kolb Rep.; (2) "Index Rules," which Fortinbras claims defines the terms of the swaps, *see* ECF No. 754-6 ("Index Rules"); (3) a sample "Structured Products Termsheet," which Fortinbras claims summarizes the process by which the proceeds of the trades passed between Fortinbras and Credit Suisse, *see* ECF No. 754-7 ("Termsheet"); (4) automated "Confirmation Emails" sent by Credit Suisse to Fortinbras, indicating changes in position — long or short — from one day to the next, *see* Fortinbras Obj. 7; and (5) a May 23, 2019 spreadsheet, sent by Credit Suisse to Fortinbras, which described certain purported transactions, *see* ECF No. 761-2 (the "May Data").  Fortinbras argues that these documents, taken together, establish that the disputed swaps actually occurred — that is, that Fortinbras exchanged funds or re-allocated risk with Credit Suisse.

Substantially for the reasons stated in Class Counsel's reply, the Court disagrees. Contrary to Fortinbras's contention, Dr. Kolb's report does not "provide[] independent confirmation" that the alleged trades were actually "carried out."  *See id.* at 8.  Instead, Dr.

Kolb's report merely describes the "Three Factor Model" trading strategy and calculates the total notional value of the daily trades, based on data provided by Fortinbras.  Indeed, Dr. Kolb's report is premised on the assumption that the data provided describes real, not hypothetical, transactions.  *See* Kolb Rep. 5 (noting that Dr. Kolb "was not able to verify the information obtained as it is proprietary to Fortinbras").  As Fortinbras itself concedes, *see* ECF No. 760 at 2, the Index Rules also fail to confirm that the transactions actually occurred.  Instead, they merely explain how the Index is calculated and how it depends on the Three Factor Model.  Nothing in the Index Rules suggests that Fortinbras engages in transactions with Credit Suisse.  Although the Index Rules suggest that Credit Suisse *could* use the Index in financial products it offers, the Index Rules reference no real transactions.  *See, e.g.*, Index Rules at 10 ("This document is not to be used or considered as an offer or solicitation to buy or subscribe for . . . financial products [to which the TFMI Index is linked].").  Instead, the Index Rules explain the Three Factor Model, define terms, and describe how the Index is calculated.  Indeed, the terminology used suggests that Fortinbras, as "Index Advisor," *see* Index Rules at 2, merely assisted Credit Suisse, the "Index Sponsor," *see id.*, in calculating, using a proprietary model owned by Fortinbras, an index that could be incorporated into financial products offered by Credit Suisse to other investors.  *See* Index Rules at 9-10 ("[Credit Suisse] or its affiliates may offer securities or other financial products . . . the return on which is linked to the performance of the Index.").

Next, the Termsheet is related to such a financial product, but nowhere does it suggest that Fortinbras itself purchased that product.  The Termsheet states only that Fortinbras is the "Index Advisor" to the "Underlying/Reference Index."  Termsheet at 1.  The Confirmation Emails, in turn, confirm only that Fortinbras transmitted to Credit Suisse the position that Fortinbras's proprietary algorithm produced each day, which are inputs into the Index; they do

6

not confirm actual transactions.  *See* Fortinbras Obj. 5-7; *see also* Index Rules 2-3 ("[Fortinbras]
communicates the positions to the Index Calculation Agent [a division of Credit Suisse] who
then uses these signals for the calculation of the Index . . . .").  Finally, Fortinbras itself concedes
that the transactions described in the May Data are "not the Fortinbras Swaps *traded by* the
Fortinbras Fund."  Fortinbras Obj. 11.  Notably, Fortinbras submits none of the documents one
would expect to see in the event of real transactions, such as bank confirmations of individual
trades, bank transaction reports or statements, trading venue transaction reports or statements,
prime broker reports or statements, custodian reports or statements, or daily or monthly account
statements.  *See* ECF Nos. 512-3, at 5; ECF No. 692, at 24.

In short, the Court concludes that Epiq properly rejected Fortinbras's disputed claims
because Fortinbras failed to prove that it engaged in real transactions.  Fortinbras seeks to justify
this lack of evidence by asserting that it had agreed with Credit Suisse to create only "minimal
documentation" because each trade would be "unwound one business day after being opened."
Fortinbras Obj. 5.  But, putting aside the improbability that Credit Suisse and Fortinbras would
engage in transactions totaling more than $3 trillion in notional value based on such paltry
documentation, Fortinbras's assertion undermines, rather than salvages, its claims.  One risk of
creating so little documentation is that, if the existence or validity of a trade is later questioned,
the parties to the transaction would be hard-pressed to prove it.  The documents provided here
suggest only that Fortinbras assisted in the calculation of an index to which other financial
products were linked.  No evidence suggests, let alone proves, that Fortinbras purchased any of
those products — a conclusion that is reinforced by the fact that Credit Suisse searched its
records and was "unable to identify any transactions with Fortinbras . . . during the relevant

period." ECF No. 756-3.  Accordingly, the Court holds that Epiq and Class Counsel did not err in finding the disputed claims invalid and excluding them from the proposed distribution.

<strong>CONCLUSION</strong>

For the reasons stated above, Class Counsel's motion to approve the distribution of net settlement funds in the manner described in their supporting papers is GRANTED and Fortinbras's objection is OVERRULED.  Consistent with those rulings, the Court has signed, and will docket, Class Counsel's proposed order approving the distribution plan.

The Clerk of Court is directed to terminate ECF No. 746.

SO ORDERED.

Dated: February 26, 2020
     New York, New York

_____
JESSE M. FURMAN
United States District Judge